

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| OHIO POLICE & FIRE PENSION FUND<br>140 East Town Street<br>Columbus, OH 43215-5125 | X<br>:<br>: |

**FILED**

TIME: _____ .

NOV 2 0 2009

JAMES BONINI, Clerk
COLUMBUS, OHIO

Case No.: **2 : 0 9 cv 1 0 5 4**

**JUDGE GRAHAM**

Judge:

**MAGISTRATE JUDGE KEMP**

TRIAL BY JURY DEMANDED

OHIO POLICE & FIRE PENSION FUND
140 East Town Street
Columbus, OH 43215-5125      :

OHIO PUBLIC EMPLOYEES RETIREMENT
SYSTEM                        :
277 East Town Street
Columbus, OH 43215-4642       :
                              :
STATE TEACHERS RETIREMENT SYSTEM OF
OHIO                          :
275 East Broad Street
Columbus, OH 43215-3771       :
                              :
SCHOOL EMPLOYEES RETIREMENT SYSTEM OF :
OHIO
300 East Broad Street, Suite 100  :
Columbus, OH  43215-3746      :
                              :
            and               :
                              :
OHIO PUBLIC EMPLOYEES DEFERRED :
COMPENSATION PROGRAM          :
257 East Town Street, Suite 457  :
Columbus, OH 43215-4626       :
                  Plaintiffs, :
                              :
            v.                :
                              :
STANDARD & POOR'S FINANCIAL   :
SERVICES LLC
55 Water Street               :
New York, NY 10041            :
                              :
THE MCGRAW-HILL COMPANIES, INC. :
1221 Avenue of the Americas
New York, NY 10020            :
                              :
MOODY'S CORP.                 :
250 Greenwich Street
New York, NY 10007            :
                              :

MOODY'S INVESTORS SERVICE, INC.               :
250 Greenwich Street                          :
New York, NY 10007                            :
                                              :
            and                               :
                                              :
FITCH, INC.                                   :
One State Street Plaza                        :
New York, NY 10004                            :
                                              :
                            Defendants.       :
_____ X

**<u>COMPLAINT</u>**

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION .............................................................................. 1

II.    JURISDICTION AND VENUE......................................................................... 4

III.   PARTIES ......................................................................................................... 5

       A.   Plaintiffs ................................................................................................ 5

            1.   Ohio Police & Fire Pension Fund ............................................... 5

            2.   Ohio Public Employees Retirement System ............................... 6

            3.   State Teachers Retirement System of Ohio ................................ 6

            4.   School Employees Retirement System of Ohio........................... 7

            5.   Ohio Public Employees Deferred Compensation Program .......... 8

       B.   Defendants............................................................................................. 9

            1.   Standard & Poor's........................................................................ 9

            2.   Moody's ....................................................................................... 9

            3.   Fitch .......................................................................................... 10

            4.   The Significance of the Rating Agencies' NRSRO Designations ................ 10

IV.    FACTUAL BACKGROUND........................................................................... 11

       A.   The Creation and Structure of ABS ...................................................... 11

       B.   The Rating Agencies' Stated Process for Evaluating ABS...................... 13

       C.   The Rating Agencies Assigned False And Misleading Ratings To The ABS
            Purchased By The Ohio Funds. ............................................................. 15

            1.   The Rating Agencies Sacrificed The Integrity Of Their Ratings For
                 Financial Gain. ........................................................................... 15

            2.   The Rating Agencies Were Intimately Involved In Structuring And
                 Issuing The ABS The Ohio Funds Purchased............................. 28

            3.   The Rating Agencies Used Outdated Models To Rate ABS And
                 Failed To Disclose Significant Aspects Of The Ratings Process. ........... 30

       D.   The Rating Agencies Failed To Conduct Adequate Ratings Surveillance. .............. 35

       E.   The Ohio Funds Relied To Their Detriment On The Defendants' Ratings In
            Purchasing And Holding ABS During The Relevant Period............................... 35

            1.   Ohio Police & Fire Pension Fund ............................................. 37

            2.   Ohio Public Employees Retirement System ............................. 43

            3.   State Teachers Retirement System of Ohio .............................. 48

            4.   School Employees Retirement System of Ohio......................... 55

            5.   Ohio Public Employees Deferred Compensation Program .......... 60

i

V.   CLAIMS FOR RELIEF ........................................................................................ 65

Plaintiffs Ohio Police & Fire Pension Fund, Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio, and Ohio Public Employees Deferred Compensation Program (collectively, the "Ohio Funds" or "Plaintiffs") allege the following upon information and belief (except as to those allegations pertaining to Plaintiffs of which they have personal knowledge) based upon the investigation conducted by and under the supervision of Plaintiffs' counsel, which included reviewing and analyzing information and financial data obtained from numerous public and proprietary sources (such as LEXIS-NEXIS, Dow Jones, and Bloomberg), filings with the Securities and Exchange Commission ("SEC"), other regulatory and court filings, press releases, published interviews, news articles, and other media reports.

## I.      NATURE OF THE ACTION

1.      This action arises out of the Ohio Funds' purchases of certain asset-backed securities ("ABS"), namely residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS"), during the period from January 1, 2005 through July 8, 2008 (the "Relevant Period") in reliance on the false and misleading AAA (or equivalent) credit ratings that were negligently assigned to the securities by Defendants Standard & Poor's Financial Services LLC, The McGraw-Hill Companies, Inc., Moody's Corp., Moody's Investors Service, Inc., and Fitch, Inc. (collectively, the "Rating Agencies" or "Defendants").

2.      As detailed below, the Rating Agencies falsely represented that their AAA[1] credit ratings were independent, objective, and based upon thoughtful and adequate methodologies.  In truth, the Rating Agencies subverted those principles and negligently

---

[1] The Rating Agencies vary slightly with respect to their highest credit rating designation -- Standard & Poor's and Fitch use "AAA" whereas Moody's uses "Aaa."  Unless otherwise indicated, references to "AAA" in the complaint include "AAA" and the Moody's equivalent.

provided unjustified and inflated ratings in exchange for the lucrative fees that the ABS issuers paid the Defendants for not only rating the securities but also for helping to structure them.

3.     The Rating Agencies were well aware that the structuring process for ABS started with the rating.  The Defendants' AAA ratings were the gold standard for investors such as the Ohio Funds, who willingly paid a premium for AAA rated securities in exchange for the supposedly lower risk such high ratings purportedly entailed.

4.     Eschewing their purportedly independent and objective ratings process, the Rating Agencies assigned inflated ratings to a vast array of structured finance securities during the Relevant Period, including those identified in the attached exhibits.  Investor interests took a back seat to the Defendants' interests in maximizing profits by rating as many ABS deals as possible.  As one of the Defendant's analysts put it, "We rate every deal.  It could be structured by cows and we would rate it."

5.     Indeed, as Raymond McDaniel, Chief Executive Officer and Chairman of Moody's, admitted, "What happened in '04 and '05 . . . is that our competition, Fitch & S&P, went nuts.  Everything was investment grade.  It really didn't matter . . . No one cared because the machine just kept going."  And, once the ratings machine started, the Defendants continued to assign baseless ratings to inferior ABS because no one wanted to, as one analyst put it, "kill the golden goose."

6.     As discussed further below in ¶¶ 42-75, the Defendants' false and misleading AAA ratings arose from the "issuer pays" model -- whereby ABS issuers, rather than investors in the securities, paid the Rating Agencies to provide the ratings upon which the Ohio Funds relied.  While the Rating Agencies consistently represented that any actual or potential conflicts of interest were accounted for and well managed, only recently has information

surfaced demonstrating the Defendants' misconduct.  These revelations, particularly those set forth in the July 2008 Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies By the Staff of the Securities and Exchange Commission (the "SEC Report"), make clear that the Rating Agencies succumbed to the attraction of the high fees that they generated by providing the AAA ratings that the ABS issuers demanded.  In so doing, the Rating Agencies failed to provide accurate ratings or to employ adequate rating methodologies.

       7.    Based upon its investigation, including reviewing documents and interviewing witnesses unavailable to Plaintiffs, the SEC identified numerous deficiencies in the Rating Agencies' methodologies and the Defendants' failures to manage conflicts of interest. The issuer pays model cultivated a market-driven system whereby issuers and underwriters could essentially shop around for a desired rating:  if an issuer was dissatisfied with an agency's proposed rating, the issuer could simply turn to another agency that would provide the desired rating.  Given that the Rating Agencies did not receive their full fees for a deal unless the deal was completed and the requested rating was provided, they had an acute financial incentive to relax their stated standards of "integrity" and "objectivity" to placate their clients.  While the potential for such a conflict of interest had always been inherent in the issuer pays model, recent revelations have shown that the Rating Agencies in fact succumbed to the conflict and degraded their ratings standards.

       8.    Additionally, as highlighted in the SEC Report and explained below, the Rating Agencies utilized outdated and flawed methodologies for evaluating ABS issuances.  The Rating Agencies also did not have written procedures for assessing certain types of ABS and neglected to institute adequate measures to monitor the performance of ABS, which was

particularly detrimental to investors such as the Ohio Funds because the Rating Agencies provided the only practicable means for assessing the performance of these complex and opaque securities.

9.      When the housing and credit markets finally collapsed, the flaws in the Defendants' AAA ratings gradually became clear.  Moreover, the value of the AAA rated securities purchased by the Ohio Funds dropped precipitously, causing the Funds to lose in excess of $457 million as these purportedly safe investments became obvious for what they were -- high risk securities that both the issuers and Rating Agencies knew to be little more than a house of cards.

## II.    JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because it is an action between citizens of different states and the amount in controversy exceeds $75,000.

11.     This Court has jurisdiction over each Defendant pursuant to R.C. § 2307.382, the Ohio Long Arm Statute.

12.     Each Defendant regularly rates and analyzes securities issued, either through private or public offerings, by Ohio corporations and/or Ohio governmental entities.

13.     Each Defendant caused tortious injury to each Plaintiff in Ohio through the conduct alleged herein.

14.     As such, each Defendant has sufficient contacts with Ohio, promotes its products and services in Ohio on a continuous and systematic basis, and otherwise purposefully availed itself of the benefits of conducting business in Ohio so as to render the exercise of jurisdiction over each Defendant by this Court consistent with traditional notions of fair play and substantial justice.

4

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of Defendants' conduct giving rise to the causes of action occurred in this District.

## III.   PARTIES

### A.     Plaintiffs

#### 1.     Ohio Police & Fire Pension Fund

16.     Plaintiff Ohio Police & Fire Pension Fund ("OP&F") is an instrumentality of the State of Ohio.  OP&F was established and operates pursuant to Chapter 742 of the Ohio Revised Code.  OP&F is authorized by its enabling statute to provide retirement, disability, and other benefits to active police officers and firefighters, retirees, and beneficiaries and survivors. See R.C. § 742.02.  OP&F's enabling statute also:  (i) vests the administration and management of OP&F in a board of trustees, the composition of which is defined by statute, see R.C. § 742.03(B); (ii) assigns title to the assets of the system to the OP&F board, see R.C. § 742.11(E); (iii) provides the terms of membership in OP&F, the conditions for receiving benefits, and the formulas for determining the amount of any benefit due, see generally R.C. §§ 742.63(A)(1), 742.37, 742.39; and (iv) designates the manner in which the monies of the system are kept in statutorily designated accounts, see R.C. §§ 742.59, 742.60.

17.     OP&F serves more than 56,210 public employees across the State of Ohio. OP&F manages approximately $10.2 billion in assets (as of October 28, 2009).  During the Relevant Period, OP&F purchased both the RMBS and the CMBS identified in Exhibits A-1 and A-2 in reliance on the inflated and inaccurate credit ratings assigned by the Rating Agencies as set forth herein.  OP&F has suffered in excess of $83 million in losses as a result of its reliance on Defendants' false and misleading credit ratings.

5

### 2.        Ohio Public Employees Retirement System

18.        Plaintiff Ohio Public Employees Retirement System ("PERS") is an instrumentality of the State of Ohio.  PERS was established and operates pursuant to Chapter 145 of the Ohio Revised Code.  PERS is authorized by its enabling statute to provide retirement, disability, and survivor benefit programs to public employees in the State of Ohio who are not covered by another state or local retirement system.  <u>See</u> R.C. § 145.03(A).  PERS's enabling statute also:  (i) vests the administration and management of PERS in a board of trustees, the composition of which is defined by statute, <u>see</u> R.C. § 145.04; (ii) assigns title to the assets of the system to the PERS board, <u>see</u> R.C. § 145.09; (iii) provides the terms of membership in PERS, the conditions for receiving benefits, and the formulas for determining the amount of any benefit due, <u>see generally</u> R.C. §§ 145.03(A), 145.321-.34; and (iv) designates the manner in which the monies of the system are kept in statutorily designated accounts, <u>see</u> R.C. §§ 145.23, 145.25.

19.        Established in 1935, PERS currently serves more than 3,700 public employers, over 936,000 members, and 166,500 retirees and surviving beneficiaries.  PERS manages approximately $66 billion in assets (as of October 23, 2009), making it the largest public pension fund in Ohio.  During the Relevant Period, PERS purchased both the RMBS and the CMBS identified in Exhibits B-1 and B-2 in reliance on the inflated and inaccurate credit ratings assigned by the Rating Agencies as set forth herein.  PERS has suffered in excess of $222 million in losses as a result of its reliance on Defendants' false and misleading credit ratings.

### 3.        State Teachers Retirement System of Ohio

20.        Plaintiff State Teachers Retirement System of Ohio ("STRS") is an instrumentality of the State of Ohio.  STRS was established and operates pursuant to Chapter 3307 of the Ohio Revised Code.  STRS is authorized by its enabling statute to provide retirement, disability, and other benefits to active, inactive, and retired Ohio public educators.

6

<u>See</u> R.C. § 3307.03.  STRS's enabling statute also:  (i) vests the administration and management of STRS in a board of trustees, the composition of which is defined by statute, <u>see</u> R.C. §§ 3307.04, 3307.05; (ii) assigns title to the assets of the system to the STRS board, <u>see</u> R.C. § 3307.03; (iii) provides the terms of membership in STRS, the conditions for receiving benefits, and the formulas for determining the amount of any benefit due, <u>see generally</u> R.C. §§ 3307.21-.252, 3307.26-.32, 3307.50-.79; and (iv) designates the manner in which the monies of the system are kept in statutorily designated accounts, <u>see</u> R.C. §§ 3307.14, 3307.141.

