# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

-------------------------------------------------------- x
                    :

OHIO POLICE & FIRE PENSION FUND,  :
OHIO PUBLIC EMPLOYEES RETIREMENT :
SYSTEM, STATE TEACHERS             :
RETIREMENT SYSTEM OF OHIO,       :
SCHOOL EMPLOYEES RETIREMENT     :
SYSTEM OF OHIO, and OHIO PUBLIC    :
EMPLOYEES DEFERRED             :
COMPENSATION PROGRAM,        :
                    :     Civil Action No. 2:09-cv-1054
                    :
            Plaintiffs,   :     Judge Graham
                    :     Magistrate Judge Kemp
         v.            :

STANDARD & POOR'S FINANCIAL    :
SERVICES LLC, THE MCGRAW-HILL   :
COMPANIES, INC., MOODY'S CORP.,  :
MOODY'S INVESTORS SERVICE, INC.,  :
and FITCH, INC.,               :
                    :
            Defendants.  :
                    :
-------------------------------------------------------- x

## THE RATING AGENCIES' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Floyd Abrams (admitted *pro hac vice*)
S. Penny Windle (admitted *pro hac vice*)
Tammy L. Roy (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Counsel for Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC*

Drew H. Campbell (0047197)
BRICKER & ECKLER LLP
100 South Third Street
Columbus, Ohio 43215-4291
Telephone:  (614) 227-2319
Facsimile:  (614) 227-2390

*Trial Counsel for Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC*

James J. Coster (admitted *pro hac vice*)
Joshua M. Rubins (admitted *pro hac vice*)
SATTERLEE STEPHENS BURKE & BURKE
LLP
230 Park Avenue, 11th Floor
New York, New York 10169
Telephone:  (212) 818-9200
Facsimile:  (212) 818-9606

*Counsel for Defendants Moody's Corp. and
Moody's Investors Service, Inc.*

Michael H. Carpenter
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: (614) 365-4100
Facsimile: (614) 365-9145

*Trial Counsel for Defendants Moody's
Corp. and Moody's Investors Service, Inc.*

Martin Flumenbaum (*pro hac vice* to be
submitted)
Roberta A. Kaplan (*pro hac vice* to be submitted)
Julia Tarver Mason (*pro hac vice* to be submitted)
Tobias J. Stern (*pro hac vice* to be submitted)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-373-3000
Facsimile:  212-757-3990

*Counsel for Defendant Fitch, Inc.*

Thomas D Warren
BAKER & HOSTETLER LLP
3200 National City Center
1900 East 9th Street
Cleveland, Ohio 44114-3485
Telephone: (216) 621-0200
Facsimile:  (216) 696-0740

*Trial Counsel for Defendant Fitch, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS.............................................................................. 6

STANDARD OF REVIEW.............................................................................. 8

ARGUMENT.................................................................................................... 9

I. THE FIRST AMENDMENT BARS PLAINTIFFS' CLAIMS ................................................. 9

Credit ratings are "protected expression[s] of opinion" that are absolutely immunized from liability. Since Plaintiffs' claims here are predicated on the purported "falsity" of the Rating Agencies' ratings, which are, as a matter of law, predictive opinions that cannot be proven "false," these claims must be dismissed on that ground alone. The Rating Agencies' ratings of publicly-offered, registered securities are likewise protected under the "actual malice" standard of First Amendment jurisprudence, which Plaintiffs do not satisfy.

Principal Authorities: *Compuware Corp.* v. *Moody's Investors Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007); *Jefferson County Sch. Dist. No. R-1* v. *Moody's Investor's Servs., Inc.*, 175 F.3d 848 (10th Cir. 1999); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742 (S.D. Tex. 2005); *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964); *Time, Inc.* v. *Hill*, 385 U.S. 374 (1967); *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009).

II. THE CRARA PREEMPTS PLAINTIFFS' CLAIMS.............................................................. 14

Plaintiffs allege that the Rating Agencies "should have" used different methodologies and models in rating the securities at issue. Yet, the broad language of the Credit Rating Agency Reform Act of 2006 provides that the U.S. Securities and Exchange Commission ("SEC") "shall have exclusive authority" to regulate the Rating Agencies and that "neither the [SEC] nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies" by which such ratings are created. Courts have repeatedly recognized that this type of language preempts state law, including litigation based on state statutory and common law claims such as those Plaintiffs assert here. Plaintiffs' claims are thus preempted by federal law.

Principal Authorities: 15 U.S.C. § 78o-7(c)(1)-(2); *Train* v. *Colo. Pub. Interest Research Group, Inc.*, 426 U.S. 1 (1976); *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559 (1996); *City of Cleveland* v. *Ameriquest Mortgage Sec., Inc.*, 621 F. Supp. 2d 513 (N.D. Ohio 2009); *Riegel* v. *Medtronic, Inc.*, 552 U.S. 312 (2008).

III. PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED UNDER EITHER NEW YORK OR OHIO LAW ............................................................ 21

    A.  New York Law Applies to Plaintiffs' Negligent Misrepresentation Claim .................... 22

Ohio's choice-of-law principles strongly counsel the application of New York law to Plaintiffs' claims.  Specifically, all three Rating Agencies are based in New York, any representations on which Plaintiffs relied would have been made in New York, and the markets for the securities Plaintiffs purchased are dominated by New York-based investment banks.

Principal Authorities: Restatement (Second) of Conflict of Laws § 148 (1971); *Jamhour* v. *Scottsdale Ins. Co.*, 211 F. Supp. 2d 941 (S.D. Ohio 2002); *In re Nord Res. Corp. Sec. Litig.*, Nos. C-3-90-380, C-3-90-391, C-3-90-409, C-3-90-410, 1992 WL 1258516 (S.D. Ohio Dec. 16, 1992).

    B.  New York's Martin Act Preempts Plaintiffs' Negligent Misrepresentation Claim .......... 24

Plaintiffs' negligent misrepresentation claim, premised on securities transactions "within or from" New York, falls squarely within the purview of New York's Martin Act.  Because there is no private right of action under the Martin Act, this claim is preempted by New York law.

Principal Authorities: N.Y. Gen. Bus. Law § 352-c; *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009); *CPC Int'l Inc.* v. *McKesson Corp.*, 514 N.E.2d 116 (N.Y. 1987); *Horn* v. *440 East 57th Co.*, 547 N.Y.S.2d 1 (App. Div. 1st Dep't 1989).

    C.  Plaintiffs Have Not Pled Facts Sufficient to Sustain a Claim of Negligent Misrepresentation Under New York or Ohio Law ......................................................... 26

        1.  Plaintiffs Fail to Allege Facts Giving Rise to the Requisite Duty .............................. 27

Plaintiffs' negligent misrepresentation claim must be dismissed because, under both New York and Ohio law, Plaintiffs fail to allege facts establishing any relationship with the Rating Agencies that gives rise to the requisite duty.

        (a)  Defendants Did Not Owe Plaintiffs a Duty Under New York Law .................... 29

Under New York law, a plaintiff must allege a "special relationship," consisting of some form of privity or near-privity, with the defendant in order to maintain a cause of action for negligent misrepresentation.  Plaintiffs fail to satisfy this requirement, as they do not allege any contact with the Rating Agencies.  Nor does the Complaint allege that the Rating Agencies were aware that *these specific Plaintiffs* were interested in *these specific securities*.  New York courts have consistently rejected the notion that providers of financial information such as credit rating agencies assume a duty of care to investors

and others who—notwithstanding the absence of any direct contact or special relationship—claim reliance on allegedly erroneous information or opinions.

Principal Authorities: *Hydro Investors, Inc.* v. *Trafalgar Power, Inc.*, 227 F.3d 8 (2d Cir. 2000); *Parrott* v. *Coopers & Lybrand, L.L.P.*, 95 N.Y.2d 479 (2000); *Ossining Union Free Sch. Dist.* v. *Anderson LaRocca Anderson*, 73 N.Y.2d 417 (1989); *M&T Bank Corp.* v. *Gemstone CDO VII, Ltd.*, 891 N.Y.S.2d 578 (App. Div. 4th Dep't 2009).

(b) Defendants Did Not Owe Plaintiffs a Duty Under Ohio Law ............................. 33

Ohio law is equally clear that where a plaintiff, not in privity with the defendant, claims reliance on ratings or other public statements disseminated to hundreds of thousands of potential investors, there cannot be liability for negligent misrepresentation. Recognizing the same public policy concerns articulated by New York courts, courts in Ohio restrict potential liability for negligent misrepresentation to "a special limited class (or group) of foreseeable persons" as set forth in Restatement (Second) of Torts § 552.

Principal Authorities: *Federated Mgmt. Co.* v. *Coopers & Lybrand*, 738 N.E.2d 842 (Ohio Ct. App. 10th Dist. 2000); *Gutter* v. *Dow Jones, Inc.*, 490 N.E.2d 898 (Ohio 1986).

2. The Defendants' Credit Ratings Are Not Actionable False Statements ..................... 35

A necessary element to a negligent misrepresentation action under both New York and Ohio law is proof that defendants made material misrepresentations of fact. Because the Rating Agencies' ratings are predictive opinions, not statements of fact, they do not constitute actionable misrepresentations.

Principal Authorities: *Grammar* v. *Turits*, 706 N.Y.S.2d 453 (App. Div. 2d Dep't 2000); *Telxon Corp.* v. *Smart Media of Del., Inc.*, Nos. 22098, 22099, 2005 WL 2292800 (Ohio Ct. App. 9th Dist. Sept. 21, 2005); *CAN Reins. of London Ltd.* v. *Home Ins. Co.*, No. 85 CIV. 5681 (JFK), 1990 WL 3231 (S.D.N.Y. Jan. 10, 1990); *Kondrat* v. *Morris*, 692 N.E.2d 246 (Ohio Ct. App. 8th Dist. 1997); *Compuware Corp.* v. *Moody's Investors Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007).

3. Plaintiffs Have Not Pled Loss Causation ................................................................. 37

Plaintiffs have failed to plead loss causation under either New York or Ohio law. Plaintiffs have failed to plead any connection between the Rating Agencies' alleged misrepresentations and any theoretical loss purportedly suffered by Plaintiffs. Nor do Plaintiffs plead any facts alleging how their purported "losses" actually occurred, much less how they were precipitated by the Rating Agencies' conduct and not other market forces—most notably, the precipitous collapse of the U.S. housing market and the ensuing global credit market crisis.

Principal Authorities: *Laub* v. *Faessel*, 745 N.Y.S.2d 534 (App. Div. 1st Dep't 2002); *Leal* v. *Holtvogt*, 702 N.E.2d 1246 (Ohio Ct. App. 2d Dist. 1998); *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2007 WL 1087605 (N.D. Ohio Apr. 9, 2007); *Dura Pharm.* v. *Broudo*, 544 U.S. 336 (2005).

4. Plaintiffs Do Not Plead Justifiable Reliance ............................................................ 42

Plaintiffs have failed to plead justifiable reliance under New York law because they do not and cannot allege that there was a "special relationship of trust or confidence" between the parties, nor do they allege that the Rating Agencies issued their ratings "for the purpose" of inducing these particular Plaintiffs to rely upon them. Likewise, under Ohio law, Plaintiffs have not pled justifiable reliance because they do not allege that the Rating Agencies' ratings were Plaintiffs' *sole* source of information concerning the securities.

Principal Authorities: *Kimmell* v. *Schaefer*, 675 N.E.2d 450 (N.Y. 1996); *Davis* v. *Monterey*, 880 N.E.2d 488 (Ohio Ct. App. 7th Dist. 2007); *Quinn* v. *McGraw-Hill Cos.*, 168 F.3d 331 (7th Cir. 1999).

D. Plaintiffs' Negligent Misrepresentation Claim Is Time-Barred........................................ 45

Plaintiffs' negligent misrepresentation claim is also barred in substantial part by: (i) the three-year statute of limitations applicable to negligent misrepresentation claims under New York law; or (ii) the four-year statute of limitations applicable under Ohio law. Moreover, should the Court apply Ohio law, the two-year "discovery" statute of limitations provided under the Ohio Securities Laws would control Plaintiffs' negligent misrepresentation claim.

Principal Authorities: *Colon* v. *Banco Popular N. Am.*, 874 N.Y.S.2d 44 (App. Div. 1st Dep't 2009); *Schnippel Constr., Inc.* v. *Profitt*, No. 17-09-12, 2009 WL 3720585 (Ohio Ct. App. Nov. 9, 2009); *Metz* v. *Unizan Bank*, No. 5:05 CV 1510, 2008 WL 2017574 (N.D. Ohio May 7, 2008).

IV. PLAINTIFFS' OHIO BLUE SKY CLAIMS MUST BE DISMISSED ............................... 49

A. Plaintiffs' Blue Sky Claims Must Be Dismissed for the Same Reasons Plaintiffs'
   Negligent Misrepresentation Claim Fails ...................................................................... 49

For the reasons previously outlined, Plaintiffs' Ohio Blue Sky claims are preempted by federal law and time-barred. These claims also fail because Plaintiffs do not adequately plead either a material misstatement of fact or reasonable reliance.

Principal Authorities: Ohio Rev. Code §§ 1707.41, 1707.43; *Citizens Nat'l Bank* v. *Barge-In, Inc.*, No. CA83-07-008, 1984 WL 3429 (Ohio Ct. App. 12th Dist. Sept. 28, 1984).

B. The Requisite Nexus Between the Rating Agencies' Alleged Conduct and the Sale of
   Securities in Ohio Is Not—and Cannot Be—Pled ........................................................ 50

Plaintiffs' Blue Sky claims should be dismissed for the additional reason that Plaintiffs do not and cannot allege that any nexus exists between Ohio and the Rating Agencies' ratings of the securities at issue—much less a nexus sufficient to warrant application of Ohio's Blue Sky laws.

<u>Principal Authorities</u>: *Martin* v. *Steubner*, 485 F. Supp. 88 (S.D. Ohio 1979); *In re Revco Sec. Litig.*, No. 89CV593, 1991 WL 353385 (N.D. Ohio Dec. 12, 1991).

C.   Plaintiffs Fail to Allege that the Rating Agencies Offered Securities for Sale ................. 51

Plaintiffs' Blue Sky claims also fail as a matter of law because Plaintiffs have failed to allege that the Rating Agencies engaged in any acts relating to the "sale" of securities.

<u>Principal Authorities</u>: Ohio Rev. Code § 1707.41; *Boomershine* v. *Lifetime Capital, Inc.*, No. 22179, 2008 WL 54803 (Ohio Ct. App. 2d Dist. Jan. 4, 2008); *Pinter* v. *Dahl*, 486 U.S. 622 (1988); *In re Lehman Bros. Sec. and ERISA Litig.*, No. 09 MD 2017(LAK), 2010 WL 337997 (S.D.N.Y. Feb 1, 2010).

D.   Plaintiffs' Section 1707.43 Claim Fails Because No Violation of the Statute Is Alleged Against a Seller ........................................................................................................... 55

Plaintiffs' claim under § 1707.43 fails for the separate reason that Plaintiffs have failed to allege a substantive, primary violation of the Ohio securities laws.

<u>Principal Authorities</u>: Ohio Rev. Code § 1707.43; *Hardin* v. *Reliance Trust Co.*, No. 1:04 CV 02079, 2006 WL 2850455 (N.D. Ohio Sept. 29, 2006).

E.   Plaintiffs Fail to Allege that the Rating Agencies Participated or Aided Such Sale ......... 56

Even if a seller's violation of Chapter 1707 had been properly alleged—which it has not—Plaintiffs do not and cannot allege that the Rating Agencies "participated in or aided the seller . . . in making such sale." Plaintiffs' claim under § 1707.43 accordingly fails for this reason.

<u>Principal Authorities</u>: Ohio Rev. Code § 1707.43; *Boomershine* v. *Lifetime Capital, Inc.*, No. 22179, 2008 WL 54803 (Ohio Ct. App. 2d Dist. Jan. 4, 2008).

CONCLUSION ...................................................................................................................... 59

## Table of Authorities

**Page(s)**

### CASES

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009) ............................................................. 2, 12, 13, 24

*Ackerman* v. *Schwartz*,
    733 F. Supp. 1231 (N.D. Ind. 1989), *rev'd on other grounds*, 947 F.2d 841 (7th
    Cir. 1991) ...................................................................................................................57

*AES Sparrows Point LNG, LLC* v. *Smith*,
    527 F.3d 120 (4th Cir. 2008) ......................................................................................17

*AG Capital Funding Partners, L.P.* v. *State St. Bank & Trust Co.*,
    5 N.Y.3d 582 (2005).....................................................................................................30

*AIG Global Sec. Lending Corp.* v. *Banc of Am. Sec. LLC*,
    646 F. Supp. 2d 385 (S.D.N.Y. 2009) .........................................................................41

*Amann* v. *Clear Channel Commc'ns, Inc.*,
    846 N.E.2d 95 (Ohio Ct. App. 1st Dist. 2006)............................................................33

*Amerifast Sav. Bank of Xenia* v. *Krug*,
    737 N.E.2d 68 (Ohio Ct. App. 2d Dist. 1999) ....................................................43, 44-45

*Ashcroft* v. *Iqbal*,
    556 U.S. ___, 129 S. Ct. 1937 (2009) ...................................................................8, 34

*Bastien* v. *AT&T Wireless Servs., Inc.*,
    205 F.3d 983 (7th Cir. 2000) ......................................................................................18

*Beaver County Ret. Bd.* v. *LCA-Vision Inc.*,
    No. 1:07-CV-750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009).....................................6

*Bell Atl. Corp.* v. Twombly,
    550 U.S. 544 (2007) ......................................................................................................8

*Bennett* v. *U.S. Trust Co. of N.Y.*,
    770 F.2d 308 (2d Cir. 1985)........................................................................................41

*BMW of N. Am., Inc.* v. *Gore*,
    517 U.S. 559 (1996) ...............................................................................................2, 18

*Boomershine* v. *Lifetime Capital, Inc.*,
   No. 22179, 2008 WL 54803 (Ohio Ct. App. 2d Dist. Jan 4, 2008) ..........................52, 56

*Bose Corp.* v. *Consumer Union of United States, Inc.*,
   466 U.S. 485 (1984) ..................................................................................................11

*Brown* v. *Earthboard Sports USA, Inc.*,
   481 F.3d 901 (6th Cir. 2007) ....................................................................................17

*Brug* v. *Enstar Group, Inc.*,
   755 F. Supp. 1247 (D. Del. 1991) .............................................................................33

*Buford White Lumber Co. Profit Sharing & Sav. Plan & Trust* v. *Octagon Props. Ltd.*,
   740 F. Supp. 1553 (W.D. Okla. 1989).....................................................................53-54

*CAN Reins. of London Ltd.* v. *Home Ins. Co.*,
   No. 85 CIV. 5681 (JFK), 1990 WL 3231 (S.D.N.Y. Jan. 10, 1990)..............................36

*Castellano* v. *Young & Rubicam, Inc.*,
   257 F.3d 171 (2d Cir. 2001)......................................................................................25

*Church of Scientology Int'l* v. *Behar*,
   238 F.3d 168 (2d Cir. 2001)....................................................................................11-12

*Cisneros* v. *Alpine Ridge Group*,
   508 U.S. 10 (1993) ....................................................................................................18