21.    Established in 1919, STRS serves more than 455,000 public employees across the State of Ohio.  STRS manages approximately $56.8 billion in assets (as of August 31, 2009).  During the Relevant Period, STRS purchased both the RMBS and the CMBS identified in Exhibits C-1 and C-2 in reliance on the inflated and inaccurate credit ratings assigned by the Rating Agencies as set forth herein.  STRS has suffered in excess of $85 million in losses as a result of its reliance on Defendants' false and misleading credit ratings.

**4.    School Employees Retirement System of Ohio**

22.    Plaintiff School Employees Retirement System of Ohio ("SERS") is an instrumentality of the State of Ohio.  SERS was established and operates pursuant to Chapter 3309 of the Ohio Revised Code.  SERS is authorized by its enabling statute to provide pension benefits and access to post-retirement health care coverage to active and retired non-teaching public school employees.  <u>See</u> R.C. § 3309.03.  SERS's enabling statute also:  (i) vests the administration and management of SERS in a board of trustees, the composition of which is defined by statute, <u>see</u> R.C. §§ 3309.04, 3309.05; (ii) assigns title to the assets of the system to the SERS board, <u>see</u> R.C. § 3309.03; (iii) provides the terms of membership in SERS, the conditions for receiving benefits, and the formulas for determining the amount of any benefit due, <u>see generally</u> R.C. §§ 3309.23-.26, 3309.34-.381; and (iv) designates the manner in which

7

the monies of the system are kept in statutorily designated accounts, see R.C. §§ 3309.60, 3309.61.

23.    Established in 1937, SERS serves more than 189,000 public employees across the State of Ohio.  SERS manages approximately $8.8 billion in assets (as of August 31, 2009).  During the Relevant Period, SERS purchased both the RMBS and the CMBS identified in Exhibits D-1 and D-2 in reliance on the inflated and inaccurate credit ratings assigned by the Rating Agencies as set forth herein.  SERS has suffered in excess of $48 million in losses as a result of its reliance on Defendants' false and misleading credit ratings.

### 5.    Ohio Public Employees Deferred Compensation Program

24.    Plaintiff Ohio Public Employees Deferred Compensation Program ("Deferred Comp") is an instrumentality of the State of Ohio.  Deferred Comp was established and operates pursuant to Chapter 148 of the Ohio Revised Code.  Deferred Comp is authorized by its enabling statute to supplement retirement benefits from the other Ohio retirement systems. See R.C. § 148.02.  Deferred Comp's enabling statute also:  (i) vests the administration and management of Deferred Comp in a board of trustees, the composition of which is defined by statute, see R.C. §§ 148.02, 148.04; (ii) assigns title to the assets of the system to the Deferred Comp board, see R.C. § 148.02; (iii) provides the terms of membership in Deferred Comp, the conditions for receiving benefits, and the formulas for determining the amount of any benefit due, see generally R.C. §§ 148.01, 148.04; and (iv) designates the manner in which the monies of the system are kept in statutorily designated accounts, see R.C. § 148.02.

25.    Established in 1974, Deferred Comp provides services to over 193,000 participants from 1,745 Ohio state and local governments.  Deferred Comp manages approximately $7.1 billion in assets (as of September 30, 2009).  During the Relevant Period, Deferred Comp purchased both the RMBS and the CMBS identified in Exhibits E-1 and E-2 in

8

reliance on the inflated and inaccurate credit ratings assigned by the Rating Agencies as set forth herein.  Deferred Comp has suffered in excess of $19 million in losses as a result of its reliance on Defendants' false and misleading credit ratings.

>    **B.**    **Defendants**

>        **1.**    **Standard & Poor's**

>        26.    Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.  Standard & Poor's Ratings Services is a business unit within Defendant Standard & Poor's Financial Services LLC, a Delaware limited liability company whose principal place of business is at 55 Water Street, New York, New York, and which is wholly-owned by McGraw-Hill (McGraw-Hill, Standard & Poor's Ratings Services and Standard & Poor's Financial Services LLC are referred to collectively as "S&P").  S&P is a nationally recognized statistical rating organization ("NRSRO") and provides credit ratings, risk evaluation, investment research, securities monitoring, and financial data to investors.  S&P holds an approximately 40 percent share of the world's credit ratings market, and played an integral role in structuring, issuing, and rating the ABS securities that the Ohio Funds purchased during the Relevant Period.

>        **2.**    **Moody's**

>        27.    Defendant Moody's Investors Service, Inc. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007. Defendant Moody's Corp. is a Delaware corporation with its principal place of business at 250 Greenwich Street, New York, New York 10007.  Moody's Investors Service, Inc. is a division and subsidiary of Moody's Corp. (Moody's Investors Service, Inc. and Moody's Corp. are referred to herein collectively as "Moody's").  Moody's is an NRSRO and provides credit

ratings, risk evaluation, investment research, securities monitoring, and financial data to investors.  Moody's holds an approximately 40 percent share of the world's credit ratings market, and played an integral role in structuring, issuing, and rating the ABS securities that the Ohio Funds purchased during the Relevant Period.

**3.    Fitch**

28.    Defendant Fitch, Inc. ("Fitch") is a Delaware corporation with its principal place of business at One State Street Plaza, New York, New York 10004.  Fitch is an NRSRO and provides credit ratings, risk evaluation, investment research, securities monitoring, and financial data to investors.  Fitch holds an approximately 10 percent share of the world's credit ratings market, and played an integral role in structuring, issuing, and rating the ABS securities that the Ohio Funds purchased during the Relevant Period.

**4.    The Significance of the Rating Agencies' NRSRO Designations**

29.    An NRSRO is a credit rating agency approved by the SEC to issue credit ratings that other financial institutions may use for certain regulatory purposes.  <u>See</u> 15 U.S.C. § 78(c)(a).  Rating agencies desire NRSRO status because NRSRO credit ratings may be used for a variety of purposes vital to the financial markets:  (i) the SEC permits certain bond issuers to use a shorter prospectus form if the issuer's credit rating is sufficiently high, <u>see</u> 17 C.F.R. § 239.13; (ii) money market funds may only invest in securities above a certain rating, <u>see</u> 17 C.F.R. § 270.2(a)-7; (iii) banks and broker-dealers calculate their net capital requirements based on the ratings assigned to the securities they own, <u>see</u> 17 C.F.R. § 240.15c3-1; (iv) insurance regulators use the ratings to calculate the strength of the reserves held by insurance companies; and (v) certain investors (<u>e.g.</u>, state pension funds like the Ohio Funds) may only purchase or hold securities with ratings at or above a certain level based upon their governing investment guidelines.  As observed by former SEC Commissioner Richard Y. Roberts, "Most financial

institutions in the United States (banks, insurance companies, mutual funds, pension funds) are required by law to incorporate NRSRO ratings in their business decisions."

30.     Moody's, S&P, and Fitch are among the ten credit rating agencies currently registered with the SEC as NRSROs.  Between March 2005 and May 2007, the SEC only recognized five NRSROs.  Between February 2003 and March 2005, the SEC only recognized four NRSRSOs.

## IV.     FACTUAL BACKGROUND

### A.     The Creation and Structure of ABS

31.     ABS are financial products whose value is derived from and collateralized by (i.e., "backed" by) the revenue stream flowing from a discrete pool of underlying assets.  The assets underlying ABS are often illiquid and not easily marketable on an individual basis.  The ABS at issue in this case, namely RMBS and CMBS, are backed by residential mortgage loans and commercial mortgage loans, respectively.  Residential mortgage loans, in particular, became an increasingly popular securitized asset as the housing market thrived during the early to middle part of this decade.

32.     While the asset pool underlying an ABS may vary, the basic mechanism for transforming the asset pool into an ABS, in a process known as securitization, is generally the same.  In creating an RMBS, for example, the arranger (sometimes identified as an underwriter or placement agent, typically an investment bank) packages mortgage loans into a pool and transfers the loans to a bankruptcy remote trust (sometimes a "special purpose vehicle" or a "special investment vehicle") that is usually an affiliate of the program arranger.  Thus, by separating the trust assets from the arranger, the trust is immune from any bankruptcy the arranger might suffer and vice versa.

33.     Working through the trust, the arranger then issues securities collateralized

11

by the underlying pool of residential mortgages.  With the proceeds from the trust's issuance of

RMBS to investors, the trust purchases the residential mortgage loans and is entitled to the

interest and principal payments borrowers make on those loans.  The interest and principal

payments from the residential mortgage loan pool are in turn used to make regular interest and

principal payments to the purchasers of the RMBS issued by the trust.

34.  To appeal to investors with different risk profiles, the trust issues

securities in several different classes (i.e., tranches) based upon principles of subordination (i.e.,

the order of priority in claims for ownership).  As a result, the tranches offer a descending scale

of interest rates based in part on the level of credit enhancement accruing to the security.  Credit

enhancement (i.e., the process of reducing credit risk through various mechanisms) is meant to

shield the tranche securities from the loss of interest and principal that would result from

deficiencies and defaults of loans in the pool.  Any losses of interest and principal the trust

suffers are allocated first to the lowest tranche (until that tranche's principal amount is

eliminated) and then to the next lowest tranche, and so forth.

35.  Sponsors of securitizations seek to provide credit enhancement through a

number of different methods, including overcollateralization and excess spread.

Overcollateralization is the amount by which the principal balance of the mortgage pool exceeds

the principal balance of the tranche securities issued by the trust.  The resulting

overcollateralization creates an additional "equity" tranche that acts as a buffer below the lowest

tranche security to absorb initial losses.  Excess spread is the difference between the total interest

received on the underlying loans and the total interest payments due to investors in the securities

(less administrative expenses the trust incurs, including mortgage loan servicing fees).  The

excess spread can go toward building up loss reserves or satisfying delinquent interest payments

due to a tranche security.

**B.    The Rating Agencies' Stated Process for Evaluating ABS**

36.    Throughout the Relevant Period, the Rating Agencies putatively employed varying methodologies to rate the creditworthiness of ABS but generally focused on the type of collateral underlying the securities and the proposed capital structure of the vehicle issuing the securities.

37.    The trust arranger typically initiated the RMBS rating process, for example, by sending one of the Rating Agencies ("Rating Agency" when singular) data on a pool of loans (e.g., principal amount, geographic location, borrower's credit history and credit score, loan-to-value ratio, and type of loan:  first lien, second lien, primary residence, secondary residence) and the proposed capital structure of the trust.  The Rating Agency then assigned a lead analyst who was responsible for analyzing the loan pool and proposed capital structure of the trust and formulating ratings recommendations for a rating committee.  The analyst next developed predictions based on models and other factors as to how many of the loans in the collateral pool would be expected to default under stresses of varying severity.  The analysis also included assumptions as to how much principal would be recovered after a defaulted loan was foreclosed.

38.    The ostensible purpose of the loss analysis was to determine how much credit enhancement a given tranche security needed to receive a particular credit rating.  For example, the severest stress test was run to determine the credit enhancement required for the highly coveted AAA rating.  The test might result in an output predicting that, under the worst case scenario, 40 percent of the assets in the collateral pool would default and that after default the trust would only recover 50 percent of the principal amount of each loan in foreclosure.  Consequently, to get a AAA rating, a trust security collateralized by the pool would need a credit

13

enhancement level of at least 20 percent (40 percent of loans default x 50 percent recovery at

default).  Put another way, the tranches below AAA would need to be sized such that they could

incur a 20 percent loss in the aggregate principal of the collateral pool before any loss would be

allocated to the AAA tranche.  The next most severe scenario was then run to determine the

amount of credit enhancement required of the AA tranche, and so on down the capital structure.

The lowest tranche (typically BB or B) was analyzed under a benign market scenario.

Consequently, its required level of credit enhancement -- the trust equity -- was the amount of

loss expected absent any macroeconomic stress.  Sometimes the Rating Agencies required that

the analyst bring the credit enhancement requirements to a "loss committee" that approved the

assumptions before the analyst could continue with further ratings analysis.

        39.     After determining the level of credit enhancement required for each credit

rating category, the analyst was supposed to check the proposed capital structure of the RMBS

against those requirements.  For example, if the senior tranche required a 20 percent credit

enhancement to receive a AAA rating but would only have an 18 percent enhancement under the

proposed structure, the analyst was supposed to let the arranger know that the senior class would

only receive a AA rating.  The arranger then could accept that determination and have the trust

issue the securities with the proposed capital structure or the arranger could adjust the structure

to provide the requisite credit enhancement for the senior tranche to get the desired AAA rating

(e.g., shift two percent of the principal amount of the senior tranche to a lower tranche).

Alternatively, the arranger could choose not to hire the Rating Agency and instead have another

Rating Agency rate the security, in which case the arranger might not pay the initial Rating

Agency.

        40.     After the arranger settled on the capital structure, the analyst was supposed

to perform a cash flow analysis on the interest and principal expected to be received by the trust from the collateral pool to determine whether it was sufficient to pay the interest and principal due on each tranche of the trust.  The analyst was supposed to review the legal documentation for the transaction to verify, among other things, that the subordination structure of the trust as documented was consistent with the structure as proposed by the arranger.  If the cash flow was sufficient and the legal documentation in order, the analyst was then supposed to develop a recommendation for a final credit rating for each tranche.  The analyst thereafter brought those recommendations to a ratings committee that would either approve or adjust them.  The Rating Agency then notified the arranger of the final ratings decisions.  The arranger then decided whether to have the credit rating issued and made public.  The Rating Agency was typically only paid if the credit rating was issued.

41.     After a Rating Agency issued an initial rating for an RMBS, it purportedly continued to monitor the rating.  With ABS ratings, that continued monitoring could be important because factors influencing an issuer's chances of default (e.g., economic circumstances, success of product lines, etc.) might change; with RMBS, those changing factors might include changes to the composition of the security itself (e.g., some mortgages may be removed from the security and replaced by others if they were paid off early).

**C.     The Rating Agencies Assigned False And Misleading Ratings To The ABS Purchased By The Ohio Funds.**

**1.     The Rating Agencies Sacrificed The Integrity Of Their Ratings For Financial Gain.**

42.     Both prior to and during the Relevant Period, the Rating Agencies repeatedly referred to their purported objectivity and independence in rating securities issuances. The Rating Agencies attempted to assure investors that the potential conflicts of interest associated with the issuer pays model did not actually compromise ratings integrity.