*Citizens Nat'l Bank* v. *Barge-In, Inc.*,
   No. CA83-07-008, 1984 WL 3429 (Ohio Ct. App. 12th Dist. Sept. 28, 1984)...............50

*City of Cleveland* v. *Ameriquest Mortgage Sec., Inc.*,
   621 F. Supp. 2d 513 (N.D. Ohio 2009) ..................................................................2, 18

*Cleveland Clinic Found.* v. *Commerce Group Benefits, Inc.*,
   No. 79907, 2002 WL 485764 (Ohio Ct. App. 8th Dist. Mar. 28, 2002) ........................37

*Colon* v. *Banco Popular N. Am.*,
   874 N.Y.S.2d 44 (App. Div. 1st Dep't 2009) ..............................................................45

*Compuware Corp.* v. *Moody's Investors Servs., Inc.*,
   222 F.R.D. 124 (E.D. Mich. 2004).........................................................................23-24

*Compuware* v. *Moody's Investors Servs., Inc.*,
   499 F.3d 520 (6th Cir. 2007) .............................................................................passim

*County of Orange* v. *McGraw Hill Cos.*,
   245 B.R. 151 (C.D. Cal. 1999)...................................................................................12

vii

*CPC Int'l Inc.* v. *McKesson Corp.*,
    514 N.E.2d 116 (N.Y. 1987)..............................................................................3, 25

*Crigger* v. *Fahnestock & Co., Inc.*,
    No. 01 Civ. 07819(JFK), 2003 WL 22170607 (S.D.N.Y. Sept. 18, 2003) .....................31

*Davis* v. *Montenery*,
    880 N.E.2d 488 (Ohio Ct. App. 7th Dist. 2007) ...........................................................4,43

*DeBlasio* v. *Merrill Lynch & Co.*,
    No. 07 Civ 318(RJS), 2009 WL 2242605 (S.D.N.Y. July 27, 2009)...................31, 42-43

*Dorchester Investors* v. *Peak Int'l Ltd.*,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001) ...........................................................................53

*Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985) .......................................................................................................11

*Dura Pharm.* v. *Broudo*,
    544 U.S. 336 (2005) .......................................................................................................40

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    511 F. Supp. 2d 742 (S.D. Tex. 2005)..................................................................passim

*In re Enron Corp. Sec., Derivative & "Erisa" Litig.*,
    No. MDL1446, CIV.A. H-01-3624, CIV.A. H-02-3185, 2003 WL 23305555...............25

*Federated Mgmt. Co.* v. *Coopers & Lybrand*,
    738 N.E.2d 842 (Ohio Ct. App. 10th Dist. 2000) .................................................3, 33, 51

*Field* v. *Mans*,
    516 U.S. 59 (1995) .........................................................................................................45

*First Energy Leasing Corp.* v. *Attorney-General*,
    68 N.Y.2d 59 (1986)........................................................................................................25

*First Equity Corp. of Fl.* v. *Standard & Poor's Corp.*,
    690 F. Supp. 256 (S.D.N.Y. 1988)..................................................................................12

*First Equity Corp. of Fl.* v. *Standard & Poor's Corp.*,
    869 F.2d 175 (2d Cir. 1989).......................................................................................29-30

*Floor Craft Floor Covering, Inc.* v. *Parma Comm. Gen. Hosp. Ass'n*,
    560 N.E.2d 206 (Ohio 1990)...........................................................................................34

*Freeman* v. *Burlington Broadcasters, Inc.*,
    204 F.3d 311 (2d Cir. 2000)............................................................................................17

*George Backer Mgmt. Corp.* v. *Acme Quilting Co.*,
    385 N.E.2d 1062 (N.Y. 1978) ..................................................................................36

*Ginsburg* v. *Agora Inc.*,
    915 F. Supp. 733 (D. Md. 1995) ............................................................................33

*Glidepath Holding B.V.* v. *Spherion Corp.*,
    590 F. Supp. 2d 435 (S.D.N.Y. 2007) ...................................................................41

*Goldberg* v. *Cohen*,
    No. 01-CA-49, 2002 WL 1371031 (Ohio Ct. App. 7th Dist. June 13, 2002)..................46

*Grammar* v. *Turits*,
    706 N.Y.S.2d 453 (App. Div. 2d Dep't 2000) .......................................................35

*Granite Partners, L.P.* v. *Bear, Stearns & Co.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998) ............................................................24, 25

*Gustafson* v. *Alloyd Co.*,
    513 U.S. 561 (1995) ...........................................................................................13

*Gutter* v. *Dow Jones, Inc.*,
    490 N.E.2d 898 (Ohio 1986) ..................................................................3, 33, 34

*Hainbuchner* v. *Miner*,
    No. 1558, 1986 WL 3205 (Ohio Ct. App. 11th Dist. Mar. 14, 1986), *aff'd*, 509
    N.E.2d 424 (Ohio 1987) ......................................................................................52

*Hall* v. *Geiger-Jones Co.*,
    242 U.S. 539 (1917) ...........................................................................................51

*Hardin* v. *Reliance Trust Co.*,
    No. 1:04 CV 02079, 2006 WL 2850455 (N.D. Ohio Sept. 29, 2006)............................55

*Hater* v. *Gradison Div. of McDonald & Co. Sec. Inc.*,
    655 N.E.2d 189 (Ohio Ct. App. 1st Dist. 1995)....................................................46

*Heftel* v. *Gen. Motors Corp.*,
    Civ. A. No. 85-1713, 1988 WL 19615 (D.D.C. Feb. 23, 1988) ...................................19

*Hild* v. *Woodcrest Ass'n*,
    59 Ohio Misc. 13 (Ct. Com. Pl. 1977).................................................................57

*Hilton* v. *Guyot*,
    159 U.S. 113 (1895) ...........................................................................................51

*Horn* v. *440 East 57th Co.*,
    547 N.Y.S.2d 1 (App. Div. 1st Dep't 1989) ....................................................25

*Hustler Magazine* v. *Falwell*,
    485 U.S. 46 (1988) ..........................................................................................11

*Hydro Investors, Inc.* v. *Trafalgar Power, Inc.*,
    227 F.3d 8 (2d Cir. 2000) ............................................................... 3, 26, 29

*Immuno AG* v. *Moor-Jankowski*,
    567 N.E.2d 1270 (N.Y. 1991), *cert. denied*, 500 U.S. 954 (1991) ...................9

*In re Imperial Credit Indus. Inc.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) .......................................................39

*In re Infocure Sec. Litig.*,
    210 F. Supp. 2d 1331 (N.D. Ga. 2002).........................................................53

*Jaillet* v. *Cashman*,
    189 N.Y.S. 743 (Sup. Ct. 1921), *aff'd mem.*, 194 N.Y.S. 947 (App. Div. 1st Dep't
    1922), *aff'd mem.*, 235 N.Y. 511 (1923) .....................................................30

*Jamhour* v. *Scottsdale Ins. Co.*,
    211 F. Supp. 2d 941 (S.D. Ohio 2002).........................................................23

*Jefferson County Sch. Dist. No. R-1* v. *Moody's Investors Servs., Inc.*,
    175 F.3d 848 (10th Cir. 1999)................................................................10,36

*Johnson v. Church of the Open Door*,
    902 N.E.2d 1002 (Ohio Ct. App. 9th Dist. 2008) ....................................43-44

*Johnson* v. *Ventra Group, Inc.*,
    191 F.3d 732 (6th Cir. 1999) ......................................................................22

*Katz* v. *Genninger*,
    No. C-840219, 1985 WL 9294 (Ohio Ct. App. 1st Dist. Jan. 31, 1985).....................46-47

*Kimmell* v. *Schaefer*,
    675 N.E.2d 450 (N.Y. 1996)................................................................ 32, 42, 43

*Kondrat* v. *Morris*,
    692 N.E.2d 246 (Ohio Ct. App. 8th Dist. 1997) ...........................................36

*Lasher* v. *Albion Cent. Sch. Dist.*,
    833 N.Y.S.2d 791 (App. Div. 4th Dep't 2007)...............................................45

*Laub* v. *Faessel*,
    745 N.Y.S.2d 534 (App. Div. 1st Dep't 2002) ........................................................ passim

*Leal* v. *Holtvogt*,
    702 N.E.2d 1246 (Ohio. Ct. App. 2d Dist. 1998) ........................................................ 4, 37

*In re Lehman Bros. Sec. & ERISA Litig.*,
    No. 09 MD 2017(LAK), 2010 WL 337997 (S.D.N.Y. Feb. 1, 2010) ............................ 54

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................................................ 40

*Lewis* v. *Horace Mann Ins. Co.*,
    410 F. Supp. 2d 640 (N.D. Ohio 2005) ......................................................................... 22

*Leykin* v. *AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 Fed. Appx. 14 (2d Cir. 2007) ........ 40-41

*Lilly, Jr.* v. *Hewlett-Packard Co.*,
    No. 1:05-CV-465, 2006 WL 1064063 (S.D. Ohio Apr. 21, 2006) ................................. 38

*Lowe* v. *Sec. & Exch. Comm'n*,
    472 U.S. 181 (1985) ........................................................................................................ 10

*M&T Bank Corp.* v. *Gemstone CDO VII, Ltd.*,
    891 N.Y.S.2d 578 (App. Div. 4th Dep't 2009) ........................................................... 31-32

*Martin* v. *Steubner*,
    485 F. Supp. 88 (S.D. Ohio 1979) ............................................................................. 51, 55

*Mendes* v. *Medtronic, Inc.*,
    18 F.3d 13 (1st Cir. 1994) .............................................................................................. 18

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) ........................................................................... 39

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ........................................................................... 40

*Metz* v. *Unizan Bank*,
    No. 5:05 CV 1510, 2008 WL 2017574 (N.D. Ohio May 7, 2008) ............................ 45-46

*Miami Valley Paper, LLC* v. *Lebbing Eng'g & Consulting Gmbh*,
    No. 1:05-CV-00702, 2009 WL 818618 (S.D. Ohio Mar. 26, 2009) ............................... 36

*Murphy* v. *Stargate Def. Sys. Corp.*,
No. 1:05 CV 2121, 2006 WL 721746 (N.D. Ohio Mar. 21, 2006), *aff'd in part,*
*rev'd in part on other grounds*, 498 F.3d 386 (6th Cir. 2007)..........................................41

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
541 F. Supp. 2d 986 (S.D. Ohio 2007) ..........................................................................56

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
("*NCFE*"), 580 F. Supp. 2d 630 (S.D. Ohio 2008) ...................................................passim

*Nat'l Mulch & Seed, Inc.* v. *Rexius Forest By-Prods., Inc.*,
No. 2:02-cv-1288, 2007 WL 894833 (S.D. Ohio Mar. 22, 2007)....................................33

*Neff* v. *Standard Fed. Bank*,
No. 2:06-cv-856, 2007 WL 2874794 (S.D. Ohio Sept. 27, 2007) ...................................45

*New Day Farms, LLC* v. *Bd. of Trs. of York Twp., Ohio*,
No. 2:08-cv-01107, 2009 WL 4016480 (S.D. Ohio Nov. 17, 2009)..................................8

*New York Times Co.* v. *Sullivan*,
376 U.S. 254 (1964) ......................................................................................................11

*Nickels* v. *Koehler Mgmt. Corp.*,
541 F.2d 611 (6th Cir. 1976) ........................................................................................50

*In re Nord Res. Corp. Sec. Litig.*,
Nos. C-3-90-380, C-3-90-391, C-3-90-409, C-3-90-410, 1992 WL 1258516 (S.D.
Ohio Dec. 16, 1992) ......................................................................................................23

*Ossining Union Free Sch. Dist.* v. *Anderson LaRocca Anderson*,
73 N.Y.2d 417 (1989).....................................................................................................30

*Pappas* v. *Harrow Stores, Inc.*,
528 N.Y.S.2d 404 (App. Div. 2d Dep't 1988).................................................................37

*Parkhurst* v. *N. Am. Fin. Servs. Cos. Inc.*,
919 F. Supp. 270 (E.D. Mich. 1996) .............................................................................44

*Parrott* v. *Coopers & Lybrand, LLP*,
95 N.Y.2d 479 (2000)...............................................................................................29, 30

*People* v. *Coventry First LLC*,
No. 0404620/2006, 2007 WL 2905486 (N.Y. Sup. Ct. Sept. 25, 2007), *aff'd*, 861
N.Y.S.2d 9 (App. Div. 1st Dep't 2008).........................................................................26

*Phelps* v. *PNC Bank*,
No. C-000518, 2001 WL 992081 (Ohio Ct. App. 1st Dist. Aug. 31, 2001)....................43

xii

*Pinter* v. *Dahl*,
    486 U.S. 622 (1988) .........................................................................................52-53, 56

*Premier Busn. Group, LLC* v. *Red Bull of N. Am., Inc.*,
    No. 08-CV-01453, 2009 WL 3242050 (N.D. Ohio Sept. 30, 2009) ...............................34

*Premier Capital Mgmt., LLC* v. *Cohen*,
    No. 02 C 5368, 2008 WL 4378300 (N.D. Ill. Mar. 24, 2008) ...................................13-15

*Q & R Assocs., Inc.* v. *Unifi Technical Fabrics, LLC*,
    No. 01 Civ. 641, 2006 WL 2850503 (S.D. Ohio Oct. 3, 2006) .......................................23

*Quinn* v. *McGraw-Hill Cos.*,
    168 F.3d 331 (7th Cir. 1999) .........................................................................................44

*Rego Park Gardens Owners, Inc.* v. *Rego Park Gardens Assoc.*,
    595 N.Y.S.2d 492 (App. Div. 2d Dep't 1993) ................................................................25

*Rendler* v. *Markos*,
    453 N.W.2d 202 (Wis. Ct. App. 1990) ...........................................................................57

*In re Revco Sec. Litig.*,
    No. 89CV593, 1991 WL 353385 (N.D. Ohio Dec 12, 1991) ..........................................51

*Riegel* v. *Medtronic, Inc.*,
    552 U.S. 312, 128 S. Ct. 999 (2008) .........................................................................19-20

*San Diego Bldg. Trades Council* v. *Garmon*,
    359 U.S. 236 (1959) .......................................................................................................18

*Schnippel Constr., Inc.* v. *Profitt*,
    No. 17-09-12, 2009 WL 3720585 (Ohio Ct. App. Nov. 9, 2009)....................................45

*Scottish Heritable Trust, PLC* v. *Peat Marwick Main & Co.*,
    81 F.3d 606 (5th Cir. 1996) ...........................................................................................33

*Sec. Investor Prot. Corp.* v. *BDO Seidman LLP*,
    222 F.3d 63 (2d Cir. 2000) ........................................................................................30-31

*Sedona Corp.* v. *Ladenburg Thalmann & Co., Inc.*,
    No. 03 Civ 3120(LTS)(THK), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) .............25-26

*Sheth* v. *N.Y. Life Ins. Co.*,
    709 N.Y.S.2d 74 (App. Div. 1st Dep't 2000) .................................................................36

*Sotheby's Fin. Servs., Inc.* v. *Baran*,
    107 Fed. Appx. 235 (2d Cir. 2004) ...........................................................................35-36

xiii

*St. Amant* v. *Thompson*,
    390 U.S. 727 (1968) ........................................................................................11

*Stancik* v. *CNBC*,
    420 F. Supp. 2d 800 (N.D. Ohio 2006) ..........................................................34

*Sykes* v. *RFD Third Ave. 1 Assocs., LLC*,
    884 N.Y.S.2d 745 (App. Div. 1st Dep't 2009) ...............................................31

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................40

*Telxon Corp.* v. *Smart Media of Del., Inc.*,
    Nos. 22098, 22099, 2005 WL 2292800 (Ohio Ct. App. 9th Dist. Sept. 21, 2005)..........35

*Time, Inc.* v. *Hill*,
    385 U.S. 374 (1967) ................................................................................11, 14

*In re Time Warner Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ...............................................................................29

*Train* v. *Colo. Pub. Interest Research Group, Inc.*,
    426 U.S. 1 (1976) ............................................................................................17

*Traveler's Health Assoc.* v. *Virginia*,
    339 U.S. 643 (1950) ........................................................................................51

*Ultramares Corp.* v. *Touche*,
    255 N.Y. 170 (1931).......................................................................................29

*Unicredito Italiano* v. *JPMorgan Chase Bank*,
    No. 02-104 GMS, 2002 WL 1378226 (D. Del. June 26, 2002).....................24

*United States* v. *Poulsen*,
    No. CR2-06-129, 2006 U.S. Dist. LEXIS 68214 (S.D. Ohio Sept. 12, 2006).................35

*Universal Contracting Corp.* v. *Aug*,
    No. C-030719, A-0103486, 2004 WL 3015325 (Ohio Ct. App. 1st Dist. Dec. 30, 2004)........................................................................................................34

*Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) ........................................................................................27

*Vail* v. *The Plain Dealer Publ'g Co.*,
    649 N.E.2d 182 (Ohio 1995), *cert. denied*, 516 U.S. 1043 (1996) ...................9

*Vanguard Mun. Bond Fund, Inc.* v. *Cantor, Fitzgerald L.P.*,
    40 F. Supp. 2d 183 (S.D.N.Y. 1999) ...........................................................................31

*Virtual Countries, Inc.* v. *Republic of S. Afr.*,
    148 F. Supp. 2d 256 (S.D.N.Y. 2001) ....................................................................39-40

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) .........................................................................41

*Water St. Leasehold LLC* v. *Deloitte & Touche LLP*,
    796 N.Y.S.2d 598 (App. Div. 1st Dep't 2005) ............................................................42

*In re Welding Fume Prods. Liab. Litig.*,
    No. 1:03-CV-17000, 2007 WL 1087605 (N.D. Ohio Apr. 9, 2007).............37-38, 39, 41

*Wodek* v. *Brandt Constr., Inc.*,
    No. 2578-M, 1997 WL 148055 (Ohio Ct. App. 9th Dist. Mar. 19, 1997) .....................34

*Wyser-Pratte Mgmt. Co.* v. *Telxon Corp.*,
    No. 5:02CV1105, 2003 WL 25861087 (N.D. Ohio June 4, 2003) .................................46

## CONSTITUTIONAL PROVISIONS

N.Y. Const. art. I, § 8 .............................................................................................................9

Ohio Const. art. I, § 11 ...........................................................................................................9

U.S. Const. amend. I ...................................................................................................... passim

## STATUTES

Credit Rating Agency Reform Act of 2006 ("CRARA"), Pub. L. No. 109-291, 120 Stat.
    1327 (2006).............................................................................................................15

15 U.S.C. § 77d...................................................................................................................13

15 U.S.C. § 78o-7 ........................................................................................................2, 15, 16

N.Y. Gen. Bus. Law § 352-c ..........................................................................................24, 25

Ohio Rev. Code § 1707.01 .................................................................................................52

Ohio Rev. Code § 1707.41 ......................................................................................50, 51, 55-56

Ohio Rev. Code § 1707.43 ............................................................................................ passim

xv

Ohio Rev. Code § 2305.09 ...........................................................................................45

**RULES**

17 C.F.R. 230.144A ....................................................................................................35

Fed. R. Civ. P. 8..........................................................................................................1

Fed. R. Civ. P. 12(b)(6)............................................................................................1, 8