43.     For example, in a statement to the SEC on November 21, 2002, Raymond McDaniel, then President of Moody's Investors Service, Inc. and current Chief Executive Officer and Chairman of Moody's Corp., stated, "Moody's internal policies and procedures have mitigated the latent conflict of interest that is inherent in the rating agency business model.  As such, our rating opinions are the product of analysis that is unbiased and trustworthy."  McDaniel also touted the "predictive content" of Moody's ratings, which he characterized as "consistently mapped and measured," as well as the "rigorous and judicious process that tends not to react to transitory conditions in favor of longer-term considerations and ratings stability."

44.     Moody's subsequently stated in its Annual Report to Shareholders for 2005:

> In recent years, legislative and regulatory scrutiny of financial services firms has focused on whether investment analysis is truly independent or whether its integrity is tainted by conflicts of interest or otherwise compromised.  With respect to credit rating agencies, and Moody's in particular, the examinations have been reassuring.  Nonetheless, the growing reliance on our opinions and analyses highlights the importance of assuring integrity into the future.  Moody's must be increasingly rigorous and transparent in demonstrating our independence and managing potential conflicts.

45.     Moody's further identified the "raw materials" supporting its business as "the proliferation of credit risk-sensitive instruments in the global marketplace, and the market's trust in and reliance upon Moody's."  The company expressed its commitment "to reinforcing among all relevant stakeholders -- debt issuers, the investment community, employees, governmental authorities and shareholders -- a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business. . . . Our operating, financial and regulatory strategies must, in essence, be strategies of trust."

46.     Significantly, in a report published on its website on or about April 12, 2006, Moody's noted that in 2005, the agency derived approximately 87 percent of its revenue

from issuer payments for credit ratings, with virtually all of the remainder deriving from sales of credit research and data products.  The company acknowledged "that this business model entails potential conflicts of interest that could impact the independence and objectivity of our rating process," and stated that to maintain its "objectivity and independence" in the face of that and other sources of potential conflicts of interest and "to protect the integrity" of its credit ratings and rating process, Moody's had "adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee."

47.    S&P likewise touted its purported commitment to integrity.  Testifying before Congress on March 20, 2002, Ronald N. Barone, then a Managing Director in the Corporate and Government Ratings Group of S&P's, stated the company "is -- and has always been -- independent of any investment banking firm, bank or similar organization" and "independence, credibility and integrity are the foundations of the Standard & Poor's ratings business and they are what ultimately provide value to the marketplace."  He further stated, "Our rating opinions are based on an objective and independent process that we consistently disclose and describe to the marketplace."

48.    McGraw-Hill Chairman, President, and CEO Terry McGraw similarly stated at the Credit Suisse Global Services Conference on March 13, 2006, "Independent and objective information is what professionals expect and get from us.  Respect for the integrity of information is part of our company's makeup."

49.    In a letter to the editor of <u>The Wall Street Journal</u> dated September 17, 2007, Vickie Tillman, then Executive Vice President of Credit Market Services at S&P (and currently Chief Ratings Officer), stated, "We have numerous safeguards in place that have helped us effectively manage" potential conflicts of interest.  "Our credit ratings provide

objective, impartial opinions on the credit quality of bonds." Tillman likewise testified before

the Senate Committee on Banking, Housing and Urban Affairs on September 26, 2007:

> S&P maintains rigorous policies and procedures designed to ensure
> the integrity of our analytical processes. For example, analysts are
> not compensated based upon the amount of revenue they generate.
> Nor are analysts involved in negotiating fees. Similarly,
> individuals responsible for our commercial relationships with
> issuers are not allowed to vote at rating committees. These
> policies, and others, have helped ensure our long-standing track
> record of excellence.

      50.    Fitch likewise heralded its purported objectivity and independence. In a

November 12, 2002 statement to the SEC, Fitch CEO Stephen Joynt stated, "we emphasize

independence and objectivity because our independent, unbiased coverage of the companies and

securities we rate is important to our research subscribers and the marketplace in general."

Subsequently, during the time when Congress was considering the Credit Rating Agency Reform

Act of 2006, Fitch stated it "has always believed that objective indicators of reliability are critical

components of rating agency recognition." It further stated, "The public interest will not be

served if the ratings of agencies without proven records of reliability are indiscriminately used in

safety and soundness regulations."

      51.    Indeed, even after striking revelations of the Rating Agencies' pervasive

failure to manage conflicts of interest surfaced, the Defendants continued to profess their

"objectivity" and "independence." In testimony before Congress given on October 22, 2008,

S&P President Deven Sharma stated that S&P's "core mission is to provide the markets with

quality, independent analysis" and "independence is a core principle of our business."

      52.    Notwithstanding the Defendants' representations to the contrary during the

Relevant Period, the Rating Agencies allowed the conflicts of interest inherent in the issuer pays

model to taint the ratings process, resulting in the unjustifiably high ratings upon which the Ohio

Funds relied in purchasing the ABS that are the subject of this action.

53.     As reported in The Wall Street Journal on April 11, 2008, Mark Froeba, a former Moody's analyst, stated there was "a palpable erosion of institutional support for ratings analysis that threatened market share."  In other words, Moody's allowed the fear of losing rating fees to affect its credit ratings.

54.     Similarly, on April 22, 2008, Arturo Cifuentes, a former Senior Vice-President at Moody's, testified to the Senate Banking, Housing and Urban Affairs Committee: "There is a far more serious conflict of interest than is commonly believed at the root of the current rating agency business model."  The witness further stated "one could make the case that whenever a rating analyst is supervised by a manager whose compensation is determined by market share or revenue growth, the objectivity of ratings is compromised."

55.     On June 11, 2008, then-SEC Chairman Christopher Cox observed that while "it was well understood that certain conflicts of interest were hardwired into the rating agency business model," the rating of structured products involving subprime assets "made those conflicts of interest even more acute."  Chairman Cox further explained the problem arose "because structured products were specifically designed for each tranche to achieve a particular credit rating -- and the ratings agencies then made a lucrative business of consulting with issuers on exactly how to go about getting those ratings."  Chairman Cox continued, "Selling consulting service to entities that purchased ratings became a triple-A conflict of interest."

56.     In stark contrast to the previous role the Rating Agencies played as passive, independent raters, the Defendants became intimately involved in the issuance of ABS such as RMBS and Collateralized Debt Obligations ("CDOs"), assisting securitization program arrangers to obtain the highest ratings possible.  The financial windfall the Rating Agencies

received as a result of their booming securitization business created the incentive to sacrifice ratings quality in order to keep the revenue stream from the structured finance machine flowing. In fact, the fees the Rating Agencies received for rating structured finance products were significantly greater than those the Rating Agencies received from rating corporate and municipal bonds.

57.    From 2002 to 2006, S&P's revenues increased by more than 800 percent from the payments it received for participating in, composing, and rating structured finance transactions, and provided S&P's parent, McGraw-Hill, with more than 75 percent of its 2007 operating profit.  In 2006, S&P's revenues rose 20 percent to $12.7 billion, with almost half of that growth based upon increased sales of structured finance ratings.

58.    Similarly, structured finance ratings increasingly became Moody's dominant source of income.  In 2006, Moody's derived more than 54 percent, or $887 million, of its ratings revenue from structured finance products.  Moreover, from 2000 to 2007, Moody's operating margins averaged 53 percent and outpaced those of Exxon and Microsoft.  For five years in a row, Moody's had the highest profit margin of any company in the S&P 500.

59.    Fitch, the smallest of the Rating Agencies, likewise brought in record profits for rating structured finance products.  Fitch reported that 51 percent of its total fiscal year 2006 revenue of $480.5 million was derived from such work.  Fitch had its best year ever in 2007, earning $240 million before interest and taxes, up 22 percent from the year before, on revenue of $1.1 billion, up 18 percent from the previous year.

60.    Demonstrating the allure of the structured finance ratings income stream, Jerome Fons, former Moody's Managing Director in charge of Credit Policy, observed in an April 10, 2008 "White Paper on Rating Competition and Structured Finance" published on the

Gerson Lehrman Group website:

> Structured finance is perhaps the largest single product line for the
> major rating agencies, representing 40% or more of total revenues.
> Moreover, growth in structured finance helped fuel high
> price/earnings multiples for rating agency shares.  So there is
> intense pressure for each agency to see its structured finance
> practice thrive.  In addition to being profitable for rating agencies,
> structured finance is very profitable for the arranging banks.
> Consequently, the incentive to see a transaction close is strong.
> This has led rating agencies to compete on standards of credit
> support.  The rating agency most willing to assign a low level of
> support to a given transaction is most likely to receive the mandate
> to rate it.  The result is a situation in which rating shopping
> dominates the structured finance business.

61.     Additional recent revelations demonstrate that concerns over the potential

conflicts of interest inherent in the issuer pays ratings model were, in fact, borne out.  The SEC

Report disclosed that Moody's, S&P, and Fitch "do not appear to take steps to prevent

considerations of market share and other business interests from the possibility that they could

influence ratings or ratings criteria."  The SEC observed, "At one firm, internal communications

appear to expose analytical staff to this conflict of interest by indicating concern or interest in

market share when firm employees were discussing whether to make certain changes in ratings

methodology."

62.     The SEC noted one instance in which "a senior analytical manager in the

Structured Finance group wrote 'I am trying to ascertain whether we can determine at this point

if we will suffer any loss of business because of our decision [on assigning separate ratings to

principal and interest] and if so, how much?'  'Essentially, [names of staff] ended up agreeing

with your recommendations but the [ABS] team didn't agree with you because they believed it

would negatively impact business.'"  As another example, "after noting a change in a

competitor's ratings methodology, an employee stated:  '[w]e are meeting with your group this

week to discuss adjusting criteria for rating [ABS] of real estate assets this week because of the

ongoing threat of losing deals.'"

63.     Another Rating Agency disclosed to the SEC "that one of its foreign ratings surveillance committees had knowledge that the rating agency had issued ratings on almost a dozen securities using a model that contained an error."  The agency reported to the Commission "that, as a result, the committee was aware that the ratings were higher than they should have been.  Nonetheless, the committee agreed to continue to maintain the ratings for several months, until the securities were downgraded for other reasons.  Members of the committee, all analysts or analytical managers, considered the rating agency's reputational interest in not making its error public, according to the rating agency."

64.     During his October 22, 2008 testimony before the U.S. House of Representatives' Committee on Oversight and Government Reform, former Moody's Managing Director Jerome Fons plainly stated "the focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" to the detriment of ratings quality.  Fons explained that originators of structured securities "typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality."  He further noted the rating agencies' "drive to maintain or expand market share made [them] willing participants in this shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  That business model, according to Fons, "prevented analysts from putting investor interests first."

65.     During the Relevant Period, issuers and the Rating Agencies engaged in a collaborative process for arriving at ratings most favorable to the issuer.  Typically, the sponsoring bank initially designated a target rating it required.  The Rating Agencies then worked with the issuer to design the credit enhancement aspects of the capital structure to justify

the desired rating.  However, each credit enhancement would reduce the issuer's profit; thus, issuers had an acute financial interest in awarding their business to the rating agency that assigned the lowest "expected loss" designations, as lower expected losses led to greater profit. The Rating Agencies placated issuers by maintaining artificially low expected loss projections, thereby keeping ratings (and the profits associated with those ratings) artificially high.

66.     Further demonstrating the subversion of ratings standard quality that pervaded the Rating Agencies, Raymond McDaniel of Moody's made numerous statements during a confidential presentation to the board of directors in October 2007, entitled "Credit Policy issues at Moody's suggested by the subprime/liquidity crisis," acknowledging the problem of conflicts of interest.  At the presentation, which was recounted during a hearing of the House Committee on Oversight and Government Reform in October 2008, McDaniel stated, "The real problem is not that the market . . . underweight[s] ratings quality but rather that in some sectors, it actually penalizes quality. . . . It turns out that ratings quality has surprisingly few friends."  McDaniel described to the board how Moody's has "erected safeguards to keep teams from too easily solving the market share problem by lowering standards" but then stated, "This does NOT solve the problem."  Turning then to a topic he referred to as "Rating Erosion by Persuasion," McDaniel observed, "Analysts and [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"

67.     The hearing before the House Oversight and Government Reform Committee on September 30, 2009 revealed new troubling information regarding past and ongoing practices within Moody's.  Eric Kolchinksy, former Moody's Managing Director in charge of the business line that rated subprime-backed CDOs during 2007, testified that "[m]ethodologies produced by Moody's for rating structured finance securities are inadequate

23

and do not realistically reflect the underlying credits. Rating models are put together in a hap-hazard fashion and are not validated if doing so would jeopardize revenues." During his testimony, Kolchinsky was also asked how and why mortgage-backed securities failed in light of the high ratings Moody's and other rating agencies originally assigned. Kolchinsky responded that he thought the "main part of the problem was -- poor incentives across the board."

       68.    Scott McCleskey, who served as Vice President for Compliance at Moody's from April 2006 to early September 2008, testified at the same hearing that his authority and independence were greatly diminished during his time at Moody's. McCleskey revealed that despite his role as the executive formally designated as responsible for the organization's compliance with SEC regulations and internal policies, he was often excluded from decision-making meetings concerning potential SEC violations. During McCleskey's tenure at Moody's, experienced compliance officers on his staff were replaced with analysts from the structured finance group "without a single day of compliance experience," creating "a clear conflict of interest issue." According to McCleskey, the new compliance officers were forced to pass "judgment on their own former practices and deciding whether to discipline friends or former colleagues and potentially their own future managers should they return to their previous business units." Perhaps most disturbing, McCleskey revealed that Moody's operated under an explicit directive not to put anything in writing that could be used against Moody's in litigation or regulatory proceedings, so as to avoid having potentially harmful "documents lying around." This recent Congressional testimony by former Rating Agency senior personnel underscores the significant detrimental effect that Defendants' pursuit of ABS issuer fees had on the integrity of the rating process and, in turn, ratings quality.

       69.    Like the other Defendants, S&P underwent a fundamental shift to secure

more ratings business and increase market share.  According to Frank Raiter, former Managing
Director and head of RMBS at S&P, when S&P was competing for fees on a $484 million
structured finance deal called Pinstripe I CDO Ltd., a member of an S&P executive committee
ordered Raiter to rate a real estate investment he had never reviewed.  In a 2001 e-mail exchange
between Raiter and S&P CDO Global Ratings Chief Richard Gugliada, Raiter requested the
"collateral tapes" in order to adequately assess the creditworthiness of the home loans backing
the proposed CDO.  Gugliada replied:

> Any request for loan level tapes is TOTALLY
> UNREASONABLE!!!  Most investors don't have it and can't
> provide it.  Nevertheless we MUST produce a credit estimate. . . .
>
> It is your responsibility to provide those credit estimates and your
> responsibility to devise some method for doing so.  Please provide
> the credit estimates requested!