**OTHER AUTHORITIES**

Alan Greenspan, *We Will Never Have a Perfect Model of Risk*, Fin. Times (London),
    Mar. 16, 2008, http://www.ft.com/cms/s/0/edbdbcf6-f360-11dc-b6bc-
    0000779fd2ac.html ...........................................................................................39

Arthur Levitt, Jr., *Conflicts and the Credit Crunch*, Wall St. J., Sept. 9, 2007, at A15 ..............47

Bethany McLean, *The Dangers of Investing in Subprime Debt*, Fortune, Mar. 19, 2007,
    http://money.cnn.com/magazines/fortune/fortune_archive/2007/04/02/8403416/
    index.htm .........................................................................................................47

Complaint, *Nach* v. *Huber*, No. 07-CV-4071 (N.D. Ill. filed July 19, 2007) .............................48

Complaint, *Reese* v. *Bahash*, No. 07-CV-01530 (D.D.C. filed Aug. 28, 2007) .........................48

Complaint, *Teamsters Local 282 Pension Trust Fund* v. *Moody's Corp.*, No. 07-CV-8375
    (S.D.N.Y. filed Sept. 26, 2007)..........................................................................49

Jesse Eisinger, *Overrated*, Portfolio.com, Aug. 13, 2007, http://www.portfolio.com/news-
    markets/ national-news/portfolio/2007/08/13/Moody-Ratings-Fiasco/index.html......46-47

*Measuring the Measurers*, Economist, May 31, 2007, at 42 ......................................................47

Restatement (Second) of Conflict of Laws § 148.............................................................22, 23

Restatement (Second) of Torts § 552.........................................................................26-27, 33

Richard Beales, et al., *Failing Grades?*, Fin. Times (London), May 16, 2007,
    http://www.ft.com/cms/s/0/4cfb5b30-0413-11dc-a931-
    000b5df10621.html?nclick_ check=1 ...................................................................46, 47

*The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets:*
    *Hearing Before the S. Comm. on Banking, Housing & Urban Affairs*, 110th Cong.
    (2007) (statement of Christopher Cox, Chairman, U.S. Securities and Exchange
    Commission) ..................................................................................................16-17

*The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets:*
  *Hearing Before the S. Comm. on Banking, Housing & Urban Affairs*, 110th Cong.
  (2007) (testimony of Michael Kanef)............................................................................48

*The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets:*
  *Hearing Before the S. Comm. on Banking, Housing & Urban Affairs*, 110th Cong.
  (2007) (testimony of Vickie Tillman, Executive Vice President, Standard &
  Poor's) .................................................................................................................47-48

Defendants Standard & Poor's Financial Services LLC, The McGraw-Hill Companies, Inc., Moody's Corp., Moody's Investors Service, Inc.,[1] and Fitch, Inc. ("Fitch," and collectively, the "Rating Agencies" or "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 8 and 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs are five highly-sophisticated public investment funds that collectively have nearly $150 *billion* under management.  They have brought the instant lawsuit seeking to recover $457 million of what they characterize as "losses" arising from over 300 separate investments they made in securities backed by residential and commercial mortgages.  Plaintiffs have chosen not to sue any issuers of these securities, any investment advisors that likely recommended the securities to them, or any mortgage originators who generated these problematic mortgages in the first place.  Instead, Plaintiffs seek to create new law—and ignore clear federal and state statutes—by suing third-party, federally-regulated credit rating agencies who have no relationship with these Plaintiffs and whose only form of "communication" with them was the general publication to the worldwide investing community of forward-looking credit opinions about the securities.  Plaintiffs do not claim that the Rating Agencies acted with "actual malice" or any other fraud-like intent; rather, the crux of their claim is that the Rating Agencies *negligently* failed to anticipate an unprecedented market crisis in their opinions about the creditworthiness of securities that they rated.  Such allegations cannot state a claim under applicable state or federal law.

---

[1]   Because the allegations in the Complaint regarding The McGraw-Hill Companies, Inc. concern its wholly-owned subsidiary, Standard & Poor's Financial Services LLC, we refer to these two Defendants collectively as "S&P." Moody's Investors Service, Inc. is the only Moody's entity engaged in the business of developing and publishing rating opinions, and Moody's Corp., its parent corporation, is incorrectly named as a defendant herein. For purposes of this motion, however, the two Moody's entities are referred to collectively as "Moody's."

*First*, the gravamen of the Complaint is that the Rating Agencies negligently issued "false ratings" concerning certain mortgage-backed securities that Plaintiffs purchased over a period of more than three years.  Yet Plaintiffs ignore the fact that the U.S. Court of Appeals for the Sixth Circuit has held that credit ratings are not statements of fact, but rather statements of opinion, which enjoy absolute protection under the First Amendment.  *Compuware* v. *Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007).  In addition, in *Compuware* and other cases across the country, the Rating Agencies' credit rating opinions have been held to be protected by the "actual malice" standard of the First Amendment and thus not subject to liability absent proof of "actual malice," an allegation conspicuously absent here.  *See, e.g.*, *id.* at 526-28; *see also Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 822 (S.D. Tex. 2005).

*Second*, even if the U.S. Constitution did not bar Plaintiffs' claims, the clear congressional mandate embodied in the Credit Rating Agency Reform Act of 2006 ("CRARA") does so.   In relevant part, the CRARA provides that the United States Securities and Exchange Commission ("SEC") "shall have exclusive authority" to regulate and supervise Rating Agencies and that "neither the [SEC] nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies" by which such ratings are created. 15 U.S.C. § 78o-7(c)(1)-(2).  Congressional mandates such as these repeatedly have been found to preempt common law causes of action such as Plaintiffs' negligent misrepresentation claim, as well as claims under state securities laws.  *See, e.g.*, *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 572 n.17 (1996); *City of Cleveland* v. *Ameriquest Mortgage Sec., Inc.*, 621 F. Supp. 2d 513, 517-18 (N.D. Ohio 2009).

*Third*, Plaintiffs' common law negligent misrepresentation claim fails under both New York and Ohio law.  Under New York law, which should control, Plaintiffs' claim is preempted by a state statute that bars private individuals or entities from asserting such claims—which may be commenced *only* by New York's Attorney General.  *See, e.g.*, *CPC Int'l Inc.* v. *McKesson Corp.*, 514 N.E.2d 116, 118 (N.Y. 1987).  In addition, Plaintiffs' negligent misrepresentation claim fails under both New York and Ohio law because such claims only lie when Plaintiffs can plead—as they cannot here—that they were in a "special relationship" with Defendants or were part of a select, limited group of investors of which Defendants were specifically aware when they issued their credit ratings.  *See, e.g.*, *Hydro Investors, Inc.* v. *Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000); *Gutter* v. *Dow Jones, Inc.*, 490 N.E.2d 898, 900 (Ohio 1986); *Federated Mgmt. Co.* v. *Coopers & Lybrand*, 738 N.E.2d 842, 855-56 (Ohio Ct. App. 10th Dist. 2000).  Although Plaintiffs assert once in their 70-page Complaint that they were "part of a limited class of qualified investors to whom Defendants intended their ratings to be supplied" (Compl. ¶ 158), this *ipse dixit* incantation cannot change the dispositive fact—acknowledged elsewhere in the Complaint—that the ratings at issue were *public* ratings issued to *public* investors worldwide as part of *public* offerings registered with the SEC.  (*Id.* ¶¶ 106, 116, 126, 136, 146, 159.)  Plaintiffs thus cannot adequately allege the special or unique relationship with Defendants necessary to support their claim.

*Fourth*, Plaintiffs have failed adequately to plead the required element of loss causation under New York or Ohio law.  Once again, Plaintiffs assert in boilerplate fashion that they "suffered significant damages" as a "direct, foreseeable, and proximate result of Defendants' negligence" (*Id.* ¶ 161), and that Defendants' "materially misleading statements and omissions were a direct and proximate cause of [their] losses." (*Id.* ¶¶ 172, 184.)  Yet Plaintiffs fail to allege, as they must, *how* their purported "losses" actually occurred and how they were precipitated by the

3

Defendants' conduct rather than other forces affecting the market as a whole—most notably the precipitous collapse of the U.S. housing market and the ensuing global financial crisis.  This failure, too, is fatal to Plaintiffs' claims.  *See, e.g.*, *Laub* v. *Faessel*, 745 N.Y.S.2d 534, 536 (App. Div. 1st Dep't 2002); *Leal* v. *Holtvogt*, 702 N.E.2d 1246, 1254 (Ohio. Ct. App. 2d Dist. 1998).

      *Fifth,* Plaintiffs have failed to plead justifiable reliance under either New York or Ohio law.  New York law requires that in order to rely reasonably on the statements of a third party, there must be a "special relationship of trust or confidence" between the parties and that the Defendant have made the statement "for the express purpose" of inducing the Plaintiff to rely upon it.  *See, e.g.*, *Kimmell* v. *Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996).  There are no such allegations in the Complaint; indeed, the Complaint alleges that the Rating Agencies issued their ratings knowing that the *general public* (not these particular Plaintiffs) would rely thereon and for the purpose of making supposedly lucrative fees from issuers—not in order to induce sales of securities. (Compl. ¶¶ 2, 98, 159.)  Therefore, under New York law, Plaintiffs have not pled justifiable reliance.  Likewise, under Ohio law, Plaintiffs have failed to allege—as they must, but cannot—that Defendants' ratings were their *sole* source of information concerning the securities.  *See, e.g.*, *Davis* v. *Montenery*, 880 N.E.2d 488, 497 (Ohio Ct. App. 7th Dist. 2007).   Indeed, Plaintiffs cite repeatedly to the prospectuses for the securities, which were not created or distributed by the Defendants and certainly represent  independent sources of information about the investments. Hence, their claims fare no better under Ohio law.

      *Sixth*, Plaintiffs' claims are time-barred.  Plaintiffs filed the Complaint on November 20, 2009.  Under New York law, the statute of limitations for Plaintiffs' common law negligent misrepresentation claim is three years—running from the date of Plaintiffs' alleged reliance. Taking Plaintiffs' assertion of reliance at face value, the reliance must have occurred at the time the

securities were first purchased.  Hence, any purchases made before November 20, 2006 are time-barred under New York law.[2]  Under Ohio law, negligent misrepresentation claims must be brought within four years of the alleged misrepresentation.  Therefore, any purchases made in reliance on ratings issued prior to November 20, 2005 are time-barred under Ohio law.  Moreover, under Ohio securities law, both the Ohio securities ("Blue Sky") claims and the related negligent misrepresentation claim are governed by the two-year "discovery" statute of limitations and are thus likewise time-barred, as there was ample information in the public domain by at least November 20, 2007 that put Plaintiffs on notice of their purported claims.  Indeed, the Complaint is replete with references to congressional inquiries and news articles published prior to that date that raise the very issues Plaintiffs seek to litigate here.

*Finally,* Plaintiffs' Blue Sky claims must be dismissed on other grounds as well.  Plaintiffs have failed to assert—and cannot assert—a sufficient nexus between the state of Ohio and the Rating Agencies' conduct with respect to these securities, as required under the Ohio statute.  There is no allegation that the ratings were prepared or issued in Ohio.  Other than the allegation that the Plaintiffs are Ohio entities, the Complaint is devoid of any facts supporting a nexus to Ohio.  In addition, Plaintiffs have failed to allege that Defendants themselves offered any securities for sale or aided others in such a sale.  Hence, Plaintiffs' attempt to bring claims under the Ohio Securities Law must be rejected for these additional reasons, as well.

---

[2]   As explained below, the Complaint is silent with regard to when the securities were purchased.  Instead, the Complaint asserts in a blanket fashion that Plaintiffs purchased the investments "during the period from January 1, 2005 through July 8, 2008."  (Compl. ¶ 1.)

**STATEMENT OF FACTS**[3]

S&P, Moody's, and Fitch are New York-based credit rating agencies registered with the SEC as "nationally recognized statistical rating organizations" ("NRSROs"). (Compl. ¶¶ 26-28, 30.)  Credit ratings issued by NRSROs such as Defendants are, by their nature, "predictive opinion[s]." *Compuware*, 499 F.3d at 529.  The Defendants each published credit ratings to the public regarding the creditworthiness of various asset-backed securities ("ABS"), specifically various MBS ("mortgage-backed securities")—both residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS").[4]  The Complaint concerns Plaintiffs' alleged purchase of various MBS (listed in Exhibits A-1 to E-2 of the Complaint) from January 1, 2005 through July 8, 2008.  (Compl. ¶ 1.)

Plaintiffs' fundamental claim is that the Defendants issued "false and misleading" credit ratings concerning MBS.[5]  (*Id.*)  Plaintiffs contend that the Rating Agencies "succumbed" to a

---

[3]   The facts set forth in this Memorandum are taken from the allegations in the Complaint, which are assumed true only for the purposes of this motion (and many of which will be subject to dispute if this action proceeds), or from documents referred to or incorporated by reference therein and attached as Exhibits to the Declaration of Thomas D. Warren.  *See Beaver County Ret. Bd.* v. *LCA-Vision Inc.*, No. 1:07-CV-750, 2009 WL 806714, at *4 (S.D. Ohio Mar. 25, 2009) (on a motion to dismiss, "if documents are . . . specifically referred to in the complaint, they are considered part of the complaint and a court may consider them").

[4]   ABS are "financial products whose value is derived from and collateralized by (*i.e.*, 'backed' by) the revenue stream flowing from a discrete pool of underlying assets." (Compl. ¶ 31.)  RMBS and CMBS, in particular, are "backed by residential mortgage loans and commercial mortgage loans, respectively." (*Id.*)  An arranger of these MBS (usually an investment bank) packages mortgage loans into a pool and transfers the pool to a bankruptcy remote trust. (*Id.* ¶ 32.)  Working through the trust, the arranger issues securities collateralized by the underlying pool of mortgages, generating different classes of securities with different risk characteristics. (*Id.* ¶¶ 33-34.)  With the proceeds from the issuance, the trust purchases the mortgage loans, thereby obtaining the accompanying right to the interest and principal payments on the loans, and a portion of those interest and principal payments are then used to pay the purchasers of the MBS. (*Id.* ¶ 33.)

[5]   While Plaintiffs claim that Defendants made misrepresentations in addition to the allegedly false ratings, it is only the ratings themselves upon which Plaintiffs allegedly relied in purchasing the securities at issue.  *Compare* Compl. ¶ 155 ("Defendants knew or should have known that their representations concerning the ABS, *including the ratings themselves*, were materially false or misleading" (emphasis added)), *with id.* ¶ 160 ("In deciding to purchase and/or retain the securities identified in the attached exhibits, Plaintiffs justifiably relied on the false and misleading AAA

conflict inherent in the "issuer pays" model—whereby "ABS issuers, rather than investors in the securities" pay the Ratings Agencies to provide opinions about the credit quality of the securities. (*Id.* ¶¶ 6, 52.)  In addition, Plaintiffs allege that the Rating Agencies "failed to monitor adequately the ABS they rated."  (*Id.* ¶ 94.)

Plaintiffs allege that the public prospectuses for the MBS conditioned the issuance of the securities on their obtaining the highest credit ratings from one or more of S&P, Moody's, and Fitch.  (*Id.* ¶¶ 107, 117, 127, 137, 147.)  Notably, however, Plaintiffs *do not* allege that they obtained the ratings directly from the Defendants or otherwise had any form of interaction with any of the Defendants.  Similarly, while Plaintiffs allege that S&P, Moody's, and Fitch were aware that investors generally relied on their credit ratings in purchasing MBS (*Id.* ¶ 98), nowhere does the Complaint allege that Defendants were aware that *these Plaintiffs in particular* relied upon their credit ratings—or that Defendants were aware that Plaintiffs were interested in *the specific securities listed in the Complaint.*

According to the Complaint, Defendants' actions purportedly caused  Plaintiffs "to lose in excess of $457 million" in connection with the MBS at issue  (*Id.* ¶ 9), yet Plaintiffs fail to explain, as they must, how that "loss" is connected in any way to the alleged conduct of the Defendants.  In fact, Plaintiffs' allegations fail to provide *any* information regarding their purchases of the MBS at issue (*i.e.*, when, where, how, or through whom the MBS were purchased), including what role, if any, the Defendants' ratings supposedly played in their investment decisions.  In

---

ratings Defendants supplied.").  Given that the ratings are the only alleged misrepresentations upon which Plaintiffs claim they relied, and given that reliance is a required element of a negligent misrepresentation claim under both New York and Ohio law, and under the Ohio securities statute, the Court need not consider any other alleged misrepresentations.

addition, Plaintiffs fail to allege any information regarding any subsequent sale of these MBS that could have given rise to the losses claimed. Finally, conspicuously absent from the Complaint is any mention of the collapse of the U.S. housing market (and, in turn, the MBS market) in the summer of 2007 or the global credit market crisis that followed.

## **STANDARD OF REVIEW**

As the United States Supreme Court recently affirmed, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint may not rely on mere "labels and conclusions" but, instead, must "contain sufficient factual matter, accepted as true, to 'state a claim . . . that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). A claim may be considered plausible when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough to plead facts that are "'merely consistent with'" liability. *Id.* (quoting *Twombly*, 550 U.S. at 557); *see also New Day Farms, LLC* v. *Bd. of Trs. of York Twp., Ohio*, No. 2:08-cv-01107, 2009 WL 4016480, at *2 (S.D. Ohio Nov. 17, 2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (citing *Iqbal*, 129 S. Ct. at 1949)). Indeed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Plaintiffs' failure to allege key facts renders the Complaint legally deficient, for the reasons outlined below.

## ARGUMENT

### I.
### THE FIRST AMENDMENT BARS PLAINTIFFS' CLAIMS

Each of Plaintiffs' three claims against the Rating Agencies is barred by fundamental principles of constitutional law.  In addition to the host of fatal defects (discussed below) that otherwise require dismissal of the Complaint, the First Amendment provides an independent and dispositive basis for dismissal of Plaintiffs' claims.

Rating agencies gather and analyze information about issuers, form opinions resulting from that analysis, and disseminate their forward-looking opinions to the public.  The rating agencies publish such opinions with respect to hundreds of thousands of financial instruments relating to trillions of dollars of debt each year.  The potential for inhibition of the free flow of information inherent in imposing virtually unlimited liability, in hindsight, for an allegedly "erroneous" or "mistaken" assessment is plain, particularly since the opportunities for backward-looking criticism of the credit ratings (when markets inevitably perform differently than expected) are virtually endless.  Courts have thus consistently held that credit ratings are entitled to broad First Amendment protection.

The Sixth Circuit has held that the Rating Agencies' broadly disseminated opinions, such as those at issue here, enjoy absolute constitutional protection.[6]  In *Compuware*, the Sixth Circuit held that a letter rating of the kind published by the Rating Agencies on the securities at issue

---

[6]   The Rating Agencies' rating opinions are also absolutely protected under the Constitutions of New York (Article I, Sec. 8) and Ohio (Article I, Sec. 11), which provide even more expansive protection for opinion speech than the First Amendment.  *See, e.g.*, *Immuno AG* v. *Moor-Jankowski*, 567 N.E.2d 1270, 1277 (N.Y. 1991), *cert. denied*, 500 U.S. 954 (1991); *Vail* v. *The Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 187 (Ohio 1995) (Wright, J., concurring), *cert. denied*, 516 U.S. 1043 (1996).

here is opinion speech, incapable by its nature of being proven true or false, and is therefore non-actionable:

> A Moody's credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors. *We find no basis upon which we could conclude that the credit rating itself communicates any provably false factual connotation.* Even if we could draw any fact-based inferences from this rating, such inferences could not be proven false because of the inherently subjective nature of Moody's rating calculation.