Raiter responded, "This is the most amazing memo I have ever received in my
business career."

70.	Additionally, an internal e-mail among S&P analysts in May 2004,
entitled "Competition with Moody's," described a deal S&P lost to Moody's based on "criteria
issues," which threatened to "have an impact in the future deals" if not addressed.  The analyst
concluded "the only way to compete is to have a paradigm shift in thinking, especially with the
interest rate risk."

71.	A September 25, 2008 Bloomberg article entitled "'Race to the Bottom' at
Moody's, S&P Secured Subprime's Boom, Bust" further describes S&P's and Moody's
subversion of ratings quality standards:  "The world's two largest bond-analysis providers
repeatedly eased their standards as they pursued profits from structured investment pools sold by
their clients, according to company documents, e-mails and interviews with more than 50 Wall
Street professionals.  It amounted to a 'market-share war where criteria were relaxed,' says

25

former S&P Managing Director Richard Gugliada."  The article further quoted Gugliada as stating, "I knew it was wrong at the time."  He stated, as well, "[i]t was either that or skip the business. . . . My mandate was to find a way.  Find the way."

72.    The same article reported "S&P tinkered with its methodology for grading CDOs that bought commercial mortgage securities backed by apartments, hotels, offices and stores, according to an August 17, 2004, e-mail obtained by Bloomberg."  In the e-mail, S&P Managing Director Gale Scott "warned of the 'threat of losing deals' to Moody's unless the company [S&P] relaxed its rating requirements."  As part of the e-mail exchange, Gugliada, then S&P's top CDO-rating executive, replied, "OK with me to revise criteria."  Bloomberg reported that in an interview, "Gugliada confirmed the e-mail's contents and said it led to one of S&P's adjustments to accommodate clients."  According to Bloomberg, Gugliada said Gale Scott "did research supporting a relaxation of S&P's assumptions about how closely correlated the default probabilities were for commercial real estate securities."  The article further reported, "The changes gave S&P's clients more flexibility.  The switch directly preceded 'aggressive underwriting and lower credit support' in the market for commercial mortgage-backed securities from 2005 to 2007, according to an S&P report that Scott co-wrote in May 2008.  This led to growing delinquencies, defaults and losses, the report said."  Furthermore, according to Bloomberg, Gugliada said that when the subject of tightening S&P's criteria came up, co-director of CDO ratings David Tesher stated, "Don't kill the golden goose."

73.    Former S&P Managing Director Frank Raiter echoed those sentiments in or around November 2008, stating, "profit was primary, analytics were secondary."

74.    Further demonstrating the problematic linking of the Rating Agencies' financial self-interest and the ratings they issued, the SEC Report disclosed, "While each rating

26

agency has policies and procedures restricting analysts from participating in fee discussions with issuers, these policies still allowed key participants in the ratings process to participate in fee discussions."  The SEC stated one Rating Agency "allowed senior analytical managers to participate directly in fee discussions with issuers until early 2007 when it changed its policy." Another Rating Agency allowed an analyst's immediate supervisor to "engage in fee negotiations directly with issuers" until the Rating Agency changed its procedure in October 2007 to allow only business development personnel to engage in fee discussions with issuers. The SEC also found, "One rating agency permits an analytical manager to participate in internal discussions regarding which considerations are appropriate for determining a fee for a particular rated entity."  The SEC further reported, "Only one rating agency actively monitors for compliance with its policy against analysts participating in fee discussions with issuers, and, as a result was able to detect and correct certain shortcomings in its process."

75.     Significantly, the SEC found, "Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal."  The Commission referenced an e-mail from an analyst at one firm to his manager "asking about whether the firm would be charging a fee for a particular service and what the fee schedule will be."  At another firm, the SEC Report noted, "a business manager in the RMBS group wrote in an e-mail to several analysts, 'if you have not done so please send me any updates to fees on your transactions for this month.  It is your responsibility to look at the deal list and see what your deals are currently listed at.'"  Furthermore, at two Rating Agencies, the SEC continued, "there were indications that analysts were involved in fee discussions with employees of the rating agency's billing department."

27

2.     **The Rating Agencies Were Intimately Involved In Structuring**
       **And Issuing The ABS The Ohio Funds Purchased.**

76.     Because the desired rating of a securitized product was the starting point
for any securities offering, the Rating Agencies were actively involved in helping issuers
structure the products to achieve the requested rating.  This results-oriented approach resulted in
a highly subjective ratings process, where the Rating Agencies essentially worked backwards,
starting with the issuer's target rating and thereafter working toward a structure that could
conceivably yield the desired rating.

77.     The Rating Agencies would not receive their full fees unless the issuance
of the ABS was completed and the target rating was attained.  Therefore, both the issuers and the
Rating Agencies were highly incentivized to agree to the targeted ratings so that the ABS could
be marketed to investors like the Ohio Funds, which were interested in purchasing the highest
investment grade securities.  In the words of one former Moody's executive for structured
finance products, "the ratings process became a negotiation."

78.     The SEC Report revealed that the Rating Agencies worked hand in glove
with the issuers to help them obtain the highest ratings:

> [t]ypically, if the analyst concludes that the capital structure of the
> RMBS does not support the desired ratings, this preliminary
> conclusion would be conveyed to the arranger.  The arranger could
> accept that determination and have the trust issue the securities
> with the proposed capital structure and the lower rating or adjust
> the structure to provide the requisite credit enhancement for the
> senior tranche to get the desired highest rating.  Generally,
> arrangers aim for the largest possible senior tranche, i.e., to provide
> the least amount of credit enhancement possible, since the senior
> tranche -- as the highest rated tranche -- pays the lowest coupon
> rate of the RMBS' tranches and, therefore, costs the arranger the
> least to fund.

79.     Similarly, the April 2008 issue of Mortgage Banking contained
information on the Rating Agencies' role in structuring ABS and noted how that role -- and the

issuer pays model that drove the Rating Agencies' structuring work -- deprived the Rating

Agencies' ratings of the objectivity investors expected and deserved:

> [S]erious concerns have also been voiced by members of Congress about whether the [Rating Agencies'] business model -- where the large investment banks that underwrite mortgage-backed securities (MBS) and collateralized debt offerings actually pay to have their deals rated by the agencies, and the agencies in turn provide feedback to the underwriters on how to boost their deals' credit rating to the highly coveted triple-A status -- may have prejudiced their objectivity and integrity.

> "It seems to me that the credit-rating agencies are playing both coach and referee," said Sen. Robert Menendez (D-New Jersey), during a September 2007 hearing by the Senate Banking Committee on the collapse of the subprime market.

> Critics also argue that the CRAs are actively involved in the structuring of RMBS and CDO deals, and thus can hardly claim that their ratings are merely "opinions" on the likelihood that a debt security might go into default -- or, as one agency official has called them, "the world's shortest editorials."

> Joseph Mason, an associate professor of finance at Drexel University in Philadelphia and a former economist at the Office of the Comptroller of the Currency (OCC), says it is indisputable that the CRAs provide underwriters with "active structuring advice" on how to get a triple-A credit rating for their deals.

80.    The SEC described the Rating Agencies' rating of financial products as

problematic, criticizing the practice as "in effect, rating their own work."  By playing such an

active role in structuring these complex securities, the Rating Agencies abandoned any

independent, objective perspective when rating them.

81.    In sum, the role that the Rating Agencies played in rating structured

finance products was far different from their work in rating corporate and municipal bonds, and

similar traditional debt products.  In the structured finance area, the rating is less an outcome of

the work performed than it is the result of the issuer and the Rating Agencies working together to

achieve the targeted rating.  In this process, the Rating Agencies provided issuers with guided

feedback on structure and configuration to make sure that the desired ratings were obtained.

      **3.**    **The Rating Agencies Used Outdated Models To Rate ABS And Failed To Disclose Significant Aspects Of The Ratings Process.**

      82.    The Rating Agencies did not have adequate credit models to address the risks esoteric structured finance securities presented.  For example, S&P's model for determining the amount and form of credit enhancement in structured finance products had not been materially updated since 1999 and Moody's used a model last updated in 2002.  Those outdated fixed interest models were ill-equipped to deal with the newer and more variable loan products underlying structured finance securities, such as subprime, adjustable rate mortgages, and limited documentation loans.  As a result, the older models failed to adequately assess levels of required credit enhancement.

      83.    An article appearing in the April 2008 issue of <u>Mortgage Banking</u> explained the Rating Agencies' models drew on statistical assumptions that relied on the performance of 30-year fixed mortgages, which had little relation to the mortgages securitized during this decade:

> [T]he data that the rating agencies used when evaluating mortgage - backed securities -- including those backed by subprime mortgages -- were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as [Drexel University Associate Professor Joseph R.] Mason explains during an interview, is a very different animal.
>
> "This is not your historical mortgage loan," he says. "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

      84.    In an April 27, 2008 article in <u>The New York Times</u> entitled "Triple-A Failure," Mark Adelson, a former Managing Director in Moody's structured finance division,

described Moody's use of historical data pertaining to 30-year fixed mortgages to predict defaults and delinquencies in nonprime mortgage products as "observing 100 years of weather in Antarctica to forecast the weather in Hawaii."

85.     Investigations initiated in the wake of the credit crisis have revealed evidence of inadequacies in the Rating Agencies' ratings practices.  For instance, further details of the Rating Agencies' reliance on inadequate models were disclosed in testimony before the House Committee on Oversight and Government Reform.  Specifically, S&P former Managing Director Frank Raiter testified "it was critical to maintain the best models as they were the linchpins of the rating process."  According to Raiter, S&P developed the "LEVELS" model in 1995 to estimate the default and loss rates of individual loans and pools.  LEVELS was updated in early 1999 based on a database of 900,000 loans.  Raiter testified that S&P developed a vastly improved model in 2001, with updated data in 2003 and 2004, based upon approximately 9.5 million loans "covering the full spectrum of new mortgage products, particularly in AAA and fixed/floating payment type categories" -- but the model was not utilized!  Raiter further testified that using the old version led to a "failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."

86.     S&P's current President Deven Sharma agreed that "a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work . . . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

87.     An April 5, 2007 "instant message" conversation between S&P analysts

31

Rahul Shah and Shannon Mooney released by the House Committee on Oversight and

Government Reform reads:

> **Shah:** btw -- that deal is ridiculous
>
> **Mooney:** i know right . . . model def[initely] does not capture half
> of the rish [sic]
>
> **Mooney:** risk
>
> **Shah:** we should not be rating it
>
> **Mooney:** we rate every deal
>
> **Mooney:** it could be structured by cows and we would rate it
>
> **Shah:** but there's a lot of risk associated with it -- I personally
> don't feel comfy signing off as a committee member.

88.     In a December 5, 2006 S&P e-mail released by the House Committee, an

S&P Analytical Manager in the same group as Shah and Mooney wrote to a Senior Analytical

Manager that the "[r]ating agencies continue to create and [sic] even bigger monster -- the CDO

market.  Let's hope we are all wealthy and retired by the time this house of cards falters."

89.     Moreover, the SEC Report highlights that neither Moody's, S&P, nor

Fitch "had specific written procedures for rating RMBS and CDOs."  The SEC observed, "One

rating agency maintained comprehensive written procedures for rating structured finance

securities, but these procedures were not specifically tailored to rating RMBS and CDOs.  The

written procedures for the two other rating agencies were not comprehensive and did not address

all significant aspects of the RMBS and/or CDO ratings process."  The SEC further observed,

"Rating agencies do not appear to have specific policies and procedures to identify or address

errors in their models or methodologies."

90.     Reflecting its acknowledgment of the deficiencies in its ratings

methodologies during the Relevant Period, in December 2008 Fitch announced new procedures

related to RMBS ratings.  Fitch CEO Stephen Joynt conceded,

> In retrospect, too many of our structured finance credit rating opinions have clearly not performed as well as originally intended. We have downgraded significant numbers of structured finance securities due to the performance of the underlying assets and structures of deals. . . . Fitch has previously acknowledged that while we were aware of, and believed we accounted for many various risks posed by subprime mortgages and the rapidly changing underwriting environment in the U.S. housing market in our models and analysis, we did not foresee the magnitude or the velocity of the decline in housing prices, nor the dramatic shift in borrower behavior brought on by the changing practices in the market. Nor did we appreciate the extent of dubious mortgage origination practices and fraud -- by lenders and borrowers in the 2006-2007 period.

Joynt also acknowledged, "building complex highly tranched securities on historical default probabilities does not always provide enough cushion for extraordinary variable economic and asset performance."

91.     The Rating Agencies failed to make adequate disclosures regarding the ratings process and their methodologies. In its July 2008 Report, the SEC stated, "certain significant aspects of the ratings process and the methodologies used to rate RMBS and CDOs were not always disclosed, or were not fully disclosed." Documents the SEC reviewed indicated "the use of unpublished ratings criteria." At one firm, the SEC reported, "communications by the firm's analytical staff indicate that they were aware of the use of unpublished criteria." One e-mail from an Analytical Manager to a banker stated, "[N]ot all our criteria is published. [F]or example, we have no published criteria on hybrid deals, which doesn't mean that we have no criteria." The SEC further reported that another Rating Agency, from 2004 to 2006, "reduced its model's raw loss numbers for second lien loans based upon internal matrices." The report further observed, "The raw loss outputs from the model were adjusted to set numbers from the matrices depending on the issuer and the raw loss numbers. The rating agency did not publicly disclose its use of matrices to adjust model outputs for second lien loans." At a third Rating

Agency, "in certain instances there was a time lag from the date at which the firm implemented changes to its criteria and the date at which it published notice of these changes to the market." Additionally, the SEC "discovered emails indicating that the firm's analysts utilized an unpublished model to assess data."

92.     The SEC disclosed that Rating Agencies "made 'out of model adjustments' and did not document the rationale for the adjustment."  The Commission explained that in certain instances, "the loss level that was returned by application of the rating agency's quantitative model was not used, and another loss level was used instead."  Those decisions to deviate from the model "were approved by ratings committees but in many cases the rating agency did not have documentation explaining the rationale for the adjustments, making it difficult or impossible to identify the factors that led to the decision to deviate from the model."