499 F.3d at 529 (emphasis added) (applying First Amendment to dismiss both contract and defamation claims).[7]  The Tenth Circuit, in *Jefferson County School District No. R-1* v. *Moody's Investors Services, Inc.*, 175 F.3d 848, 855-56 (10th Cir. 1999), adopted precisely the same reasoning, concluding that a rating agency's evaluation of "creditworthiness" is a "protected expression of opinion" that depends on differing views and judgments about the relative importance of various financial factors and is therefore absolutely immunized from liability.  *See also In re Enron*, 511 F. Supp. 2d at 822 ("rating creditworthiness is far from an exact science . . . [and] an evaluation necessarily involves interpretive skills that may produce unverifiable statements of the rater's opinion").  Because Plaintiffs' claims are predicated on the purported "falsity" of credit ratings, which are as a matter of law predictive opinions that cannot be proven "false," the claims must be dismissed on that ground alone.[8]

---

[7]   The Supreme Court has long since confirmed that opinions about marketable securities are no less constitutionally protected than opinions on other subjects.  *Lowe* v. *Sec. & Exch. Comm'n*, 472 U.S. 181, 210 n.58 (1985).

[8]   In *In re National Century Financial Enterprises, Inc., Investment Litigation* ("*NCFE*"), 580 F. Supp. 2d 630 (S.D. Ohio 2008), this Court hesitated to apply the First Amendment on a motion to dismiss because in that case, in striking contrast to this one: (i) the Complaint alleged that the notes "were issued by a privately-held" company pursuant to "private placement memoranda," *id.* at 634, 640; (ii) the Complaint specifically alleged that the offerings were made only to a "select class of *institutional* investors," *id.* at 640 (emphasis added); (iii) the statements at issue were alleged to have appeared *nowhere* except "in the offering materials given to the select class of investors," *id.*; and (iv) the Complaint contained *no* allegations that any of the statements were made public or had any relevance to,

Even if the *Compuware* ruling were less authoritative in its clear holding of absolute protection for ratings, the "actual malice" standard of First Amendment jurisprudence would protect the statements cited in the Complaint.  That standard, first enunciated by the U.S. Supreme Court in *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-80 (1964), supplies the "breathing space" the First Amendment requires for statements to the public on matters of public concern.  *Id.* at 272; *see also In re Enron*, 511 F. Supp. 2d at 822.  In doing so, the actual malice standard bars liability for "*either innocent or negligent misstatement*."  *Time, Inc.* v. *Hill*, 385 U.S. 374, 389 (1967) (emphasis added).

Indeed, under this standard, there can be no liability for an allegedly false statement unless the statement is made "with knowledge that the statement was false or with reckless disregard as to whether or not it was true."  *Hustler Magazine* v. *Falwell*, 485 U.S. 46, 56 (1988).  Recklessness under the actual malice standard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."  *St. Amant* v. *Thompson*, 390 U.S. 727, 731 (1968).  Instead, the standard is a subjective one, requiring the plaintiff to establish that "the defendant in fact entertained serious doubts as to the truth" of his statement.  *Id.*; *see also Bose Corp.* v. *Consumer Union of United States, Inc.*, 466 U.S. 485, 511 n.30 (1984) (there is no "actual malice" unless "the defendant realized that his statement was false or . . . *subjectively* entertained serious doubt as to the truth of his statement" (emphasis added)); *Church of Scientology*

---

or impact on, the broader investment community.  Indeed, in declining to apply the First Amendment, the Court relied solely on *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985), in which the Supreme Court held that there was no "public concern" involved in a private, confidential credit report about the financial condition of a small lumber company that was sent to *five* subscribers. *Id* at 763.  Here, as discussed above, the offerings at issue were public, registered offerings disseminated to investors worldwide.

*Int'l* v. *Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (actual malice requires proof of "speaker's *subjective* doubts about the truth of the publication" (emphasis added)).

This general principle has been consistently applied to credit rating opinions. An alternative holding in *Compuware* was to this effect. *See Compuware*, 499 F.3d at 526-28 (affirming dismissal of claims based on the alleged falsity of a Moody's rating in the absence of actual malice). Still more recently, a federal ruling confirmed that "[i]t is well-established that under typical circumstances, the First Amendment protects rating agencies, subject to an 'actual malice' exception, from liability arising out of their issuance of ratings and reports because their ratings are considered matters of public concern." *Abu Dhabi*, 651 F. Supp. 2d at 175; *see also*, *e.g.*, *In re Enron*, 511 F. Supp. 2d at 825 (failure to allege facts showing that the Rating Agencies "knew or had significant suspicions that their statements were false and thus acted with actual malice" was alternative ground for dismissal of negligent misrepresentation claim); *County of Orange* v. *McGraw Hill Cos.*, 245 B.R. 151, 157 (C.D. Cal. 1999) (finding that "[b]ecause the County alleges harm arising from S&P's expressive activity," *i.e.*, its published credit ratings, "the County must . . . satisfy the heightened pleading standards of the First Amendment"); *First Equity Corp. of Fl.* v. *Standard & Poor's Corp.*, 690 F. Supp. 256, 259-60 (S.D.N.Y. 1988) (dismissing negligence claim with respect to report on bond).

Here, Plaintiffs' claims are explicitly based on the Rating Agencies' ratings of publicly offered, registered securities and thus unequivocally involve matters of public concern. As the Offering Documents make clear, and as Plaintiffs themselves acknowledge in their Complaint, the Rating Agencies' ratings were published in "prospectuses and full supplements" that were "filed with the SEC." (*See, e.g.*, Compl. ¶ 106.) *See also* Warren Decl., Exhs. A-D (excerpts from 1933 Act registration statements and prospectus supplements filed in connection with the offering of an

RMBS listed in Complaint Exhibit A-1 and a CMBS listed in Complaint Exhibit A-2). It is well-settled that the federal securities registration requirements, *e.g.*, the Securities Act of 1933 and regulations promulgated thereunder, pursuant to which these securities were registered, are triggered by *public* offerings. *See Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 571 (1995) ("The primary innovation of the 1933 Act was the creation of federal duties—for the most part, registration and disclosure—*in connection with public offerings*." (emphasis added)); *cf.* 15 U.S.C. § 77d (providing that the registration requirements of the 1933 Act do not apply to "transactions by an issuer not involving any public offering").[9] Plaintiffs also concede that the Rating Agencies' ratings are "used for a variety of purposes *vital to the financial markets*" and are of such public importance that "[m]ost financial institutions in the United States (banks, insurance companies, mutual funds, pension funds) are required by law to incorporate NRSRO ratings in their business decisions." (Compl. ¶ 29 (emphasis added) (internal quotation marks omitted).) Under these circumstances, there can be no question that the credit ratings relating to the securities Plaintiffs purchased, and the public statements about the Rating Agencies' ratings, involve matters of public concern and, accordingly, are entitled to the constitutional protections courts have repeatedly extended to ratings. *In re Enron*, 511 F. Supp. 2d at 825 (applying an actual malice standard because "nationally published credit ratings focus upon matters of public concern").

---

[9]    In *Abu Dhabi*, 651 F. Supp. 2d at 176, the court concluded that "where a rating agency has disseminated their ratings to a select group of investors rather than to the public at large, the rating agency is not afforded the same protection" under the First Amendment. Attempting to exploit this exception, Plaintiffs' Complaint contains the unsupported and self-serving assertion that Plaintiffs "were part of a limited class of qualified investors to whom Defendants intended their ratings to be supplied." (Compl. ¶ 158.) But as noted above, the offering documents for these securities make plain that the securities were offered in registered public offerings. (*See also id.* ¶ 106.) In fact, the very act of registering the securities with the SEC makes the relevant offering documents public. *See Premier Capital Mgmt., LLC* v. *Cohen*, No. 02 C 5368, 2008 WL 4378300, at *4 (N.D. Ill. Mar. 24, 2008)

Yet, Plaintiffs make no attempt to satisfy the actual malice test, alleging only that the Rating Agencies acted *negligently*. (*See, e.g.*, Compl. ¶ 1 (alleging that Rating Agencies "*negligently* assigned" "AAA (or equivalent) credit ratings" (emphasis added)); *id.* ¶ 2 (alleging that the Rating Agencies "*negligently* provided unjustified and inflated ratings" (emphasis added)); *id.* ¶ 161 (referring to the Defendants' alleged "*negligence* in performing their duties" and their alleged "*negligent* misrepresentations and omissions" (emphasis added)).) It is well settled that neither "innocent [n]or negligent misstatements" are actionable, *Time, Inc.*, 385 U.S. at 389, and Plaintiffs' claims against the Rating Agencies must therefore be dismissed.

## II.
## THE CRARA PREEMPTS PLAINTIFFS' CLAIMS

The heart of Plaintiffs' claims against the Rating Agencies is that the credit ratings assigned to certain RMBS and CMBS were supposedly "false and misleading" because "[t]he Rating Agencies did not have adequate credit models to address the risks esoteric structured finance securities presented." (Compl. ¶¶ 1, 82.) Plaintiffs assert that the Rating Agencies' purported failure "to provide accurate ratings or to employ adequate rating methodologies" "arose from the 'issuer pays' model—whereby ABS issuers, rather than investors in the securities, paid the Rating Agencies to provide" ratings. (*Id.* ¶ 6.) In short, Plaintiffs allege that the Rating Agencies "*should have*" used different methodologies and models in rating the RMBS and CMBS at issue, which in turn "*should have*" resulted in different ratings. (*Id.* ¶¶ 82-93 (emphasis added).)

But these very subjects—the methodologies used by the Rating Agencies and the substance of their resulting ratings opinions—are ones that Congress has expressly placed beyond

---

("Registration of securities [under the 1933 Act] ensures that companies file essential facts with the SEC, *which*

14

regulation by state actors, whether through legislation or litigation.   Indeed, in the CRARA, Congress recognized the national importance of ratings and protecting the ability of rating agencies to make their best independent analytical judgment free of concern about later second-guessing if events turn out differently than anticipated.   To address that concern, Congress specifically limited regulation of the credit rating industry solely to the SEC and banned all persons—including the SEC—from regulating the *substance* of ratings and the *methodologies* by which rating agencies formulate their ratings.

The CRARA was enacted in 2006 "[t]o improve ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating agency industry."   Pub. L. No. 109-291, 120 Stat. 1327, 1327 (2006) (Preamble).   It establishes guidelines for registration by rating agencies with the SEC in order to qualify as an NRSRO—*i.e.*, a federally recognized rating agency.   The Act specifies the information to be furnished by a rating agency to the SEC and the public regarding the procedures, policies, and methodologies used in formulating its credit ratings in order to assist the SEC in the oversight role crafted for it by the Legislature.   15 U.S.C. § 78o-7(a)(1)(B).   The CRARA also proscribes certain NRSRO conduct, *e.g.*, *id.* § 78o-7(f)-(i), and grants the SEC the *exclusive* authority to promulgate final rules regarding, *inter alia*, potential conflicts of interest and the potential misuse of non-public information.   *Id.* § 78o-7(c), (d), (g)-(i).   Each of the three rating agencies in this case is registered as an NRSRO.   (Compl. ¶ 30.)

---

*then makes these facts public.*" (emphasis added)).

15

The CRARA also contains broad preemption language in service of its overall regulatory goals.  The CRARA provides that:

> The [SEC] shall have *exclusive* authority to enforce the provisions of this section in accordance with this chapter with respect to any [NRSRO], if such [NRSRO] issues credit ratings in material contravention of those procedures relating to such [NRSRO], including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest . . . . *Notwithstanding any other provision of law, neither the* [*SEC*] *nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies* by which any [NRSRO] determines credit ratings.

15 U.S.C. § 78o-7(c)(1)-(2) (emphasis added).

This provision contains two preemption clauses, both of which bear directly on this case.  The first makes clear that the SEC has "exclusive authority" to address situations where an NRSRO is alleged to have issued ratings in "material contravention" of its procedures, including procedures related to the management of conflicts of interest.  The second provides that "notwithstanding" any other law, the substance of ratings and the methodologies used to generate them are not matters for external regulation—even by the SEC.  In other words, the SEC—and the SEC alone—is responsible for regulating an NRSRO's compliance with that NRSRO's procedures, but in order to protect the independence of the rating agencies from the sort of after-the-fact second-guessing that is at the core of this case, Congress concluded that *no one*, including the SEC, may regulate the substance of those procedures or an NRSRO's credit ratings.  As former SEC Chairman Christopher Cox put it in testimony before the Senate Banking Committee, this framework reflects a "balance" between the need for regulatory oversight and the need to preserve the analytical independence of NRSROs so that their rating opinions reflect their own judgment and are not the product of outside influences, whether governmental or otherwise.  *The Role and Impact of Credit*

16

*Rating Agencies on the Subprime Credit Markets:  Hearing Before the S. Comm. on Banking, Housing & Urban Affairs*, 110th Cong. 1 (2007) (statement of Christopher Cox, Chairman, U.S. Securities and Exchange Commission).

Courts have repeatedly recognized that the type of language contained within the CRARA preempts state law, including claims, such as those asserted here, brought under state statutory and common law.  With respect to the first of the CRARA's preemption provisions, it is well settled that a grant of "exclusive authority" to a federal agency necessarily preempts state law in the relevant area.  *See, e.g.*, *Train* v. *Colo. Pub. Interest Research Group, Inc.*, 426 U.S. 1, 15-16 (1976) (noting that the Atomic Energy Commission "was to retain full authority to regulate the materials covered by the [Atomic Energy Act]" and that the Act vested "exclusive authority to regulate" radioactive discharge in the Commission and preempted state regulation (citation omitted)); *AES Sparrows Point LNG, LLC* v. *Smith*, 527 F.3d 120, 125-27 (4th Cir. 2008) (National Gas Act's grant of "exclusive authority" to Federal Energy Regulatory Commission regarding siting of "LNG terminals" expressly preempts state laws prohibiting the siting of such terminals); *Brown* v. *Earthboard Sports USA, Inc.*, 481 F.3d 901, 909-12 (6th Cir. 2007) (National Securities Markets Improvement Act, providing for exclusive federal regulation of covered securities by the SEC, preempts state blue sky laws with respect to such securities); *Freeman* v. *Burlington Broadcasters, Inc.*, 204 F.3d 311, 320 (2d Cir. 2000) (Federal Communications Act provisions preempted defined field because "Congress intended the [Federal Communications Commission] to possess exclusive authority over technical matters related to radio broadcasting").

With respect to the CRARA's second preemption clause, the statutory language could hardly be clearer:  *notwithstanding* any and all other laws, *no one*, including the SEC itself, may *regulate* the substance of an NRSRO's rating opinions or the process by which they derive those

17

opinions. Courts—including the Supreme Court—have repeatedly interpreted such language as constituting an explicit announcement of Congress's preemptive intent. *See Cisneros* v. *Alpine Ridge Group*, 508 U.S. 10, 18 (1993) ("As we have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section. Likewise, the Courts of Appeals generally have interpreted similar 'notwithstanding' language . . . to supersede all other laws, stating that '[a] clearer statement is difficult to imagine.'" (citations and internal quotation marks omitted)). This language includes an intent not only to preempt positive enactments by state legislatures or regulatory agencies, but also to preempt lawsuits based on state statutory and common law claims. *See, e.g.*, *BMW of N. Am., Inc.*, 517 U.S. at 572 n.17 ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute."); *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."); *Bastien* v. *AT&T Wireless Servs., Inc.*, 205 F.3d 983, 987-90 (7th Cir. 2000) (plaintiff's claims under state consumer fraud statute attacking wireless company's rates were preempted by provision of Federal Communications Act providing that "no State or local government shall have any authority to regulate the entry of or the rates charged by any . . . mobile service" (citation and internal quotation marks omitted)); *Mendes* v. *Medtronic, Inc.*, 18 F.3d 13, 18 (1st Cir. 1994) ("The common law, no less than agency regulations and statutes, can impose 'requirements' on a manufacturer."); *Ameriquest Mortgage Sec.*, 621 F. Supp. 2d at 518 ("Without question, common law actions for damages represent an important manner of regulating conduct . . . [and] the judicial process can be viewed as an extension of a government's regulatory power.");

18

*Heftel* v. *Gen. Motors Corp.*, Civ. A. No. 85-1713, 1988 WL 19615, at *2 (D.D.C. Feb. 23, 1988) ("Common law liability does constitute a form of state regulation.").

        The Supreme Court has spoken recently about preemption of state claims in an analogous case. *See Riegel* v. *Medtronic, Inc.*, 552 U.S. 312, 128 S. Ct. 999 (2008). In *Riegel*, the Supreme Court considered a provision of the Medical Devices Act ("MDA"), which provided in relevant part that "'no State or political subdivision of a State may establish or continue in effect . . . *any requirement*'" regarding the safety or effectiveness of medical devices, if such requirement is different from, or in addition to, any requirement under Federal law. *Riegel*, 128 S. Ct. at 1003 (citation omitted) (emphasis added). The Court found that this language preempted all "common-law claims challenging the safety and effectiveness of a medical device given premarket approval by the [FDA]." *Id.* at 1002, 1011. In finding that the MDA's preemption provision reached common law claims, the Court explained that "[a]bsent other indication, reference to a State's '*requirements*' includes its common-law duties." *Id.* at 1008 (emphasis added).

        Even more broadly than the language at issue in Riegel, the language of the CRARA is worded so as to pre-empt *all* forms of regulation—including common law liability. Indeed, given Congress's clear intent to preclude both the SEC—the NRSROs' exclusive regulator—and the states from regulating the substance of an NRSRO's credit ratings or rating methodologies, it would be a strange result to permit juries across the country who are not experts in this complicated area to develop and enforce varying standards for ratings methodologies through the imposition of common law liability, while the SEC—an agency with specific expertise and "exclusive authority" to oversee NRSROs—is prevented from doing the same. *See id.* ("Indeed, one would think that tort law, applied by juries under a negligence or strict-liability standard, is less deserving of preservation . . . . it is implausible that the [statute] was meant to 'grant greater power (to set state standards "different

from, or in addition to" federal standards) to a single state jury than to . . . officials acting through . . . administrative or legislative lawmaking processes.'" (citation omitted)).