93.     The SEC stated two Rating Agencies "frequently" employed "out of model" adjustments in issuing ratings.  One Rating Agency "regularly reduced loss expectations on subprime second lien mortgages from the loss expectations output by its RMBS model, in some cases reducing the expected loss."  The SEC observed that while the Rating Agency's analysts "might have discussed the adjustment with issuers in the course of rating a deal, it appears that the firm did not publicly disclose the practice of overriding model outputs regarding loss expectations on subprime second liens."  Another Rating Agency indicated to the SEC "that its ratings staff, as a general practice, did not adjust its collateral or cash flow analysis based upon factors that were not incorporated into the firm's models."  However, the SEC "observed instances in the firm's deal files that demonstrated adjustments from the cash flow models as well as instances where the firm implemented changes to its ratings criteria which were utilized prior to disclosure or used before being incorporated into its models."

**D.**     **The Rating Agencies Failed To Conduct Adequate Ratings Surveillance.**

94.     The Rating Agencies also failed to monitor adequately the ABS they rated. The SEC Report disclosed that the Rating Agencies failed to conduct surveillance due to a lack of personnel and inadequate models to track required developments.

95.     For example, an internal e-mail from one of the Rating Agencies revealed the following regarding the failure to review ratings determinations:  "(i) lack of sufficient personnel resources and (ii) not having the same models /information available for surveillance to relook [sic] at an existing deal with the new assumptions, i.e., no cash flow models for a number of assets."  Another e-mail composed by the Senior Analytical Manager of RMBS Surveillance at one of the Rating Agencies stated in response to a request for revised ratings actions:  "We do not have the resources to support what we are doing now. . . . I am seeing evidence that I really need to add the staff to keep up with what is going on with sub prime [sic] and mortgage performance in general, NOW."

96.     The Rating Agencies' failure to conduct or document meaningful surveillance is also directly related to their inability and/or unwillingness to assess risk adequately in their initial ratings.  The Rating Agencies' misconduct in connection with their initial ratings and their subsequent monitoring (or lack thereof) of the rated securities directly and proximately caused losses to the Ohio Funds.

**E.**     **The Ohio Funds Relied To Their Detriment On The Defendants' Ratings In Purchasing And Holding ABS During The Relevant Period.**

97.     The Ohio Funds relied on the Defendants' ratings, which the Funds did not know and could not have known were false and misleading, in deciding to purchase the ABS at issue in this action.  Both the opaque and complex nature of the securities, as well as the

Rating Agencies' prior reputations for objectivity and integrity, rendered reliance on the ratings reasonable and necessary.

98.     The Rating Agencies themselves acknowledged the widespread reliance on their ABS credit ratings.  Former Moody's Managing Director Jerome Fons observed that investors "relied heavily" on rating agencies when purchasing ABS for a number of key reasons. First, "subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral."  He continued, "Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool. Loan-by-loan data, the highest level of detail, is generally not available to investors."  Second, Fons stated, "the complexity of the securitization process requires extremely sophisticated systems and technical competence to properly assess risk at the tranche level."  Third, he noted, "rating agencies had a reputation, earned over nearly one century, of being honest arbiters of risk."

99.     Moreover, the lack of transparency and the complex nature of structured finance products rendered the ratings on those securities even more significant than ratings on other investments.  In his "White Paper on Rating Competition and Structured Finance" Fons characterized the "opacity of rated securities" as "[s]omewhat unique to the structured finance market."  He further observed that in certain situations, "the details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny." Additionally, "unless the banker/originator brings a transaction to a rating agency for evaluation, the agency will generally not have enough information to assign it a rating."  Fons stated the role of rating agencies "is particularly important to the structured finance process" and investors rely on the agencies when making purchase decisions because of the opacity of structured finance

securities.  He also observed, "the tools to analyze credit risk, even with transparent assets, are beyond the grasp of many investors," noting rating methods "are quite technical, often relying on advanced statistical techniques" and documentation supporting a transaction "can be equally daunting, reading more like a legal brief than helpful financial guidance."  He continued, "In turn, a solid understanding of how to value structured securities remains elusive."

100.    The AAA ratings on the wide array of RMBS and CMBS issued and sold during the Relevant Period were crucial to the Ohio Funds' decisions to purchase these securities and sustained the artificially high prices at which the Ohio Funds purchased them.  However, the Rating Agencies' false and misleading representations regarding their ratings -- most prevalently, the inflated ratings themselves -- caused the Ohio Funds to suffer significant losses when the real estate market collapsed during the last two years.

101.    To date, the Ohio Funds have suffered losses in excess of $457 million on the ABS at issue in this action, as further detailed in the attached exhibits.

### 1.    Ohio Police & Fire Pension Fund

102.    During the Relevant Period, OP&F purchased ABS in reliance on the inflated and inaccurate AAA credit ratings assigned by the Rating Agencies.  As a result, OP&F has suffered in excess of $83 million in losses thus far.

103.    OP&F purchased numerous RMBS issued during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants.  Included among these were at least 105 securities for which OP&F originally paid in excess of $168 million.  These securities have since been downgraded significantly, or have received no ratings change (because of lack of surveillance and monitoring by the Defendants) but have nonetheless lost value.  As a result, OP&F has suffered losses exceeding $79 million in these RMBS, as set forth in the table attached as Exhibit A-1.

104.    OP&F also purchased numerous CMBS during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants.  Included among these were at least 13 securities for which OP&F originally paid in excess of $25 million.  These securities have since been downgraded significantly, or have received no ratings change (because of lack of surveillance and monitoring by the Defendants) but have nonetheless lost value.  As a result, OP&F has suffered losses exceeding $3 million in these securities, as set forth in the table attached as A-2.

105.    The prospectuses for each of the ABS identified in Exhibits A-1 and A-2 stated that the expected initial AAA, or highest investment grade, ratings would be provided by one or more of the Defendants.

106.    As a general rule, the expected initial AAA ratings for these ABS were provided by the Defendants to the issuers before the applicable prospectuses and full supplements were filed with the SEC or otherwise distributed to investors such as OP&F.  In fact, Defendants S&P, Moody's, and Fitch issued "Pre-Sale" reports for CMBS that customarily contained their preliminary ratings.  Commitments for the purchase and sale of these securities were often made based on the information contained in these reports, well ahead of the publication or availability of the respective prospectuses.  Issuers, brokers, underwriters, investment managers, and the Defendants knew that these pre-sale reports influenced purchase decisions in the CMBS marketplace.

107.    The relevant prospectuses for the ABS identified in Exhibits A-1 and A-2 stated that the ABS would not be issued unless at least one or more of the Defendants had assigned them the highest initial investment grade rating, i.e., AAA (or its equivalent).  The very creation and issuance of the securities depended upon the initial AAA rating by one or more of

the Defendants. For example:

        (a)     The prospectus supplement dated May 16, 2006 for securities identified by CUSIP numbers 12668BDP1 belonging to different classes of Countrywide Home Loans Mortgage Pass-Through Certificates, Series 2006-OA6 states "[i]t is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." Defendants Moody's and S&P assigned these securities the highest (AAA equivalent) investment grade rating.

        (b)     The prospectus supplement dated December 16, 2005 for the RMBS securities identified by CUSIP number 40430HCN6 belonging to the HSI Asset Securitization Corporation Trust, Mortgage Pass-Through Certificates, Series 2005-I1 states "[i]n order to be issued, the Offered Certificates must be assigned ratings not lower than the following by Fitch, Moody's & S&P." Defendants Fitch, Moody's, and S&P assigned these securities the highest (AAA equivalent) investment grade rating.

        (c)     The prospectus supplement dated December 20, 2006 for the RMBS identified by CUSIP number 41162NAE7 belonging to HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates Series 2006-14 states "[i]t is a condition to the issuance of the offered certificates that they have the applicable rating or ratings by . . . Moody's and . . . S&P indicated under 'Initial Certificate Ratings' in the table on page S-1." Defendants Moody's and S&P assigned these securities the highest (AAA equivalent) investment grade rating.

        (d)     The prospectus supplement dated May 14, 2007 for the RMBS identified by CUSIP number 57645NAC4 belonging to MASTR Adjustable Rate Mortgages Trust 2007-3 states that the minimum investment grade ratings for the certificates were required

and provided by Moody's and S&P.  "It is a condition to the issuance of the certificates of the offered certificates that they receive the rating set forth in the table … on page S-7 in this prospectus supplement."  Defendants Moody's and S&P assigned these securities the highest (AAA equivalent) investment grade rating.

(e)     The prospectus supplement dated April 17, 2008 for the CMBS security identified by CUSIP number 50180LAC4 belonging to different classes of LB-UBS Commercial Mortgage Trust 2008-C1 states "[i]t is a condition to their issuance that the respective classes of offered certificates be rated as set forth in the table on page S-8 of this prospectus supplement."  Defendants Moody's and S&P assigned these securities the highest (AAA equivalent) investment grade rating.

(f)     The prospectus supplement dated November 18, 2005 for the CMBS security identified by CUSIP number 46625YVV2 belonging to different classes of J.P. Morgan Chase Commercial Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2005-CIBC13 states "[i]t is a condition to issuance that the Offered Certificates be rated not lower than the following ratings by [Moody's] and [Fitch]."  Defendants Moody's and Fitch assigned these securities the highest (AAA equivalent) investment grade rating.

108.    The prospectuses and prospectus supplements for the other ABS purchased by OP&F all contained language concerning the assigned ratings that was substantially similar to that cited in ¶ 107 above.

109.    Additionally, as a general rule, the applicable prospectus for each ABS stated (in a section entitled "Use of Proceeds") that the issuer planned to purchase the mortgages that would constitute the asset pool primarily from the proceeds from the sale of the security.  In

other words, the mortgage asset base was to be acquired and created after the security was sold, which in turn would only occur if one or more of the Defendants had provided the AAA rating necessary for the issuance of the security.  For example:

      (a)     The "Use of Proceeds" section of the prospectus supplement dated May 16, 2006 for securities identified by CUSIP numbers 12668BDP1 belonging to different classes of Countrywide Home Loans Mortgage Pass-Through Certificates, Series 2006-OA6 states "[w]e expect the proceeds to the depositor from the sale of the offered certificates . . . to be approximately $1,069,049,215, plus accrued interest. . . . The depositor will apply the net proceeds from the sale of these classes of certificates against the purchase price of Mortgage Loans."

      (b)     The "Use of Proceeds" section of the prospectus supplement dated December 16, 2005 for the RMBS securities identified by CUSIP number 40430HCN6 belonging to the HSI Asset Securitization Corporation Trust, Mortgage Pass-Through Certificates, Series 2005-I1 states "[t]he depositor will apply all or substantially all of the net proceeds from the sale of each series of securities for one or more of the following purposes:  to purchase the related assets of the trust fund. . . ."

      (c)     The "Use of Proceeds" section of the prospectus supplement dated December 20, 2006 for the RMBS identified by CUSIP number 41162NAE7 belonging to HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates Series 2006-14 states "[t]he net proceeds from the sale of the offered certificates will be applied by the depositor . . . toward the purchase of the mortgage loans. . . ."

      (d)     The "Use of Proceeds" section of the prospectus supplement dated May 14, 2007 for the RMBS identified by CUSIP number 57645NAC4 belonging to MASTR

Adjustable Rate Mortgage Trust 2007-3 states "[t]he depositor intends to use the net proceeds from the sale of the offered certificates to acquire the Loans and to pay other expenses associated with the pooling of the loans and the issuance of the certificates. . . ."

(e)     The "Use of Proceeds" section of the prospectus supplement dated April 17, 2008 for the CMBS identified by CUSIP numbers 50180LAC4 belonging to different classes of LB-UBS Commercial Mortgage Trust 2008-C1 states "the net proceeds to be received from the sale of the offered certificates of any series will be applied by us to the purchase of assets for the related trust or will be used by us to cover expenses related to that purchase and the issuance of those certificates."

(f)     The "Use of Proceeds" section of the prospectus supplement dated November 18, 2005 for CMBS identified by CUSIP numbers 46625YVV2 belonging to different classes of J.P. Morgan Chase Commercial Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2005-CIBC13 states "[w]e will apply the net proceeds to be received from the sale of the certificates of any series to the purchase of trust assets or use the net proceeds for general corporate purposes."

110.    The prospectuses and prospectus supplements for the other ABS purchased by OP&F all contained language substantially similar to that cited in ¶ 109 above concerning the planned "Use of Proceeds."

111.    Had Defendants not assigned the initial AAA ratings to the ABS described in Exhibits A-1 and A-2, the issuers could not have created the securities as described in the respective prospectuses, let alone sold them.  The AAA ratings were necessary for the ABS to be sold at a price sufficient to generate the proceeds necessary to purchase the planned mortgage pools as described in the relevant prospectuses.  Without the AAA ratings, the economic basis

42

for the ABS would have collapsed, as would the entire planned offering for each ABS.  Absent

those high ratings, OP&F would not have purchased the ABS.

> **2.      Ohio Public Employees Retirement System**

112.    During the Relevant Period, PERS purchased ABS in reliance on the

inflated and inaccurate AAA credit ratings assigned by the Rating Agencies.  As a result, PERS

has suffered in excess of $222 million in losses thus far.

113.    PERS purchased numerous ABS issued during the Relevant Period that

were given the highest investment grade rating of AAA or its equivalent by one or more of the

Defendants.  Included among these securities were at least 50 RMBS for which PERS originally

paid in excess of $595 million.  These securities have since been downgraded significantly, or

have received no ratings change (because of lack of surveillance and monitoring by the

Defendants) but have nonetheless lost value.  As a result, PERS has suffered losses exceeding

$120 million in these RMBS, as set forth in the table attached as Exhibit B-1.

114.    PERS also purchased numerous CMBS during the Relevant Period that

were given the highest investment grade rating of AAA or its equivalent by one or more of the

Defendants.  Included among these securities were at least 23 CMBS for which PERS originally

paid in excess of $295 million.  These securities have since been downgraded significantly, or

have received no ratings change (because of lack of surveillance and monitoring by the

Defendants) but have nonetheless lost value.  As a result, PERS has suffered losses exceeding

$102 million in these CMBS, as set forth in the table attached as Exhibit B-2.

115.    The prospectuses for each of the ABS identified in Exhibits B-1 and B-2

stated that the expected initial AAA, or highest investment grade, ratings would be provided by

one or more of the Defendants.