Here, Plaintiffs' claims are based, at their core, on an allegation that Defendants' published ratings were "inflated" (Compl. ¶ 1) because the Rating Agencies purportedly employed "outdated and flawed methodologies." (*Id.* ¶ 8.) Plaintiffs allege, for example, that the ratings were inflated because the risk models used by Defendants in determining the ratings were not "adequate . . . to address the risks esoteric structured finance securities presented" (*Id.* ¶¶ 82-93), and that the Defendants "failed to provide accurate ratings or to employ adequate rating methodologies." (*Id.* ¶ 6.) Tellingly, many of the allegations in the Complaint are lifted directly from the SEC's July 2008 Summary Report of Issues Identified in the Commission Staff's Examinations of Select Rating Agencies, which was issued pursuant to the SEC's authority under the CRARA and is relied on heavily throughout Plaintiffs' Complaint. (*Id.* ¶¶ 6, 61-63, 74-65, 78, 89, 91-94.) Plaintiffs' blatant attempt to "piggy-back" on the SEC's examination serves to highlight not only that their claims are clearly within the SEC's exclusive jurisdiction, but also that the claims asserted have already been examined by Commission staff in connection with its discharge of its regulatory duties under the CRARA.[10]

---

[10]  Plaintiffs' broad allegations about the Defendants' general ratings practices and their repeated citations to the SEC's July 2008 report are particularly apposite, given this Court's opinion in *NCFE*. In that case, the Court noted that "with as little briefing as this issue has received, the Court is not prepared to hold that the [CRARA] preempts the application of state blue sky laws to credit rating agencies who have registered as NRSROs." *NCFE*, 580 F. Supp. 2d at 651. In *NCFE*, however, the plaintiffs claims concerned only ratings of a single offering; there, the "notes were issued by a privately-held company" and were "targeted to a select class of institutional investors." *Id.* at 640. In stark contrast to *NCFE*, Plaintiffs' allegations in this case concern the Defendants' broader credit rating practices as to all MBS issuances—as demonstrated by Plaintiffs' allegations concerning Defendants' purported "conflicts of interest" with respect to issuers (Compl. ¶ 52), "failure to conduct or document meaningful surveillance of their ratings" (*Id.* ¶ 96), and "fail[ure] to provide accurate ratings or to employ adequate ratings methodologies." (*Id.* ¶ 6.) These are precisely the areas of regulation that the SEC has prohibited in the CRARA. Unlike the claims in *NCFE*, Plaintiffs claims here directly implicate the *substance* of Defendants' ratings and the *methodologies* by

In short, the Complaint asks the Court to adjudicate claims asserting that the predictive opinions of the NRSROs here were "wrong" when viewed in hindsight, that the Rating Agencies "should have" used different methodologies, and that the Rating Agencies failed "to manage conflicts of interest." (*Id.* ¶ 7.)  But this is precisely what the CRARA forbids:  intrusion into the substance or methodology of credit ratings and usurpation of the regulatory role of the SEC based on backwards-looking (and speculative) conclusions.  Congress has struck the balance in the public interest between the need for oversight and the need to preserve the independence of Rating Agencies' opinions.  The CRARA reflects that federally-mandated balance.  All of Plaintiffs' claims are thus preempted by federal law and should be dismissed with prejudice.

## III.
### PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED UNDER EITHER NEW YORK OR OHIO LAW

Plaintiffs fail to state a claim for negligent representation under either New York law, which governs their claim, or under Ohio law.  Under New York law, Plaintiffs' claim is—to the extent not already preempted by the CRARA—preempted by New York's Martin Act.  The Martin Act bars private individuals or entities from asserting claims of deception in connection with the offer or sale of securities, reserving all such claims to the New York Attorney General.  Under Ohio and New York law, Plaintiffs fundamentally fail to allege the following required elements of a viable negligent misrepresentation claim:  (a) Plaintiffs were in a relationship with Defendants akin to privity or were part of a select, limited class to which the Defendant rating agencies owe a special duty; (b) Defendants made actionable false statements of fact; (c) Defendants actually caused

---

which they formulate their ratings.  Therefore, notwithstanding this Court's comments in *NCFE*, Plaintiffs' claims are preempted and must be dismissed.

Plaintiffs' purported losses; or (d) Plaintiffs reasonably relied on Defendants' ratings in making their investment decisions.  For all these reasons, and because significant portions of the negligent misrepresentation are time-barred, Plaintiffs' negligent misrepresentation claim should be dismissed.

**A.    New York Law Applies to Plaintiffs' Negligent Misrepresentation Claim**

Federal courts sitting in diversity apply the choice-of-law rules of the state in which they sit.  *Johnson* v. *Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999).  Ohio courts in turn apply Section 148 of the Restatement (Second) of Conflict of Laws to determine the law that will govern a negligent misrepresentation claim.  *See, e.g.*, *Lewis* v. *Horace Mann Ins. Co.*, 410 F. Supp. 2d 640, 653-54 (N.D. Ohio 2005).  Restatement § 148(2) provides that the law of the state with the "most significant relationship" to a particular claim and the parties to the action shall apply.  *See*, *e.g.*, *id.* at 655.  Section 148(2) sets forth the following factors to determine which state has the "most significant relationship":

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Id.* (quoting Restatement § 148(2) (internal quotation marks omitted)).

These factors strongly counsel the application of New York law.  While Plaintiffs are based in Ohio, that fact by itself does not justify the application of Ohio law.  There is no allegation that any of the securities at issue have any connection to Ohio; there is no allegation that any of the issuers, sponsors, underwriters, or sellers of any of the securities are located in Ohio.  Rather, the central allegations in the Complaint are that New York-based Defendants published credit ratings

(which were indisputably issued in New York) that were false and misleading, and that Plaintiffs relied upon those ratings to their detriment when purchasing certain MBS.  (*See, e.g.*, Compl. ¶¶ 1-9, 152-62.)  The fact that all three Defendants are headquartered in New York (*see* Compl. ¶¶ 26-28), and that any representations upon which Plaintiffs relied would have been made from the Defendants' offices in New York provide ample basis to apply New York law.  *See Jamhour* v. *Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 952 (S.D. Ohio 2002) ("'The making of the representations provides a more important contact when the representations are made only in one state than when they are made in two or more.'" (quoting Restatement § 148 cmts. c & g)).  As this Court has previously held:

> Application of the [Section 148] factors to a fraud on the market claim, requires determining where Plaintiffs were when they received and relied on Defendants' alleged misrepresentations, and determining where Defendants were when they made the allegedly false statements, the first three factors identified in Section 148.  The complaint contains no information about where Plaintiffs were when they acted in reliance on the misrepresentations, the first factor. . . . New York was the place where some Plaintiffs received the misrepresentations and where some Defendants made the misrepresentations that play most prominently in this action.  Application of the Restatement § 148 second and third factors indicate that New York law should apply.

*In re Nord Res. Corp. Sec. Litig.*, Nos. C-3-90-380, C-3-90-391, C-3-90-409, C-3-90-410, 1992 WL 1258516, at *7 (S.D. Ohio Dec. 16, 1992); *see also Q & R Assocs., Inc.* v. *Unifi Technical Fabrics, LLC*, No. 01 Civ. 641, 2006 WL 2850503, at *1-3 (S.D. Ohio Oct. 3, 2006).

Courts have consistently determined that New York has a particularly compelling interest in the operations, and exposure to liability, of information providers and other financial industry professionals who have chosen to operate their businesses in New York.  *See, e.g.*, *Compuware Corp.* v. *Moody's Investors Servs., Inc.*, 222 F.R.D. 124, 133 (E.D. Mich. 2004) (citing

New York's role as "the center of the financial publishing industry" as special circumstance favoring application of New York law regarding privilege); *Unicredito Italiano* v. *JPMorgan Chase Bank*, No. 02-104 GMS, 2002 WL 1378226, at *4 (D. Del. June 26, 2002) ("New York City remains the financial center of the United States, if not the world.  Therefore, the impact of this case might be expected to be felt more acutely in that jurisdiction."); *Granite Partners, L.P.* v. *Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 306 n.16 (S.D.N.Y. 1998) (making a choice-of-law determination in favor of New York law and noting that disposition of a claim involving money manager of investment funds "is vitally important to the financial industry, which is centered in New York").

The above factors plainly establish that New York has "the most significant relationship" with the facts underlying the Complaint, and Plaintiffs have not provided this Court with a basis to apply any law to their negligent misrepresentation claim other than that of New York.

## B.   New York's Martin Act Preempts Plaintiffs' Negligent Misrepresentation Claim

Applying New York law, Plaintiffs' negligent misrepresentation claim must be dismissed because it falls squarely within the purview of New York's Martin Act.  *See, e.g., Abu Dhabi*, 651 F. Supp. 2d at 172 (dismissing negligent misrepresentation claim against rating agencies on the basis of the Martin Act).  The Martin Act prohibits fraud or deception in connection with the offer or sale of a security, N.Y. Gen. Bus. Law § 352-c,[11] and the New York Court of Appeals has

---

[11]   More specifically, the Martin Act prohibits acts of

> fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale . . . . where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities . . . regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

N.Y. Gen. Bus. Law § 352-c(1).

held there is no private right of action under the Martin Act; rather, enforcement of claims covered by its terms are reserved to the Attorney General.  *CPC Int'l Inc.*, 514 N.E.2d at 118.

New York's state and federal courts have consistently recognized that sustaining a private common law claim that arises within the Martin Act's terms would be equivalent to allowing a private cause of action under the Act.  *Horn* v. *440 East 57th Co.*, 547 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1989); *Castellano* v. *Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001); *see also First Energy Leasing Corp.* v. *Attorney-General*, 68 N.Y.2d 59, 64 (1986) (dismissing claims under the Martin Act, which "should be liberally construed to give effect to its remedial purpose").  Because such a private cause of action would conflict with the New York Attorney General's exclusive enforcement authority, courts in New York and other jurisdictions applying New York law repeatedly have held that the Martin Act preempts negligent misrepresentation claims concerning the purchase or sale of securities.  *See, e.g., Horn*, 547 N.Y.S.2d at 5-6; *Granite Partners, L.P.*, 17 F. Supp. 2d at 291-92 (dismissing claim for negligent misrepresentation); *Rego Park Gardens Owners, Inc.* v. *Rego Park Gardens Assoc.*, 595 N.Y.S.2d 492, 494 (App. Div. 2d Dep't 1993) ("[T]he Supreme Court properly dismissed the . . . action to recover damages for negligent misrepresentation, because this cause of action sought, in essence, to pursue a private cause of action under the Martin Act."); *In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. MDL1446, CIV.A. H-01-3624, CIV.A. H-02-3185, 2003 WL 23305555, at * 13 (S.D. Tex. Dec 11, 2003) (following the "logical and persuasive" rationale set forth in *Horn* in concluding negligent misrepresentation claim preempted by the Martin Act).

Thus, the Martin Act preempts a negligent misrepresentation claim that is premised on securities transactions "within or from" New York.  *See* N.Y. Gen. Bus. Law § 352-c(1); *Sedona Corp.* v. *Ladenburg Thalmann & Co., Inc.*, No. 03 Civ 3120(LTS)(THK), 2005 WL 1902780, at *21

25

(S.D.N.Y. Aug. 9, 2005).  This requirement is met either where a party to the transaction was a New York entity *or* where the alleged misconduct took place in the State.  *See, e.g.*, *People* v. *Coventry First LLC*, No. 0404620/2006, 2007 WL 2905486, at *6 (N.Y. Sup. Ct. Sept. 25, 2007) ("[I]nsofar as New York sellers or brokers or misconduct in New York is involved, the State has stated sufficient grounds to sue on behalf of citizens."), *aff'd*, 861 N.Y.S.2d 9 (App. Div. 1st Dep't 2008).  Here, the alleged misconduct—Defendants' publishing their credit ratings—indisputably took place in New York.  Moreover, as discussed above, many of the "part[ies] to the transaction[s]" at issue are based in New York, and *none* are based in Ohio.  For these reasons, Plaintiffs' negligent misrepresentation claim must be dismissed.

### C.    Plaintiffs Have Not Pled Facts Sufficient to Sustain a Claim of Negligent Misrepresentation Under New York or Ohio Law

Even if the Plaintiffs' negligent misrepresentation claim were not preempted by the Martin Act—and it is—the Complaint does not plead facts sufficient to support such a claim under New York or Ohio law.  Both states require a plaintiff to plead certain basic elements:  that the defendant made a misstatement to a plaintiff to whom that defendant owed a duty on account of a special relationship, and that plaintiff justifiably relied on that misstatement to plaintiff's detriment.[12]

---

[12]    Specifically, under New York law, the elements of a negligent misrepresentation claim are that:

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc.*, 227 F.3d at 20.

Ohio relies on Restatement (Second) of Torts § 552, which provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable

While each state's respective courts have interpreted each element somewhat differently (as discussed in detail below), Plaintiffs have failed properly to plead the elements under *either* New York or Ohio law.

1.    **Plaintiffs Fail to Allege Facts Giving Rise to the Requisite Duty**

A fundamental element of any negligence claim is that a duty run from the defendant to the plaintiff.  Here, Plaintiffs' negligent misrepresentation claim must be dismissed because, under either New York or Ohio law, Plaintiffs fail to allege facts establishing any relationship with the Defendants that gives rise to the requisite duty.

As demonstrated below, the courts of both New York and Ohio have established, and strictly apply, rigorous standards that narrow the circumstances in which a duty giving rise to liability for negligent misrepresentation can be found.  These laws reflect the strong public policy against subjecting anyone, especially information providers such as Defendants, to the spectre of unlimited liability.  Such open-ended liability to the investing public would effectively end the free flow of information that the Supreme Court has deemed "indispensable" to a free economy.  *See Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council*, 425 U.S. 748, 765 (1976).  Because publicly disseminated information or opinions—whether available online, in materials prepared by

---

reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered:

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

third parties, or otherwise—may be read by a virtually unlimited number of persons anywhere on the globe, the requirement of a "special relationship" between the information provider and the plaintiff protects the information provider from limitless liability that would otherwise chill the dissemination of financial information. *See, e.g.*, *In re Enron*, 511 F. Supp. 2d at 809, 827 (rejecting claims against credit rating agencies and explaining: "[T]he significant r[o]le played by the Credit Rating Agencies in the efficient operation of capital markets . . . would be chilled by unlimited potential liability for creditworthiness ratings . . . . [A]llowing anyone to sue credit rating agencies who had read the credit rating reports and claimed to have relied upon them and lost money in any endeavor that person undertook would be far more deleterious than beneficial to society as a whole.").

    In this action, Plaintiffs effectively ask this Court to ignore this strong precedent and instead recognize an actionable duty running from the Defendant Rating Agencies to the *entire global investment community*.  Nowhere in the Complaint do Plaintiffs allege privity, or anything approaching near-privity, with Defendants.  Indeed, they do not allege that they had *any* interaction or communication of any kind with Defendants.  In essence, Plaintiffs concede that they had no more of a relationship with Defendants than the millions of other investors in the global financial markets to whom the publicly-disseminated rating opinions were accessible.  Therefore, despite Plaintiffs' boilerplate allegation that Plaintiffs were part of a "limited class of qualified investors" (Compl. ¶ 158), the Complaint fails to define any such limiting criteria that would separate Plaintiffs from the rest of global investing community.[13]

---

[13] In fact, the Complaint is replete with vague references to Defendants' purported duty to "investors" in general. (*See, e.g.*, Compl. ¶¶ 99, 156, 159, 170, 182).

(a)    *Defendants Did Not Owe Plaintiffs a Duty Under New York Law*

New York law unequivocally provides that a Plaintiff cannot maintain a claim for negligent misrepresentation without demonstrating that "the defendant had a duty, *as a result of a special relationship*, to give correct information" to the Plaintiff. *Hydro Investors, Inc.*, 227 F.3d at 20 (emphasis added). The "special relationship" New York law requires is that of privity or, in some circumstances, near-privity. *See Parrott* v. *Coopers & Lybrand, LLP*, 95 N.Y.2d 479, 483 (2000). New York courts have expressly confirmed the important policy considerations that support this well-established rule.

In the seminal case of *Ultramares Corp.* v. *Touche*, 255 N.Y. 170 (1931), then-Judge Benjamin Cardozo observed that a rule allowing plaintiffs to state a claim for negligent misrepresentation absent privity or its functional equivalent would expose the speaker to the unacceptable prospect of "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 179; *see also Parrott*, 95 N.Y.2d at 485 ("[W]e have previously rejected a rule 'permitting recovery by any 'foreseeable' plaintiff who relied on the negligently prepared report, and have rejected even a somewhat narrower rule that would permit recovery where the reliant party or class of parties was actually known or foreseen' but the individual defendant's conduct did not link it to that third party." (citation omitted)). Thus, New York courts have consistently rejected the notion that providers of financial information such as credit rating agencies assume a duty of care to investors and others who—notwithstanding the absence of any direct contact or special relationship—claim reliance on allegedly erroneous information or opinions. *See, e.g.*, *In re Time Warner Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993) (affirming dismissal of negligent misrepresentation claim on grounds that there can be no duty to "the investing public"); *First Equity Corp. of Fl.* v. *Standard & Poor's Corp.*, 869 F.2d 175, 179-80 (2d Cir. 1989) (holding that in

29

absence of privity, S&P owed no duty of care to investors who allegedly relied on non-ratings data it disseminated); *Parrott,* 95 N.Y.2d at 483 (near-privity requirement necessary "in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability"); *Jaillet* v. *Cashman,* 189 N.Y.S. 743, 744 (Sup. Ct. 1921) (no liability for financial data received by plaintiff who was "but one of a public to whom all news is liable to be disseminated"), *aff'd mem.,* 194 N.Y.S. 947 (App. Div. 1st Dep't 1922), *aff'd mem.,* 235 N.Y. 511 (1923).

Where, as here, there is no contractual privity between Plaintiffs and Defendants, New York courts require that the plaintiff adequately plead a special relationship with the defendant that "closely resembles" such privity. *AG Capital Funding Partners, L.P.* v. *State St. Bank & Trust Co.,* 5 N.Y.3d 582, 595 (2005) (citing *Ossining Union Free Sch. Dist.* v. *Anderson LaRocca Anderson,* 73 N.Y.2d 417, 424 (1989)).  New York's Court of Appeals has held that the requisite near-privity special relationship exists *only* where the following conditions are met:  "(i) awareness that the [allegedly negligent representations] were to be used for a particular purpose or purposes; (ii) reliance by a *known party or parties* in furtherance of that purpose; and (iii) some *conduct by the defendants linking them to the party or parties* and evincing defendant's understanding of their reliance."  *See Ossining Union Free Sch. Dist.*, 73 N.Y.2d at 425 (emphasis added).

Plaintiffs' Complaint plainly does not contain allegations satisfying any, much less all, of these requirements.  The Complaint does not allege any contact between Plaintiffs and Defendants—let alone the "direct contact" that New York courts require in order to sustain a negligent misrepresentation claim.  *Sec. Investor Prot. Corp.* v. *BDO Seidman LLP*, 222 F.3d 63, 75 (2d Cir. 2000) (observing that to establish the requisite duty of care under New York law, "a plaintiff generally must show some form of direct contact between the [defendant] and the plaintiff, such as a face-to-face conversation, the sharing of documents, or other 'substantive communication' between

30

the parties.  Where direct contact . . . has been nonexistent or even minimal, however, the plaintiff

cannot recover for negligence." (citations omitted)).[14]  Moreover, nowhere does the Complaint allege

that Defendants were aware that *these specific Plaintiffs* were interested in *these specific securities*

rated by Defendants. *Sykes* v. *RFD Third Ave. 1 Assocs., LLC*, 884 N.Y.S.2d 745, 746 (App. Div. 1st

Dep't 2009) (reversing lower court and dismissing plaintiffs' negligent misrepresentation claim

because "plaintiffs have failed to allege that they were known to defendant at the time of the alleged

misrepresentation and have failed to allege some conduct on the part of defendant linking it to

plaintiffs").  Rather, the only allegation in the Complaint is that Defendants were generally aware

that all investors relied on their credit ratings.  (*See, e.g.*, Compl. ¶ 98.)  These bare allegations fall

far short of alleging a "special relationship" between Plaintiffs and Defendants.  *See Vanguard Mun.*

*Bond Fund, Inc.* v. *Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183, 191-92 (S.D.N.Y. 1999) (holding

that despite plaintiff's conclusory allegation that the securities at issue were "regularly and routinely

traded by sophisticated investors" such as itself,  plaintiff "failed to show that it was anything more

than one of an indeterminate number of past, present and future investors who can trade in" such

securities).