116.    As a general rule, the expected initial AAA ratings for these ABS were

provided by the Defendants to the issuers before the applicable prospectuses and full supplements were filed with the SEC or otherwise distributed to investors such as PERS.  In fact, S&P, Moody's, and Fitch issued "Pre-Sale" reports for CMBS that customarily contained their preliminary ratings.  Commitments for the purchase and sale of these securities were often made based on the information contained in these reports, well ahead of the publication or availability of the respective prospectuses.  Issuers, brokers, underwriters, investment managers, and the Defendants knew that these pre-sale reports influenced purchase decisions in the CMBS marketplace.

117.    The relevant prospectuses for the ABS identified in Exhibits B-1 and B-2 stated that the ABS would not be issued unless at least one or more of the Defendants had assigned them the highest initial investment grade rating, i.e., AAA (or its equivalent).  Thus, the very creation and issuance of the securities depended upon the initial AAA rating by one or more of the Defendants.  For example:

(a)     The prospectus supplement dated July 24, 2007 for the RMBS identified by CUSIP number 07324FAC4 belonging to different classes of Bayview Financial Mortgage Pass-Through Trust 2007-B states "[i]t is a condition to the issuance of the securities of each series offered by this prospectus that at the time of issuance they will have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  These securities were assigned the highest (AAA equivalent) investment grade rating by Moody's, S&P, and Fitch.

(b)     The prospectus supplement dated September 27, 2006 for the RMBS identified by CUSIP number 12666UAB9 belonging to the Countrywide Asset-Backed Certificates Trust 2006-15 states "[i]t is a condition of the issuance of the Offered Certificates

that each class of Offered Certificates set forth below be assigned the ratings at least as high as those designated below by Moody's. . . S&P. . . and Fitch. . . ." These securities were assigned the highest (AAA equivalent) investment grade rating by Moody's, S&P, and Fitch.

(c)     The prospectus supplement dated July 27, 2007 for the RMBS identified by CUSIP number 52519BBF6 belonging to Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-7 states "[i]t is a condition to the issuance of the Offered Certificates that they receive the ratings set forth in the table beginning on page S-1 to this prospectus supplement.  The ratings of 'AAA' and 'Aaa' are the highest ratings that the applicable Rating Agency assigns to securities."  These securities were assigned the highest (AAA equivalent) investment grade rating by Moody's, S&P, and Fitch.

(d)     The prospectus supplement dated April 25, 2005 for the RMBS identified by CUSIP number 94982HAH0 belonging to Wells Fargo Mortgage Backed Securities 2005-AR9 Trust states "[i]t is a condition to the issuance of the Offered Certificates that each such Class will have received at least the rating set forth in the table on page S-4 from Moody's… and S&P...."  These securities were assigned the highest (AAA equivalent) investment grade rating by Moody's and S&P.

(e)     The prospectus supplement dated October 27, 2006 for CUSIP 466285AQ6, J.P. Morgan Alternative Loan Trust 2006-A6 states "[i]t is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S-1 by each of the Rating Agencies, as applicable."  Once again, the securities were assigned the highest investment grade rating (AAA or its equivalent) by Moody's and S&P.

(f)     The prospectus supplement dated December 13, 2006 for the CMBS identified by CUSIP 20047EAD4, Commercial Mortgage Pass Through Certificates

45

COMM 2006-C8 Mortgage Trust states "[i]t is a condition to issuance that the Offered

Certificates be rated not lower than the following ratings by Moody's. . . and Fitch . . . Each of

the rating agencies identified above will perform ratings surveillance with respect to its ratings

for so long as the Offered Certificates remain outstanding."  These securities were assigned the

highest (AAA equivalent) investment grade rating by Moody's and Fitch.

118.    The prospectuses and prospectus supplements for the other ABS

purchased by PERS all contained language concerning the assigned ratings that was substantially

similar to that is cited in ¶ 117 above.

119.    Additionally, as a general rule, the applicable prospectus for each ABS

stated (in a section entitled "Use of Proceeds") that the issuer planned to purchase the mortgages

that would constitute the asset pool primarily from the proceeds from the sale of the security.  In

other words, the mortgage asset base was to be acquired and created after the security was sold,

which in turn would only occur if one or more of the Defendants had provided the AAA rating

necessary for the issuance of the security.  For example:

(a)    The "Use of Proceeds" section in the Prospectus Supplement dated

July 24, 2007 for the RMBS security identified by CUSIP number 07324FAC4 belonging to

different classes of Bayview Financial Mortgage Pass-Through Trust 2007-B states "[t]he

depositor will apply all or substantially all of the proceeds from the sale of the securities of each

series to purchase the related Primary Assets and certain other property, to fund any applicable

credit enhancement and to pay fees and expenses associated with the issuance of the securities."

(b)    The "Use of Proceeds" section of the the Prospectus Supplement

dated September 27, 2006 for the RMBS security identified by CUSIP number 12666UAB9

belonging to the Countrywide Asset-Backed Certificates Trust 2006-15 states "[i]t is expected

that the proceeds to the Depositor from the sale of the Underwritten Certificates will be approximately $935,525,744. . . . The Depositor will apply the net proceeds of the sale of the Offered Certificates against the purchase price of the Initial Mortgage Loans on the Closing Date and deposit the Pre-Funded Amount, if any, in the Pre-Funding Account."

(c)     The "Use of Proceeds" section of the Prospectus Supplement dated July 27, 2007 for the RMBS identified by CUSIP number 52519BBF6 belonging to Lehman Mortgage Trust Mortgage Pass-Through Certificates 2007-7 states "[t]he depositor will apply all or substantially all of the net proceeds from the sale of each series offered hereby and by the prospectus supplement to purchase the Primary Assets, to repay indebtedness that has been incurred to obtain funds to acquire the Primary Assets, to establish the Reserve Funds, if any, for the series and to pay costs of structuring and issuing the Securities."

(d)     The "Use of Proceeds" section of the Prospectus Supplement dated April 25, 2005 for the RMBS identified by CUSIP number 94982HAH0 belonging to Wells Fargo Mortgage Backed Securities 2005-AR9 Trust states "[t]he net proceeds from the sale of each Series of Certificates will be used by the Seller for the purchase of the Mortgage Loans represented by the Certificates of such Series from Wells Fargo Bank.  It is expected that Wells Fargo Bank will use the proceeds from the sale of the Mortgage Loans to the Seller for its general business purposes, including, without limitation, the origination or acquisition of new mortgage loans and the repayment of borrowings incurred to finance the origination or acquisition of mortgage loans, including the Mortgage Loans underlying the Certificates of such Series."

(e)     The "Use of Proceeds" section of the Prospectus Supplement dated October 27, 2006 for the RMBS security identified by CUSIP 466285AQ6, J.P. Morgan

47

Alternative Loan Trust 2006-A6 offering states, "[t]he net proceeds from the sale of the Offered Certificates will be applied by the Depositor to pay for the acquisition of the Mortgage Loans from the Seller, as well as to pay the costs of structuring and issuing the securities, which generally consists of legal, accounting and rating agency fees and the costs of obtaining the Swap Agreement."

(f)     The "Use of Proceeds" section of the prospectus supplement dated December 13, 2006 for the CMBS identified by CUSIP 20047EAD4, Commercial Mortgage Pass Through Certificates COMM 2006-C8 Mortgage Trust, states "[t]he net proceeds to be received from the sale of the certificates of any series will be applied by the depositor to the purchase of the assets of the trust fund or will be used by the depositor to cover expenses related thereto."

120.    The prospectuses and prospectus supplements for the other ABS purchased by PERS all contained language substantially similar to that cited in ¶ 119 above concerning "Use of Proceeds."

121.    Had Defendants not assigned the initial AAA ratings to the ABS described in Exhibits B-1 and B-2, the issuers could not have created the securities as described in the respective prospectuses, let alone sold them.  The AAA ratings were necessary for the ABS to be sold at a price sufficient to generate the proceeds necessary to purchase the planned mortgage pools as described in the relevant prospectuses.  Without the AAA rating, the economic basis for the ABS would have collapsed, as would the entire planned offering for each ABS.  Absent those high ratings, PERS would not have purchased the ABS.

**3.     State Teachers Retirement System of Ohio**

122.    During the Relevant Period, STRS purchased ABS in reliance on the inflated and inaccurate AAA credit ratings assigned by the Rating Agencies.  As a result, STRS

48

has suffered in excess of $85 million in losses thus far.

123.     STRS purchased numerous ABS issued during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants.  Included among these securities were at least seven RMBS for which STRS originally paid in excess of $265 million.  These securities have since been downgraded significantly.  As a result, STRS has suffered losses exceeding $49 million in these RMBS as set forth in the table attached as Exhibit C-1.

124.     STRS also purchased numerous CMBS during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants.  Included among these securities were at least three CMBS for which STRS originally paid in excess of $215 million.  These securities have since been downgraded significantly.  As a result, STRS has suffered losses exceeding $36 million in these CMBS as set forth in the table attached as Exhibit C-2.

125.     The prospectuses for each of the ABS identified in Exhibits C-1 and C-2 stated that the expected initial AAA ratings would be provided by one or more of the Defendants.

126.     As a general rule, the expected initial AAA ratings for these ABS were provided by the Defendants to the issuers before the applicable prospectuses and full supplements were filed with the SEC or otherwise distributed to investors such as STRS.  In fact, Defendants S&P, Moody's, and Fitch issued "Pre-Sale" reports for CMBS that customarily contained their preliminary ratings.  Commitments for the purchase and sale of these securities were often made based on the information contained in these reports, well ahead of the publication or availability of the respective prospectuses.  Issuers, brokers, underwriters,

investment managers, and the Defendants knew that these pre-sale reports influenced purchase decisions in the CMBS marketplace.

127.    The relevant prospectuses for the ABS identified in Exhibits C-1 and C-2 stated that the ABS would not be issued unless at least one or more of the Defendants had assigned them the highest initial investment grade rating, i.e., AAA (or its equivalent).  The very creation and issuance of the securities depended upon the initial AAA rating by one or more of the Defendants.  For example:

(a)    The prospectus supplement dated August 29, 2007 for the RMBS identified by CUSIP numbers 12544KAF0, 12544KAD5, and 12544KAG8, belonging to different classes of Countrywide Home Loans Mortgage Pass-Through Certificates 2007-17, states "[i]t is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement."  S&P and Fitch assigned the highest (AAA equivalent) investment grade rating to these securities.

(b)    The prospectus supplement dated July 27, 2007 for the RMBS identified by CUSIP number 46631NEA3 belonging to the J.P. Morgan Mortgage Trust, Mortgage Pass-Through Certificates, Series 2007-S3 states "[i]t is a condition of the issuances of the Offered Certificates that they be rated as indicated in the table beginning on page S-1 by each of the Rating Agencies as applicable."  S&P and Fitch assigned the highest (AAA equivalent) investment grade rating to these securities.

(c)    The prospectus supplement dated September 28, 2007 for the RMBS identified by CUSIP number 949834AA3 belonging to Wells Fargo Mortgage Backed Securities 2007-14 Trust 1A1 states "[i]t is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table beginning on

page S-6 from Fitch Ratings and Standard & Poor's, a division of The McGraw-Hill Companies, Inc.  The ratings of Fitch on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled. Fitch's rating opinions address the structural and legal aspects associated with the certificates, including the nature of the underlying mortgage loans."  S&P and Fitch assigned the highest investment grade rating (AAA or its equivalent) to these securities.

        (d)      The prospectus supplement dated November 28, 2007 for CUSIP 52522QAD4, Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-10 offering states "[t]he certificates offered by this prospectus supplement will initially have the ratings from Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and Fitch Ratings set forth in the table beginning on page S-1."  S&P and Fitch assigned the highest investment grade rating (AAA or its equivalent) to these securities.

        (e)      The prospectus supplement dated June 21, 2007 for the CMBS identified CUSIP 36246LAE1, Goldman Sachs Mortgage Securities Trust 2007-GG10 offering states that, "[i]t is a condition to the issuance of each Class of Offered Certificates that they be rated as follows by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc. and Fitch, Inc.:  [AAA].  A securities rating on mortgage pass-through certificates addresses the likelihood of the timely receipt by their holders of interest and the ultimate repayment of principal to which they are entitled by the Rated Final Distribution Date.  The rating takes into consideration the credit quality of the pool of mortgage loans, structural and legal aspects associated with the certificates, and the extent to which the payment stream from the pool of mortgage loans is adequate to make payments required under the

certificates." S&P, Moody's, and Fitch assigned the highest investment grade rating (AAA or its equivalent) to these securities.

(f)    The prospectus supplement dated December 18, 2007 for the CMBS identified by CUSIP 46630DAG7, J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-C1, states that "[i]t is a condition to issuance that the Offered Certificates be rated not lower than the following ratings by [the CRAs]: 'AAA.' . . . The offered certificates will not be issued unless each of the offered classes receives the following ratings from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc."

128.    The prospectuses and prospectus supplements for the other ABS purchased by STRS all contained language concerning the assigned ratings that was substantially similar to that cited in ¶ 127 above.

129.    Additionally, as a general rule, the applicable prospectus for each ABS stated (in a section entitled "Use of Proceeds") that the issuer planned to purchase the mortgages that would constitute the asset pool primarily from the proceeds from the sale of the security. In other words, the mortgage asset base was to be acquired and created after the security was sold, which in turn would only occur if one or more of the Defendants had provided the AAA rating necessary for the issuance of the security. For example:

(a)    The "Use of Proceeds" section in the prospectus supplement dated August 29, 2007 for securities identified by CUSIP numbers 12544KAF0, 12544KAD5, & 12544KAG8 belonging to different classes of Countrywide Home Loans Mortgage Pass-Through Certificates 2007-17 states "[w]e expect the proceeds to the depositor from the sale of the offered certificates . . . . to be approximately $806,349,743, plus accrued interest, before

deducting issuance expenses payable by the depositor.  The depositor will apply the net proceeds from the sale of these classes of certificates against the purchase price of the Closing Date Mortgage Loans and to fund the Pre-funding Account and Capitalized Interest Account."

    (b)  The "Use of Proceeds" section of the prospectus supplement dated July 27, 2007 for the RMBS identified by CUSIP number 46631NEA3 belonging to the J.P. Morgan Mortgage Trust, Mortgage Pass-Through Certificates, Series 2007-S3 states "[t]he net proceeds from the sale of the Offered Certificates will be applied by the Depositor to pay for the acquisition of the Mortgage Loans from the Seller."

    (c)  The "Use of Proceeds" section of the prospectus supplement dated September 28, 2007 for the RMBS identified by CUSIP number 94984AA3 belonging to Wells Fargo Mortgage Backed Securities 2007-14 Trust 1A1 states "[t]he net proceeds to be received from the sale of the Offered Certificates will be applied by the Depositor to the purchase from the Sponsor of the Mortgage Loans underlying the Certificates."