Indeed, less than two months ago, a New York court dismissed a negligent

misrepresentation claim by a plaintiff with a significantly closer relationship to the defendant than

found here—that of *purchaser and seller*.  In *M&T Bank Corp.* v. *Gemstone CDO VII, Ltd.*, 891

---

[14]    The existence of direct contact does not *per se* create the requisite duty.  For example, the relationship between an
investment broker and its client does not automatically give rise to such a duty.  *See DeBlasio* v. *Merrill Lynch &
Co.*, No. 07 Civ 318(RJS), 2009 WL 2242605, at *33 (S.D.N.Y. July 27, 2009) ("'Although a broker-client
relationship can evolve into a special relationship, the mere fact that [the defendant] and the plaintiffs had a broker-
client relationship does not in and of itself create a special or fiduciary relationship.'" (quoting *Crigger* v.
*Fahnestock & Co., Inc.*, No. 01 Civ. 07819(JFK), 2003 WL 22170607, at *10 (S.D.N.Y. Sept. 18, 2003)) (alteration
in original)).

N.Y.S.2d 578 (App. Div. 4th Dep't 2009), plaintiff M&T Bank Corp., an institutional investor like

Plaintiffs, brought suit seeking to recover losses from its investment in a collateralized debt

obligation ("CDO"), a structured finance debt instrument similar to the securities at issue here.

Defendant Deutsche Bank Securities, Inc. ("DBSI") sold $82 million of those securities to M&T

Bank.  After the trial court denied DBSI's motion to dismiss the negligent misrepresentation claim,

the New York Supreme Court Appellate Division reversed, holding that M&T Bank could not

adequately plead that there was a special relationship between M&T Bank and DBSI giving rise to a

duty of care, *even though* M&T Bank purchased the securities directly from DBSI.  *Id.* at 581.  In

doing so, the court explained:

> Essential to [the negligent misrepresentation] cause[] of action is the
> existence of a special relationship of trust or confidence and there is
> no such special relationship in this case, particularly in light of the
> facts that the parties had no relationship prior to this arms-length
> transaction . . . .  We further note that "unique or special expertise"
> alone is insufficient to create an issue of fact concerning the existence
> of a special relationship.

*Id.* (quoting *Kimmell*, 675 N.E.2d at 454) (citations omitted).[15]

If a direct sale of securities by an issuing investment bank to an institutional investor

like Plaintiffs cannot give rise to the requisite duty, then surely Plaintiffs have not pled a duty here,

where the Defendants are merely third parties to the transactions at issue and their sole role was

issuing—to the investing public generally—opinions about the creditworthiness of the securities.

---

[15]  The Appellate Division also emphasized that the offering documents in that case contained various disclaimers advising the purchaser, among other things, to perform its own due diligence regarding the securities, *see M&T Bank Corp.*, 891 N.Y.S.2d at 579-80, just like the prospectuses in this matter that Plaintiffs repeatedly quote in their Complaint.  (*See* Compl. ¶¶ 107-10, 117-20, 127-30, 137-40, 147-50.)

*(b)     Defendants Did Not Owe Plaintiffs a Duty Under Ohio Law*

Ohio law is equally clear that in circumstances such as this—where a plaintiff, not in privity with the defendant, claims reliance on ratings or other public statements disseminated to hundreds of thousands of potential investors—there cannot be any liability for negligent misrepresentation.  *See, e.g., Federated Mgmt. Co.*, 738 N.E.2d at 855-56 (investing public is an unlimited class of persons that cannot hold company's auditor liable for alleged negligent misrepresentations); *Nat'l Mulch & Seed, Inc.* v. *Rexius Forest By-Prods., Inc.*, No. 2:02-cv-1288, 2007 WL 894833, at *10 (S.D. Ohio Mar. 22, 2007) ("Representations made to the public-at-large cannot result in liability" for negligent misrepresentation); *Amann* v. *Clear Channel Commc'ns, Inc.*, 846 N.E.2d 95, 100-01 (Ohio Ct. App. 1st Dist. 2006) (no liability for negligent misrepresentation where statements made to general audience).

Applying Restatement (Second) of Torts § 552, the Ohio courts have recognized the same public policy concerns articulated by the New York courts.  As the Supreme Court of Ohio explained, Section 552 restricts potential liability for negligent misrepresentation to "the person or one of a *limited group of persons* for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it."  *Gutter*, 490 N.E.2d at 900.[16]  In

---

[16]   In other jurisdictions as well, the "limited group" requirement of Section 552 has been applied to bar negligent misrepresentation claims by members of the investing public or other large "faceless" groups that are not clearly defined and limited.  *See, e.g., Scottish Heritable Trust, PLC* v. *Peat Marwick Main & Co.*, 81 F.3d 606, 612-13 (5th Cir. 1996) (holding that Section 552 "does not allow recovery for every reasonably foreseeable consumer of financial information" and that "to interpret the 'limited group' requirement as including all potential investors would render that requirement meaningless"); *Ginsburg* v. *Agora Inc.*, 915 F. Supp. 733, 739 (D. Md. 1995) (dismissing negligent misrepresentation claim by subscriber on grounds that information was offered to the general public was "not specifically tailored to [the] financial situation of any individual subscriber"); *Brug* v. *Enstar Group, Inc.*, 755 F. Supp. 1247, 1258 (D. Del. 1991) ("If any member of the public who might choose to invest in [the corporation's] common stock were to qualify as part of a protected class, then the 'limited group' requirement would be meaningless.").

*Gutter*, the court dismissed a negligent misrepresentation claim brought against a newspaper by an investor who claimed to have relied on a report in the newspaper that certain corporate bonds were "trading with interest." *Id.* at 899. Notwithstanding allegations that the defendant "knew, or should have known" the report was inaccurate and that it published the report "with the intent that investors rely" on it in making financial decisions, the court concluded that plaintiff did not fall "within a special limited class (or group) of foreseeable persons as set forth in Section (2)(a) [of Section 552]. . . . A contrary result would in effect extend liability to all the world and not a *limited* class . . . ." *Id.* at 900; *see also Premier Busn. Group, LLC* v. *Red Bull of N. Am., Inc.*, No. 08-CV-01453, 2009 WL 3242050, at *11 (N.D. Ohio Sept. 30, 2009) (dismissing negligent misrepresentation claim for failure to plead a "special relationship" akin to a fiduciary relationship, such as "a client placing his or her trust in an attorney or accountant"); *Stancik* v. *CNBC*, 420 F. Supp. 2d 800, 808 (N.D. Ohio 2006) (granting motion to dismiss negligence action brought by viewer against financial cable television network and noting the spectre of unlimited liability); *Floor Craft Floor Covering, Inc.* v. *Parma Comm. Gen. Hosp. Ass'n*, 560 N.E.2d 206, 209-11 (Ohio 1990) (absent privity, or equivalent nexus, a party cannot recover economic damages for negligent misrepresentation); *Universal Contracting Corp.* v. *Aug*, No. C-030719, A-0103486, 2004 WL 3015325, at *4 (Ohio Ct. App. 1st Dist. Dec. 30, 2004) ("fiduciary or fiduciary-like situation" usually required, at minimum, as substitute nexus for privity to impose liability for negligent misrepresentation); *Wodek* v. *Brandt Constr., Inc.*, No. 2578-M, 1997 WL 148055, at *1-2 (Ohio Ct. App. 9th Dist. Mar. 19, 1997) (Ohio has given a "strict application" to the doctrine of negligent misrepresentation, given the "nature of information and the spectre of unlimited liability" (citation and internal quotation marks omitted)).[17]

---

[17]     In *NCFE*, decided before *Iqbal*, this Court found that the plaintiff had sufficiently pleaded the "limited group"

34

Again, Plaintiffs allege no facts that would place them within such a "limited group" of investors such that Defendants would owe them a unique duty. Hence, Plaintiffs have not pled the existence of the duty of care required to sustain a negligent misrepresentation claim under Ohio law. Accordingly, Plaintiffs' negligent misrepresentation claim should be dismissed.

## 2. The Defendants' Credit Ratings Are Not Actionable False Statements

Plaintiffs' claim also fails because they have not alleged a legally actionable misrepresentation or omission by Defendants. A necessary element to a negligent misrepresentation action under both New York and Ohio law is proof that Defendants made a material misrepresentation of *fact*. *See, e.g.*, *Grammar* v. *Turits*, 706 N.Y.S.2d 453, 455 (App. Div. 2d Dep't 2000) (viable negligent misrepresentation claims require existence of representation of material fact and falsity); *Telxon Corp.* v. *Smart Media of Del., Inc.*, Nos. 22098, 22099, 2005 WL 2292800, at *13 (Ohio Ct. App. 9th Dist. Sept. 21, 2005) (a "misrepresentation of material fact" is required for negligent misrepresentation claim).

Statements of opinion do not constitute actionable misrepresentations. *See Sotheby's Fin. Servs., Inc.* v. *Baran*, 107 Fed. Appx. 235, 238 (2d Cir. 2004) ("It is well established that

---

requirement because the complaint in that action alleged that the notes at issue were sold via a *private placement* to *only* those investors who were in a select class of investors. *NCFE*, 580 F. Supp. 2d at 634, 648 ("According to the complaint, Moody's prepared the bond ratings knowing that its ratings would be seen on the offering materials given to *only* a select class of qualified investors, of whom [the plaintiff] was one." (emphasis added)). Indeed, the securities at issue in *NCFE* were—as required by federal law—sold only to those investors who qualified as "qualified institutional buyers" ("QIBs") under SEC Rule 144A. *Cf. United States* v. *Poulsen*, No. CR2-06-129, 2006 U.S. Dist. LEXIS 68214, at *4 (S.D. Ohio Sept. 12, 2006) (noting that the NCFE notes were sold to QIB investors); *see also* 17 C.F.R. 230.144A (defining "qualified institutional buyer"). To the extent that any of the Plaintiffs are QIBs—and the Complaint is devoid of any such allegation—that status is wholly irrelevant here, as Plaintiffs have not pled that the sale of the securities they allegedly purchased were in any way restricted, much less offered *privately* to *only* certain investors, as was the case in *NCFE*. Because MBS are not required to be sold to a limited group—and Plaintiffs have not alleged that *any* of the securities they allegedly purchased had any such restrictions—this case is plainly distinguishable from *NCFE*.

conclusory representations . . . opinions as to value, or future expectations cannot form the basis of a claim for negligent misrepresentation." (citing *Sheth* v. *N.Y. Life Ins. Co.,* 709 N.Y.S.2d 74, 75 (App. Div. 1st Dep't 2000))); *Miami Valley Paper, LLC* v. *Lebbing Eng'g & Consulting Gmbh*, No. 1:05-CV-00702, 2009 WL 818618, at *12 (S.D. Ohio Mar. 26, 2009) (holding that a statement of opinion by defendant seller to plaintiff purchaser regarding value of item for sale "cannot establish the necessary element of material misrepresentation to support a . . . negligent misrepresentation claim" under Ohio law); *CAN Reins. of London Ltd.* v. *Home Ins. Co.*, No. 85 CIV. 5681 (JFK), 1990 WL 3231, at *10 (S.D.N.Y. Jan. 10, 1990) ("Under New York law, expressions of opinion 'cannot form the basis of a claim of misrepresentation.'" (quoting *George Backer Mgmt. Corp.* v. *Acme Quilting Co.*, 385 N.E.2d 1062, 1067 (N.Y. 1978))); *Kondrat* v. *Morris*, 692 N.E.2d 246, 251-52 (Ohio Ct. App. 8th Dist. 1997).

Here, Plaintiffs' central—albeit unsupported—allegations are that the Defendants "negligently issued unjustified and inflated ratings" on MBS generally and "false and misleading AAA ratings" in particular.  (Compl. ¶¶ 2, 5.)  Yet the credit ratings at issue constitute predictive opinions regarding the future performance of MBS; they are not statements of fact.  As the Sixth Circuit in *Compuware* and other courts have long recognized, there can be no "facts" about what will happen in the future.  *See Compuware*, 499 F.3d at 529 (recognizing that a "credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors" and holding that there was no basis to "conclude that the credit rating itself communicates any provably false factual connotation" that could render it actionable); *see also Jefferson County Sch. Dist. No. R-1*, 175 F.3d at 855-56 (recognizing that credit ratings are "expression[s] of opinion"); *In re Enron Corp.*, 511 F. Supp. 2d at 825 (recognizing that Moody's and S&P's credit ratings "are matters of public concern and opinion").

36

Plaintiffs' claims should accordingly be dismissed.

### 3.     Plaintiffs Have Not Pled Loss Causation

Plaintiffs' negligent misrepresentation claim should also be dismissed because they fail to plead—and indeed cannot plead as a matter of law—the required element of loss causation. Loss causation is the "fundamental core of the common-law concept of proximate cause." *Laub*, 745 N.Y.S.2d at 536; *see also Pappas* v. *Harrow Stores, Inc.*, 528 N.Y.S.2d 404, 407 (App. Div. 2d Dep't 1988) ("[a]s with all negligence actions, the negligence on which the plaintiff relies [in asserting a negligent misrepresentation claim] must be a proximate cause of the injury for which he or she seeks recovery"); *Cleveland Clinic Found.* v. *Commerce Group Benefits, Inc.*, No. 79907, 2002 WL 485764, at *5 (Ohio Ct. App. 8th Dist. Mar. 28, 2002) ("as with other claims of negligence, proximate causation and damages must be shown" to sustain a negligent misrepresentation claim).

To establish loss causation, Plaintiffs must demonstrate "both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Laub,* 745 N.Y.S.2d at 536; *see also Leal*, 702 N.E.2d at 1254 (for negligent misrepresentation to be actionable, plaintiff's reliance on defendants' statements must have caused "pecuniary loss that they otherwise would not have suffered"); *accord In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2007 WL 1087605, at *8 (N.D. Ohio Apr. 9, 2007) (observing in a products liability action that to establish a negligent misrepresentation claim under Ohio law, a plaintiff must show a "cause which:  (1) in a natural and continuous sequence, unbroken by any new and independent cause, produces an injury; (2) without which the injury would not have occurred; and (3) from which a person of ordinary prudence could have reasonably foreseen that such a result,

or some similar injurious result, was probable under the facts as they existed" (citation and internal

quotation marks omitted)).  In other words, Plaintiffs must allege with specificity an economic loss

that was proximately caused by the alleged misconduct; if they fail adequately to allege loss

causation, the court must dismiss the claim.  *See Laub*, 745 N.Y.S.2d at 536 (holding that "plaintiff's

claims must fail because he has not alleged . . . any evidence that those misrepresentations directly

and proximately caused his investment losses"); *Lilly, Jr.* v. *Hewlett-Packard Co.*, No. 1:05-CV-465,

2006 WL 1064063, at *5 (S.D. Ohio Apr. 21, 2006) (under Ohio law, "whether it be termed an issue

of reliance or an issue of proximate cause, an appropriate rule is that where the defendant is alleged

to have made material misrepresentations or misstatements, there must be a cause and effect

relationship between the defendant's acts and the plaintiff's injuries." (citation omitted)).

Plaintiffs' pleading does not come close to satisfying this standard.  Beyond the

boilerplate allegation that Plaintiffs "suffered significant damages, losing all or part of their

investments" as a "direct, foreseeable, and proximate result of Defendants' negligence" (Compl.

¶ 161), Plaintiffs have failed to plead any causal connection between the Defendants' alleged

misrepresentations—the "false and misleading ratings"—and any theoretical loss purportedly

suffered by Plaintiffs.  In fact, Plaintiffs have failed to provide any supporting information about

how, if at all, the securities they purchased have "lost value."  (*See, e.g.*, Compl. ¶ 102 (referencing

"$83 million in losses *thus far*" on securities allegedly purchased by one Plaintiff (emphasis added));

*id.* ¶ 103 (stating that those securities have "lost value"); *see also id.* ¶¶ 112-13, 122-23, 132-33,

142-43 (identical allegations for remaining Plaintiffs).)  Nowhere in the Complaint is there any

allegation that Plaintiffs have sold their securities at a loss (or that they have sold them at all), or

even that they have been unable to sell the securities.  Indeed, Plaintiffs do not even allege, with any

particularity, what their loss is—stating instead simply that the securities have "lost value" and

providing a minimum amount of their losses "thus far." (*See, e.g.*, Compl. ¶¶ 102-03.)  Most significant, Plaintiffs plead *no* facts explaining how or why these vague and unidentified losses are in *any* way attributable to Defendants' allegedly false credit ratings.  Such allegations are plainly insufficient to meet any standard of loss causation, let alone the relevant standards requiring that Plaintiffs plead specific conduct by Defendants that "directly caused [their] loss," *Laub*, 745 N.Y.S.2d at 536, or, "in a natural and continuous sequence, unbroken by any new and independent cause," produced Plaintiffs' loss, *Welding Fume*, 2007 WL 1087605, at *8.