    (d)  The "Use of Proceeds" section of the prospectus supplement dated November 28, 2007 for the RMBS identified by CUSIP number 52522QAD4 belonging to Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-10, states "[t]he depositor will apply all or substantially all of the net proceeds from the sale of each series offered hereby and by the prospectus supplement to purchase the Primary Assets, to repay indebtedness that has been incurred to obtain funds to acquire the Primary Assets, to establish the Reserve Funds, if any, for the series and to pay costs of structuring and issuing the Securities."

    (e)  The "Use of Proceeds" section of the prospectus dated June 21, 2007 for the CMBS identified by CUSIP 36246LAE1, Goldman Sachs Mortgage Securities Trust 2007-GG10 A4, states "[t]he net proceeds from the sale of the Certificates will be used by

the depositor to pay the purchase price of the Mortgage Loans . . .  the Seller intends to apply all or substantially all of the net proceeds from the sale of each series offered in this Prospectus and by the related prospectus supplement to acquire the mortgage loans relating to the series, to establish any reserve funds, for the series, to obtain other credit enhancement, if any, for the series, to pay costs incurred in connection with structuring and issuing the certificates and for general corporate purposes.  Certificates may be exchanged by the Seller for mortgage loans."

(f)     The "Use of Proceeds" section of the prospectus dated December 18, 2007 for the CMBS identified by CUSIP 46630DAG7, J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-C1, states "[w]e will apply the net proceeds to be received from the sale of the certificates of any series to the purchase of trust assets. We expect to sell the certificates from time to time, but the timing and amount of offerings of certificates will depend on a number of factors, including the volume of mortgage assets we have acquired, prevailing interest rates, availability of funds and general market conditions."

130.     The prospectuses and prospectus supplements for the other ABS purchased by STRS all contained language substantially similar to that cited in ¶ 129 above concerning "Use of Proceeds."

131.     Had Defendants not assigned the initial AAA ratings to the ABS described in Exhibits C-1 and C-2, the issuers could not have created the securities as described in the respective prospectuses, let alone sold them.  The AAA ratings were necessary for the ABS to be sold at a price sufficient to generate the proceeds necessary to purchase the planned mortgage pools as described in the relevant prospectuses.  Without the AAA rating, the economic basis for the ABS would have collapsed, as would the entire planned offering for each ABS.  Absent those high ratings, STRS would not have purchased the ABS.

**4.      School Employees Retirement System of Ohio**

132.      During the Relevant Period, SERS purchased ABS in reliance on the inflated and inaccurate AAA credit ratings assigned by the Rating Agencies.  As a result, SERS has suffered in excess of $48 million in losses thus far.

133.      SERS purchased numerous ABS during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants at the time of issuance.  Included among these securities were at least 62 RMBS for which SERS originally paid in excess of $144 million.  These securities have since been downgraded significantly, or have received no ratings change (because of lack of surveillance and monitoring by the Defendants) but have nonetheless lost value.  As a result, SERS has suffered losses exceeding $47 million in these RMBS, as set forth in the table attached as Exhibit D-1.

134.      SERS also purchased numerous CMBS during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants.  Included among these securities were at least three securities for which SERS originally paid in excess of $11 million.  These securities have since been downgraded significantly, or have received no ratings change (because of lack of surveillance and monitoring by the Defendants) but have nonetheless lost value.  As a result, SERS has suffered losses exceeding $1 million in these CMBS, as set forth in the table attached as Exhibit D-2.

135.      The prospectuses for each of the ABS identified in Exhibits D-1 and D-2 stated that the expected initial AAA ratings would be provided by one or more of the Defendants.

136.      As a general rule, the expected initial AAA ratings for these ABS were provided by the Defendants to the issuers before the applicable prospectuses and full

supplements were filed with the SEC or otherwise distributed to investors such as SERS.  In fact, Defendants S&P, Moody's, and Fitch issued "Pre-Sale" reports for CMBS that customarily contained their preliminary ratings.  Commitments for the purchase and sale of these securities were often made based on the information contained in these reports, well ahead of the publication or availability of the respective prospectuses.  Issuers, brokers, underwriters, investment managers, and the Defendants knew that these pre-sale reports influenced purchase decisions in the CMBS marketplace.

137.    The relevant prospectuses for the ABS identified in Exhibits D-1 and D-2 stated that the ABS would not be issued unless at least one or more of the Defendants had assigned them the highest initial investment grade rating, i.e., AAA (or its equivalent).  The very creation and issuance of the securities depended upon the initial AAA rating by one or more of the Defendants.  For example:

(a)    The prospectus supplement dated October 29, 2007 for the RMBS identified by CUSIP number 02151WAA0 belonging to Countrywide Home Loans Servicing LP Mortgage Pass-Through Certificates, Series 2007-OA11, states "[i]t is a condition of the issuance of the offered certificates that they receive the respective ratings set forth in the Summary of this prospectus supplement by . . . [Moody's] . . . and [S&P]. . . . The depositor has requested that Moody's and S&P maintain ongoing surveillance of the ratings assigned to the applicable classes of offered certificates in accordance with their respective policies. . . ."  According to this prospectus supplement, Moody's and S&P assigned these securities the highest investment grade rating, i.e., AAA or its equivalent.

(b)    Similarly, the prospectus supplement dated September 28, 2006 for the RMBS securities identified by CUSIP number 52522DAM3 belonging to the Lehman XS

Trust Mortgage Pass Through-Certificates, Series 2006-16N states "[i]t is a condition to the issuance of the Offered Certificates that they have the applicable rating or ratings by Moody's and S&P indicated under 'Initial Certificate Ratings' in the table on page S-1.  The ratings of 'AAA' and 'Aaa' are the highest ratings that the applicable rating agency assigns to securities." Moody's and S&P assigned initial investment grade ratings of AAA or its equivalent to these securities.

   (c) The prospectus supplement dated November 14, 2006 for the RMBS identified by CUSIP number 55275NAN1 belonging to MASTR Adjustable Rate Mortgages Trust 2006-OA2 states "[i]t is a condition to the issuance of the offered certificates that they receive the ratings set forth in the table entitled 'The Series 2006-OA2 Certificates' beginning on page S-7 in this prospectus supplement."  Once again, Moody's, S&P, and Fitch assigned the highest investment grade rating, i.e., AAA or its equivalent, to these securities.

   (d) Similarly, the prospectus supplement dated December 20, 2005 for the RMBS identified by CUSIP number 59020UZ57 belonging to Merrill Lynch Mortgage Investors Trust Mortgage Loan Asset –Backed Notes, Series 2005-A9 states "[i]t is a condition of the issuance of the Offered Notes that they be assigned the ratings of 'AAA' by each of Fitch and S&P."  S&P and Fitch assigned the highest investment grade rating, i.e., AAA or its equivalent, to these securities.

   (e) The prospectus supplement dated September 13, 2006 for CMBS CUSIP 07388LAE0 belonging to Bear Stearns Commercial Mortgage Securities Trust 2006-PWR13 states "[i]t is a condition to their issuance that the respective classes of offered certificates receive credit ratings no lower than those shown in that table."  S&P and Fitch assigned the highest investment grade rating, i.e., AAA or its equivalent, to these securities.

(f)  The prospectus supplement dated January 19, 2007 for CMBS CUSIP 61751XAE0 belonging to Morgan Stanley Capital I Trust 2007-TOP25 states "[t]he certificates offered to you will not be issued unless each of the classes of certificates being offered by this prospectus supplement receives the following ratings from Fitch, Inc., and Moody's. . . ."   Moody's and Fitch assigned the highest investment grade rating, i.e., AAA or its equivalent, to these securities.

138.  The prospectuses and prospectus supplements for the other ABS purchased by SERS all contained language concerning the assigned ratings that was substantially similar to that cited in ¶ 137 above.

139.  Additionally, as a general rule, the applicable prospectus for each ABS stated (in a section entitled "Use of Proceeds") that the issuer planned to purchase the mortgages that would constitute the asset pool primarily from the proceeds from the sale of the security.  In other words, the mortgage asset base was to be acquired and created after the security was sold, which in turn would only occur if the one or more of the Defendants had provided the AAA rating necessary for the issuance of the security.  For example:

(a)  The "Use of Proceeds" section of the prospectus supplement dated October 29, 2007 for the RMBS identified by CUSIP number 02151WAA0 belonging to Countrywide Home Loans Servicing LP Mortgage Pass-Through Certificates, Series 2007-OA11 states "[t]he net proceeds to be received from the sale of the securities will be applied by the depositor to the purchase of Trust Fund Assets or will be used by the depositor for general corporate purposes."

(b)  The "Use of Proceeds" section of the the prospectus supplement dated September 28, 2006 for the RMBS identified by CUSIP number 52522DAM3 belonging to

the Lehman XS Trust Mortgage Pass Through-Certificates, Series 2006-16N states "[t]he depositor will apply all or substantially all of the net proceeds from the sale of each series offered hereby and by the prospectus supplement to purchase the Primary Assets, to repay indebtness that has been incurred to obtain funds to acquire the Primary Assets, to establish the Reserve Funds, if any, for the series and to pay costs of structuring and issuing the Securities."

(c)     The "Use of Proceeds" section of the prospectus supplement dated November 14, 2006 for the RMBS identified by CUSIP number 55275NAN1 belonging to MASTR Adjustable Rate Mortgages Trust 2006-OA2 states "[t]he depositor intends to use the net proceeds to be received from the sale of the offered certificates to acquire the Loans and to pay other expenses associated with the pooling of the Loans and the issuance of the certificates."

(d)     The "Use of Proceeds" section of the prospectus supplement dated December 20, 2005 for the RMBS identified by CUSIP number 59020UZ57 belonging to Merrill Lynch Mortgage Investors Trust Mortgage Loan Asset–Backed Notes, Series 2005-A9 states "[t]he net proceeds to be received from the sale of the Securities will be applied by the Depositor to the purchase of Assets, or the payment of the financing incurred in such purchase, and to pay for certain expenses incurred in connection with such purchase of Assets and sale of Securities."

(e)     The "Use of Proceeds" section of the prospectus dated September 13, 2006 for CMBS CUSIP 07388LAE0 belonging to Bear Stearns Commercial Mortgage Securities Trust 2006-PWR13 states "[t]he net proceeds to be received from the sale of the certificates of any series will be applied by us to the purchase of trust assets or will be used by us for general corporate purposes."

(f)     The "Use of Proceeds" section of the prospectus dated January 19, 2007 for CMBS CUSIP 61751XAE0 belonging to Morgan Stanley Capital I Trust 2007-TOP25

states "[w]e will apply the net proceeds of the offering of the certificates towards the simultaneous purchase of the mortgage loans from the mortgage loan sellers and to the payment of expenses in connection with the issuance of the certificates."

140.    The prospectuses and prospectus supplements for the other ABS purchased by SERS all contained language substantially similar to that cited in ¶ 139 above concerning "Use of Proceeds."

141.    Had Defendants not assigned the initial AAA ratings to the ABS described in Exhibits D-1 and D-2, the issuers could not have created the securities as described in the respective prospectuses, let alone sold them.  The AAA ratings were necessary for the ABS to be sold at a price sufficient to generate the proceeds necessary to purchase the planned mortgage pools as described in the relevant prospectuses.  Without the AAA rating, the economic basis for the ABS would have collapsed, as would the entire planned offering for each ABS.  Absent those high ratings, SERS would not have purchased the ABS.

**5.    Ohio Public Employees Deferred Compensation Program**

142.    During the Relevant Period, Deferred Comp purchased ABS in reliance on the inflated and inaccurate AAA credit ratings assigned by the Rating Agencies.  As a result, Deferred Comp has suffered in excess of $19 million in losses thus far.

143.    Deferred Comp purchased numerous ABS during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants at the time of issuance.  Included among these securities were at least 39 RMBS for which Deferred Comp originally paid in excess of $55 million.  These securities have since been downgraded significantly, or have received no ratings change (because of lack of surveillance and monitoring by the Defendants) but have nonetheless lost value.  As a result, Deferred Comp has suffered losses exceeding $18 million in these RMBS as set forth in the table attached as

60

Exhibit E-1.

144.    Deferred Comp also purchased numerous CMBS during the Relevant Period that were given the highest investment grade rating of AAA or its equivalent by one or more of the Defendants.  Included among these securities were at least three CMBS for which Deferred Comp originally paid in excess of $10 million.  These securities have since been downgraded significantly, or have received no ratings change (because of lack of surveillance and monitoring by the Defendants) but have nonetheless lost value.  As a result, Deferred Comp has suffered losses exceeding $800,000 in these CMBS as set forth in the table attached as Exhibit E-2.

145.    The prospectuses for each of the ABS identified in Exhibits E-1 and E-2 stated that the expected initial AAA, or highest investment grade, ratings would be provided by one or more of the Defendants.

146.    As a general rule, the expected initial AAA, or highest investment grade, ratings for these ABS were provided by the Defendants to the issuers before the applicable prospectuses and full supplements were filed with the SEC or otherwise distributed to investors such as Deferred Comp.  In fact, Defendants S&P, Moody's, and Fitch issued "Pre-Sale" reports for CMBS that customarily contained their preliminary ratings.  Commitments for the purchase and sale of these securities were often made based on the information contained in these reports, well ahead of the publication or availability of the respective prospectuses.  Issuers, brokers, underwriters, investment managers, and the Defendants knew that these pre-sale reports influenced purchase decisions in the CMBS marketplace.

147.    The relevant prospectuses for the ABS identified in Exhibits E-1 and E-2 stated that the ABS would not be issued unless at least one or more of the Defendants had

assigned them the highest initial investment grade rating, i.e., AAA (or its equivalent).  The very creation and issuance of the securities depended upon the initial AAA rating by one or more of the Defendants.  For example:

      (a)     The prospectus supplement dated November 28, 2005 for the RMBS identified by CUSIP number 2254W0NT8 belonging to different classes of Credit Suisse First Boston Mortgage-Backed Trust Series 2005-11, states "[i]t is a condition to the issuance of the offered certificates that they be rated as indicated on pages S-8 and S-9 of this prospectus supplement by Standard & Poor's Ratings Services. . . . Moody's Investor Services, Inc. and Fitch."  According to this prospectus supplement, Moody's, Fitch, and S&P assigned these securities the highest investment grade rating, i.e., AAA or its equivalent.