Further precluding any showing of loss causation, Plaintiffs' Complaint conspicuously ignores other obvious potential causes of the loss in value of their securities—such as the precipitous collapse of the U.S. housing market (and, in turn, the MBS market) in 2007 and the global credit market crisis that followed as a result.  As former Federal Reserve Chairman Alan Greenspan has explained, the global credit crisis that took hold in the summer of 2007 is "likely to be judged in retrospect as the most wrenching since the end of the second world war."  *See* Alan Greenspan, *We Will Never Have a Perfect Model of Risk*, Fin. Times (London), Mar. 16, 2008, http://www.ft.com/cms/s/0/edbdbcf6-f360-11dc-b6bc-0000779fd2ac.html.[18]   While Plaintiffs attempt to pin their losses from a global market crash on Defendants, the law is well settled that where an alleged investment loss coincides with a market-wide phenomenon causing comparable

---

[18]   Courts have routinely taken judicial notice of articles and public records available to the market regarding the state of the U.S. economy at a crucial time during a proposed class period. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 419 (S.D.N.Y. 2003) (taking judicial notice of the "burst of the notorious internet bubble which directly intervened during plaintiffs' ownership of the securities and caused the virtual destruction of their stock holdings, before the accrual of their claims"); *In re Imperial Credit Indus. Inc.*, 252 F. Supp. 2d 1005, 1015-16 (C.D. Cal. 2003) (taking judicial notice of economic crises of late 1990s resulting in dramatic changes in interest rates, "which might have influenced the drop in stock prices" of the defendant company); *Virtual Countries, Inc.* v. *Republic of S. Afr.*, 148 F. Supp. 2d 256, 267 n.12 (S.D.N.Y. 2001) (taking

losses to other investors, a plaintiff must allege facts that, if true, are sufficient to show that its loss was caused by the defendant's actions, rather than those intervening market-wide events. *See, e.g., Dura Pharm.* v. *Broudo*, 544 U.S. 336, 343-45 (2005) (holding that even where a plaintiff can allege and prove that a misrepresentation necessarily caused it to pay an inflated purchase price, there can still be no recovery, unless the plaintiff also alleges that it was the defendant's misrepresentation, as opposed to "the tangle of [other] factors affecting [the] price" of the security, which *caused* the alleged damage);[19] *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." (citation and internal quotation marks omitted)); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008) (dismissing claim where plaintiff "cannot successfully plead that his losses resulted solely or even partially from the purported materialization of the risk that the defendants allegedly concealed, rather than from intervening causes, such as the collapse of the Internet sector"); *Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (dismissing complaint on the ground that it did "not allege facts showing that it was the claimed concealment which caused plaintiff's losses, rather than the market-wide Internet stock collapse," and because

---

judicial notice of the internet market decline in 2000); *see also Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

[19]   The *Dura* court recognized that investment losses are often caused by factors other than reliance on misrepresentations, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all" of an alleged loss. *Dura*, 544 U.S. at 342-43.

there was no "way to separate the effect of the misstatements (if there was any) from the general collapse or other causes"), *aff'd*, 216 Fed. Appx. 14 (2d Cir. 2007).[20]

Here, it is difficult to conceive of more obvious and overwhelming intervening events that could have caused Plaintiffs' alleged losses than the unprecedented developments in the commercial and residential real estate markets in 2007 and 2008.  Remarkably, however, Plaintiffs' Complaint says virtually nothing about the global financial crisis, nor does it even begin to explain why the asserted actions of Defendants, as opposed to the crisis itself, caused their losses.  Indeed, it is far more plausible that the unprecedented global financial crisis, not the allegedly false ratings of MBS, led to Plaintiffs' alleged losses.  Of course, the Court need not decide on this motion what caused Plaintiffs' alleged losses; the Court need only recognize the fundamental deficiency in the Complaint itself:  Plaintiffs have not pled facts sufficient, if proven, to show that their losses were caused in some determinable part by the allegedly false ratings.

---

[20]  While the claim at issue is not a federal securities fraud claim, courts in Ohio and New York have noted the similarity between the loss causation standards for federal securities fraud and those for common law fraud (and in some cases negligent misrepresentation as well).  *See, e.g., AIG Global Sec. Lending Corp.* v. *Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 395 (S.D.N.Y. 2009) (noting that "[o]n both the federal securities fraud claim and the New York common law claim, the plaintiffs bore the burden of proving loss causation" and applying the same standard (citation omitted)); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009) (noting that the loss causation requirement for actions under federal securities fraud claims is a "similar requirement" to the proximate causation element of both common law fraud and negligent misrepresentation); *Murphy* v. *Stargate Def. Sys. Corp.*, No. 1:05 CV 2121, 2006 WL 721746, at *18-19 (N.D. Ohio Mar. 21, 2006) (noting that "[t]he elements of common law fraud under Ohio law are substantially similar" to the elements of a Rule 10b-5 claim, and that both require "a resulting injury proximately caused by the [plaintiff's] reliance"), *aff'd in part, rev'd in part on other grounds*, 498 F.3d 386 (6th Cir. 2007); *compare Laub*, 745 N.Y.S.2d at 536 (negligent misrepresentation requires both loss causation and transaction causation), *with Bennett* v. *U.S. Trust Co. of N.Y.*, 770 F.2d 308, 313 (2d Cir. 1985) (noting that "[i]n order to recover under section 10(b)," the plaintiff must show "both *loss causation . . .* and *transaction causation*" (citation and internal quotation marks omitted)).

Likewise, courts have recognized, under both New York and Ohio law, the similarity between the loss causation standards for negligent misrepresentation and common law fraud.  *See, e.g., Glidepath Holding B.V.* v. *Spherion Corp.*, 590 F. Supp. 2d 435, 457 (S.D.N.Y. 2007) (laying out the requirements for common law fraud and negligent misrepresentation claims under New York law and noting that "[l]oss causation is an essential element of each claim"); *Welding Fume*, 2007 WL 1087605, at *9 (granting summary judgment to defendants on negligent misrepresentation and fraud claims because plaintiffs did not satisfy proximate cause elements of either claim).

### 4.    Plaintiffs Do Not Plead Justifiable Reliance

Even if the Complaint adequately alleged the other elements of negligent misrepresentation—which, as demonstrated above, it does not—Plaintiffs' claim fails because they have not adequately pled reliance.

New York law requires Plaintiffs to demonstrate that that they "reasonably relied" on Defendants' alleged misstatements to their detriment. *See, e.g.*, *Water St. Leasehold LLC* v. *Deloitte & Touche LLP*, 796 N.Y.S.2d 598, 599 (App. Div. 1st Dep't 2005) (describing "reasonable reliance" as an "essential element of any fraud or negligent misrepresentation claim" under New York law). Under New York law, three factors determine whether Plaintiffs' reliance was reasonable in the negligent misrepresentation context:  "(1) whether the defendant held or appeared to hold unique or special expertise; (2) whether there was a special relationship of trust or confidence between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *DeBlasio*, 2009 WL 2242605, at *33 (quoting *Kimmel*, 675 N.E.2d at 454) (internal quotation marks omitted).

Here, Plaintiffs have not pled—and cannot plead—facts sufficient to prove the latter two elements of reasonable reliance.  The "special relationship of trust or confidence" that New York law requires to prove reasonable reliance is akin to the relationship required in the duty context.  *See Kimmel*, 675 N.E.2d at 454 (requiring in a negligent misrepresentation action that "there must be some identifiable source of a special duty of care").  As discussed above, Plaintiffs do not allege that they had *any* relationship with Defendants, much less the privity or near-privity required by New York law to support Plaintiffs' reasonable reliance on Defendants' ratings.

Plaintiffs also fail to plead—and likewise cannot plead—that Defendants were "aware of the use to which [their ratings] would be put and *supplied it for that purpose.*" *DeBlasio*, 2009

42

WL 2242605, at *33 (quoting *Kimmel*, 675 N.E.2d at 454) (internal quotation marks omitted) (emphasis added).  Putting aside Plaintiffs' boilerplate allegation that "Defendants knew Plaintiffs . . . intended to, and did, rely on the ratings in deciding whether to purchase and/or retain the securities" (Compl. ¶ 157), Plaintiffs plainly cannot plead, and have not pled, that Defendants "supplied" their ratings "for [the] purpose" of inducing investors—let alone Plaintiffs—to purchase MBS.  Indeed, accompanying all of Defendants' ratings were their respective disclaimers emphasizing that the ratings were opinions on credit quality, rather than recommendations to buy or sell a security.[21] Therefore, under New York law, Plaintiffs cannot establish reasonable reliance.

          Plaintiffs' claim fares no better under Ohio law.  Ohio law requires Plaintiffs to demonstrate that they "justifiably relied" on Defendants' alleged misstatements.  *See, e.g.*, *Phelps* v. *PNC Bank*, No. C-000518, 2001 WL 992081, at *6 (Ohio Ct. App. 1st Dist. Aug. 31, 2001).  While Ohio's justifiable reliance is a standard distinct from New York law, cf. *Amerifast Sav. Bank of Xenia* v. *Krug*, 737 N.E.2d 68, 88 (Ohio Ct. App. 2d Dist. 1999), Ohio courts, like New York courts, focus the reliance inquiry on "the circumstances of the claim and the relationship between the parties."  *See Davis*, 880 N.E.2d at 497.  Specifically, Ohio courts consider whether a plaintiff relied *only* on the alleged misrepresentations or whether the plaintiff relied on *other sources* of information in entering into the transaction at issue.  *See id.* ("when buyers continue to investigate possible problems on their own and look to others, such as inspectors and electricians representations, the buyers are not justifiably relying on the agent's representations regarding those possible problems"); *Johnson v. Church of the Open Door*, 902 N.E.2d 1002, 1007-08 (Ohio Ct. App. 9th Dist. 2008)

---

[21]  *See* Warren Decl., Exhs. A-D (excerpting disclaimers from registration statements and prospectus supplements filed in connection with MBS listed in Complaint which note that credit ratings are not recommendations to buy, sell, or

(finding no justifiable reliance where plaintiff was referred to an investment advisor by defendant and made independent inquiry into advisor's business before investing).

Plaintiffs thus fail to satisfy the Ohio standard for justifiable reliance because they have not pled that Defendants' credit ratings were the *only* basis upon which they purchased the securities. Indeed, Plaintiffs repeatedly cite to the prospectuses for the securities at issue, which were not created or distributed by the Defendants and certainly represent an independent source of information about the securities. (*See* Compl. ¶¶ 105, 107-10, 115, 117-20, 125, 127, 135, 137-40, 145, 147-50.)

Furthermore, Plaintiffs repeatedly tout their status as sophisticated institutional investors with hundreds of millions of dollars of public pension money under management. As the Seventh Circuit recognized in *Quinn* v. *McGraw-Hill Cos.*, 168 F.3d 331, 336 (7th Cir. 1999), such investors are responsible for doing their own analysis of complex investments (such as the alleged transactions here) and cannot point the finger at parties such as ratings agencies when their sophisticated investments go bad. In affirming the district court's decision granting a motion to dismiss, *inter alia*, negligent misrepresentation claims, the Seventh Circuit noted that, as a sophisticated investor, plaintiff "was responsible for doing his own homework about the risks he was assuming." *Id.*; *see also Parkhurst* v. *N. Am. Fin. Servs. Cos. Inc.*, 919 F. Supp. 270, 273-74 (E.D. Mich. 1996) (noting plaintiff's sophistication and expertise in financial and security matters as a factor to consider in evaluating justifiable reliance on a motion to dismiss); *cf. Amerifast Sav. Bank*, 737 N.E.2d at 88 (Ohio reliance inquiry considers "the qualities and characteristics of the particular

hold the securities).

plaintiff" (quoting *Field* v. *Mans*, 516 U.S. 59, 70-71 (1995))).  Therefore, Plaintiffs' claim fails under Ohio law, as well.

**D.      Plaintiffs' Negligent Misrepresentation Claim Is Time-Barred**

Plaintiffs' negligent misrepresentation claim is also time-barred.  Under New York law, the statute of limitations for negligent misrepresentation is three years and begins to run from the date of the alleged reliance.  *Colon* v. *Banco Popular N. Am.*, 874 N.Y.S.2d 44, 44 (App. Div. 1st Dep't 2009); *Lasher* v. *Albion Cent. Sch. Dist.*, 833 N.Y.S.2d 791, 792 (App. Div. 4th Dep't 2007). Under Ohio law, the statute of limitation is four years and runs from the date on which the alleged misrepresentation was made.  *See Schnippel Constr., Inc.* v. *Profitt*, No. 17-09-12, 2009 WL 3720585, at *3 (Ohio Ct. App. Nov. 9, 2009) (citing Ohio Rev. Code § 2305.09); *see also Neff* v. *Standard Fed. Bank*, No. 2:06-cv-856, 2007 WL 2874794, at *6 (S.D. Ohio Sept. 27, 2007) (observing that the "discovery rule" for fraud claims does not apply to negligent misrepresentation claims).

Plaintiffs filed the Complaint on November 20, 2009.  While the Complaint conspicuously lacks any allegations concerning the dates of Plaintiffs' actual purchases or sales of securities, the Complaint does allege that Plaintiffs purchased MBS "during the period from January 1, 2005 through July 8, 2008."  (Compl. ¶ 1.)  Thus, any claims arising out of purchases made between January 1, 2005 and November 20, 2006 are clearly time-barred under New York law and must be dismissed.  Under Ohio law, any purchases made based on *ratings issued* prior to November 20, 2005 are likewise time-barred.

Moreover, the two-year "discovery" statute of limitations rule provided under the Ohio Securities Laws controls Plaintiffs' negligent misrepresentation claim, as well.  *See Metz* v. *Unizan Bank*,  No. 5:05 CV 1510, 2008 WL 2017574, at *1 (N.D. Ohio May 7, 2008) (Ohio Rev.

Code § 1707.43(B) "applie[s] when the claims arise out of a sale or contract for sale made in violation of the Ohio securities laws").[22] Section 1707.43 provides a limitations period of two years after Plaintiffs "knew, or had reason to know" of the basis of their claims or five years from the date of the transaction, whichever is sooner. Thus, under Ohio law, any claims that Plaintiffs knew or should have known about prior to November 20, 2007 are time-barred and must be dismissed.

Virtually all of the allegations underlying the Ohio Blue Sky claims and the negligent misrepresentation claim were widely reported in the press and known to the investing community prior to November 20, 2007. Thus, under § 1707.43(B), any claims related to securities purchased between January 1, 2005 and November 20, 2007 are time-barred and must be dismissed.

Plaintiffs' allegations about the purportedly collaborative role Rating Agencies play in the securitization process (Compl. ¶¶ 76-81) were widely reported in the financial media by at least the summer of 2007. *See, e.g.*, Richard Beales, et al., *Failing Grades?*, Fin. Times (London), May 16, 2007, http://www.ft.com/cms/s/0/4cfb5b30-0413-11dc-a931-000b5df10621.html?nclick_check=1 (Warren Decl., Exh. E) (noting purported conflict of interest in rating system); Jesse Eisinger, *Overrated*, Portfolio.com, Aug. 13, 2007, http://www.portfolio.com/news-markets/national-news/portfolio/2007/08/13/Moody-Ratings-Fiasco/index.html (Warren Decl., Exh. F) (describing an "iterative process," wherein rating agencies gave "'feedback' to underwriters before

---

[22]   *See also Wyser-Pratte Mgmt. Co.* v. *Telxon Corp.*, No. 5:02CV1105, 2003 WL 25861087, at *5 (N.D. Ohio June 4, 2003) ("[A]lthough [plaintiff] states common law fraud and negligent misrepresentation claims, Ohio's Blue Sky laws provide the applicable statute of limitations."); *Goldberg* v. *Cohen*, No. 01-CA-49, 2002 WL 1371031, at *4 (Ohio Ct. App. 7th Dist. June 13, 2002) ("R.C. 1707.43 concerns not only the claims involving the sale of securities but also those claims that *arise out of* the sale of securities."); *Hater* v. *Gradison Div. of McDonald & Co. Sec. Inc.*, 655 N.E.2d 189, 198 (Ohio Ct. App. 1st Dist. 1995) (claims "inextricably interwoven" with the sale of securities are governed by the statute of limitations articulated in Ohio Revised Code § 1707.43); *Katz* v. *Genninger*, No. C-840219, 1985 WL 9294, at *2 (Ohio Ct. App. 1st Dist. Jan. 31, 1985) ("[W]hen a claim grounded in common law

bonds are even issued"); Arthur Levitt, Jr., *Conflicts and the Credit Crunch*, Wall St. J., Sept. 9, 2007, at A15 (Warren Decl., Exh. G) ("As documented both in the media and by the Securities and Exchange Commission (SEC), credit ratings agencies . . . are playing both coach and referee in the debt game.").

Plaintiffs' allegation that Defendants relied upon "outdated" models that were "ill-equipped to deal with the newer and more variable loan products underlying structured finance securities" (Compl. ¶ 82), was also publicly known by at least the summer of 2007.   For example, on May 31, 2007, *The Economist* reported that Defendants' standards had "slipped" and that they had "misread the level of correlation between different types of assets . . . and ignored signs that risks were greater than historical data suggested." *Measuring the Measurers*, Economist, May 31, 2007, at 42 (Warren Decl., Exh. H); *see also* Beales, et al., *Failing Grades?*, *supra* (Warren Decl., Exh. E) (describing purported decline in confidence in ratings models).  As early as March 2007, *Fortune* was reporting one expert's assertion that "[n]o one believes that ratings have any value." Bethany McLean, *The Dangers of Investing in Subprime Debt*, Fortune, Mar. 19, 2007, http://money.cnn.com/magazines/fortune/fortune_archive/2007/04/02/8403416/ index.htm (Warren Decl., Exh. I) (quoting the head of a prominent structured finance consulting firm).  Indeed, as Plaintiffs themselves allege, a representative of Defendant Standard & Poor's testified to Congress on September 26, 2007 that "certain historically-rooted assumptions we made in determining which RMBS ratings to issue do not, in retrospect, appear to have remained as relevant as they previously have been." *The Role and Impact of Credit Ratings Agencies on the Subprime Credit Markets:*

---

fraud arises out of a sale made in violation of R.C. 1707.01 *et seq.*, the statute of limitations governing the claim is that provided in R.C. 1707.43.").

*Hearing Before S. Comm. on Banking, Housing & Urban Affairs*, 110th Cong. 13 (2007) (testimony of Vickie Tillman, Executive Vice President, Standard & Poor's) (Warren Decl., Exh. J) (cited in Compl. ¶ 49).

      To the extent that Plaintiffs base any of their claims on Defendants' failure to perform "due diligence" on MBS, Defendants widely stated, by at least September 2007 that they did not perform such due diligence.  For example, a representative of Moody's testified to Congress in September 2007 that the Defendants "do not conduct any 'due diligence' on these loans," "do not participate in the origination of the loan," and "do not receive or review individual loan files for due diligence."  *The Role and Impact of Credit Ratings Agencies on the Subprime Credit Markets: Hearing Before S. Comm. on Banking, Housing & Urban Affairs*, 110th Cong. 5 n.2, 6 (2007) (testimony of Michael Kanef) (Warren Decl., Exh. K).

      Finally, Plaintiffs were certainly put on notice of the existence of their potential claims when several market participants filed suits in the summer of 2007 making similar allegations.  On July 19, 2007, a group of investors in Moody's Corporation brought a putative class action against Moody's, alleging that Moody's had "misrepresented or failed to disclose that the Company assigned excessively high ratings to bonds backed by risky subprime mortgages . . . which was materially misleading to investors concerning the quality and relative risk of these investments." Complaint ¶ 4, *Nach* v. *Huber*, No. 07-CV-4071 (N.D. Ill. filed July 19, 2007) (Warren Decl., Exh. L).  On August 28, 2007, an investor in the parent company of Standard & Poor's filed a putative class action in the U.S. District Court for the District of Columbia, alleging that the company's CFO made misrepresentations and omissions about the company's high ratings of MBS.  Complaint ¶ 5, *Reese* v. *Bahash*, No. 07-CV-01530 (D.D.C. filed Aug. 28, 2007) (Warren Decl., Exh. M).  And on September 26, 2007, an employee pension fund filed another putative class action against Moody's,

making similar allegations to those in the *Nach* complaint.  Complaint ¶¶ 4-5, *Teamsters Local 282 Pension Trust Fund* v. *Moody's Corp.*, No. 07-CV-8375 (S.D.N.Y. filed Sept. 26, 2007) (Warren Decl., Exh. N).

Given these lawsuits, extensive media coverage, as well as public statements of Defendants' own executives, Plaintiffs were clearly on notice of their alleged claims long before November 2007.  As a result, Plaintiffs' claims under the Ohio Securities law and, if the Court applies Ohio law, Plaintiffs' negligent misrepresentation claim, as well, is time-barred.