      (b)     The prospectus supplement dated October 25, 2005 for the RMBS identified by CUSIP number 05949CLZ7 belonging to Banc of America Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2005-10 states "[i]t is a condition to the issuance of the Certificates of any Series offered pursuant to this Prospectus and a Prospectus Supplement that they be rated in one of the four highest categories by at least one Rating Agency."  Here, Moody's, Fitch, and S&P provided the initial ratings of AAA or its equivalent.

      (c)     The prospectus dated June 26, 2007 for the RMBS identified by CUSIP number 17312HAF6 belonging to Citicorp Residential Mortgage Trust Series 2007-2 states "[t]he offered Certificates will not be sold unless S&P and Moody's have rated the offered Certificates as shown above."  S&P and Moody's assigned these securities the highest (AAA equivalent) investment grade rating.

      (d)     The prospectus supplement dated October 18, 2007 for the CMBS identified by CUSIP 20173VAC4, Greenwich Capital Commercial Funding Corp. Commercial

Mortgage Trust 2007-GG11 offering states "[i]t is a condition to their issuance that the respective classes of the offered certificates receive credit ratings no lower than those shown in [the above] table.  Each of the rating agencies identified above is expected to perform ratings surveillance with respect to its ratings for so long as the offered certificates remain outstanding." Once again, S&P and Fitch assigned the highest investment grade rating, i.e., AAA or its equivalent, to these securities.

        (e)      The offering memorandum dated July 19, 2007 for the CMBS identified by CUSIP 50177AAC3, LB Commercial Mortgage Trust 2007-C3 states "[i]t is a condition to their issuance that the respective classes of the offered certificates receive credit ratings no lower than those shown in the table on page S-7 of this prospectus supplement." Moody's and S&P assigned the highest investment grade rating, i.e., AAA or its equivalent, to these securities.

        148.    The prospectuses and prospectus supplements for the other ABS purchased by Deferred Comp all contained language concerning the assigned ratings that was substantially similar to that cited in ¶ 147 above.

        149.    Additionally, as a general rule, the applicable prospectus for each ABS stated (in a section entitled "Use of Proceeds") that the issuer planned to purchase the mortgages that would constitute the asset pool primarily from the proceeds from the sale of the security.  In other words, the mortgage asset base was to be acquired and created after the security was sold, which in turn would only occur if the one or more of the Defendants had provided the AAA rating necessary for the issuance of the security.  For example:

        (a)      The "Use of Proceeds" section of the prospectus supplement dated October 25, 2005 for the RMBS identified by CUSIP number 05949CLZ7 belonging to Banc of

America Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2005-10 states "[t]he net proceeds from the sale of each Series of Certificates will be used by the Depositor for the purchase of the Mortgage Loans represented by the Certificates of such Series."

(b)     The "Use of Proceeds" section of the prospectus supplement dated November 28, 2005 for RMBS identified by CUSIP number 2254W0NT8 belonging to different classes of Credit Suisse First Boston Mortgage-Backed Trust Series 2005-11 states "[t]he depositor will apply all or substantially all of the net proceeds from the sale of each series offered by this prospectus and by the related prospectus supplement to purchase the mortgage assets. . . to establish reserve funds, if any, for the series and to pay costs of structuring guaranteeing and issuing the securities."

(c)     The "Use of Proceeds" section of the prospectus dated June 26, 2007 for the RMBS identified by CUSIP number 17312HAF6 belonging to Citicorp Residential Mortgage Trust Series 2007-2 states "CRMSI intends to use net proceeds from the sale of the Certificates to purchase residential mortgage loans and for other general corporate purposes."

(d)     The "Use of Proceeds" section of the prospectus supplement dated October 18, 2007 for CMBS CUSIP 20173VAC4, Greenwich Capital Commercial Mortgage Trust 2007-GG11 offering states "[s]ubstantially all of the proceeds from the sale of the offered certificates will by used by us to purchase the mortgage loans that we will include in the trust and pay expenses incurred in connection with the issuance of the series 2007-GG11 certificates."

(e)     The "Use of Proceeds" section of the offering memorandum dated July 19, 2007 for CMBS CUSIP 50177AAC3, LB Commercial Mortgage Trust 2007-C3 offering states "[t]he net proceeds to be received from the sale of the offered certificates of any series will

64

be applied by us to the purchase of assets for the related trust or will be used by us to cover expenses related to that purchase and the issuance of those certificates."

150.    The prospectuses and prospectus supplements for the other ABS purchased by Deferred Comp all contained language substantially similar to that cited in the foregoing paragraphs concerning "Use of Proceeds."

151.    Had Defendants not assigned the initial AAA ratings to the ABS described in Exhibits E-1 and E-2, the issuers could not have created the securities as described in the respective prospectuses, let alone sold them.  The AAA ratings were necessary for the ABS to be sold at a price sufficient to generate the proceeds necessary to purchase the planned mortgage pools as described in the relevant prospectuses.  Without the AAA rating, the economic basis for the ABS would have collapsed, as would the entire planned offering for each ABS.  Absent those high ratings, Deferred Comp would not have purchased the ABS.

## V.    CLAIMS FOR RELIEF

### COUNT I
### Negligent Misrepresentation

152.    Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

153.    Defendants owed Plaintiffs a duty to act with reasonable care in preparing, assigning, maintaining, and disseminating the AAA credit ratings assigned to each of the securities Plaintiffs purchased during the Relevant Period.

154.    As a result of their failure to manage and/or disclose conflicts of interest arising out of the issuer pays model, their use of faulty models in determining assigned ratings, and their failure to monitor adequately the structured finance securities they rated, Defendants breached their duty to Plaintiffs, assigning and maintaining inaccurate, unjustifiably high credit

65

ratings to the securities set forth in the attached exhibits.

155.    Defendants knew or should have known that their representations concerning the ABS, including the ratings themselves, were materially false or misleading.

156.    Defendants' misrepresentations and omissions were material to investors, including Plaintiffs, in that reasonable investors, including Plaintiffs, would have considered the misrepresented or omitted facts important in making their investment decisions.

157.    In supplying the false and misleading ratings on the securities in which Plaintiffs invested, Defendants knew Plaintiffs and other qualified institutional investors, and their agents, intended to, and did, rely on the ratings in deciding whether to purchase and/or retain the securities and that without those ratings Plaintiffs and other qualified institutional investors never would have acquired and/or retained the securities.

158.    Plaintiffs were part of a limited class of qualified investors to whom Defendants intended their ratings to be supplied as part of the issuance of the securities in which Plaintiffs ultimately invested.

159.    Defendants issued ABS credit ratings during the Relevant Period to provide guidance to investors, including Plaintiffs, in making investment decisions, and Defendants knew Plaintiffs and other investors would rely on those ratings.

160.    In deciding to purchase and/or retain the securities identified in the attached exhibits, Plaintiffs justifiably relied on the false and misleading AAA ratings Defendants supplied.

161.    As a direct, foreseeable, and proximate result of Defendants' negligence in performing their duties, Plaintiffs have suffered significant damages, losing all or part of their investments as a result of their reliance upon Defendants' negligent misrepresentations and

omissions.

162.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II
## Violation of Section 1707.41 of the Ohio Securities Act

163.    Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

164.    The securities Plaintiffs now own were offered for sale pursuant to offering materials that contained false and misleading statements, omitted to state material facts necessary in order to make the statements made not misleading, and contained unfounded and unjustified AAA ratings.

165.    Specifically, the offering materials falsely represented that the securities Plaintiffs purchased had a credit quality consistent with Defendants' criteria for the particular credit ratings assigned.

166.    Succumbing to the conflicts of interest that plagued the issuer pays business model of rating securities, Defendants failed to assign structured finance products the appropriate lower ratings based on those securities' exposure to, among other things, poorly underwritten subprime mortgages and related commercial and consumer credit loans.

167.    Furthermore, the securities did not have the credit quality consistent with Defendants' assigned ratings because, as Defendants knew, the models used to rate the securities did not accurately reflect the credit risks of the underlying collateral.

168.    Additionally, Defendants did not adequately monitor the securities they rated during the Relevant Period, exacerbating the effects of their failure to assign accurate initial ratings.

67

169.     Defendants received substantial profit accruing from the sale to Plaintiffs of the securities identified in the attached exhibits in violation of Section 1707.41 of the Ohio Securities Act.

170.     Defendants' misrepresentations and omissions were material to investors, including Plaintiffs, in that reasonable investors, including Plaintiffs, would have considered the misrepresented or omitted facts important in making their investment decisions.

171.     Plaintiffs reasonably relied on the offering materials, including but not limited to the false representations of credit quality contained therein, in purchasing and holding the securities identified in the attached exhibits during the Relevant Period.  Had Plaintiffs known the truth about the credit quality of those securities, Plaintiffs would not have purchased them.

172.     Defendants' materially misleading statements and omissions were a direct and proximate cause of the losses Plaintiffs suffered.

173.     Plaintiffs commenced this action within two years of when they knew or had reason to know of the facts by reason of which Defendants' actions were unlawful and within five years of the dates of sale of the securities at issue.

174.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial and are entitled to the remedies provided under Section 1707.43 of the Ohio Securities Act.  Pursuant to that Section, Plaintiffs hereby elect to void the sales of securities they purchased during the Relevant Period that are the subject of this suit.

**COUNT III**
**Violation of Section 1707.43 of the Ohio Securities Act**

175.     Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

68

176.    The securities Plaintiffs now own were offered for sale pursuant to offering materials that contained false and misleading statements, omitted to state material facts necessary in order to make the statements made not misleading, and contained unfounded and unjustified ratings.

177.    Specifically, the offering materials falsely represented that the securities Plaintiffs purchased had a credit quality consistent with Defendants' criteria for the particular credit ratings assigned.

178.    Succumbing to the conflicts of interest that plagued the issuer pays business model of rating securities, Defendants failed to assign structured finance products the appropriate lower ratings based on those securities' exposure to, among other things, poorly underwritten subprime mortgages and related commercial and consumer credit loans.

179.    Furthermore, the securities did not have the credit quality consistent with Defendants' assigned ratings because, as Defendants knew, the models used to rate the securities did not accurately reflect the credit risks of the underlying collateral.

180.    Additionally, Defendants did not adequately monitor the securities they rated during the Relevant Period, exacerbating the effects of their failure to assign accurate initial ratings.

181.    Defendants participated in and aided the seller in the sale to Plaintiffs of the securities identified in the attached exhibits in violation of the Ohio Securities Act.

182.    Defendants' misrepresentations and omissions were material to investors, including Plaintiffs, in that reasonable investors, including Plaintiffs, would have considered the misrepresented or omitted facts important in making their investment decisions.

183.    Plaintiffs reasonably relied on the offering materials, including but not

69

limited to the false representations of the credit quality contained therein, in purchasing and holding the securities identified in the attached exhibits during the Relevant Period.  Had Plaintiffs known the truth about the credit quality of those securities, Plaintiffs would not have purchased or retained them.

184.    Defendants' materially misleading statements and omissions were a direct and proximate cause of the losses Plaintiffs have suffered.

185.    Plaintiffs commenced this action within two years of when they knew or had reason to know of the facts by reason of which Defendants' actions were unlawful and within five years of the dates of sale of the securities at issue.

186.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial and are entitled to the remedies provided under Section 1707.43 of the Ohio Securities Act.  Pursuant to that Section, Plaintiffs hereby elect to void the sales of securities they purchased during the Relevant Period that are the subject of this suit.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.    Awarding Plaintiffs rescission of their purchases of the securities at issue;

B.    Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

C.    Awarding Plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

Dated: November 20, 2009

Respectfully submitted,

RICHARD CORDRAY
OHIO ATTORNEY GENERAL

John P. Gilligan (0024542)
250 West Street
Columbus, Ohio 43215
Telephone:  (614) 462-2700
Facsimile:  (614) 462-5135
Email:       jgilligan@szd.com

Trial Attorney for Plaintiffs
Ohio Police & Fire Pension Fund, Ohio
Public Employees Retirement System, State
Teachers Retirement System of Ohio,
School Employees Retirement System of
Ohio, and Ohio Public Employees Deferred
Compensation Program

Of Counsel:

John C. McDonald (0012190)
Matthew L. Fornshell (0062101)
Kevin L. Murch (0066833)
Katherine G. Manghillis (0077307)
SCHOTTENSTEIN ZOX & DUNN CO., LPA
250 West Street
Columbus, Ohio  43215
Telephone:  (614) 462-1087
Facsimile:  (614) 228-4846
Email: jmcdonald@szd.com
        mfornshell@szd.com
        kmanghillis@szd.com


ENTWISTLE & CAPPUCCI LLP
Andrew J. Entwistle (will seek *pro hac vice* admission)
Johnston de F. Whitman, Jr. (will seek *pro hac vice* admission)
Richard W. Gonnello  (will seek *pro hac vice* admission)
Francis P. McConville  (will seek *pro hac vice* admission)
280 Park Avenue, 26th Floor West

New York, New York 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
Email: aentwistle@entwistle-law.com
          jwhitman@entwistle-law.com
          rgonnello@entwistle-law.com
          fmcconville@entwistle-law.com


LIEFF, CABRASER, HEIMANN &
          BERNSTEIN, LLP
Steven E. Fineman (will seek *pro hac vice* admission)
Daniel P. Chiplock (will seek *pro hac vice* admission)
Michael Miarmi (will seek *pro hac vice* admission)
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592
Email: sfineman@lchb.com
          dchiplock@lchb.com
          mmiarmi@lchb.com

Richard M. Heimann (will seek *pro hac vice* admission)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
Email: rheimann@lchb.com


*Special Counsel for Plaintiffs Ohio Police & Fire Pension Fund, Ohio Public Employees*
*Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement*
*System of Ohio, and Ohio Public Employees Deferred Compensation Program*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all issues in this action so triable.

Respectfully submitted,

RICHARD CORDRAY
OHIO ATTORNEY GENERAL

SCHOTTENSTEIN, ZOX & DUNN
        CO., L.P.A.
John P. Gilligan (0024542)
250 West Street
Columbus, Ohio 43215
Telephone:  (614) 462-2700
Facsimile:  (614) 462-5135
Email:        jgilligan@szd.com

*Trial Attorney for Plaintiffs
Ohio Police & Fire Pension Fund, Ohio
Public Employees Retirement System, State
Teachers Retirement System of Ohio, School
Employees Retirement System of Ohio, and
Ohio Public Employees Deferred
Compensation Program*

73