**IV.**
**PLAINTIFFS' OHIO BLUE SKY CLAIMS MUST BE DISMISSED**

**A.    Plaintiffs' Blue Sky Claims Must Be Dismissed for the Same Reasons Plaintiffs' Negligent Misrepresentation Claim Fails**

For many of the same reasons that Plaintiffs' negligent misrepresentation claim fails, Plaintiffs' Blue Sky claims also fail.

*First*, as demonstrated above in Section II, the CRARA was clearly intended to make the SEC the exclusive regulator of the NRSROs and to preempt the SEC and the states from regulating the substance of the Rating Agencies' rating opinions through Blue Sky laws.  Indeed, Defendants are unaware of any instance in which a credit rating agency has been found liable under the Blue Sky laws of any state.  Thus, Plaintiffs' Ohio Blue Sky claims (Counts II and III) are preempted and should be dismissed on that ground alone.

*Second*, these claims are also time-barred.  The applicable statute of limitations, *see* Ohio Rev. Code § 1707.43, bars all claims brought more than two years after a plaintiff "knew, or had reason to know" the basis for his claims.  As detailed above at Section III.D, given the public information available prior to November 20, 2007, Plaintiffs here certainly had reason to know the basis for their claims more than two years prior to the filing of the Complaint.

49

*Third*, the shortcomings of Plaintiffs' negligent misrepresentation claim apply equally to their claims for violations of Sections 1707.41 and 1707.43 of the Ohio Securities Act, all of which are based on allegations that the Rating Agencies falsely represented that the securities purchased by Plaintiffs had "a credit quality consistent with Defendants' criteria for the particular credit ratings assigned"—*i.e.*, the Rating Agencies' rating opinions.  (Compl. ¶¶ 165, 177.)  As demonstrated above, the Sixth Circuit and other courts have held that a credit rating is a predictive opinion that cannot be proven false and therefore, as a matter of law, cannot constitute a material misstatement of fact for pleading purposes.  *See supra* Sections I & III.C.2; Ohio Rev. Code § 1707.41(A) (requiring, for civil liability, that there be a "falsity of any material statement" in the prospectus or an "omission therefrom of material facts")

*Finally*, as a matter of law, Plaintiffs cannot have relied reasonably on Rating Agencies' ratings.  *See supra* Section III.C.4.  The inability to plead reasonable reliance on the Rating Agencies ratings dooms Plaintiffs' Blue Sky claims, as well.  *See Citizens Nat'l Bank* v. *Barge-In, Inc.*, No. CA83-07-008, 1984 WL 3429, at *5 (Ohio Ct. App. 12th Dist. Sept. 28, 1984) (plaintiff must show "reliance on the part of the purchaser" (citing *Nickels* v. *Koehler Mgmt. Corp.*, 541 F.2d 611, 616 (6th Cir. 1976))).

## B.      The Requisite Nexus Between the Rating Agencies' Alleged Conduct and the Sale of Securities in Ohio Is Not—and Cannot Be—Pled

The Blue Sky claims also fail as a matter of law on the separate ground that the Complaint does not and cannot allege that any nexus exists between Ohio and the Rating Agencies' ratings of the securities at issue—much less a nexus sufficient to warrant the application of Ohio's Blue Sky laws.

It is fundamental that a state securities statute can have no extraterritorial effect without a sufficient nexus to the state. *See Hilton* v. *Guyot*, 159 U.S. 113, 163 (1895) (laws do not have effect beyond the boundaries of the sovereignty from whose authority the law derives); *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539, 557 (1917) (upholding Ohio's Blue Sky law because the statutory language limited the law's application to transactions within Ohio). In assessing the reach of a state law, courts have looked to particular contacts and ties that a transaction has with the regulating state. *Martin* v. *Steubner*, 485 F. Supp. 88, 100 (S.D. Ohio 1979) (citing *Traveler's Health Assoc.* v. *Virginia*, 339 U.S. 643 (1950)). Ohio courts have applied Ohio securities law where the securities in question were issued out of Ohio, *see NCFE*, 580 F. Supp. 2d at 649; *Federated Mgmt. Co.*, 738 N.E.2d at 857, or where the plaintiff purchaser was actively solicited in Ohio, *Martin*, 485 F. Supp. at 99 (Ohio law applied when defendants advertised in *Wall Street Journal* with circulation in Ohio and mailed letters to plaintiff in Ohio). However, where the nexus to Ohio is peripheral to the sale of the securities, Ohio's securities law is inapplicable. *See In re Revco Sec. Litig.*, No. 89CV593, 1991 WL 353385, at *14 (N.D. Ohio Dec 12, 1991) (court refused to apply Ohio Blue Sky law where the activities in Ohio did not "directly concern the sale of" securities to plaintiff).

Here, other than the allegation that the Plaintiffs are Ohio entities, the Complaint is devoid of any facts that could support a nexus with Ohio. *See supra* Section III.A. In sum, the Complaint alleges an insufficient basis for the application of Ohio's Blue Sky laws and should be dismissed on this ground as well.

## C.   Plaintiffs Fail to Allege that the Rating Agencies Offered Securities for Sale

Plaintiffs' Count II, asserting violations of § 1707.41, further fails as a matter of law because Plaintiffs have not alleged—and cannot allege—that the Rating Agencies offered any security for "sale" under § 1707.41. Significantly, the Complaint here alleges no more than that the

51

Ratings Agencies did not properly rate the "credit quality" of the securities purchased by Plaintiffs. (Compl. ¶¶ 165, 167.)  Nowhere do Plaintiffs allege any acts by the Rating Agencies that would qualify the Rating Agencies as sellers of the securities.  Absent such allegations, Ohio's Blue Sky law simply does not apply.  *See Boomershine* v. *Lifetime Capital, Inc.*, No. 22179, 2008 WL 54803, at *2 (Ohio Ct. App. 2d Dist. Jan 4, 2008) (although facts indicated defendant bank provided services related to securities at issue, court dismissed claim where defendants' were not "involved in the *sale* of those policies"); *Hainbuchner* v. *Miner*, No. 1558, 1986 WL 3205, at *2 (Ohio Ct. App. 11th Dist. Mar. 14, 1986) (dismissing contribution clam against a director of the seller and holding that he did not violate the Blue Sky law because he did not participate in or have knowledge of the sale in question), *aff'd*, 509 N.E.2d 424 (Ohio 1987); *NCFE*, 580 F. Supp. 2d at 649 (stating that "[t]here is no dispute that Moody's was not the seller of notes to Lloyds" and finding no potential liability under § 1707.41); *see also* Ohio Rev. Code § 1707.01(C)(1) (defining "sale" as "every disposition, or attempt to dispose, of a security or of an interest in a security," including "a contract to sell, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, a solicitation of an offer to buy, a subscription, or an offer to sell, directly or indirectly, by agent, circular, pamphlet, advertisement, or otherwise").

        The conclusion that the Rating Agencies have not engaged in the "sale" of any securities is further supported by the Supreme Court's holding in *Pinter* v. *Dahl*, 486 U.S. 622, 643 (1988), which clarified that, under Section 12 of the Securities Act, the definition of "seller" for Section 12 purposes is limited to the (i) the actual seller, *i.e.*, the entity or person which passed title to the plaintiff purchaser; or (ii) those who directly solicit the plaintiff purchaser on the seller's behalf for financial gain.  All other parties—including those who are alleged to have extensively participated in the transaction at issue—are not statutory "sellers" and accordingly not subject to

Section 12 liability.  *Id.*; *see also Dorchester Investors* v. *Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 580 (S.D.N.Y. 2001) (party whose name appeared frequently in prospectus and who was allegedly key to success of securities transaction at issue not subject to Section 12(a)(2) liability in the absence of allegations which satisfied statutory definition of seller).  Courts have rightfully relied on *Pinter* in refusing to expand state Blue Sky Laws to the activities of entities not actually engaged in the "sale" of securities.  *See, e.g.*, *In re Infocure Sec. Litig.*, 210 F. Supp. 2d 1331, 1362-67 (N.D. Ga. 2002) (applying *Pinter* to analyze claims under the Blue Sky laws of South Carolina, North Carolina, Michigan, and Florida and accordingly, dismissing the state Blue Sky claims against a defendant even though it "may have prepared certain documents and even provided an opinion as to facts relevant to the transaction").

        Not only does the Complaint fail to make any allegations tying the Rating Agencies to the sale of any the securities purchased by Plaintiffs, but the ratings themselves plainly and consistently state that the credit ratings issued are not recommendations to "purchase, sell or hold any security."  *See supra* Section III.C.4.  At most, the Complaint vaguely and conclusorily alleges that the Rating Agencies were involved solely in the pre-sale structuring of the offerings.  (Compl. ¶¶ 76-81.)  But as the Supreme Court explained in *Pinter*, 486 U.S. at 644, a seller is naturally understood as "some person[] who *urged* the buyer to purchase." (emphasis added).  Even if accepted as true, Plaintiffs' allegations of the Rating Agencies' involvement in the creation of the securities does not come even remotely within this realm of seller activity.  *See, e.g.*, *Buford White Lumber Co. Profit Sharing & Sav. Plan & Trust* v. *Octagon Props. Ltd.*, 740 F. Supp. 1553, 1558 (W.D. Okla. 1989) (granting motion to dismiss Section 12(a)(2) claims against law firm that merely drafted the offering documents: "A law firm [that] does [nothing] more than prepare an offering memorandum is not 'persuading' or 'urging' a person to purchase and thus is not 'soliciting' a

purchase as contemplated by the Supreme Court in *Pinter* v. *Dahl*.").  There are simply no allegations that the Rating Agencies undertook any activity that is typically associated with a seller of securities, including the absence of any allegation that the Rating Agencies actively contacted Plaintiffs or any other client regarding a potential investment in the securities at issue.

A court in the Southern District of New York has recently considered—and rejected—a similar claim based upon a theory that Rating Agencies were sellers and underwriters of MBS that the Agencies rated.  *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017(LAK), 2010 WL 337997 (S.D.N.Y. Feb. 1, 2010).  The claim dismissed in *In re Lehman Bros.* involved allegations of greater involvement in the creation and structuring of the securities than the allegations at issue here.  As the *Lehman* court explained, the plaintiffs in that case claimed that "the Rating Agencies' activities in assisting the drafting of the Prospectus Supplements, collaborating on credit enhancements, and using their models to structure particular deals to obtain the desired AAA ratings transformed them into statutory sellers."  *Id.* at *3.  The court nonetheless soundly rejected the claim and—relying on the controlling precedent of *Pinter*—recognized that seller liability cannot attach without "direct contact with plaintiffs or any other sales prospects."  *Id.*  The Court aptly analogized the alleged role of the Ratings Agencies to that of a builder or architect of a house, who "cannot properly be said to have participated in any legally relevant sense in its resale down the line." *Id.* at *4.  Because the Complaint does not allege any direct contacts between any Defendant and any Plaintiff, Defendants "cannot properly be said to have participated in any legally relevant sense" to the sale of the securities at issue.

Extending Ohio's Blue Sky law to the Rating Agencies based on the notion that their rating opinions on the securities or their alleged advice regarding the structuring of the securities are

related to the "sale" of securities would require an unprecedented and improper expansion of Ohio's

Blue Sky law—one that is at odds with all applicable definitions of "seller."

### D.   Plaintiffs' Section 1707.43 Claim Fails Because No Violation of the Statute Is Alleged Against a Seller

Plaintiffs' claim under § 1707.43 (Count III) fails for the separate reason that no such

claim can be made unless the Complaint also adequately alleges a substantive, primary violation of

the Ohio securities law.  Indisputably, there is no such allegation here.

Section 1707.43, entitled "Remedies of Purchaser in Unlawful Sale," creates no

independent cause of action.  Instead, it provides that "every sale or contract for sale *made in*

*violation of Chapter 1707* of the Revised Code, is voidable at the election of the purchaser," and,

when such a violation has occurred, it extends a security purchaser's potential remedy of rescission

as against any person that "participated in or aided *the seller . . .* in making such sale."  Ohio Rev.

Code § 1707.43 (emphasis added).  Thus, no liability can be imposed under this purely remedial

provision unless there has been a violation of a separate, substantive provision of the Ohio Securities

Statute.  Absent a finding of such a violation, there can exist no claim under § 1707.43.  *See Hardin*

v. *Reliance Trust Co.*,  No. 1:04 CV 02079, 2006 WL 2850455, at *4 (N.D. Ohio Sept. 29, 2006)

("Section 1707.43 is only a 'remedies' statute that provides for the *joint* liability of persons who aid

or participate in sales *made in violation of other portions* of the Ohio Securities Act.  Accordingly, *§*

*1707.43 is not susceptible to being 'violated.'"* (emphasis added)); *Martin*, 485 F. Supp. at 97

(Section 1707.43 claim requires proof that a *substantive* provision has been violated).

Here, Plaintiffs fail to allege the violation of any provision of the Ohio Securities Act

in connection with the sale of the securities at issue.  As demonstrated above, the Rating Agencies

are indisputably not "sellers," and the asserted § 1707.41 claim against them fails as a matter of law.

No other substantive violation of Chapter 1707 is even alleged. The Complaint is devoid of any allegations asserting any violations by the actual sellers of the securities at issue. Indeed, the Complaint fails even to identify who the sellers were. Necessarily, then, as there are no tenable allegations alleging a seller violation under § 1707.41, or any other violation, there can be no claim for "secondary liability" under § 1707.43 against the Rating Agencies.[23]

**E.      Plaintiffs Fail to Allege that the Rating Agencies Participated or Aided Such Sale**

Plaintiffs' Count III also fails as a matter of law because, even if a seller's violation of Chapter 1707 had been properly alleged—which it has not—Plaintiffs do not and cannot allege that the Rating Agencies, pursuant to Ohio Rev. Code § 1707.43, "*participated in or aided* the seller . . . in making such sale." (emphasis added). Again, as with § 1707.41, a properly pled cause of action requires a defendant be involved in the sale of the securities at issue. *See Boomershine*, 2008 WL 54803, at *2 (dismissing claim under § 1707.43 where defendants were not "involved" in the sale).

As discussed above, the Complaint contains no allegations whatsoever that connect the Rating Agencies to the solicitation or sale of the MBS. There is no allegation of any contact or communication between any of the Rating Agencies and Plaintiffs in connection with any of the alleged purchases. Nor is there even an allegation that the Plaintiffs were situated any differently from the tens of thousands of other investors around the globe who invested in any of the billions of dollars of securities offerings at issue in this case.

---

[23]   In *NCFE*, 580 F. Supp. 2d at 649-50, this Court allowed a § 1707.43 claim to proceed against Moody's, but in that case the alleged seller—Credit Suisse First Boston—*was* sued for substantive violations of the Blue Sky laws, thus establishing a potential predicate for secondary liability. *See In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp 986, 994 (S.D. Ohio 2007) (listing claims against seller). In this case, however, Plaintiffs fail to make *any* allegations against a seller that could provide the basis for a primary violation or secondary liability.

The Ohio courts, in interpreting § 1707.43, have observed that the statutory language ("every person that has participated in or aided the seller in any way in making such sale or contract for sale") is broad in scope, yet those same courts have consistently cited connections to the actual sale or solicitation process in finding a defendant potentially liable under this provision. *See, e.g.*, *Hild* v. *Woodcrest Ass'n*, 59 Ohio Misc. 13, 28 (Ct. Com. Pl. 1977) (defendant "prepare[d] a . . . [m]emorandum for the purpose of attracting potential investors" and "contacted a number of its own clients (including the plaintiff) interested in making the type of investment available").[24]

Under other states' Blue Sky laws, courts have rejected similar attempts to expand liability for participation in the sale of securities to entities, like the Rating Agencies, that have provided an opinion on a security or allegedly assisted in the process of structuring a security. *See* *Ackerman* v. *Schwartz*, 733 F. Supp. 1231, 1252 (N.D. Ind. 1989) (even presuming defendant law firm's "opinion letter may have been 'a factor contributing to the result' (the ultimate sale), no evidence suggests that [defendant law firm] personally and actively employed the opinion letter to solicit investors. In other words, [defendant law firm] cannot be said to have effected or attempted to effect the sale of a security. Liability under the Indiana Securities Act requires something more than the mere drafting of an opinion letter."), *rev'd on other grounds*, 947 F.2d 841 (7th Cir. 1991); *Rendler* v. *Markos*, 453 N.W.2d 202, 206-07 (Wis. Ct. App. 1990) (under Wisconsin version of Uniform Securities Act, although complaint alleged that defendants "directly . . . participated in offers, offers for sale and sales of the securities," plaintiffs' allegations were actually based on

---

[24]    In *NCFE*, where plaintiff alleged that it was "targeted" to receive Moody's ratings in connection with a *private placement* for securities issued by a non-public company and did not merely learn of the ratings as a member of the "investing public," the Court found a sufficient pleading of involvement in the sales process. *NCFE*, 580 F. Supp.

assertion that defendants "materially aided [the promoters] in a violation of Wisconsin law by failing to give them correct advice about the law; by withholding information about [the promoters'] fraudulent and unlawful acts from the limited partners; by preparing a private placement memorandum, advertising, which he knew would be used by [the promoters] to solicit investors in [the limited partnerships]; and by failing to withdraw from further representation of [the promoters] when he realized that they disregarded his legal advice, creating a conflict of interest between the general partners and the limited partnerships"; court concluded this did not allege defendants had "offered or sold securities" (alterations in original) (internal quotation marks omitted)).

   In sum, the complete absence of any adequate allegations that the Rating Agencies aided in the making of the sale provides yet another ground for the dismissal of Count III.

---

2d at 634, 648, 649-50. Here, in contrast, there is no allegation of any facts that even arguably suggest a connection between the Plaintiffs and the Rating Agencies. *See supra* Section III.C.1.a.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Complaint should be dismissed in its entirety, with prejudice.

Dated:   February 9, 2010

Respectfully submitted,

Floyd Abrams (admitted *pro hac vice*)
S. Penny Windle (admitted *pro hac vice*)
Tammy L. Roy (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Counsel for Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC*

James J Coster (admitted *pro hac vice*)
Joshua M. Rubins (admitted *pro hac vice*)
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, New York 10169
Telephone:  (212) 818-9200
Facsimile:  (212) 818-9606

*Counsel for Defendants Moody's Corp. and Moody's Investors Service, Inc.*

By: ____/s/ Drew H. Campbell_____
Drew H. Campbell (0047197)
BRICKER & ECKLER LLP
100 South Third Street
Columbus, Ohio 43215-4291
Telephone:  (614) 227-2300
Facsimile:  (614) 227-2390

*Trial Counsel for Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC*

By: ____/s/ Michael H. Carpenter_____
Michael H. Carpenter
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: (614) 365-4100
Facsimile: (614) 365-9145

*Trial Counsel for Defendants Moody's Corp. and Moody's Investors Service, Inc.*

Martin Flumenbaum (*pro hac vice* to be submitted)
Roberta A. Kaplan (*pro hac vice* to be submitted)
Julia Tarver Mason (*pro hac vice* to be submitted)
Tobias J. Stern (*pro hac vice* to be submitted)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Counsel for Defendant Fitch, Inc.*

By:   /s/ Thomas D. Warren
Thomas D. Warren
BAKER & HOSTETLER LLP
3200 National City Center
1900 East 9th Street
Cleveland, Ohio 44114-3485
Telephone: (216) 621-0200
Facsimile:  (216) 696-0740

*Trial Counsel for Defendant Fitch, Inc.*