## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| X | |
| OHIO POLICE & FIRE PENSION FUND, OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, STATE TEACHERS RETIREMENT SYSTEM OF OHIO, SCHOOL EMPLOYEES RETIREMENT SYSTEM OF OHIO, and OHIO PUBLIC EMPLOYEES DEFERRED COMPENSATION PROGRAM, : : : : : : : | Case No.: 2:09 cv 1054 |
| Plaintiffs, : : | |
| v. : : | Judge Graham |
| STANDARD & POOR'S FINANCIAL SERVICES LLC, THE MCGRAW-HILL COMPANIES, INC., MOODY'S CORP., MOODY'S INVESTORS SERVICE, INC., and FITCH, INC. : : : : : | Magistrate Judge Kemp |
| Defendants. : | |
| X | |

## THE OHIO FUNDS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT RATING AGENCIES' MOTION TO DISMISS

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................4

III. RELEVANT PLEADING STANDARDS .............................................................9

IV. ARGUMENT ......................................................................................................10

    A.  The First Amendment Does Not Bar Plaintiffs' Claims ................................10

        1.  Defendants Are Not Absolutely Immune From Liability Stemming From Their Ratings .........................................................................................12

Generally applicable laws do not offend the First Amendment based upon incidental effects on the press's ability to gather and report the news.  Defendants may be liable for negligence where their credit ratings are not factually well-grounded and cause injury.

Principal Authorities:  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S.Ct. 2513 (1991);  *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp.2d 630 (S.D. Ohio 2008).

        2.  The "Actual Malice" Standard Of Liability Does Not Bar Plaintiffs' Claims ............28

The "actual malice" standard does not apply where:  (i) Plaintiffs do not allege "defamation-type" injuries; (ii) Defendants have not acted in a traditional journalistic capacity; and (iii) Defendants' statements are not matters of "public concern."  Additionally, the "actual malice" standard raises questions of fact ordinarily not resolvable on a motion to dismiss.

Principal Authorities:  *Compuware v. Moody's Investors Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008); *LaSalle National Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y. 1996).

    B.  The Credit Rating Agency Reform Act of 2006 Does Not Preempt Plaintiffs' Claims ...........................................................................................................35

        1.  CRARA's Plain Text Forecloses Defendants' Strained Interpretation........................37

CRARA addresses regulation directed at "the registration, licensing, or qualification" of entities as NRSROs as well as "the substance of credit ratings" or the "procedures and methodologies" for determining ratings.  Plaintiffs' claims do not fall within that purview.

Principal authorities:  15 U.S.C. § 78o-7(c); *Wyeth v. Levine*, 129 S. Ct. 1187 (2009); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984); *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901 (6th Cir. 2007); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008).

2.   CRARA's Legislative History Does Not Support Preemption Here ..........................42

CRARA's legislative history reflects that CRARA's primary purpose is to establish universally applicable requirements for obtaining NRSRO status – not to be a shibboleth against state law liability.

Principal authorities:  152 Cong. Rec. H. 7565 (Sept. 27, 2006); 152 Cong. Rec. S. 10011 (Sept. 22, 2006); *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (plurality opinion); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008).

3.   Plaintiffs Do Not Purport to Regulate the Substance of Ratings or the Procedures or Methodologies for Determining Them .................................................45

None of Plaintiffs' claims requires jurors to determine standards governing "the substance of credit ratings" or the "procedures and methodologies" for determining them.  Nor do they invade the SEC's authority to oversee the licensing and registration of NRSROs.

Principal authorities:  *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008).

4.   CRARA Does Not Impliedly Preempt Plaintiffs' Claims ...........................................47

Nothing in CRARA's text or legislative history supports implied preemption.

Principal authorities:  *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002); *English v. Gen. Elec. Co.*, 496 U.S. 72 (1990); *Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008).

5.   Defendants' Authorities Do Not Support Preemption Here ........................................49

Defendants' authorities address statutes that – unlike CRARA – explicitly precluded the types of claims at issue or evinced a clear congressional intent to do so.

Principal authorities:  *Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005); *Burlison v. United States*, 533 F.3d 419 (6th Cir. 2008); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008).

6.   CRARA Does Not Apply Retroactively ...................................................................53

CRARA expressly provides it is to apply prospectively.  Accordingly, Plaintiffs' claims based on conduct occurring prior to CRARA's enactment could not be preempted.

Principal authorities:  15 U.S.C. § 78o-7(p); *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008).

C.  The Ohio Funds Successfully State Claims For Negligent Misrepresentation..................58

    1.  Ohio Law Governs the Ohio Funds' Claims................................................................58

Though a choice of law determination is premature, Ohio has the most significant relationship to the parties and the transactions at issue.

<u>Principal Authorities:</u>  *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 469468 (S.D. Ohio Feb. 27, 2006); Restatement (Second) of Conflicts of Law § 148.

    2.  New York's Martin Act Does Not Preclude The Ohio Funds' Claims ......................62

Neither New York law nor the Martin Act applies.  The Ohio Attorney General is the only person authorized by the Ohio General Assembly to bring the Ohio Funds' claims. The transactions at issue did not take place in their entirety "within or from" New York, as the Martin Act requires, and the Martin Act only precludes private plaintiffs from using the Martin Act's disclosure requirements to satisfy the duty element of a common law claim.

<u>Principal Authorities:</u>   Ohio Rev. Code §§ 145.10, 148.02, 742.09, 3307.13, 3309.13 (2010); N.Y. Gen. Bus. L. § 352-c; *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005); *Caboara v. Babylon Cove Dev., LLC.*, 862 N.Y.S.2d 535 (N.Y. App. Div. 2d Dep't 2008); *Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639 (N.Y. App. Div. 4th Dep't 2001).

    3.  The Ohio Funds' Claims Are Timely Under Ohio and New York Law......................68

        a.  The Ohio Funds Are Exempt From Ohio Rev. Code §1707.43(B) Under the *Nullum Tempus* Doctrine .............................................................. 69

As instrumentalities of the State of Ohio, the Ohio Funds are exempt from generally worded statutes of limitations, such as Ohio Rev. Code § 1707.43(B), under the common law doctrine of *nullum tempus occurrit regi*.

<u>Principal Authorities:</u>   *Ohio Dep't. of Transp. v. Sullivan*, 527 N.E.2d 798, 801 (Ohio 1988); *In re Ford*, 446 N.E.2d 214 (Ohio Ct. App. 10th Dist. 1982); *Law v. Lake Metroparks*, 11th Dist. No. 2006-L-072, 2006-Ohio-7010, 2006 WL 3833863

        b.  Plaintiffs Filed Within Two Years' Notice of Their Claims, Satisfying Ohio Rev. Code. § 1707.43(B) ..........................................................................72

Plaintiffs' claims are timely under Ohio law, having been commenced within two years of the date by which Plaintiffs were on "inquiry notice."  Defendants' own statements dissipated any putative "storm warnings."

Principal Authorities:  *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553 (6th Cir. 2005); *In re Firstenergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581 (N.D. Ohio 2004); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005); *Bovee v. Coopers & Lybrand*, 320 F. Supp. 2d 646 (S.D. Ohio 2004).

c.   The Ohio Funds' Claims Are Timely Under New York Law ............................. 82

The Ohio Funds' negligent misrepresentation claim is timely under New York law, as it was brought within six years of Plaintiffs' reliance upon Defendants' representations.

Principal Authorities:  N.Y. CPLR § 213(1); *Milin Pharmacy, Inc. v. Cash Register Sys., Inc.*, 570 N.Y.S.2d 341 (N.Y. App. Div. 2d Dep't 1991).

4.   The Ohio Funds Adequately Allege All of the Elements of a Negligent
Misrepresentation Claim ............................................................................83

a.   The Ohio Funds Allege Facts Giving Rise To a Duty ......................................... 83

Under both Ohio and New York law, Defendants' intimate involvement in structuring and rating the MBS for sale to the Ohio Funds and to other members of the limited group of eligible purchasers gave rise to a duty to issue the MBS ratings with reasonable care.

Principal Authorities:  Restatement (Second) of Torts § 552(1); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008); *Credit Alliance Corp. v. Arthur Anderson & Co.*, 65 N.Y.2d 536 (N.Y. 1985); *LaSalle National Bank v. Duff & Phelps*, 951 F. Supp. 1071 (S.D.N.Y. 1996).

b.   Defendants' Credit Ratings Are Actionable False Statements ............................. 93

Courts have repeatedly rejected Defendants' arguments that their ratings are non-actionable opinions.  The Complaint sufficiently alleges that Defendants did not believe in the accuracy of their ratings and/or issued them without adequate factual bases.

Principal Authorities:  *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009).

c.   The Ohio Funds Allege Justifiable Reliance ....................................................... 96

Plaintiffs' reliance allegations raise fact questions that are inappropriate to resolve on the current record and more than suffice at the pleading stage.

Principal Authorities:  *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009).

            d.  The Ohio Funds Allege Proximate Causation ........................................................ 99

The Complaint adequately pleads both transaction causation and loss causation, and there is no requirement that the Ohio Funds allege that they sold the MBS at issue to meet the standard.

Principal Authorities:  *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006); *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, No. 08 CIV 7422, 2009 WL 4668579 (S.D.N.Y. Dec. 9, 2009).

    D.  Plaintiffs Have Alleged Viable Claims Under The Ohio Securities Act .........................105

        1.  Plaintiffs' Complaint Alleges A Sufficient Ohio Nexus To Warrant Application of the Ohio Securities Act .....................................................................105

The Ohio Funds are instrumentalities of the state, and Ohio has the most compelling interest in their claims.

Principal Authorities:  *Federated Management Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 738 N.E.2d 842; *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986 (S.D. Ohio 2007); *In re Columbus Skyline Securities, Inc.* (1996), 74 Ohio St.3d 495; *Martin v. Steubner*, 485 F. Supp. 88 (S.D. Ohio 1979).

        2.  Defendants Are Liable Under Ohio Rev. Code §1707.41 .........................................108

Defendants' receipt of substantial "profits" from the securities sold to the Ohio Funds triggers liability under §1707.41.  Defendants' reliance on jurisprudence interpreting §12(a) of the Securities Act of 1933 is misplaced.

Principal Authorities:  Ohio Rev. Code § 1707.41; 15 U.S.C.A. 77l(a); *Federated Management Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 738 N.E.2d 842.

        3.  Plaintiffs Have Sufficiently Alleged That Defendants Are Liable To Plaintiffs Under Ohio Rev. Code §1707.43 ............................................................................112

Defendants' material misrepresentations upon which the Ohio Funds reasonably relied violated the Ohio Securities Act, creating liability for Defendants under Ohio Rev. Code §§1707.41 and 1707.43.  Ohio Rev. Code §1707.43 is interpreted broadly and extends liability to those who aid or participate *in any way* in any violation of the Ohio Securities Act.

Principal Authorities:  Ohio Rev. Code §§ 1707.43, 1707.44(B)(4); *Martin v. Stuebner,* 485 F. Supp. 88 (S.D. Ohio 1979)*; In re Nat'l Century Fin. Enters., Inc., Inv. Litig.,* 541 F. Supp. 2d 986 (S.D. Ohio 2007); *Federated Management Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 738 N.E.2d 842.

V.  CONCLUSION ...................................................................................................................118

## TABLE OF AUTHORITIES

**Page**

__Cases__

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780 (3d Cir. 1999) .................................. 60

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155
(S.D.N.Y. 2009) .......................................................................................................... passim

*Ackerman v. Schwartz*, 733 F. Supp. 1231 (N.D. Ind. 1989)....................................................... 150

*AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120 (4th Cir. 2008)..................................... 67

*Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008) .......................................................... 61, 63, 64

*Amann v. Clear Channel Commc'ns, Inc.* (2006), 165 Ohio App.3d 291, 846
N.E.2d 95 ................................................................................................................... 113

*Amerifirst Savings Bank of Xenia v. Krug* (1999), 136 Ohio App.3d 468, 737
N.E.2d 68 ................................................................................................................... 126

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ......................................................................... 9, 10, 59

*Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*, No. 8:07-cv-00690,
2008 WL 4372847 (M.D. Fla. Sept. 24, 2008) ......................................................... 81

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004) ...................................................... 95

*Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983 (7th Cir. 2000) ......................................... 67

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) .............................................................. 64

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................ 9, 10

*Bellios v. Victor Belata Belting Co.*, 724 F. Supp. 514 (S.D. Ohio 1989)................................... 17

*Berman v. 283 Washington Ave.*, No. 101706-09, 2009 WL 2207515 (N.Y. Sup.
Ct. July 14, 2009)................................................................................................... 80, 87

*Bernie v. Waterfront, Ltd. Dividend Housing Ass'n*, 614 F.Supp. 651 (D.C. Ohio
1985) ....................................................................................................................... 138

*Bovee v. Coopers & Lybrand*, 320 F. Supp. 2d 646 (S.D. Ohio 2004)..................................... 100

*Broderick v. Rosner*, 294 U.S. 629 (1935).................................................................................. 81

*Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901 (6th Cir. 2007)........................... 53, 60, 66

*Burlison v. United States*, 533 F.3d 419 (6th Cir. 2008) .............................................. 64

*Caboara v. Babylon Cove Dev., LLC.*, 862 N.Y.S.2d 535 (N.Y. App. Div. 2d
    Dep't 2008) ............................................................................................. 84, 86

*Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002) ............................................ 128

*Callahan v. Class One, Inc.* (1991), 58 Ohio St.3d 76, 567 N.E.2d 1036 ................... 137

*Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042 (1978) .................................................. 28

*Carroll v. Lanza*, 349 U.S. 408, 411 (1955) ............................................................... 81

*Carter v. Delaware County Board of Commissioners*, No. 2:07-cv-1189, 2009
    WL 544907 (S.D. Ohio Mar. 3, 2009) ................................................................ 110

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001) ........................... 85

*City of Cleveland v. Ameriquest Mortgage Sec., Inc.*, 621 F. Supp. 2d 513 (N.D.
    Ohio 2009) .......................................................................................................... 67

*City of Painesville v. First Montauk Fin., Corp.*, 178 F.R.D. 180 (N.D. Ohio
    1998) ................................................................................................................... 99

*Clinger v. Duncan* (1957), 166 Ohio St. 216, 141 N.E.2d 156 .................................. 134

*CNA Reinsurance of London Ltd. v. Home Ins. Co.*, No. 85 CIV. 5681, 1990 WL
    3231 (S.D.N.Y. Jan. 10, 1990) ............................................................................ 124

*Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S.Ct. 2513 (1991) ............................ 13

*Colon v. Banco Popular N. Am.*, 874 N.Y.S.2d 44 (N.Y. App. Div. 1st Dep't
    2009) ................................................................................................................. 106

*Commercial Fin. Servs., Inc. v. Arthur Andersen LLP*, 94 P.3d 106 (Okla. Civ.
    App. 2004) ................................................................................................ 22, 23, 41

*Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520 (6th Cir. 2007) .................... passim

*Compuware Corp. v. Moody's Investors Servs., Inc.*, 222 F.R.D. 124 (E.D. Mich.
    2004) ............................................................................................................ 27, 43

*Compuware Corp. v. Moody's Investors Servs., Inc.*, 273 F. Supp. 2d 914 (E.D.
    Mich. 2002) ......................................................................................................... 42

*Compuware Corp. v. Moody's Investors Servs., Inc.*, 371 F. Supp. 2d 898 (E.D.
    Mich. 2005) ................................................................................................... 32, 43

*Compuware Corp. v. Moody's Investors Servs., Inc.*, No. Civ. 03-70247, 2004 WL 1092285 (E.D. Mich. May 11, 2004)) ............................................................ 43

*Corporate Partners, L.P. v. Natl. Westminster Bank PLC*, 126 Ohio App.3d 516, 710 N.E.2d 1144 (1998) ........................................................................................ 150

*County of Orange v. McGraw Hill Cos., Inc.*, 245 B.R. 151 (C.D. Cal. 1999) ............... 23, 38, 44

*CPC Int'l, Inc. v. McKesson Corp.*, 70 N.Y.2d 268 (N.Y. 1987) ........................... 83, 84, 87, 122

*Credit Alliance Corp. v. Arthur Anderson & Co.,* 65 N.Y.2d 536 (N.Y. 1985) ........................ 115

*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975 (1967) ........................................... 29

*Davis v. Montenery*, 173 Ohio App.3d 740, 2007-Ohio-6221, 880 N.E. 2d 488 ...................... 125

*Delman v. City of Cleveland Heights* (1989), 41 Ohio St.3d 1, 534 N.E.2d 835 ............... 58, 108

*DeMarco v. Robertson Stevens Inc.*, 318 F. Supp. 2d 110 (S.D.N.Y. 2004) ............................. 131

*Doss, Inc. v. Christie's Inc.*, No. 08 Civ. 10577, 2009 WL 3053713 (S.D.N.Y. Sept. 23, 2009) ..................................................................................................... 105

*Duke v. Touche Ross & Co.,* 765 F. Supp. 69 (S.D.N.Y. 1991) ................................................. 118

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939 (1985) ........................................................................................................................ 30

*Dura Pharm. v. Broudo*, 544 U.S. 336 (2005) .......................................................................... 129

*Eastwood Enters., LLC v. Farha*, No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ............................................................................... 129

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) .................................................................................................... 130

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) .......................................................................... 60

*Fair v. Sch. Employees Ret. Sys.* (1975), 44 Ohio App.2d 115, 335 N.E.2d 868 ........................ 91

*Fandy Corp. v. Lung-Fong Chen*, 691 N.Y.S.2d 572 (N.Y. App. Div. 2d Dep't 1999) ..................................................................................................................... 106

*Faulkner v. Beer*, No. 0603597/2005, 2007 WL 4639458 (N.Y. Sup. Ct. Dec. 21, 2007) ...................................................................................................................... 84

*Federated Management Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 738 N.E.2d 842 ............................................................................................. passim

*Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529 (D.C. Cir. 1984) ................................................. 61

*Ferron v. Subscriberbase Holdings, Inc.*, No. 2:08-CV-760, 2009 WL 650731 (S.D. Ohio Mar. 10, 2009) ......................................................................... 47

*Fin. Trust Co. v. Citibank, N.A.*, 268 F. Supp. 2d 561 (D. V.I. 2003) .......................................... 79

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 869 F.2d 175 (2d Cir. 1989) ............................................................................. 37, 38, 115

*First Fin. Sav. Bank, Inc. v. Am. Bankers Ins. Co.*, CIV A. 88-33-CIV-5, 1989 WL 168015 (E.D.N.C. Aug. 4, 1989) ......................................................... 19, 120

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ............................................................................... 90

*Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n* (1990), 54 Ohio St.3d 1, 560 N.E.2d 206 ......................................................... 114

*Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004) ..................................... 98

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005) ......................................................................... 81

*Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311 (2d Cir. 2000)................................... 66

*Fulgenzi v. Wyeth, Inc.*, No. 5:09CV1767, 2010 WL 649349 (N.D. Ohio Feb. 19, 2010) .................................................................................. 53

*Fulst v. Thompson*, No, 2:09-cv-725, 2009 WL 4153222 (S.D. Ohio Nov. 20, 2009) ..................................................................................... 9

*Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419 (6th Cir. 2009)........................................... 74

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997 (1974) ...................................... 28, 29, 30

*Gosden v. Louis* (1996), 116 Ohio App.3d 195, 687 N.E.2d 481 ......................................... 27, 28

*Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314 (2002) ......................................... 83

*Grammer v. Turits*, 706 N.Y.S.2d 453 (N.Y. App. Div. 2d Dep't 2000) .................................. 123

*Guttner v. Dow Jones, Inc.* (1986), 22 Ohio St.3d 286, 490 N.E.2d 898 ................................. 113

*Hardy v. Midland Enterprises, Inc.*, No. 01-4212, 2003 WL 2007940 (6th Cir. April 30, 2003) ......................................................................... 110

*Harris v. Schultz & Son, Inc.* (Ohio Ct. App. Mar. 20, 1989), 3rd Dist. No. 4-87-4, 1989 WL 29860 ......................................................................... 89

*Hayes v. Mid-Ohio Sec. Corp.*, No. 1:05 cv 1800, 2006 WL 2233234 (N.D. Ohio Aug. 3, 2006) .................................................................................. 94, 95, 103

*Hild v. Woodcrest Ass'n* (Ct. Com. Pl. 1977), 59 Ohio Misc. 13 .............................. 148, 149, 150

*Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997) .................. 69, 71, 73

*In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411, 2010 WL 727227 (S.D.N.Y. February 22, 2010) ........................................................................... 135

*In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d 728 (M.D. Tenn. 2006) ..................................... 132

*In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006) ......................... 128

*In re Century Bus. Servs. Sec. Litig.,* No. 1:99cv02200, 2002 WL 32254513 (N.D. Ohio June 27, 2002) ............................................................................... 96, 104

*In re Citisource, Inc. Sec. Litig.*, 649 F. Supp. 1069 (S.D.N.Y. 1988) ...................................... 145

*In re Columbus Skyline Securities, Inc.* (1996), 74 Ohio St.3d 495 ................................. 140, 147

*In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672 (E.D. Mich. 2004) ...................................... 129

*In re Coordinated Pretrial Proceedings In Petroleum Products Antitrust Litig.*, 109 F.3d 602 (9th Cir. 1997) ........................................................................ 134

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) ............................................................... 133

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 511 F. Supp. 2d 742 (S.D. Texas 2005) ....................................................................................... 14, 38, 107

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 25 F. Supp. 2d 837 (N.D. Ill. 1998) .............................................................................................. 14

*In re Firstenergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581 (N.D. Ohio 2004) ............................... 96

*In re Fitch, Inc.*, 330 F.3d 104 (2d Cir. 2003) .......................................................................... 37

*In re Ford* (1982), 3 Ohio App.3d 416, 446 N.E.2d 214 .......................................................... 91

*In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) .......................................................... 75

*In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F.Supp. 2d 1007 (E.D. Mich. 2003) .............................................................................................. 145

*In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) ...................................... 130

{H1831226.2 }

*In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017, 2010 WL 337997 (S.D.N.Y. Feb. 1, 2010) .................................................................. 144

*In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331 (S.D.N.Y. 2001)........................................... 131

*In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009).............................. 99, 133

*In re Nat'l Century Fin. Enters, Inc., Invest. Litig.*, 541 F. Supp. 2d 986 (S.D. Ohio 2007) .................................................................. 137

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 469468 (S.D. Ohio Feb. 27, 2006) ................................................... 73, 75

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008) .................................................................. passim

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 604 F. Supp. 2d 1128 (S.D. Ohio 2009) .................................................................. 133

*In re Nord Res. Corp. Sec. Litig.*, Nos. C-3-90-380, 391, 409 and 410, 1992 WL 1258516 (S.D. Ohio Dec. 16, 1992) ................................................. 78

*In re Revco Sec. Litig*, No. 89CV593, 1991 WL 353385 (N.D. Ohio Dec. 12, 1991) .................................................................. 136

*In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605 (D. N.J. 2005)..................... 132

*In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328 (S.D.N.Y. 2000) ........................................ 96

*In re Taxable Mun. Bond Sec. Litig.*, Civ. A. MDL 863, 1993 WL 591418 (E.D. La. Dec. 29, 1993).................................................................. passim

*In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010 (N.D. Ohio 2000).................................. 145

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .................................................. 115

*Ins. Distrib. Network, Inc. v. Mariano*, No. 1:04-cv-466, 2008 WL 520915 (S.D. Ohio Feb. 26, 2008) ................................................................ 74, 77

*Int'l Dairy Foods Ass'n v. Boggs*, No. 2:08-CV-628, 2009 WL 937045 (S.D. Ohio Apr. 2, 2009) ................................................................ 56, 61

*Jasso v. Citizens Telecomms. Co. of Cal., Inc.*, No. CIV S-05-2649 GEB EFB PS, 2007 WL 97036 (E.D. Cal. Jan. 9, 2007).................................................. 65

*Jefferson County Sch. Dist. No. R-1 v. Moody's Investors Servs., Inc.*, 175 F.3d 848 (10th Cir. 1999).................................................... 26, 27, 33, 34

*Jefferson County School Dist. No. R-1, v. Moody's Investor's Servs.*, 175 F.3d 848 (10th Cir. 1999) .................................................................................... 123

*John Hancock Mut. Life Ins. Co. v. Yates*, 299 U.S. 178 (1936) .................................. 81

*Johnson v. Church of the Open Door,* 179 Ohio App.3d 532, 2008-Ohio-6054, 902 N.E.2d 1002 ....................................................................................... 125

*Kan. Pub. Employees Ret. Sys. v. Reimer & Koger Assocs.*, 941 P.2d 1321 (Kan. 1997) ............................................................................................... 92

*Kerusa Co. v. W10Z/515 Real Estate Ltd.*, 12 N.Y.3d 236, 243-47 (N.Y. 2009) ......................... 86

*Kimmell v. Schaefer*, 89 N.Y.2d 257 (N.Y. 1996) ..................................................... 121

*Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (N.Y. 1996) .............................................. 127

*Kondrat v. Morris* (Ohio Ct. App. 1997), 118 Ohio App.3d 198, 692 N.E.2d 246 ..................... 124

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) .............................................. passim

*LaSalle National Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y. 1996) ..................................................................... passim

*Lasher v. Albion Cen. Sch. Dist.*, 833 N.Y.S.2d 791 (N.Y. App. Div. 4th Dep't 2007) ............................................................................................... 106

*Laub v. Faessel*, 745 N.Y.S.2d 534 (N.Y. App. Div. 1st Dep't 2002) ...................... 130

*Law v. Lake Metroparks*, 11th Dist. No. 2006-L-072, 2006-Ohio-7010 ........................ 91

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159 (S.D.N.Y. 2001) ................................................. 82

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)......................... 97, 98, 133

*Lewis v. Horace Mann Ins. Co.*, 410 F. Supp. 2d 640 (N.D. Ohio 2005)........................ 74, 77

*Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450 (N.D. Ohio 2008)........................ 93

*Lynch v. Dean Witter Reynolds, Inc.* (1999), 134 Ohio App.3d 668, 731 N.E.2d 1205................................................................................. 94

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 68 A.D.3d 1747 (N.Y. App. Div. 1st Dep't 2009)................................................................ 119

*Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818 (6th Cir. 1990)................................ 74

*Martin v. Steubner*, 485 F.Supp. 88 (S.D. Ohio 1979) ............................ 138, 140, 145

*Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156 (3d Cir. 1998) ............................................... 72

*Mayer v. Mylod*, 988 F.2d 635 (6th Cir. 1993) ................................................... 16, 120

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ....................................................... 46, 54

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411 (S.D.N.Y. 2003) ................................................................................................................ 128

*Miami Valley Paper, LLC v. Lebbing Eng'g & Consulting GMBH*, No. 1:05-CV-00702, 2009 WL 818618 (S.D. Ohio Mar. 26, 2009) ......................................... 124

*Milin Pharmacy, Inc. v. Cash Register Sys., Inc.*, 570 N.Y.S.2d 341 (N.Y. App. Div. 2d Dep't 1991) ........................................................................................... 105

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695 (1990) ........................................... 31

*Miller v. Currie*, 50 F.3d 373 (6th Cir. 1995) ........................................................... 107

*Motorola Credit Union Corp. v. Uzan*, 561 F.3d 123 (2d Cir. 2009) ........................................ 134

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) .......................................................................................... 46

*Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prods., Inc.*, No. 2:02-cv-1288, 2007 WL 894833 (S.D. Ohio Mar. 22, 2007) ......................................................... 114

*New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003) .................................................................................... 95

*New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710 (1964) ....................................... 28, 29

*Newman v. Warnaco Group, Inc.*, 335 F.3d 187 (2d Cir. 2003) ......................................... 96

*Ohio Dep't of Mental Retardation v. Bade* (Ohio Ct. App. Feb. 9, 1990), 11th Dist. No. 88-L-13-171, 1990 WL 10953 ...................................................................... 89

*Ohio* Dep't. of Transp. v. Sullivan *(1988), 38 Ohio St.3d 137,* 527 N.E.2d 798 .............. 88, 89, 92

*Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729 (N.D. Ill. 2006) ......................................... 132

*Pacific Employers Ins. Co. v. Indus. Accident Comm'n of Cal.*, 306 U.S. 493 (1939) .................................................................................................................. 80

*Parkhurst v. North Am. Fin. Servs.*, 919 F. Supp. 270 (E.D. Mich. 1996) ................................ 126

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009) ........................................... 82

*People v. Coventry First LLC*, No. 0404620/2006, 2007 WL 2905486 (N.Y. Sup. Ct. Sept. 25, 2007) ........................................................................................ 82

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558 (1986) ........................ 30

*Pinter v. Dahl*, 486 U.S. 622 (1988) ..................................................................................... 144

*Premier Bus. Group, LLC v. Red Bull of N. Am. Inc.*, No. 08-CV-01453, 2009 WL 3242050 (N.D. Ohio Sept. 30, 2009) ........................................................ 114

*Q & R Assocs., Inc. v. Unifi Technical Fabrics, LLC*, No. 1:01-cv-641, 2006 WL 2850503 (S.D. Ohio Oct. 3, 2006) .......................................................... 78

*Quinn v. McGraw-Hill Cos.*, 168 F.3d 331 (7th Cir. 1999) ............................................... 126

*Rendler v. Markos*, 154 Wis. 2d 420 (Wis. Ct. App. 1990) ................................................ 150

*Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S. Ct. 999 (2008) ...................................... 62, 63, 64

*Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 128 S. Ct. 989 (2008) ................................... 64

*Ryan v. Ambrosio*, 8th Dist. No. 91036, 2008-Ohio-6646, 2008 WL 5258308 ..................... 88, 93

*Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639 (N.Y. App. Div. 4th Dep't 2001) ................................................................................................. 84

*Schwartz v. Michaels*, No. 91 CIV. 3538, 1992 WL 184527 (S.D.N.Y. July 23, 1992) .................................................................................................. 117

*Scott v. Boos*, 215 F.3d 940 (9th Cir. 2000) .................................................... 71, 72, 73

*Shaheen v. Stephen Hahn, Inc.*, No. 92 Civ. 8062, 1994 WL 854659 (S.D.N.Y. March 9, 1994) ........................................................................................ 105

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) ......................................................... 52

*SIPC v. BDO Seidman, LLP*, 222 F.3d 63 (2d Cir. 2000) ..................................................... 119

*Sky Tech. Partners, LLC v. Midwest Research Inst.*, 125 F. Supp. 2d 286 (S.D. Ohio 2000) ................................................................................................. 76

*Snead v. McCaskey* (Ohio Ct. App. June 27, 1997), 11th Dist. No. 96-G-2007, 1997 WL 402396 ...................................................................................... 122

*Soc'y for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756 (No. 13, 156), 767, 2 Gall. 105 (C.C.N.H. 1814) ................................................................. 71

*Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374 (6th Cir. 1968) ......................... 138

*Sprietsma v. Mercury Marine*, 537 U.S. 51, 123 S. Ct. 518 (2002) ............................................... 59

*St. Amant v. Thompson,* 390 U.S. 727 (1968) ................................................................. 44

*Staehr v. Hartford Fin. Serv. Group*, 547 F.3d 406 (2d Cir. 2008) .................................. 44, 97, 98

*Stancik v. CNBC*, 420 F. Supp. 2d 800 (N.D. Ohio 2006) ........................................... 114

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 CIV. 8058, 2001 WL 1111508 (S.D.N.Y. Sept. 19, 2001) ................................................................. 79

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ................................................................. 85

*Sykes v. RFD Third Ave. 1 Assocs., LLC*, 884 N.Y.S. 2d 745 (N.Y. App. Div. 1st Dep't 2009) ................................................................. 117

*Texlon Corp. v. Smart Media of Del., Inc.*, 9th Dist. Nos. 22098, 22099, 2005-Ohio-4931 ................................................................. 123

*Thomson v. TransAm Trucking, Inc.*, No. 2:08-cv-927, 2009 WL 1542738 (S.D. Ohio June 1, 2009) ................................................................. 124

*Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534 (1967) ................................................... 42

*Train v. Colo. Pub. Interest Research Group, Inc.*, 426 U.S. 1 (1976) ........................ 66

*Truck-Lite Co. v. GS1 US, Inc.*, No. 07-CV-68A, 2008 WL 833498 (W.D.N.Y. Mar. 27, 2008) ................................................................. 124

*Universal Contracting Corp. v. Aug*, 1st Dist. Nos. C-030719, A-0103486, 2004-Ohio-7133, 2004 WL 3015325 ................................................................. 114

*Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183 (S.D.N.Y. 1999) ................................................................. 118

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*, No. 08 Civ. 7422, 2009 WL 4668579 (S.D.N.Y. Dec. 9, 2009) ................................................................. 132

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed. 2d 929 (1991) ................................................................. 16

*Wodek v. Bradt Constr., Inc.*,(Mar. 19, 1997), 9th Dist. No. 2578-M, 1997 WL 148055 ................................................................. 114

*Woods v. Capital Univ.*, 10th Dist. No. 09AP166, 2009-Ohio-5671, 2009 WL 3465827 ................................................................. 30

*Wyeth v. Levine*, 129 S. Ct. 1187 (2009) ................................................................. 46, 47

*Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553 (6th Cir. 2005) ......... 94, 95, 97, 102

*Xpedior Credit Trust v. Credit Suisse First Boston (U.S.A.), Inc.* No. 02 Civ. 9149, 2004 WL 435058 (S.D.N.Y. Mar. 9, 2004) ................................................. 85

*Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733 (N.D. Ohio 2006).............................. 17, 121

## **Statutes**

15 U.S.C. § 717b(e)(1)..................................................................................... 53

15 U.S.C. § 78o-7(a)(1)(B) .............................................................................. 38

15 U.S.C. § 78o-7(a)-(b) .................................................................................. 38

15 U.S.C. § 78o-7(o) ........................................................................................ 44

15 U.S.C. § 78o-7(o)(1) ................................................................................... 41

15 U.S.C. § 78o-7(p) .................................................................................. 54, 55

15 U.S.C. §§ 77r(a)(1)(A)-(B) ......................................................................... 52

15 U.S.C. §§ 78o-7(f), 78o-7(h), 78o-7(i) ....................................................... 38

15 U.S.C.A § 77l(a) ....................................................................................... 111

21 U.S.C. § 360k(a) ......................................................................................... 50

Ohio Rev. Code § 1.01 ................................................................................... 109

Ohio Rev. Code § 1.63 ..................................................................................... 53

Ohio Rev. Code § 1707.41.......................................................... 46, 108, 109, 110

Ohio Rev. Code § 1707.43 ........................................................................ passim

Ohio Rev. Code § 2305.09 ............................................................................... 73

Ohio Rev. Code § 2743.01(A) .......................................................................... 71

Ohio Rev. Code §1707.44 .............................................................................. 113

## **Rules**

Fed. R. Evid. 201 ............................................................................................. 44

Federal Rule of Civil Procedure 8(a)(2) ............................................................. 9

**Other Authorities**

152 Cong. Rec. H7567 (daily ed. Sept. 27, 2006)(statement of Rep. Oxley) .................. 37, 43, 44

152 Cong. Rec. S10011 (daily ed. Sept. 22, 2006)(statement of Sen. Sarbanes) ................. 42, 43

72 N.Y. Jur. 2d Investment Securities § 279 ............................................................. 68

75A N.Y. Jur. 2d Limitations and Laches § 233 ........................................................ 82

Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327
   (2006) ...................................................................................................... 37

Military Commissions Act of 2006, Pub. L. No. 109-366, § 6(b)(2), 120 Stat.
   2600 (2006) ............................................................................................... 55

N.Y. Gen. Bus. L. § 352-c ................................................................................ 63, 65

N.Y. Gen. Bus. L. §§352-53 ................................................................................. 62

New York Civil Practice Law Rules ("CPLR") § 213(1) ............................................. 82

Restatement (Second) of Conflicts of Law § 148 ........................................... 58, 59, 60

Restatement (Second) of Torts § 552 ........................................................... 84, 91, 92

Section 332(c)(3)(A) of Federal Communications Act ............................................... 51

Securities Act of 1933 ....................................................................................... 110

Securities Exchange Act of 1934 ........................................................................... 40

*Securitization and its Discontents:   The Dynamics of Financial Product
   Development*, 29 CARDOZO L. REV. 1553, 1700 (2008) ................................... 38, 42

U.S. CONST. art. IV, §1 ...................................................................................... 63

Plaintiffs Ohio Police & Fire Pension Fund, Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio, and Ohio Public Employees Deferred Compensation Program (collectively, the "Ohio Funds" or "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Standard & Poor's Financial Services LLC, The McGraw-Hill Companies, Inc., Moody's Corp., Moody's Investors Service, Inc., and Fitch, Inc. (collectively, the "Rating Agencies" or "Defendants")[1] Joint Motion to Dismiss the Ohio Funds' Complaint.  For the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

I.      **INTRODUCTION**

The Rating Agencies are the nucleus of the global credit markets, issuing ratings based upon analyses and assessments that directly impact both the prices at which securities sell and the investment decisions of purchasers.  Defendants have unique access to critical information otherwise unavailable.  Investors rely upon the Rating Agencies to be impartial and honest arbiters of risk.  This action arises from Defendants' wholesale abandonment of their claimed guiding principles of independence and objectivity.  Here, Defendants worked side-by-side with securities issuers to package opaque asset-backed securities ("ABS"), virtually preordained to have false and misleading investment grade ratings when they were sold to members of a limited class of qualified investors, such as  the Ohio Funds.  In purchasing the ABS at issue in the Complaint, namely residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS"), the Ohio Funds did not know that the Rating Agencies' essential

---

[1] Standard & Poor's Financial Services LLC and The McGraw-Hill Companies, Inc. are also referred to collectively herein as "S&P."  Moody's Corp. and Moody's Investors Service, Inc. are referred to collectively herein as "Moody's," and Fitch, Inc. is referred to as "Fitch."

and lucrative role in structuring these securities reduced the AAA ratings to little more than a rubber stamp of products that Defendants helped design.

The Rating Agencies were co-architects of the ABS that the Ohio Funds purchased, and these securities simply could not have issued without Defendants' active participation. As the Complaint alleges in detail, Defendants' highest ratings were *required* for the issuers to sell these securities to the Ohio Funds. In this regard, the ABS offering documents explicitly stated that the securities would issue *only if* one or more of the Defendants assigned their highest initial investment grade rating. The offering documents also indicated that the net proceeds of each offering would be used to purchase the mortgages underlying the subject securities. Absent Defendants' highest ratings, each planned offering for the ABS would have imploded, and the Ohio Funds could not have purchased the securities.

Defendants' representatives have admitted that the highest investment grade rating was required by the ABS issuers to get the rating business, it was the starting point – not the product of legitimate collaboration with ABS issuers. After receiving an issuer's rating demands, the Rating Agencies worked with the issuer from start to finish, which included designing the credit enhancement aspects of the securities' capital structures, in an effort to support the mandated ratings. Because credit enhancement reduced the issuer's profit, the Rating Agencies maintained unwarranted low expected loss projections, which correspondingly inflated the assigned ratings. Far from the unbiased and trustworthy analysis that Defendants knew investors like the Ohio Funds relied upon the Rating Agencies to provide, the ratings process became a negotiation between Defendants and issuers that enabled the ABS purchased by the Ohio Funds to issue with inflated AAA ratings. Defendants' representatives have now confessed that they knew it was

wrong to subvert their objectivity and independence to the issuers' demands, but the fees at stake proved too great for the Rating Agencies to resist.

Because the "issuer pays" model presented potential conflicts of interest, the Rating Agencies consistently represented:  (i) that they had numerous safeguards in place to manage these conflicts; and (ii) that their ratings opinions were unbiased, trustworthy, independent, and objective.  Defendants' reassurances were false.  Unbeknownst to the Ohio Funds, the Rating Agencies were engaged in a self-described "race to the bottom" pursuing the largest share of the exponentially greater fees available for designing the ABS in exchange for assigning their highest investment grade ratings to these securities.  Structured finance rating assignments, which accounted for more than 40 percent of the Rating Agencies' revenues during the Relevant Period (defined below), went to the rating agency with the lowest standards.  Relying on Defendants' ratings, the Ohio Funds fell victim to Defendants' self-proclaimed "market share war" to capture ABS ratings work which prevented analysts from putting investor interests first.  Defendants abandoned their objectivity to avoid killing their "golden goose."

The facts alleged in the Complaint plausibly demonstrate that the indispensable and lucrative role of the Rating Agencies in structuring the ABS that the Ohio Funds purchased compromised and distorted the assigned ratings.  Plaintiffs' allegations outweigh any inference that the ratings at issue were merely "predictive opinions" resulting from objective and independent analyses addressing matters of public concern.  While serving as co-architects of the ABS and possessing undeniably superior knowledge of the risks presented, the Rating Agencies assigned inaccurate and inflated ratings to these securities knowing that the Ohio Funds and other members of the limited class of qualified institutional investors would rely upon the ratings in making their investment decisions.

## II.   STATEMENT OF FACTS

Each Plaintiff is an instrumentality of the State of Ohio operating pursuant to state statute.   ¶¶16-25.[2]   Generally speaking Plaintiffs are authorized by their respective enabling statutes to provide retirement, disability or other benefits.   *Id*.   Each Plaintiff purchased certain ABS during the period from January 1, 2005 through July 8, 2008 (the "Relevant Period") as identified in Exhibits A– E to the Complaint.   ¶1.

Each Defendant is a nationally recognized statistical rating organization ("NRSROs") and provides credit ratings, risk evaluation, investment research, securities monitoring, and financial data to investors.   ¶¶26-28.   Each Defendant played an integral role in structuring, issuing and rating the ABS that Plaintiffs purchased during the Relevant Period.   *Id*.

ABS are financial products whose value is derived from and collateralized by (*i.e.*, "backed" by) the revenue stream flowing from a discrete pool of underlying assets.   ¶31.   The assets underlying ABS are often illiquid and not easily marketable on an individual basis.   *Id*.   The ABS at issue in this case, namely RMBS and CMBS, were backed by residential mortgage loans and commercial mortgage loans, respectively.   *Id*.   Residential mortgage loans, in particular, became an increasingly popular securitized asset as the housing market thrived during the early to middle part of this decade.   ¶31.   At the same time, newer and more variable types of such loan products, such as subprime, adjustable rate mortgages, and limited documentation loans, which carried significantly more risk than traditional mortgage loans, became a key component of structured finance products such as the ones Plaintiffs purchased.   ¶¶82-93. Unbeknownst to Plaintiffs, Defendants failed to make adjustments in their risk models and loss calculations to account for the considerably greater risk inherent to these loan products or, worse,

---

[2] Unless otherwise noted, all paragraph references (denoted by "¶") refer to paragraphs in the Complaint.

made "out of model" adjustments that enabled ABS collateralized by such loan products to achieve the desired AAA rating.[3]  *Id.*

The very creation and issuance of the securities Plaintiffs purchased depended upon the initial AAA rating by one or more of the Defendants.  ¶¶107, 117, 127, 137 and 147.  Each of the relevant prospectuses for the ABS identified in Exhibits A1-E2 to the Complaint stated that the ABS would not be issued unless at least one or more of the Defendants had assigned them the highest initial investment grade rating, *i.e.*, AAA (or its equivalent).  *Id.*  Furthermore, as a general rule, the applicable prospectus for each ABS stated (in a section entitled "Use of Proceeds") that the issuer planned to purchase mortgages that would constitute the asset pool primarily from the proceeds from the sale of the security.  ¶¶109, 119, 129, 139 and 149.  In other words, the mortgage asset base was to be acquired and created after the security was sold, which in turn would only occur if one or more of the Defendants had provided the AAA rating necessary for the issuance of the security.  *Id.*  Thus, the AAA ratings were necessary for the ABS to be sold at a price sufficient to generate the proceeds necessary to purchase the planned mortgage pools as described in the relevant prospectuses.  ¶¶111, 121, 131, 141 and 151.  Without the AAA ratings, the economic basis for the ABS would have collapsed, as would the entire planned offering for each ABS.  *Id.*

Defendants represented that their AAA ratings were independent and objective.  ¶2.  Eschewing their purportedly independent and objective ratings process, the Rating Agencies assigned inflated ratings to a vast array of structured finance securities, including those securities purchased by Plaintiffs.  ¶4.  Defendants' inflated AAA ratings arose from the "issuer pays"

---

[3] The highest possible ratings assigned by the Rating Agencies throughout the Relevant Period were "AAA" (by S&P and Fitch) and "Aaa" (by Moody's).  Unless otherwise specified, all references to "AAA" herein refer to ratings of "AAA" or "Aaa".

model – whereby ABS issuers, rather than investors in the securities, paid the Rating Agencies to provide the ratings upon which Plaintiffs relied.  ¶6.  The issuer pays model cultivated a market-driven system whereby issuers and underwriters could essentially shop around for a desired rating: if an issuer was dissatisfied with an agency's proposed rating, the issuer could simply turn to another agency that would provide the desired rating.  ¶7.

Initially, the sponsoring bank designated a target rating it required.  ¶65.  Because the desired rating was a prerequisite for any ABS offering, Defendants were actively involved in helping issuers structure products to achieve the requested rating.  ¶¶65, 76, 81.  Defendants, therefore, worked backwards by creating a structure designed to yield the requested AAA rating necessary for issuance of the security.  *Id.*

In fact, Defendants worked with the issuer to design the credit enhancement aspects of the capital structure to justify the desired rating.  ¶65.  However, each credit enhancement would reduce the issuer's profit; thus, issuers had an acute financial interest in awarding their business to the rating agency that assigned the lowest "expected loss" designations, because lower expected losses led to greater profit.  *Id.*  Defendants placated issuers by maintaining artificially low expected loss projections, thereby keeping ratings (and the profits associated with those ratings) artificially high.  ¶65

Defendants would not receive their full fees unless the issuance of the ABS was completed and the target rating was attained.  ¶77.  Therefore, both the issuers and Defendants were highly incentivized to agree to the targeted ratings so that the ABS could be marketed to investors, like Plaintiffs, which were interested in purchasing the highest investment grade securities.  ¶¶7, 77.  Defendants reaped record profits from rating ABS, including those collateralized by subprime mortgages, during and immediately preceding the Relevant Period.

¶¶57-60.   From 2002 to 2006, S&P's revenues increased by more than 800% based upon its work in structuring and rating structured finance securities, providing its parent company with more than 75% of its 2007 operating profit.   ¶57.   From 2000 to 2007, Moody's operating margins averaged 53 percent, outpacing global juggernauts like Exxon and Microsoft.   ¶58.   In 2006, Moody's derived more than 54 percent, or $887 million, of its ratings revenue from structured finance products.   *Id.*   Fitch also brought in record profits for rating structured finance products, including $480.5 million in revenues in 2006 – 51 percent of its total revenue that year.   ¶59.   According to one of Defendant's former managers, structured finance was "perhaps the largest single product line for the major rating agencies," and accounted for 40 percent or more of total revenues for Defendants during the Relevant Period.   ¶60.

Plaintiffs' investment guidelines during the Relevant Period provided that they may purchase or hold securities with ratings at or above a certain level of creditworthiness.   ¶29. Plaintiffs purchased the ABS at issue in this case in reliance on the AAA (or equivalent) credit ratings assigned to the securities by Defendants, which conformed with their respective investment guidelines, and paid a premium for AAA rated securities in exchange for the supposedly lower risk that the AAA ratings entailed.   ¶¶1, 3.   Had Defendants not assigned the initial AAA ratings to the ABS described in Exhibits A1-E2, the issuers could not have created the securities described in the respective prospectuses, let alone sold them.   ¶¶111, 121, 131, 141 and 151.   Moreover, absent the inflated ratings, Plaintiffs would not have purchased the ABS. *Id*.

Defendants knew that the ABS they rated were targeted for a limited class of qualified investors, including institutional purchasers such as Plaintiffs, and that the ABS would be marketed to those investors as including the rating, on which investors would rely.   ¶¶98-100,

102, 105, 112, 115, 122, 125, 132, 135, 142, 145.  Defendants knew that (i) their AAA ratings were the "gold standard" for institutional purchasers such as Plaintiffs; (ii) pension funds were required by law to incorporate Defendants' ratings in their business decisions; and (iii) even sophisticated investors relied heavily on Defendants' ratings due to the complexity of the securitization process for ABS and the relative opacity of these structured finance products.  ¶¶3, 98-99.

Congressional and other government investigations have recently begun to shed light on the extent to which Defendants subverted their traditional "objective" role as gatherers and disseminators of information about the creditworthiness of firms or their securities in favor of engineering structuring financial products with inflated ratings and generating huge profits.  The facts uncovered include admissions by Defendants' own employees that, *inter alia*, (i) the financial products at issue could be "structured by cows" and Defendants would rate them, (¶¶4, 87), (ii) they hoped to be "wealthy and retired by the time this house of cards falters," (¶88), (iii) they did not want to "kill the golden goose" that was structured financial product issuance (¶¶5, 72), (iv) they had participated in a "race to the bottom in terms of ratings quality" for those products (¶64), (v) they had "dr[u]nk the kool-aid" permitting them to lower their ratings standards for these products, (¶66), and (vi) "profit was primary, analytics were secondary" when it came to rating the securities at issue.  ¶73.

The AAA ratings on the wide array of ABS issued and sold during the Relevant Period were crucial to Plaintiffs' decisions to purchase these securities and sustained the artificially high prices at which the Ohio Funds purchased them.  ¶100.  The inflated ratings assigned by Defendants caused Plaintiffs to suffer significant losses when the subprime mortgages that were the glue for so much of the ABS issued during the Relevant Period imploded, and the real estate

market collapsed.   ¶¶95-100.   Plaintiffs have suffered losses in excess of $457 million on the ABS at issue in this action. ¶101, and Exhibits A1-E2.

## III.     RELEVANT PLEADING STANDARDS

Plaintiffs' claims must satisfy Federal Rule of Civil Procedure 8(a)(2), which requires only " 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).   In the context of a motion to dismiss under Rule 12(b)(6), a complaint "does not need detailed factual allegations."  *Id.*   Instead, Rule 8(a)(2) mandates that a complaint plead "only enough facts to state a claim to relief that is *plausible* on its face."  *Id.* at 570(emphasis added).

A court determining whether claims are plausible must accept all factual matter in the complaint as true and draw all reasonable inferences in plaintiffs' favor.  *See Twombly*, 550 U.S. at 556; *see also Fulst v. Thompson*, No, 2:09-cv-725, 2009 WL 4153222, at *2 (S.D. Ohio Nov. 20, 2009) (citing *Ashcroft v. Iqbal*, 129 S.Ct. at 1937, 1949-50 (2009)).   Plausibility "is not akin to a probability requirement."  *Iqbal*, 129 S. Ct. at 1949 (internal quotations omitted).   Rather, examining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950.   Conclusory allegations are insufficient. *See Twombly*, 550 U.S. at 555.   A complaint's claims are plausible, however, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.

Ultimately, the inquiry is not whether a plaintiff is likely to prevail on its claims, but whether the complaint provides enough "fact[s] to raise a reasonable expectation that discovery will reveal evidence [to support its allegations.]"  *Twombly*, 550 U.S. at 556.   A complaint

should be sustained even if the court believes "that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotations omitted).

The Complaint here pleads facts that give rise to a reasonable inference of Defendants' liability, and certainly does not "amount to nothing more than a 'formulaic recitation of the elements'" of Plaintiffs' claims. *Iqbal*, 129 S. Ct. at 1951. At the very least, the facts and circumstances that Plaintiffs allege have "nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. As set forth below, Defendants' motion should be denied in its entirety.

## IV.   ARGUMENT

### A.   THE FIRST AMENDMENT DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants argue that Plaintiffs' claims must be dismissed because they are "barred" by the First Amendment. In support of this argument, Defendants claim that the Sixth and Tenth Circuits have pronounced all credit ratings to be "opinion speech" that is non-actionable in any context, thus granting Defendants "absolute immunity" from any claims related to their ratings. *See* D. Br. at 2, 9-10.[4] Defendants argue, further, that even to the extent Defendants are not absolutely immune from all claims, Plaintiffs' claims should be dismissed for failure to satisfy the "actual malice" standard of liability – a standard of proof applied in defamation cases brought by public officials or figures and in cases involving statements by a journalist on matters of public concern. *Id.* at 11-14. Defendants are wrong, for three primary reasons.

First, no court has ever held rating agencies to be "absolutely immune" from any and all liability stemming from their ratings. Defendants misread or mischaracterize the decisions on which they rely to make this claim, and skirt ample unfavorable case authority, including this

---

[4] References to Defendants' Memorandum in Support of Their Motion to Dismiss [Doc. # 27-1] are signified by the prefix "D. Br."

Court's prior jurisprudence.  Indeed, Defendants are subject to laws of general applicability, just like any other citizen, when they step outside of their traditional role of gathering and disseminating information to the public, and their actions or statements – including their credit ratings – give rise to injury.  This Court has held precisely as much, based on analogous facts. *See In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008) ("*NCFE I*") (discussed *infra*).

Second, the "actual malice" standard of liability does not apply where (as here) (i) Plaintiffs do not allege "defamation-type" injuries, (ii) Defendants have not acted in a traditional "journalist[ic]" capacity, and (iii) Defendants' statements (here, their ratings) are not matters of "public concern."  *See, e.g., Compuware v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 532-33 (6th Cir. 2007); *NCFE I*, 580 F. Supp. 2d at 639-40; *LaSalle National Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1096 (S.D.N.Y. 1996) ("*LaSalle*").  Where rating agencies, in exchange for fees, have been instrumental to the creation and issuance of faulty structured finance products which were then sold to a targeted class of investors, those investors have been permitted to seek redress for their losses from the rating agencies on a negligence theory – *i.e.*, without having to prove the rating agencies' "actual malice."

Third, even to the extent it applies, the "actual malice" standard of liability requires that a plaintiff prove with "clear and convincing evidence" that the defendant acted with the requisite state of mind – *i.e.*, knowledge of falsity or reckless disregard for the truth.  *Compuware*, 499 F.3d at 525.  By definition, therefore, the "actual malice" standard raises questions of fact that ordinarily are not resolvable on a motion to dismiss.  A number of Defendants' own authorities, which arise in the context of summary judgment or trial, illustrate this point.  At a minimum, Plaintiffs' allegations raise substantial factual questions as to whether Defendants acted with the

knowledge or recklessness required to satisfy the "actual malice" standard, to the extent that standard may even be held to apply here.  Given the facts alleged, the "actual malice" standard may not be used to prevent Plaintiffs' claims from proceeding past a motion to dismiss.

For these reasons, and for those more fully explained below, the First Amendment does not provide a basis for dismissing Plaintiffs' claims.  Defendants' arguments to the contrary should be rejected.

### 1.     Defendants Are Not Absolutely Immune From Liability Stemming From Their Ratings

Defendants argue, in the first instance, that Plaintiffs' claims must fail because Defendants are "absolutely immunized" from liability stemming from their credit ratings.   D. Br. at 9-10.  Defendants contend they enjoy this immunity because their credit ratings constitute "non-actionable . . . opinion speech" that is "incapable by its nature of being proven true or false."  *Id.*

Defendants are wrong.  The Supreme Court has held that "generally applicable laws" – including those arising beyond the defamation context and which do not "target or single out the press" – do "not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669, 111 S.Ct. 2513 (1991).  Laws of general applicability – including claims for negligence or violations of state securities laws – apply to the "daily transactions of all citizens," including the press and the rating agencies.  *Cohen*, 501 U.S. at 670; *see also In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 25 F. Supp. 2d 837 (N.D. Ill. 1998) (denying motion for summary judgment of negligent misrepresentation claims against member of press).  Accordingly, as one of Defendants' own authorities indicates, "there is no automatic, blanket, absolute First Amendment protection for reports from the credit rating agencies based on their

status as credit rating agencies." *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 511 F. Supp. 2d 742, 817 (S.D. Texas 2005).  Instead, "an examination of the specific facts and circumstances of a credit rating agency's report is necessary to determine the extent, if any, of First Amendment protection it should receive." *Id.* at 819.

An examination of the specific facts and circumstances here shows that Defendants stepped outside their professed role as mere "journalists" and facilitated the sale of securities, to a limited class of qualified investors, in violation of applicable law.   In sum, Defendants (i) contracted to supply a rating that was a precondition to the issuance of a security, (ii) helped structure the security so as to achieve the desired rating, (iii) were paid by the issuer in exchange for the rating, (iv) knew that the security, and thus the rating, was intended for a select class of qualified investors, and (v) made material misrepresentations concerning the credit quality of that security.  *See* Section II, *supra.*

Under analogous facts,  courts have consistently declined to consider Defendants to be "absolutely immunized" from liability stemming from their credit ratings.   As the following cases illustrate, Defendants' statements of "opinion," including their credit ratings, may subject Defendants to negligence-based liability where those opinions lack a reasonable basis in fact. Defendants largely ignore the following cases, even though they were party to many of them.

**a.)**      In *NCFE I*, 580 F. Supp.2d 630, a bank and certain pension funds sued Moody's and Fitch for, *inter alia*, negligent misrepresentation and violations of the Ohio Securities Act for allegedly inducing the plaintiffs to invest millions of dollars in asset backed notes purportedly securitized by health care receivables.  The offering materials for the notes stated that they were "required to be rated Aaa" or "Aa3" by Moody's and Fitch – ratings which were assigned before the issuers' fraudulent "Ponzi" scheme was exposed and the notes rendered worthless.  *Id.* at

634-35.  Much like the Plaintiffs do here, the plaintiffs alleged, *inter alia*, that (i) the rating agencies knew that the notes were to be "marketed to potential buyers as including the rating condition" (*Id.* at 634), (ii) the ratings themselves constituted actionable "misstatements" (*Id.* at 637-38), (iii) the plaintiffs were "targeted to a select class of institutional investors" (*Id.* at 648), and (iv) the rating agencies failed to use "reasonable care" in assigning their ratings.  *Id.* at 653.

Just as Defendants have done here, the rating agencies moved to dismiss, citing *Compuware* and *In re Enron*, *supra*, for the proposition that their credit ratings were "predictive opinions" and thus absolutely protected as expression under the First Amendment.  *Id.* at 634, 639.  This Court disagreed, finding that "the Supreme Court has 'rejected the argument that statements containing opinions or beliefs . . . could not be a basis for' an action for securities fraud."  *Id.* at 639.[5]  Importantly, the Court denied the rating agencies' motion to dismiss the plaintiffs' *negligence*-based claims as well – including claims under the Ohio Securities Act and for negligent misrepresentation – holding that the complaint "sufficiently allege[d]" that Defendants "failed to exercise *reasonable care* in ascertaining whether the factual basis for its ratings was well-grounded," and that "opinions can be the basis of [negligence] liability if the opinion is not factually well-grounded."  *Id.* at 648 (emphasis added).[6]  The Court additionally

---

[5] *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095, 111 S.Ct. 2749, 115 L.Ed. 2d 929 (1991)).

[6] In denying the rating agencies' motion to dismiss the plaintiffs' negligence-based claims, the Court cited, *inter alia*, *Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006) (noting that negligent misrepresentation claims usually involve a defendant "who is in the business of rendering *opinions* to others for their use in guiding their business") (emphasis added) and *Bellios v. Victor Belata Belting Co.*, 724 F. Supp. 514, 519 (S.D. Ohio 1989) (noting that the tort of negligent misrepresentation most often applies to those "rendering a professional *opinion*") (emphasis added).

held that whether "the statements here were true or false" or were "matters of public concern"[7] were not issues to be decided under Rule 12(b)(6), but rather to be argued after factual discovery was complete.  *Id.* at 639, 648.

**b.)**   In *In re Taxable Mun. Bond Sec. Litig.*, Civ. A. MDL 863, 1993 WL 591418 (E.D. La. Dec. 29, 1993), S&P was the subject of third-party contribution claims brought by issuers of taxable municipal bonds who were being sued by bondholders for, *inter alia*, securities fraud (under state statute), negligence, and negligent misrepresentation.  The issuers alleged that, in exchange for fees, S&P assigned a AAA rating to the bonds, which were issued "in reliance" on that rating, and that the rating was included in the "official statements for the bonds."  *Id.* at *1, *4.  The issuers further alleged that, to the extent they were liable in the primary action "because the rating was not justified," S&P was also liable for contribution and indemnity because of its "role in the structuring of the bond transactions."  *Id.* at *3-*4.  The issuers further alleged that the "assigned ['AAA'] rating was inaccurate due to the wrongful acts and/or negligence on the part of S&P."  *Id.*

In its defense, S&P argued, as it does here, that "as a member of the financial media," its published ratings were "opinions" that were "entitled to protections under the First Amendment." *Id.* at *4.  In response, the court held that, while "S&P's publications may be afforded some protection under the First Amendment as commercial speech . . . neither S&P's membership in the 'financial media' nor its publication of . . . bond ratings through its press media shields it

---

[7] Defendants blithely attempt, in a footnote, to distinguish *NCFE I* from the instant case on the sole grounds that the securities at issue in that case were issued pursuant to "private placement[s]" and thus presumably not matters of public concern.  *See* Def. Br. at 10, n 8.  As discussed herein, apart from the fact that Plaintiffs allege they were part of a "limited class of qualified investors" to whom Defendants directed their ratings (*see* ¶158), a significant percentage of the ABS that Plaintiffs purchased were also *privately placed* – a fact of which Defendants are doubtlessly well aware, having rated those ABS.  *See* Section IV.A.2, *infra*.

from such generally applicable laws" as the statutory and common law restrictions on the dissemination of materially misleading statements in offering materials. *Id.* The court noted that, rather than acting in an ostensibly independent journalistic role, S&P had "contracted to provide services in connection with each of the bond issues and knew that its rating would be disseminated to the public as part of the official statements" for the bonds, and that "S&P therefore played an active role in the dissemination" of the materially misleading statements at issue in the case. *Id.* Accordingly, the court concluded, "S&P stands in no better position from the perspective of First Amendment defenses than any other participant in the bond transactions." *Id.* The court cited a prior case in which a federal court "squarely rejected S&P's argument that its ratings were opinions and therefore were not actionable under the law," and, like that the court in that prior case, "admonish[ed]" S&P "not to raise" the argument "in the future."[8]  *Id* at *4-*5.

    **c.)**    In *LaSalle, supra*, investors who purchased $200 million of bonds offered in connection with a Ponzi scheme sued a rating agency, along with the bond issuer, for securities fraud and negligent misrepresentation. 951 F. Supp. at 1071. The rating agency had rated the bonds "AA" or "AA+" before the Ponzi scheme collapsed. *Id.* at 1074. The court largely denied

---

[8] That prior case was *First Fin. Savings Bank, Inc. v. American Bankers Ins. Co. of Fla., Inc.*, 1989 WL 168015 (E.D.N.C. Aug. 4, 1989) (*vacated* in part on other grounds, 1991 WL 173055 (E.D.N.C. Jun. 14, 1991)), in which S&P similarly defended itself against third-party contribution claims brought by insurers of bonds that S&P had rated. The bonds at issue were "collateralized by manufactured home loans," among other things, and were rated "AA" or "A" by S&P before the issuer subsequently went bankrupt and was sued for violations of state securities fraud statutes and common law negligent misrepresentation. *Id.* at *1. Although it granted some portions of S&P's motion to dismiss, and asked for additional briefing on other points, the court stated: "This court found S&P's argument that its ratings are opinions, not representations of fact, and thus cannot be actionable, as well as its argument that its opinions are protected by the First Amendment to the United States Constitution to be without merit, and accordingly informs S&P that any further discussion of these arguments will be a waste of paper." *Id.* at *5.

the rating agency's motion to dismiss[9] based on allegations highly analogous to the present case, including, *inter alia*, that (i) the rating agency had "rated each Bond series before issuance, and in fact had 'substantial influence' in the design of each Bond program," (ii) the ratings were "necessary to sell the Bonds," (iii) it was a "condition of the initial issuance of each series" that the rating agency "rate them 'AA,'" and (iv) the rating agency "failed to reassess the rating of the then issued and outstanding Bonds." *Id.* at 1076, 1078.  The court further noted:

> As plaintiffs explain, unlike debt obligations of operating companies or governmental entities (such as municipal bonds), asset-backed securities typically are not issued at all unless they are rated double or triple-A.  The rating is therefore not determined by an analysis of an already-issued security, but rather by structuring the receivables program as required by the rating agency so as to be able to obtain the desired rating . . . . Moreover, it is the structure of the program and the quality of its servicer . . . rather than the credit-worthiness of the issuing entity . . . that determines the ratings.

*Id*.

The *LaSalle* court accordingly rejected the rating agency's argument that it was a "member of the free press entitled to the privileges and immunities accorded the press," observing that the agency was "specifically hired . . . to rate the bonds" and that the rating was "privately contracted for and intended for use in the private placement Offering Memoranda, rather than for publication in a general publication."[10]  *Id.* at 1095-96.  The court additionally refused to apply the "actual malice" standard of liability to the plaintiffs' negligent misrepresentation claim against the rating agency, holding that a lesser showing than "actual malice" applied to rating agencies because the information they publish is "solely in the

---

[9] The court granted the rating agency's motion to dismiss the RICO claims asserted against it, for reasons having to do with RICO's specific provisions.  *LaSalle*, 951 F. Supp at 1073.

[10] As discussed herein, over $181 million of the more than $460 million in losses alleged in this litigation – or approximately 40 percent – stem from ABS that were offered in private placements.  *See* Section IV.A.2, *infra*.

individual interest of the speaker and its specific business audience." *Id.* at 1097 (*citing Dun & Bradstreet*, 472 U.S. at 762, 105 S.Ct. at 2947).

       **d.)**     In *Commercial Fin. Servs., Inc. v. Arthur Andersen LLP*, 94 P.3d 106 (Okla. Civ. App. 2004), an accountant who was being sued by a customer (CFS) for professional malpractice for, *inter alia*, having given the customer a "false sense of security about its financial condition" brought third-party claims for contribution against the rating agencies (which included all three Defendants named here) who favorably rated the customer's investment certificates 'A' or "investment grade." *Id.* at 108.  In support of its contribution claim, the accountant argued that the "asset securitization plan" pursued by its customer "was dependent on those ratings, so that if the ratings had not been favorable, the plan could never have been implemented." *Id.* Defendants argued, as they do here, that their "ratings were opinions protected by the First Amendment, subject to the standard of actual malice used in libel cases." *Id.* at 109.  The Oklahoma Court of Civil Appeals disagreed, and reversed the dismissal of negligence and negligent misrepresentation claims against Defendants.  In so doing, the appellate court pointed out a "crucial distinction" between the case before it and that before the Tenth Circuit in *Jefferson Count Sch. Dist. No. R-1 v. Moody's Investors Servs., Inc.*, 175 F.3d 848 (10th Cir. 1999) (one of Defendants' principal authorities, discussed *infra*):

> There is a crucial distinction between *Jefferson County* and the instant case. In *Jefferson County*, Moody's published its opinion for the benefit of subscribers and news services.  "[I]t had not been asked to rate the bonds." *Jefferson County*, 175 F.3d at 850.  By contrast, in the instant case the Rating Agencies *had* been asked to rate the bonds, at CFS's request and at CFS's expense . . . We believe the relationship between these parties goes beyond a relationship between a journalist and a subject, and is more analogous to that of a client and the client's certified public accountant . . . . We do not believe the First Amendment shields the [rating] agencies from potential liability.

*Id.* at 110 (emphasis in original) (internal citations omitted).

The court observed that although "[i]t is true that in supplying a rating, the rating agencies also serve the public interest," and "the ratings could be said to benefit investors," the mere fact that a rating is disseminated broadly after being contracted and paid for privately does not shield the rating agency from liability for negligence related to that rating.[11]   *Id.* at 111-12.

    **e.)**    Most recently, in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009), two institutional investors brought a class action against Moody's and S&P (along with other defendants) to recover losses stemming from the liquidation of notes issued by a structured investment vehicle (or "SIV") that was partially invested in RMBS.   *Id.* at 163, 165.   Moody's and S&P assigned at or near "AAA" ratings to the Senior Notes issued by the SIV "as a condition precedent to purchase."   *Id.* at 164-65.   Just as they are alleged to have done here, defendants "played a[n] . . . integral role in the structuring and issuing of" the SIV, meaning that they "worked directly with [the issuer] to structure the Rated Notes in such a way that they could qualify for the Rating Agencies' highest ratings."   *Id.* at 166.   The court also noted that Defendants' abnormally high compensation "was contingent upon the receipt of desired ratings for the . . . SIV's Rated Notes, and only in the event that the transaction closed with those ratings."   *Id.* at 167.   The SIV, which was heavily weighted in RMBS secured by subprime mortgages, ultimately collapsed amid the credit crisis, and declared bankruptcy.   *Id.* at 168.

---

[11] Although this decision dealt primarily with whether the rating agencies owed a duty to a customer so that they may be liable for negligence to that customer for providing an inflated rating, the decision remains instructive as to whether the First Amendment broadly shields rating agencies from liability for their ratings as Defendants contend.   Defendants nonetheless ignore this decision, to which they were all parties, and which is more recent than *County of Orange v. McGraw Hill Cos., Inc.*, 245 B.R. 151 (C.D. Cal. 1999), discussed *infra*, a decision from the Los Angeles federal bankruptcy court on which Defendants heavily rely.

The plaintiffs sued the rating agencies for common law fraud, negligence and negligent misrepresentation for their losses in the SIV.  *Id.*  Defendants argued, as they do here, that they were entitled to "immunity" under the First Amendment or, in the alternative, that their credit ratings were "non-actionable opinions."  *Id.* at 175.  The court rejected Defendants' argument as to both the fraud *and* negligence-based claims, instead, holding that the plaintiffs had "sufficiently pled that the Rating Agencies did not genuinely *or reasonably* believe that the ratings they assigned to the Rated Notes were accurate and had a basis in fact.  As a result, the . . . ratings were not mere opinions but rather actionable misrepresentations."  *Id.* at 176 emphasis added).[12]

As the foregoing cases illustrate, when confronted with facts analogous to those at issue here, this Court (and numerous others) routinely have held that laws of general applicability – including the Ohio Securities Act and tort law – apply to rating agencies for their ratings, notwithstanding the protections generally offered by the First Amendment to the press.[13] Defendants' argument to the contrary relies on inapposite case authorities, along with a selective blindness toward the unfavorable precedent discussed above.

---

[12] Notwithstanding the *Abu Dhabi* court's rejection of Defendants' argument that ratings are "non-actionable opinions," Defendants have seized on the following additional statement by the court:  "It is well-established that under typical circumstances, the First Amendment protects rating agencies, subject to an 'actual malice' exception, from liability arising out of their issuance of ratings and reports because their ratings are considered matters of public concern."  *Abu Dhabi*, 651 F. Supp. 2d at 175; D. Br. at 12).  The court cited only three authorities, with little analysis, for this broad statement – *Compuware*, *Jefferson County*, and *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988).  As discussed *infra*, *Compuware* and *Jefferson County* involved defamation or "defamation-type" claims and are readily distinguishable from the present case – indeed, this Court cited and distinguished *Compuware* in *NCFE I*.  *First Equity*, meanwhile, is also readily distinguishable from the present case, for the reasons discussed *infra*.

[13] Indeed, as both *NCFE I* and *LaSalle* illustrate, the "more expansive protections for *opinion speech*" (D. Br. at n.6 (emphasis added)) purportedly offered by the State Constitutions of Ohio and New York do not change this result.

In support of their argument that they enjoy absolute immunity from any and all liability stemming from their credit ratings, Defendants rely principally on two appellate decisions – *Compuware* and *Jefferson County*  – that concern discrete questions of law and fact that are distinguishable from those at issue here.  In both cases, a plaintiff who was a "public figure" objected to allegedly defamatory statements made *about* the plaintiff by a ratings agency, and sought recovery for "defamation-type" injuries resulting from those statements.  *Compuware*, 499 F.3d at 533; *Jefferson County*, 175 F.3d at 852-54.  As discussed below, defamation claims against the media raise constitutional concerns that are not implicated by Plaintiffs' claims, which arise under an entirely different fact-pattern and body of law.

"Defamation" is a state common law claim, and typically includes the following elements:  "(1) a false and defamatory statement, (2) about [the] plaintiff, (3) published without privilege to a third party, (4) with fault of at least negligence on the part of the defendant, and (5) that was either defamatory *per se* or caused special harm to the plaintiff."  *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 206, 687 N.E.2d 481 (stating elements under Ohio law).[14] "Defamation *per se*" involves material that is "defamatory on its face," and includes written matter that "reflects upon a person's character . . . in a manner that will injure him in his trade or profession."  *Id*.  Where defamatory statements are found to be actionable *per se*, damages (in addition to actual malice) are "presumed" – *i.e.*, require no proof of actual injury to be awarded. *Id.* at 489.[15]

---

[14] The trial court in *Compuware* considered substantially similar elements for a defamation claim under Michigan law.  *See Compuware Corp. v. Moody's Investors Servs., Inc.*, 222 F.R.D. 124, 127 (E.D. Mich. 2004).

[15] Damages in a defamation *per se* case are traditionally "presumed" because "those forms of defamation that are actionable *per se* are virtually certain to cause serious injury to reputation, and . . . this kind of injury is extremely difficult to prove."  *Carey v. Piphus*, 435 U.S. 247, 263, 98 S.Ct. 1042, 1052 (1978).

Absent some limitations, actions for defamation *per se* could have an *in terrorem* effect on parties (particularly media defendants) who regularly publish statements about public officials or figures, or matters of public concern.  As the Supreme Court observed:

> The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages *without evidence of actual loss*.   Under the traditional rules pertaining to actions for libel,[16] the existence of injury is *presumed* from the fact of publication.  Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred.   The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms . . . . It is therefore appropriate to require that state remedies for *defamatory falsehood* reach no farther than is necessary to protect the legitimate interest involved.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997 (1974) (emphasis added).

The Supreme Court has accordingly erected boundaries on defamation claims against members of the press (including, in some instances, credit rating agencies), depending on the identities of the plaintiffs or subject matter involved.  In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710 (1964), the Supreme Court considered "the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his official conduct."   *Id.* at 256.   It concluded that the Constitution requires "a federal rule that prohibits a *public official* from recovering damages" – both presumed and actual – "for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *Id.* at 279-80 (emphasis added).  In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975 (1967), the

---

[16] "Libel" refers to written defamatory statements.  *See, e.g., Gosden*, 687 N.E.2d at 488.

Supreme Court extended the *New York Times* rule to apply to "public figures" as well as public officials.

In *Gertz, supra*, the Supreme Court considered whether the *New York Times* rule should be further extended to actions against a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is "neither a public official nor a public figure," but where those statements also involve a "matter of public interest." *Id.* at 332. The Supreme Court held that the *New York Times* rule did not extend to defamation actions by private individuals in such circumstances. It did hold, however, that the Constitution required some protections for defendants in such cases, including that *presumed* (rather than actual) damages could not be recovered by a plaintiff without showing that the defendant had published defamatory material with "actual malice." *Id.* at 349.[17] In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939 (1985), the Supreme Court specifically addressed whether the Constitution imposes a rule that a private plaintiff in a defamation case must prove knowledge of falsity or reckless disregard for the truth in order to recover presumed damages in cases *not* involving a matter of public concern. It held that it does not. *Id.* at 761.

Subsequently, in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558 (1986), the Supreme Court fashioned a constitutional requirement that, in defamation cases "against a media defendant for speech of public concern," the plaintiff must bear the burden of showing "falsity" of an allegedly defamatory statement, in addition to fault, before recovering damages (presumed or actual). *Id.* at 777. Finally, in *Milkovich v. Lorain Journal Co.*, 497 U.S.

---

[17] Citing *Gertz*, the Ohio Court of Appeals recently agreed, holding that in defamation cases involving statements regarding a matter of "public concern," a plaintiff "must prove *either*: (1) ordinary negligence and actual injury, in which case he can receive damages for the actual harm inflicted; *or* (2) actual malice, in which case he is entitled to presumed damages." *Woods v. Capital Univ.*, 10th Dist. No. 09AP166, 2009-Ohio-5671, at ¶ 35, 2009 WL 3465827, (emphasis added).

1, 110 S.Ct. 2695 (1990), the Supreme Court held that there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Id.* at 18. Instead, any opinion speech that amounts to a "statement on matters of public concern" must be "provable as false before there can be liability *under state defamation law.*" *Id.* at 19 (emphasis added). Importantly, the "issue of falsity" in such cases, the Supreme Court noted, relates only "to the *defamatory* facts implied by a statement," not the negligence or state of mind of the defendant in making the statement. *Id.* at 20, FN7 (emphasis in original). The Court explained:

> For instance, the statement, "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. *It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action*, though falsity at the first level may serve to establish malice where that is required for recovery.

*Id.* (emphasis added).[18]

Both *Compuware* and *Jefferson County* are logical outgrowths of the Supreme Court authority described above, insofar as they apply to defamation or "defamation-type" claims. In *Compuware*, one of Moody's corporate customers sued Moody's for defamation *per se* and breach of contract after Moody's downgraded the customer's corporate debt rating to non-investment grade status. *Compuware*, 499 F.3d at 522-24. Several years after denying Moody's motion to dismiss these claims, and after permitting substantial discovery, the trial court granted

---

[18] As discussed further below, based on Plaintiffs' allegations, the ratings at issue in this case *are* provable as false with respect to the *first* level – *i.e.*, whether Defendants actually believed (or had a reasonable basis to believe) their stated ratings, in light of admissions to the contrary by Defendants' own employees and findings by the SEC that Defendants failed to adequately measure the risks inherent to the structured finance products they rated. Plaintiffs do not allege any "defamatory facts" contained in Defendants ratings, making the test of whether the ratings themselves contain "defamatory facts" that are "provable as false" irrelevant. *Id.*

summary judgment[19] in Moody's favor, holding (under the *New York Times* rule) that the corporate customer (a public figure) had failed to establish that Moody's had acted with actual malice or reckless disregard for the truth in publishing its credit rating and associated opinions. *Compuware Corp. v. Moody's Investors Servs., Inc.*, 371 F. Supp. 2d 898 (E.D. Mich. 2005).

The Sixth Circuit affirmed, finding that the plaintiff was a "public figure for purposes of First Amendment defamation analysis," which thus required plaintiff to produce "*clear and convincing evidence*" that Moody's acted with "actual malice" in publishing its rating and associated opinions in order to recover under a defamation theory. *Compuware*, 499 F.3d at 525 (emphasis in original). The court additionally held, under the facts before it, that the credit rating in and of itself could not constitute *defamatory* speech, since it did not "communicate. . . any provably false factual connotation." *Id.* at 529. The court finally "emphasize[d] the limited nature of [its] holding," noting that the "actual malice" standard applied to the plaintiffs' breach of contract claim because, *inter alia*, the plaintiff "ha[d] not suffered a contractual injury but complain[ed] only of reputational or *defamation-type* harm." *Id.* at 533 (emphasis added).

In *Jefferson County*, a school district sued Moody's for defamation-type injuries allegedly resulting from Moody's publication of an article assigning a "negative outlook" to certain refunding bonds issued by the school district. *Jefferson County*, 175 F.3d at 850. In rating the bonds, Moody's acted well within its traditional information-gathering and disseminating role – it was not asked to rate the bonds, and accordingly was not paid for doing so. *Id.* The Tenth Circuit affirmed the trial court's dismissal of the school district's complaint for failure to state a claim, finding that Moody's "negative outlook" and statements about the

---

[19] Defendants ignore the procedural history of *Compuware* – which was decided on summary judgment and after ample discovery – when they argue that *Compuware* mandates that Plaintiffs' claims may not proceed past a motion to dismiss. This point is discussed further in Section IV.A.2, *infra*.

creditworthiness of the school district were not "provably false" *under the facts alleged*, and thus not adequate bases for defamation-type claims.  *Id.* at 855-56.

Importantly, however, the court in *Jefferson County* noted that the phrases "negative outlook" and "ongoing financial pressures" were "not necessarily too indefinite to imply a false statement of fact," and the mere fact that Moody's described its evaluation as an "opinion" was not sufficient, standing alone, to establish that Moody's statements were constitutionally protected.  *Id.* at 856.  In fact, the court stated, "[i]f such an opinion were shown to have materially false components, the issuer should not be shielded from liability by raising the word 'opinion' as a shibboleth."  *Id.*  However, the court noted, the school district had failed to identify a specific false statement reasonably implied by Moody's article – a fact which, combined with the "vagueness" of the phrases "negative outlook" and "ongoing financial pressures," indicated that Moody's article constituted a "protected expression of opinion" not susceptible to a defamation claim.  *Id.*

As illustrated above, both *Compuware* and *Jefferson County* recognize the special constitutional concerns implicated by defamation cases brought by public figure plaintiffs against media companies or journalists.  Both feature a "public figure" plaintiff (*i.e.*, a corporate customer of a rating agency) that was the subject of a widely-disseminated credit rating or opinion article.  In both cases, the corporate customer was unhappy with the rating agency's negative opinion, and sued the rating agency for defamation or "defamation-type" injury.  In both cases, the rating agency acted in its traditional information-gathering and disseminating role – the corporation on which the rating agency reported was clearly independent of the rating agency, and the bonds at issue (unlike those at issue in this case) did not owe their existence to the rating agency.

Both *Compuware* and *Jefferson County* are accordingly inapposite to the case at bar. Neither *Compuware* nor *Jefferson County* involved structured finance products for which the structuring and sale to a targeted audience was facilitated – indeed, made possible – by the rating agencies, who assigned positive ratings to those products in exchange for enormous fees. Neither of these cases involved plaintiffs who, as part of a select group of investors, were injured by their purchase of securities that were assigned inflated ratings by rating agencies who knew or should have known (i) who their intended audience was and (ii) that the ratings were inflated. Neither of these cases, accordingly, is instructive as to the scope of First Amendment protection available (if at all) to Defendants under the present circumstances.[20]

Plaintiffs do not allege defamation or "defamation-type" harm resulting from Defendants' credit ratings or opinions.  Plaintiffs accordingly do not seek (and would not be entitled to) the "presumed damages" available under defamation law.  Instead, Plaintiffs seek to recover for their actual injuries resulting from, *inter alia*, (i) Defendants' material misrepresentations and omissions concerning the faulty ABS which owed their very existence to Defendants' misrepresentations, (*see* ¶¶107-111, 117-121, 127-131, 137-141, 147-162) and (ii) Defendants' participation in or assistance in the sale of those structured financial products to Plaintiffs in violation of the Ohio Securities Act.  ¶¶163-186.  The constitutional concerns described in *Compuware*, *Jefferson County*, and the Supreme Court authority from which they derive, accordingly are not at issue here.

---

[20] Additionally, it should be noted that Plaintiffs' allegations raise significant factual questions as to whether Defendants knew or should have known that their ratings of the securities at issue in this litigation were materially false or misleading.   Under the facts alleged, therefore, whether or not Defendants actually believed (or had reasonable basis to believe) that their credit rating "opinions" about the securities at issue in this case were accurate *is* susceptible to proof that may be developed through discovery.  *See* Section IV A.2, *infra*.  This fact further distinguishes this case from both *Compuware* and *Jefferson County*, and militates against the application of those authorities to shield Defendants from Plaintiffs' claims.

2.     **The "Actual Malice" Standard Of Liability Does Not Bar Plaintiffs' Claims**

Defendants argue, in the alternative, that to the extent they are not "immunized" from liability for their ratings, the "actual malice" standard of liability mandates dismissal of Plaintiffs' claims because (i) the credit ratings at issue were matters of "public concern" and (ii) "negligent misstatements" are (by definition) not actionable under the standard.  D. Br. at 11-14. In so arguing, Defendants assume facts that are both not pleaded and untrue, and misstate applicable law (including the Sixth Circuit's holding in *Compuware*).  Defendants' argument concerning the "actual malice" standard of liability should be rejected.

Defendants argue that the "actual malice" standard of liability applies to Plaintiffs' claims because Defendants' ratings are typically considered "matters of public concern."  D. Br. at 12. In support of this argument, Defendants cite a handful of cases that ostensibly provide examples of credit ratings being considered "matters of public concern."  *Id.*  The first of these – *Compuware* – is distinguishable from the case at bar for the reasons discussed above.  The others are distinguishable as well, for the simple reason that none of them involve Defendants stepping outside of their traditional role as independent arbiters of bond creditworthiness.  In short, none of them involve allegations even remotely approaching the level of activity "inconsistent with traditional journalism" that is alleged here.  *See In re Fitch, Inc.*, 330 F.3d 104, 110-11 (2d Cir. 2003).[21]

---

[21] In *In re Fitch*, the Second Circuit affirmed an order holding Fitch in contempt for failure to comply with a subpoena issued by a customer suing its broker for negligence and breach of warranty.  Fitch was the financial rating agency used by the broker during the transactions at issue in the customer's lawsuit.  Fitch argued that it was entitled to assert the "journalist's privilege" under New York's shield law to avoid compliance with the subpoena.  The Second Circuit disagreed, and held that, under the facts presented, the "journalist's privilege" did not apply to the information Fitch sought to protect from subpoena.  In doing so, the Second Circuit noted a number of ways in which Fitch's activities were "inconsistent with traditional journalism," including (i) "Fitch's information-disseminating activity does not seem to be based

In *First Equity*, *supra*, for instance, the court considered negligent misrepresentation claims asserted against S&P based on an "alleged error" contained in a regularly-published periodical that contained descriptions of the terms and provisions of corporate bonds.  690 F. Supp. at 257.  S&P was not alleged to have induced or facilitated the sale of ABS or other securities, nor was it alleged to have even provided a credit rating for which it was paid and which was included in offering materials for a particular security.  The *First Equity* court accordingly held, unremarkably, that "the First Amendment requires a demonstration of actual malice where plaintiff seeks to impose liability on a *newspaper* for publication of a non-defamatory misstatement," and granted summary judgment for S&P.  *Id.* at 258 (emphasis added).

As discussed above, Defendants here were integrally involved in the structuring of ABS to achieve a desired rating that was a precondition to both the ABS' issuance and Defendants getting paid enormous fees.  Defendants accordingly are alleged to have engaged in activities far removed from their traditional role as "journalists" giving unbiased opinions on creditworthiness. The standard used to determine whether "a newspaper" may be held liable for a "non-defamatory misstatement" (*First Equity*, 690 F. Supp. at 258) accordingly is of no moment here.  The other cases on which Defendants rely do not support their argument, being similarly distinguishable from the present case.  *See In re Enron*, 511 F. Supp. 2d at 817-826(dismissing negligence claims against rating agencies under "actual malice" standard where, *inter alia*, the rating agencies were not paid by issuer which was a "Fortune 500 company" and did not participate in

---

on a judgment about newsworthiness, but rather on client needs," (ii) Fitch "makes its ratings criteria available to the subjects of its ratings, and . . . the companies often conform their transactions to those ratings criteria," and (iii) "Fitch plays an active role in structuring the transaction[s]" by "commenting on proposed transactions and offering suggestions about how to model the transactions."  *Id.* at 110-11.

structuring or selling the bonds they rated, and the plaintiff did "not allege . . . facts showing" that the rating agencies "knew or had significant suspicions" that their ratings were inaccurate); *County of Orange*, 245 B.R. at 155 (partial summary judgment of breach of contract and professional negligence claims granted where S&P did not participate in structuring or selling the bonds issued by a municipality).

Defendants' "public concern" argument also lacks merit for one additional, crucial reason: Plaintiffs were "part of a limited class of qualified investors to whom Defendants intended their ratings to be supplied as part of the issuance" of the ABS at issue in this case. ¶158. As this Court and other courts have held previously, in cases where securities were targeted at a "select class of investors," the ratings attached to those securities are not matters of "public concern" and thus do not trigger the "actual malice" standard of liability under the First Amendment. *See NCFE I*, 580 F. Supp. 2d at 640; *Abu Dhabi*, 651 F. Supp. 2d at 176. This is particularly true in cases involving securities sold by way of a private offering. *Id.* Defendants admit as much in their brief, citing *NCFE I* and *Abu Dhabi* (albeit in footnotes, and only in an attempt to distinguish those cases from the present case). Contrary to Defendants' argument, however, approximately 40 percent of the more than $460 million in investment losses alleged by Plaintiffs in this case – or over $181 million – relate to ABS that Plaintiffs purchased by way of a private offering, not "publicly offered" as Defendants contend. D. Br. at 12. Defendants should be well aware of this fact, since they rated each issuance, and the CUSIPs for each and every such offering are identified in the exhibits attached to and incorporated in the Complaint.

*See* Compl., Exhs. A-E.[22]   Under ample authority, including this Court's prior opinion in *NCFE I*, the ratings of these privately offered securities are surely not matters of "public concern."

Further, even with respect to non-private offerings, Plaintiffs were part of a "limited class of qualified investors" whom Defendants knew were the target of their ratings.   As Plaintiffs allege, Defendants knew, *inter alia*, that (i) their AAA ratings "were the gold standard" for institutional purchasers such as Plaintiffs (¶3), (ii) state pension funds (such as Plaintiffs) could only purchase or hold securities rated above a certain level based upon their governing investment guidelines (¶29), (iii) pension funds are "required by law to incorporate [Defendants'] ratings in their business decisions" (*id.*), and (iv) investors "relied heavily" on Defendants' ratings due to the "complexity of the securitization process" for ABS, and the relative "opacity" of these structured finance products (¶¶98-99).   Additionally, the offering documents, registration statements, and prospectuses for these offered securities each included language evincing knowledge that the securities were intended for a limited class of qualified institutional investors.

Defendants have submitted truncated excerpts from the registration statements or prospectuses for just two securities (out of the more than 300 at issue in this case) in support of their argument that the ratings at issue in this litigation were matters of "public concern" simply because they were "filed with the SEC."   D. Br. at 12; Declaration of Thomas D. Warren in Support of The Rating Agencies' Motion to Dismiss The Complaint ("Warren Decl.") [Doc. # 27-2], Exhs. A-D.   However, Defendants omit the portions of these documents that contain language identifying the select class of investors at whom the securities (and thus the ratings)

---

[22] For ease of reference, the ABS that were purchased in non-public, private placements are identified in the Exhibits attached to the Complaint as follows:  Exhs. A-1 (Rows 1-11), A-2 (Rows 1-2), B-1 (Rows 1-17), B-2 (Rows 1-22), and D-1 (Rows 1-2).

were targeted.  For instance, the Form S-3 Registration Statement for Morgan Stanley Loan Trust 2007-11AR (CUSIP 61754VAE1) (one of the RMBS referenced in the Complaint at Exh. A-1 (Row 20), and referenced in the Warren Decl. at Exhs. A), states that the "[o]ffered certificates will be sold primarily to institutional investors."  *See* Declaration of Daniel P. Chiplock In Support of The Ohio Funds' Memorandum of Law in Opposition to Defendant Rating Agencies' Motion to Dismiss ("Chiplock Decl.")[23], Exh. A at 124.  The same language appears in the Prospectus Supplement for this particular RMBS (which Defendants have selectively cited in Exhibit B to the Warren Decl.).  *See* Chiplock Decl., Exh. B at 125 ("[o]ffered certificates will be sold primarily to institutional investors").  The same applies to the registration statement and prospectus supplement for the GE Commercial Mortgage Corporation Series 2007-C1 Trust (CUSIP 36159XAE0) (one of the RMBS referenced in the Complaint at Exh. A-2 (Row 6), and referenced in the Warren Decl. at Exhs. C-D).  These documents each state "[w]e anticipate that the offered certificates. . . will be sold primarily to institutional investors."  *See* Chiplock Decl., Exhs. C at 112, D at 110.

Additionally, contrary to Defendants' argument, the mere fact that Defendants' ratings may have been available to the public as a by-product of their inclusion in the offering documents for the non-private bond offerings does not mean the ratings were matters of "public concern" sufficient to trigger heightened First Amendment protection.  *See Commercial Fin. Servs., Inc.*, 94 P.3d at 111-14 (reversing dismissal of negligence-based claims against rating agencies where ratings were for "benefit and guidance" of a targeted client or class, even if they were available to the public); *In re Taxable Mun. Bond Sec. Litig.*, 1993 WL 591418 at *4-*5 (upholding fraud and negligence-based claims against rating agencies where they played an

---

[23] The Chiplock Decl. is attached as Exhibit 1.

"active role" in the dissemination of false statements in bond offering materials, regardless of how widely disseminated).

Finally, Defendants' argument that the Court should dismiss Plaintiffs' claims for failure to meet the "actual malice" standard of liability is procedurally flawed.  Defendants fail to recognize that in requiring proof of a defendant's knowledge or state of mind by "clear and convincing evidence," the "actual malice" standard of liability is not ordinarily subject to adjudication on a Rule 12(b)(6) motion.  Several of Defendants' own cited authorities illustrate this point.  *See, e.g., Compuware*, 499 F.3d at 525 (citing *New York Times*, 376 U.S. at 279-80); *Time, Inc. v. Hill*, 385 U.S. 374, 391, 87 S.Ct. 534 (1967) (reversing jury verdict and remanding for new proceedings including instructions on the "actual malice" standard).

In *Compuware*, for instance, the trial court actually *denied* Moody's motion to dismiss the plaintiff's defamation and breach of contract claims.  *See Compuware Corp. v. Moody's Investors Servs., Inc.*, 273 F. Supp. 2d 914, 915 (E.D. Mich. 2002) (noting that motion to dismiss defamation and breach of contract claims was "denied for reasons set forth at the hearing").  It was not until more than three years later – after ample discovery (including discovery relating to third-parties, *see, e.g., Compuware Corp. v. Moody's Investors Servs., Inc.*, No. Civ. 03-70247, 2004 WL 1092285 (E.D. Mich. May 11, 2004))[24] – that the trial court granted summary judgment in Moody's favor on those claims.  *Compuware Corp. v. Moody's Investors Servs., Inc.*, 371 F. Supp. 2d 898 (E.D. Mich. 2005).  That decision was then affirmed by the Sixth

---

[24] In its May 11, 2004 decision, the *Compuware* trial court permitted Computer Associates, Inc. ("Computer Associates") to intervene in a discovery dispute between the plaintiff and Moody's, after the plaintiff sought documents concerning Moody's ratings activities concerning Computer Associates (one of Compuware's competitors) over a five-year period.  2004 WL 1092285, at *2. The court ultimately permitted limited third-party discovery in this vein to go forward, along with substantial discovery relating to the parties themselves.  *See Compuware Corp. v. Moody's Investors Servs., Inc.*, 222 F.R.D. 124 (E.D. Mich. 2004).

Circuit in the opinion on which Defendants now so heavily rely. *See Compuware*, 499 F.3d at 520.

The mere fact that Plaintiffs' claims sound in negligence rather than fraud does not consign them to dismissal absent any opportunity for discovery as to whether Defendants' misconduct satisfies the "actual malice" standard of liability, or even whether the ratings at issue constituted matters of "public concern." *See NCFE I*, 580 F. Supp. 2d at 648(denying motion to dismiss negligent misrepresentation claim, holding that "Moody's will have a full opportunity after factual discovery to prove that its ratings . . . were matters of public concern"); *see also County of Orange*, 245 B.R. at 161 (partially denying summary judgment of professional negligence claim where plaintiff "raised a genuine question of fact" that S&P acted in reckless disregard of truths of which it was aware in assigning certain ratings).[25]

Indeed, Plaintiffs' allegations raise substantial questions of fact as to whether Defendants' misconduct satisfies the "actual malice" standard, including whether Defendants

---

[25] *Time, Inc. v. Hill*, which Defendants cite for the proposition that "neither innocent nor negligent misstatements" are actionable in cases involving matters of public concern (D. Br. at 14), is both distinguishable from the case at bar and unhelpful to Defendants' argument. In *Time*, a plaintiff sued the publishers of Life Magazine under New York's privacy statute for portraying the plaintiff and his family in an allegedly false light. *Time*, 385 U.S. at 377. After a jury trial, the plaintiff was awarded both compensatory and punitive damages, and the defendant publisher appealed. *Id.* at 379. The Supreme Court observed that that "[w]e create a grave risk of serious impairment of the indispensable service of a free press in a free society if we saddle the press with the impossible burden of verifying to a certainty the facts associated in news articles with a person's name, picture or portrait, particularly as related to nondefamatory matter." *Id.* at 389. The Court accordingly held that the "constitutional protections for speech and press preclude the application of the New York [privacy] statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." *Id.* at 387-88 (emphasis added). The Court explicitly limited its holding, however, noting that it "found applicable here the standard of knowing or reckless falsehood . . . *only upon consideration of the factors which arise in the particular context of the application of the New York [privacy] statute in cases involving private individuals.*" *Id.* at 390 (emphasis added). The Court thus reversed the jury verdict and remanded the case for further proceedings.

"entertained serious doubts as to the truth"[26] of their statements, notwithstanding the fact that Plaintiffs' claims for relief do not require proof of scienter.  These allegations include admissions by Defendants' own employees that, *inter alia*, (i) the financial products at issue could be "structured by cows" and Defendants would rate them, (¶¶4, 87), (ii) they hoped to be "wealthy and retired by the time this house of cards falters," (¶88), (iii) they did not want to "kill the golden goose" that was structured financial product issuance (¶¶5, 72), (iv) they had participated in a "race to the bottom in terms of ratings quality" for those products (¶64), (v) they had "dr[u]nk the kool-aid" permitting them to lower their ratings standards for these products, (¶66), and (vi) "profit was primary, analytics were secondary" when it came to rating the securities at issue.  ¶73.  Plaintiffs also allege substantial financial motives for Defendants to assign the ratings that they did in the face of strong evidence that such ratings were not substantiated.  *See, e.g.,* ¶¶2-7, 42-75.

Dismissal at this juncture accordingly is not permissible under the "actual malice" standard.  For all of the foregoing reasons, the First Amendment does not bar Plaintiffs' claims, and Defendants' arguments to the contrary should be rejected.

## B.   THE CREDIT RATING AGENCY REFORM ACT OF 2006 DOES NOT PREEMPT PLAINTIFFS' CLAIMS

As discussed in Section IV.A above and further explained in Sections IV.C-D below, Plaintiffs' claims for negligent misrepresentation and violations of the Ohio Securities Act arise out of Defendants' alleged misconduct in helping structure ABS transactions and providing false or misleading ratings for those securities.   Seeking to shield themselves from liability,

---

[26]  *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (concerning "actual malice" in libel context).

Defendants assert the Credit Rating Agency Reform Act of 2006, 15 U.S.C. § 78o-7(c) ("CRARA" or "the Act"), expressly preempts these claims. Similar to their First Amendment argument, Defendants contend "no one" may hold them accountable for their alleged wrongdoing.

Defendants cannot point to any indication of congressional intent to foreclose Plaintiffs' claims. As detailed below, CRARA arose out of congressional concern about the lack of competition in the credit rating industry and provides for a universally applicable process, subject to SEC oversight, for licensing and registration of rating agencies as NRSROs. Neither the text of the Act, its legislative history nor its stated objective evince an intention to invoke wholesale preemption of state common law and statutory claims against credit rating agencies, including the claims the Ohio Funds assert. Indeed, Defendants' construction of CRARA would "have the perverse effect of granting complete immunity from . . . liability to an entire industry that, in the judgment of Congress, needed more stringent regulation." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487 (1996) (plurality opinion).

Relying on a distorted reading of the statute, long inferential leaps and inapposite case law, Defendants fall far short of surmounting the "starting presumption that Congress does not intend to supplant state law." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). *See also Wyeth v. Levine*, 129 S. Ct. 1187, 1195 n.3 (2009) ("We rely on the presumption because respect for the States as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt state-law causes of action") (citation and internal quotation marks omitted); *Ferron v. Subscriberbase Holdings, Inc.*, No. 2:08-CV-760, 2009 WL 650731, at *2 (S.D. Ohio Mar. 10, 2009) (courts "apply the doctrine of preemption sparingly and are guided by two presumptions":

they "do not presume that Congress intended to displace state law" and "there is a presumption against the supplanting of historic state police powers by the federal government unless preemption is the clear and manifest purpose of Congress") (citations and internal quotation marks omitted).  The Court therefore should, as it did in *NCFE I*, decline to endorse Defendants' overbroad interpretation of CRARA.

### 1.     CRARA's Plain Text Forecloses Defendants' Strained Interpretation

As "the purpose of Congress is the ultimate touchstone in every pre-emption case," an analysis of the aim and scope of CRARA is vital to evaluating whether the statute preempts Plaintiffs' claims.  *Wyeth*, 129 S. Ct. at 1194 (citation and internal quotation marks omitted). CRARA establishes a licensing and registration regime that sets forth standards for credit rating agencies seeking to obtain status as NRSROs.  The stated purpose of the Act is to "improve ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating agency industry."  Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327, 1327 (2006) (preamble).  CRARA embodies a congressional effort to eliminate the SEC's then-existing "opaque designation process" for affording credit rating agencies status as NRSROs through "no-action" letters, which had "created an artificial government-sponsored barrier to entry" that "stifled competition and helped the top two rating agencies, Moody's and Standard & Poor's, garner an 80 percent market share, clearly a duopoly."  152 Cong. Rec. H. 7565, at 7569 (daily ed. Sept. 27, 2006) (statements of Rep. Oxley, co-sponsor of CRARA).  Congress sought to counteract the skyrocketing fees and deterioration in ratings quality that the lack of "true competition" had produced, replacing the old regime with "a voluntary registration system that produces cheaper, more accurate ratings."  *Id.*

{H1831226.2 }

The Act sets certain requirements for rating agencies to "furnish information about the procedures, policies, and methodologies used in formulating [their] credit ratings," *NCFE I*, 580 F. Supp. 2d at 650(citing 15 U.S.C. § 78o-7(a)(1)(B)); establishes "detailed rules about the registration process," *id.* (citing 15 U.S.C. § 78o-7(a)-(b)); and describes certain conduct "which NRSROs are prohibited from engaging in," specifically "banning representations of United States sponsorship," "regulating conflicts of interest," and "prohibiting coercive or abusive use of credit ratings for direct or indirect advantage or gain." *Id.* (citing 15 U.S.C. §§ 78o-7(f), 78o-7(h), 78o-7(i)). *See also* Kenneth C. Kettering, *Securitization and its Discontents: The Dynamics of Financial Product Development*, 29 CARDOZO L. REV. 1553, 1700 (2008) ("The main thrust of the legislation is to lower the regulatory barrier to qualification as an NRSRO by making the process for qualification more definite, faster, and more transparent."). The Act also confers authority on the SEC to issue final rules "giving effect" to the statute. *NCFE I*, 580 F. Supp. 2d at 650(citing 15 U.S.C. § 78o-7(c), (d), (g)-(i)).

A relatively young statute, CRARA has not been subject to much judicial scrutiny. Indeed, this Court has offered the only substantive (albeit preliminary) analysis of the purpose and scope of the Act. In *NCFE I*, the Court addressed nearly identical arguments by Moody's that CRARA preempted claims under the Ohio and New Jersey blue sky laws based on Moody's allegedly false or misleading credit ratings on ABS issuances. In particular, the Court suggested the "Limitation" provision in the statute that "[n]otwithstanding any other provision of law," neither the SEC nor any state (or political subdivision thereof) may "regulate the substance of credit ratings" or the "procedures and methodologies" by which any NRSRO determines credit ratings, 15 U.S.C. § 78o-7(c)(2) – "does not appear, at first impression, to stand for the broad proposition that Moody's argues it does." 580 F. Supp. 2d at 651. Rather, the provision "seems

to mean that states may not tell NRSROs what ratings they should give or dictate how they arrive at their ratings." *Id.* The Court was "not prepared to hold" the provision "broadly preempts state regulation, without the benefit of fuller briefing of the issue and of what the phrase 'regulate the substance of credit ratings' means." *Id.* The Court therefore denied Moody's motion to dismiss plaintiff's Ohio Securities Act claim on preemption grounds. *Id.* at 652.[27]

Nothing about this case warrants a departure from the Court's initial inclination against the interpretation of CRARA Defendants urge. Similar to *NCFE I*, the Ohio Funds' claims here arise out of Defendants' misconduct in connection with rating ABS the Funds purchased during the Relevant Period. *See, e.g.*, ¶2 ("[T]he Rating Agencies falsely represented that their AAA credit ratings were independent, objective, and based upon thoughtful and adequate methodologies. In truth, the Rating Agencies subverted those principles and negligently provided unjustified and inflated ratings in exchange for the lucrative fees that the ABS issuers paid Defendants for not only rating the securities but also for helping to structure them.") (footnote omitted); *NCFE I*, 580 F. Supp. 2d at 648(holding complaint sufficiently alleged "Moody's failed to exercise reasonable care in ascertaining whether the factual basis for its ratings was well-grounded"). While the Complaint sets forth specific allegations describing the nature and extent of Defendants' misconduct, Plaintiffs' claims do not purport to impose specific standards or requirements for rating securities. Plaintiffs merely seek to hold Defendants accountable for their misconduct in falsely representing the credit risk associated with the ABS they rated during the Relevant Period.

---

[27] Fitch made similar preemption arguments but, prior to the issuance of the Court's decision, entered into a settlement that encompassed the challenged claims. The Court's ruling with respect to preemption therefore does not reference Fitch.

The provisions of the Act on which Defendants rely – when read in their entirety and in context – do not dispose of Plaintiffs' claims. Both provisions fall under a section entitled "Accountability for ratings procedures." *See* 15 U.S.C. § 78o-7(c). The first subsection states:

> (1) Authority. The [SEC] shall have exclusive authority to enforce the provisions of this section in accordance with this title with respect to any [NRSRO], if such [NRSRO] issues credit ratings in material contravention of those procedures relating to such [NRSRO], including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest, that such [NRSRO]--
>
> > (A) includes in its application for registration under subsection (a)(1)(B)(ii); or
> >
> > (B) makes and disseminates in reports pursuant to section 17(a) [of the Securities Exchange Act of 1934] or the rules and regulations thereunder.

The second subsection states:

> (2) Limitation. The rules and regulations that the [SEC] may prescribe pursuant to this title, as they apply to [NRSROs], shall be narrowly tailored to meet the requirements of this title applicable to [NRSROs]. Notwithstanding any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any [NRSRO] determines credit ratings.

The "Authority" clause thus confers exclusive authority on the SEC to enforce the provisions of the Act, which primarily relate to the licensing and registration of NRSROs, in accordance with the provisions of the statute. The subparts of that clause – portions of which Defendants selectively redact – refer to an NRSRO's "application for registration" under the Act and "reports pursuant to section 17(a) [of the Securities and Exchange Act of 1934] or the rules and regulations thereunder." Similarly, Defendants omit the portion of the "Limitation" clause directed at the "requirements" CRARA sets forth, *i.e.*, regarding licensing and registration of NRSROs. Moreover, the "Limitation" clause does not specifically address state common law and statutory claims premised on NRSROs' misrepresentations in issuing credit ratings to

investors.  It expresses a prohibition only against regulating "the substance of credit ratings" – a phrase neither Congress nor any court has clarified – or "the procedures and methodologies" by which NRSROs determine ratings.

The actual text of the Act thus does not call for the far-reaching preemption Defendants advocate.  Moreover, as this Court has noted, in contrast to this "Limitation" clause, in another section of the Act Congress did include specific language "when it came to giving the SEC exclusive authority to regulate the registration of NRSROs."  *NCFE I*, 580 F. Supp. 2d at 651 n.4.  The latter provision declares, "No provision of the laws of any State or political subdivision thereof requiring the registration, licensing, or qualification as a credit rating agency or a [NRSRO] shall apply to any [NRSRO] or person employed by or working under the control of a [NRSRO]."  15 U.S.C. § 78o-7(o)(1).[28]  The inclusion of such language in the statute further indicates that if Congress had intended the "regulation of the substance of credit ratings . . ." provision to encompass all state common law and statutory claims relating to credit ratings, it would have said so explicitly.  *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)) ("It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct."); *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007) (holding National Securities Markets Improvement Act of 1996 ("NSMIA") preempts state securities registration requirements only as to securities qualifying as "covered securities," observing, "Had Congress possessed the political will to preempt state Blue Sky laws in their practical entirety, it would have expressed that decision in the statute's plain text."); *Fulgenzi v. Wyeth, Inc.*, No. 5:09CV1767, 2010 WL 649349, at *2 (N.D. Ohio Feb. 19,

---

[28] The Act contains an exception for investigations and enforcement actions by "the securities commission (or any agency or office performing like functions) of any State" with respect to "fraud or deceit" against any NRSRO or associated person.  *Id.* § 78o-7(o)(2).

2010) ("Express preemption exists where either a federal statute or regulation contains *explicit language indicating that a specific type of state law is preempted*.") (emphasis added).

A plain reading of the statute thus belies Defendants' assertion that CRARA immunizes them from liability here.  While the Act addresses state regulation directed at "the registration, licensing, or qualification" of entities as credit rating agencies or NRSROs as well as "the substance of credit ratings" or the "procedures and methodologies" for determining ratings, Plaintiffs' claims do not fall within that purview.  Defendants' argument to the contrary distorts the words of the statute.

### 2.      CRARA's Legislative History Does Not Support Preemption Here

Just as the actual text of the Act does not countenance Defendants' broad assertion of preemption of state law causes of action, its legislative history does not bespeak any such congressional desire.  As this Court has observed, one commentator has noted the legislative history of CRARA shows Section 78o-7(c)(2) (regarding "regulation" of the "substance" of ratings, *etc.*) "was a 'last-minute amendment' which appears to preempt state law 'to some extent,'" and "though a 'broad reading of what it means to "regulate the substance" of a rating is discouraged,' the exact extent of preemption is 'a question about which reasonable minds might differ.'"  *NCFE I*, 580 F. Supp. 2d at 651(quoting Kettering, *Securitization and its Discontents*, 29 Cardozo Law Rev. at 1688-89).[29]  *See also* 152 Cong. Rec. S10011, at 10012 (Sept. 22, 2006) (Senator Sarbanes observing the managers' amendment to the legislation "clarifies the role of Federal regulation in the registration, licensing and qualification of NRSROs, and that the legislation would not regulate the substance of credit ratings or the procedures and

---

[29] *See* Kettering, *Securitization and its Discontents*, 29 Cardozo Law Rev. at 1688 n.447 (observing legislative commentary on the provision "appears to consist of one brief vague paragraph in the floor debates that contains no interpretative grist").

methodologies that NRSROs use to determine them, subject to the Federal oversight required in various parts of the legislation"). The absence in the legislative history of commentary endorsing the broad preemptive reach Defendants urge further indicates Congress did not intend such a drastic result. *See Lohr*, 518 U.S. at 491 (plurality opinion) ("There is, to the best of our knowledge, nothing in the hearings, the committee reports, or the debates suggesting that any proponent of the legislation intended a sweeping pre-emption of traditional common-law remedies . . . . If Congress intended such a result, its failure even to hint at it is spectacularly odd, particularly since Members of both Houses were acutely aware of ongoing . . . litigation.").

The legislative record confirms Congress passed CRARA to "level[] the playing field in the ratings industry by replacing an SEC designation process that benefits a privileged few with a voluntary registration system available to all." 152 Cong. Rec. H. at 7568 (Rep. Oxley). Congressman Oxley, one of CRARA's sponsors, stated:

> The SEC's opaque designation process has created an artificial government-sponsored barrier to entry that has stifled competition and helped the top two rating agencies, Moody's and Standard & Poor's, garner an 80 percent market share, clearly a duopoly. Without true competition in this industry, fees have skyrocketed and ratings quality has deteriorated. Ultimately, individual investors will benefit from a voluntary registration system that produces cheaper, more accurate ratings.

*Id.* at 7569. Congressman Oxley also referenced the Act's disclosure requirements regarding conflicts of interest and its prohibition of "abusive practices." *Id*. Senator Sarbanes similarly observed that under CRARA, "a credit rating agency can obtain the NRSRO designation unless the SEC determines that it lacks adequate financial and managerial resources to consistently produce credit ratings with integrity and to comply with its stated methodologies and procedures," and the Act "creates a transparent application process for becoming a NRSRO which requires a decision within a time certain." 152 Cong. Rec. S. at 10012. Senator Sarbanes also referenced the requirement that the SEC adopt rules "that prohibit unfair, coercive and

{H1831226.2 }

43

abusive business practices; prohibit or require the management and disclosure of any conflicts of interest; and require NRSROs to establish policies and procedures designed to prevent the misuse of nonpublic information."  *Id.*  Those statements reflect the primary purpose of CRARA to establish universally applicable requirements for obtaining NRSRO status, thereby encouraging greater competition in the rating agency industry – not to stand as a shield against state law liability.[30]

Moreover, the sole mention in the legislative history of the meaning of any applicability or limitation provision in CRARA indicates Congress limited its scope.  Congressman Kanjorski stated the provision addressing state regulation of "the registration, licensing, or qualification" of entities as credit rating agencies or NRSROs (15 U.S.C. § 78o-7(o)) "should be viewed narrowly as limiting a State's authority to regulate the day-to-day activities of credit rating agencies."  152 Cong. Rec. H. at 7569).  That interpretation accords with the nature of the Act as establishing a licensing and registration regime through which the SEC is to establish regulations governing, among other things, application procedures and disclosure requirements but is not to encroach on the rating agencies' "day-to-day activities."   As detailed below, Plaintiffs' claims reflect that distinction, asserting Defendants' liability for misrepresentations to investors while not prescribing standards to determine the "substance" of ratings or the "procedures and methodologies" Defendants utilize to determine ratings.

---

[30] The Court may take judicial notice of the Congressional Record containing the legislative history of CRARA.  *See Int'l Dairy Foods Ass'n v. Boggs*, No. 2:08-CV-628, 2009 WL 937045, at *16 n.17 (S.D. Ohio Apr. 2, 2009) (Graham, J.) (excerpts from legislative history of Organic Foods Production Act ("OFPA") "are facts that are not subject to reasonable dispute" and thus were susceptible of judicial notice pursuant to Fed. R. Evid. 201).

### 3.    Plaintiffs' Do Not Purport To Regulate The Substance Of Ratings Or The Procedures Or Methodologies For Determining Them

Contrary to Defendants' mischaracterization, Plaintiffs do not plead negligence by "hindsight." D. Br. at 21. Plaintiffs allege Defendants are subject to liability for their misconduct in participating in the ABS transactions at issue, misrepresenting their role in those transactions (including their mismanagement of conflicts of interest inherent in the issuer-pays model), and issuing false or misleading ratings. The Complaint states, for example:

- Notwithstanding Defendants' representations to the contrary during the Relevant Period, the Rating Agencies allowed the conflicts of interest inherent in the issuer pays model to taint the ratings process, resulting in the unjustifiably high ratings upon which the Ohio Funds relied in purchasing the ABS that are the subject of this action. ¶52.

- The Rating Agencies failed to make adequate disclosures regarding the ratings process and their methodologies. ¶91.

- The Rating Agencies' false and misleading representations regarding their ratings – most prevalently, the inflated ratings themselves – caused the Ohio Funds to suffer significant losses when the real estate market collapsed during the last two years. ¶100.

- Defendants knew or should have known that their representations concerning the ABS, including the ratings themselves, were materially false or misleading. ¶155.

- The securities Plaintiffs now own were offered for sale pursuant to offering materials that contained false and misleading statements, omitted to state material facts necessary in order to make the statements made not misleading, and contained unfounded and unjustified AAA ratings. ¶¶164, 176.

- Specifically, the offering materials falsely represented that the securities Plaintiffs purchased had a credit quality consistent with Defendants' criteria for the particular credit ratings assigned. ¶¶165, 177.

To find Defendants liable, the jury simply must decide, with respect to Plaintiffs' negligent misrepresentation claim, whether Defendants, in the course of their "business, profession or employment," or in "any other transaction" in which they have "a pecuniary interest," supplied "false information for the guidance of others in their business transactions" by

failing "to exercise reasonable care or competence in obtaining or communicating the information," and whether the Ohio Funds justifiably relied on the information and thereby suffered pecuniary loss. *NCFE I*, 580 F. Supp. 2d at 646 (quoting *Delman v. City of Cleveland Heights* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835 ). *See also* Section IV.C, *infra*.

Similarly, to find liability under the Ohio Securities Act, the jury must determine Defendants, "by a written or printed circular, prospectus, or advertisement," offered a security for sale or "receive[d] the profits accruing from such sale" and the publication contained a materially false misstatement or omission of fact on which the Ohio Funds relied (Ohio Rev. Code § 1707.41(A)), or Defendants "participated in or aided" a seller "in any way in making such sale or contract for sale." Ohio Rev. Code § 1707.43(A). The jury will also decide whether Defendants have met their burden to establish they had just and reasonable grounds to believe the statement to be true or the omitted facts to be not material." *Id.* § 1707.41(A); *id.* § 1707.41(C) ("For purposes of this section, lack of reasonable diligence in ascertaining the fact of a publication or the falsity of any statement contained in it or of the omission of a material fact shall be deemed knowledge of the publication and of the falsity of any untrue statement in it or of the omission of material facts."). *See also* Section IV.D, *infra*. Thus, while Plaintiffs detail why Defendants' representations were false or misleading, satisfying Plaintiffs' obligation to "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 129 S. Ct. at 1949 (citation and internal quotation marks omitted), none of Plaintiffs' claims require jurors to determine standards governing "the substance of credit ratings" or the "procedures and methodologies" for determining the ratings. Nor do Plaintiffs' claims invade the SEC's authority to oversee the licensing and registration of NRSROs.

### 4.      CRARA Does Not Impliedly Preempt Plaintiffs' Claims

Although Defendants rest their preemption argument solely on an "express" preemption theory,[31] the same bases weighing against express preemption also indicate Congress did not impliedly intend to preempt the Ohio Funds' claims.  A federal statute implicitly preempts state law either where its scope "indicates that Congress intended federal law to occupy a field exclusively" or where state law "is in actual conflict" with the federal statute.  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64, 123 S. Ct. 518 (2002) (citation and internal quotation marks omitted).  The latter brand of preemption occurs "where it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (citations and internal quotation marks omitted).

Nothing in the text or legislative history of CRARA suggests the Act, which establishes a licensing and registration regime and aims to foster increased competition in the credit rating agency industry, leaves no room for state law remedies based on licensed NRSRO's misrepresentations of ABS ratings or the other kinds of misconduct alleged in the Complaint. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990) ("Ordinarily, the mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies . . . .  Instead, we must look for special features warranting pre-emption.") (citation and internal quotation marks omitted); *Brown*, 481 F.3d at 911-12 (NSMIA "plainly restricts its preemptive scope to 'covered securities,' and it neither defines, nor requires the SEC to define, 'covered securities' in a fashion that would actually include all securities.  The statute thus does

_____

[31] *See* D. Br. at 14-15 (asserting the subjects of the claims "are ones that Congress has **expressly** placed beyond regulation by state actors, whether through legislation or litigation") (emphasis added).

not expressly preempt state laws with respect to non-'covered' securities, nor does the statute's text reveal an implied intent to preempt all state statutes in the field.").  Moreover, precluding these claims would undermine the states' interest in providing remedies to investors who suffer economic losses due to misrepresentations in connection with securities transactions.  *See A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 782 (3d Cir. 1999) ("Although the enactment of [NSMIA] narrowed the role of state blue sky laws by expanding the range of federal preemption, federal and state regulations each continue to play a vital role in eliminating securities fraud and abuse."); *Int'l Dairy Foods*, 2009 WL 937045, at *17 (while OFPA "prohibits the use of certain hormones and chemicals in organic production," plaintiff "does not cite anything in the OFPA or its regulations demonstrating that there is no room for states to exercise their traditional police powers to regulate false and misleading labeling when referring to these hormones or chemicals").

Similarly, traditional state tort claims addressing misrepresentations to investors do not stand "as an obstacle to the accomplishment and execution" of Congress's full purposes and objectives in enacting CRARA.  A jury verdict against Defendants would not compel them to institute judicially-imposed standards regarding their ratings or rating methods; rather, it simply would provide redress to victims of Defendants' misconduct.  *See Altria Group, Inc. v. Good*, 129 S. Ct. 538, 546 n.10 (2008) ("If [plaintiffs] prevail at trial, [defendants] will be prohibited from selling as 'light' or 'low tar' only those cigarettes that are not actually light and do not actually deliver less tar and nicotine.  Barring intervening federal regulation, [defendants] would remain free to make nonfraudulent use of the 'light' and 'low-tar' descriptors."); *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1540-41 (D.C. Cir. 1984) (noting damages actions "typically . . . can have *both* regulatory and compensatory aims" and observing verdict against

Chevron based on inadequacy of label "does not command Chevron to alter its label" but "merely tells Chevron that, if it chooses to continue selling paraquat in Maryland, it may have to compensate for some of the resulting injuries") (emphasis in original).  Nor is it "impossible" for Defendants to comply with both state law and federal regulations under CRARA.  They certainly can comport with the application and disclosure requirements CRARA mandates while simultaneously working to avoid making misrepresentations to investors.

### 5.      Defendants' Authorities Do Not Support Preemption Here

Disregarding the gravamen of Plaintiffs' claims as well as the complete text and scope of CRARA, Defendants invite the Court to make new law by ruling – at the pleading stage – the Act prohibits those claims, which would affirm Defendants' view that "*no one*" may hold them accountable for their alleged misconduct.  *See* D. Br. at 17-19 (emphasis in original).  Neither CRARA itself (as detailed above) nor the authorities Defendants cite support their argument.

For example, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S. Ct. 999 (2008), which Defendants cite extensively, involved circumstances distinct from those here.   In *Riegel*, plaintiffs asserted common law design, manufacturing and labeling defect claims against the manufacturer of a faulty catheter that had received premarket approval from the U.S. Food and Drug Administration ("FDA").   The Supreme Court held the Medical Device Amendments of 1976 ("MDA") preempted those claims.   The MDA's express preemption clause states that, except as otherwise provided,

> no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement--
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

*Riegel*, 552 U.S. at 316 (quoting 21 U.S.C. § 360k(a)).

The Court first found premarket approval imposes "requirements" relating to safety and effectiveness, observing, *inter alia*, "the FDA requires a device that has received premarket approval to be made with almost no [design, manufacturing, labeling or other] deviations from the specifications in its approval application." *Id.* at 317-23.  The Court then explained the term "requirements" – which does not appear in CRARA – encompasses common law duties and further concluded the claims at issue related to the safety and effectiveness of the catheter.  *Id.* at 323.  The Supreme Court therefore upheld the lower court's summary judgment ruling against plaintiffs on preemption grounds.

The Supreme Court's reasoning in *Riegel* does not support Defendants' overbroad assertion of preemption in this case.  Indeed, the Supreme Court has distinguished *Riegel* on grounds that apply with equal force here.  In *Altria Group, Inc. v. Good*, the Court observed the plaintiffs' product liability claims in *Riegel* "fell within the core of the MDA's pre-emption provision because they sought to impose different requirements on precisely those aspects of the device that the FDA had approved," as the claims "unquestionably sought to enforce 'requirement[s] relating to safety or effectiveness' under the MDA."  129 S. Ct. at 549 (alteration in original).  Noting that, unlike the case at bar, *Riegel*, *inter alia*, "involved precisely the type of state rule that Congress had intended to pre-empt," the Court held the Federal Cigarette Labeling and Advertising Act did not preempt plaintiffs' claim that defendants "deliberately deceived them about the true and harmful nature of 'light' cigarettes" in violation of the Maine Unfair Trade Practices Act.  *Id.* at 541, 548-51.

Contrary to the statute at issue in *Riegel*, the stated purpose and scope of CRARA do not indicate any congressional intent to divest states of their authority to subject credit rating

agencies to liability for their misrepresentations to investors regarding ratings of ABS. Moreover, that "the 'relating to' language of the MDA's pre-emption provision is . . . much broader than the operative language" of CRARA further renders *Riegel* inapposite. *Altria Group*, 129 S. Ct. at 549. *See also Burlison v. United States*, 533 F.3d 419, 436 (6th Cir. 2008) (observing the Refuge Act "does not contain an explicit provision such as those found in two federal statutes which the Supreme Court has recently determined to preempt state laws") (citing *Riegel*; *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 128 S. Ct. 989, 993 (2008)). Far from imposing a sweeping mandate in favor of preemption of state law, *Riegel* turned on its particular facts and merely illustrates the importance of carefully examining the text and purpose of a statute to discern its intended scope. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443-44 (2005) ("That *136v(b)* [of the Federal Insecticide, Fungicide, and Rodenticide Act] may pre-empt judge-made rules, as well as statutes and regulations, says nothing about the *scope* of that preemption.") (emphasis in original); *NCFE I*, 580 F. Supp. 2d at 651 (Court not prepared to hold CRARA "broadly preempts state regulation"); *Jasso v. Citizens Telecomms. Co. of Cal., Inc.*, No. CIV S-05-2649 GEB EFB PS, 2007 WL 97036, at *9 (E.D. Cal. Jan. 9, 2007) (addressing Section 332(c)(3)(A) of Federal Communications Act ("FCA"), which provides "no state or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service," court stated, "[d]isplacement of the authority to regulate rates charged does not equate with the displacement of state tort law for negligence").[32]

---

[32] Given the vital importance of determining CRARA's scope, rather than merely invoking statutory buzzwords, Defendants' citations to several authorities supporting the unremarkable propositions that the term "notwithstanding" has preclusive effect when used in statutes and the term "regulate" can encompass civil damages actions, *see* D. Br. at 17-19, are of no moment.

Defendants' other primary authorities likewise are inapposite. They address statutes that – unlike CRARA – explicitly precluded the types of claims at issue or contained clear pronouncements in their legislative history evidencing Congress's intent to cover the subject matter of the suit. *See Train v. Colo. Pub. Interest Research Group, Inc.*, 426 U.S. 1, 11–25 (1976) (stating legislative history of statute at issue, the Federal Water Pollution Control Act, "speaks with force to the question whether source, byproduct, and special nuclear materials are 'pollutants' subject to the [Atomic Energy] Act's permit program," observing the House Committee Report "was quite explicit on the subject"); *Brown*, 481 F.3d at 909 n.3 (addressing NSMIA, which provides, "'a) Scope of exemption. Except as otherwise provided in this section, *no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof* – (1) requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that – (A) is a covered security; or (B) will be a covered security upon completion of the transaction . . . .'") (ellipsis in original) (quoting 15 U.S.C. §§ 77r(a)(1)(A)-(B)) (emphasis added); *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 314, 319-20 (2d Cir. 2000) (FCA and regulations by Federal Communications Commission ("FCC") preempted local zoning board's "power to enforce a condition of a permit to construct and use a communications tower" that required permittees "to remedy any radio frequency interference . . . from tower signals with appliances and devices in local homes" because FCA, *inter alia*, empowers FCC "to 'determine the location of classes of stations or individual stations'" and "to 'regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein'") (quoting FCA).[33]

---

[33] *See also Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000) (where

The decisions Defendants cite are far removed from the circumstances here.  Given the

absence of explicit statutory language or other manifestation of a congressional purpose to

foreclose Plaintiffs' claims, there is no basis to rebut the presumption against preemption.

### 6.      CRARA Does Not Apply Retroactively

While the text, purpose and legislative history of CRARA do not support a finding of

preemption, even assuming *arguendo* the Act precludes claims based on Defendants'

misrepresentations, the portion of Plaintiffs' claims based on conduct occurring prior to the

effective date of the Act would not be preempted.  Indeed, this Court has observed there is "a

---

plaintiff alleged, *inter alia*, defendant "'signed up subscribers without first building the cellular
towers and other infrastructure necessary to provide reliable cellular connections,'" court held
claims "tread directly on the very areas reserved to the FCC:  the modes and conditions under
which [defendant] may begin offering service in the Chicago market") (quoting complaint); *City
of Cleveland v. Ameriquest Mortgage Sec., Inc.*, 621 F. Supp. 2d 513, 517-19 (N.D. Ohio 2009)
(claims preempted where statute provided the state "solely shall regulate the business of
originating, granting, servicing, and collecting loans and other forms of credit in the state and the
manner in which any such business is conducted," expressly preempting "'[a]ny ordinance,
resolution, regulation, or *other action*,'" and city sought "a judicial determination that the alleged
subprime mortgage lending and securitization . . . constitutes a public nuisance under Ohio
common law") (alteration and emphasis in original) (quoting Ohio Rev. Code § 1.63).

*AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120 (4th Cir. 2008), is even more readily
distinguishable.  In that case, the Fourth Circuit addressed the Natural Gas Act ("NGA"), which
contains a provision conferring "'the *exclusive authority*'" on the Federal Energy Regulatory
Commission "'to approve or deny an application for the siting, construction, expansion, or
operation of an LNG [liquefied natural gas] terminal.'"  *Id.* at 125 (emphasis in original)
(quoting 15 U.S.C. § 717b(e)(1)).  The court observed, "Viewed in isolation," the provision
"leaves state and local governments with no residual power to site LNG terminals or to take
actions that would effectively approve or deny such siting." *Id.*  However, the court determined
preemption applied to the municipal measure at issue – seeking to ban the siting of LNG
terminals in the Chesapeake Bay Critical Area – because it had not been incorporated as part of
Maryland's federally approved Coastal Zone Management Plan, which plaintiffs asserted would
have brought the bill within the scope of the NGA's preemption savings clause. *Id.* at 122, 126-
27.  The court expressly noted it did not "reach the question" whether the bill would fall within
the savings clause had it been so incorporated.  *Id.* at 127 n.9.  Therefore, in addition to the
presence in *AES Sparrows Point LNG* of statutory language directly addressing the type of
conduct at issue in the litigation ("siting" of LNG terminals) – which does not exist in the
CRARA provisions Defendants cite – the decision turned on technical peculiarities not pertinent
here.

substantial question about whether [CRARA] can be applied retroactively."  *NCFE I*, 580 F. Supp. 2d at 652.  As detailed below, the Act does not manifest any congressional intent to impose retrospective application.

As retroactivity "is not favored in the law," federal statutes "will not be construed to have retroactive effect unless their language requires this result."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994) (citation and internal quotation marks omitted).  The Supreme Court has observed "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."  *Id.* at 265.  Basic considerations of fairness "dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."  *Id.  See also id.* at 27 ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent."); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997) ("The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.  Accordingly, we apply this time-honored presumption unless Congress has clearly manifested its intent to the contrary.") (citation and internal quotation marks omitted).

The Ohio Funds' claims arise out of their investments in certain ABS Defendants rated during the period January 1, 2005 through July 8, 2008.  CRARA did not become effective until June 18, 2007, well into the Relevant Period.  *See NCFE*, 580 F. Supp. 2d at 652 (citing 15 U.S.C. § 78o-7(p); 72 Fed. Reg. 33,564 (June 18, 2007)).  Thus, a substantial portion of Plaintiffs' claims would not be susceptible to preemption as long as the Act does not apply retroactively.

The Court's "first task" in assessing the temporal scope of CRARA "is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. Where such a clear congressional pronouncement exists, "there is no need to resort to judicial default rules." *Id.* CRARA explicitly limits the applicability of its provisions to future, not past, conduct. In a subsection entitled "Applicability," the statute provides that, other than subsection (n) (relating to "Regulations"), CRARA "shall apply on the earlier of-- (1) the date on which regulations are issued in final form under subsection (n)(1); or (2) 270 days after the date of enactment of the Act (the statute was enacted on September 29, 2006). 15 U.S.C. § 78o-7(p). The Act thus manifests congressional intent to apply prospectively. *Compare id. with, e.g.*, Military Commissions Act of 2006, Pub. L. No. 109-366, § 6(b)(2), 120 Stat. 2600, at *2635 (2006) (including section entitled "Retroactive applicability," providing in relevant part, "[t]he amendments made by this subsection . . . shall take effect as of November 26, 1997, as if enacted immediately after the amendments made by section 583 of Public Law 105-118"). The Court need go no farther in its analysis.

Any other reading would be incongruous with the Act's purpose as a licensing and registration measure. Congress could not legitimately seek to hold rating agencies accountable retroactively for failing to meet the registration requirements it had not established until promulgating CRARA. In the same vein, any preemptive effect of CRARA would necessarily be prospective. Given the nature and objective of the Act, as well as the lack of any mention in the legislative history suggesting Congress intended the Act to apply retrospectively, no preemption applies with respect to ABS purchases the Ohio Funds made prior to June 18, 2007.

Additionally, even absent CRARA's express "Applicability" provision, the statute should not apply retroactively to bar private rights of action. Where (unlike here) a statute lacks an

explicit command as to its temporal application, "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. *See also id.* at 269-70 (court must ask "whether the new provision attaches new legal consequences to events completed before its enactment"). If the statute would have "retroactive effect," the traditional presumption mandates the statute does not govern "absent clear congressional intent favoring such a result." *Id.* at 280.[34] Assuming *arguendo* the preemption provisions in CRARA actually encompass state law claims based on Defendants' alleged misconduct, application of the Act to bar those private causes of action would impose an impermissible "retroactive effect." *See Scott v. Boos*, 215 F.3d 940, 942, 950 (9th Cir. 2000) (holding Private Securities Litigation Reform Act of 1995 ("PSLRA"), which eliminated securities fraud as a predicate act for a private cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), did not apply retroactively to bar plaintiff's civil RICO claim filed after PSLRA's effective date where alleged conduct occurred prior to effective date); *id.* at 946 ("If the RICO amendment is applied here, it would attach new legal consequences to events completed before its enactment because prior to the amendment, the legal consequences of engaging in a pattern of racketeering involving

---

[34] The Supreme Court has noted Justice Story's pronouncement that "'every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective.'" *Id.* at 269 (quoting *Soc'y for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756 (No. 13, 156), 767, 2 Gall. 105 (C.C.N.H. 1814)). However, the Court has admonished against a restrictive interpretation of the elements triggering the presumption against retroactivity. Neither the language quoted above from *Landgraf* nor the similar excerpt from Justice Story's opinion "purport[s] to define the outer limit of impermissible retroactivity." *Hughes*, 520 U.S. at 947. Rather, those formulations "merely described that any such effect constituted a *sufficient*, rather than a *necessary*, condition for invoking the presumption against retroactivity." *Id.* (emphasis in original).

securities fraud included federal securities violations and RICO violations; after the amendment, the legal consequences of the same actions only include federal securities violations"); *Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 165, 171 (3d Cir. 1998) (holding PSLRA did not apply retroactively to plaintiff's pending claims; citing *Landgraf*, court reasoned, "If a change in the law from back pay to compensatory and punitive damages [in *Landgraf*] is seen as *creating* a new cause of action and impairing a party's rights, certainly a change from treble damages (under RICO) to compensatory damages alone (under the securities laws) may be seen as *destroying* a cause of action and impairing a party's rights.") (emphasis in original).[35]

Retroactive application of CRARA would have a particularly draconian effect here, as Plaintiffs would be left with *no* remedy for the losses they suffered due to Defendants' misconduct. Application of the statute to bar claims based on transactions occurring prior to CRARA's effective date thus would clearly have a "retroactive effect." Consequently, given the lack of "clear congressional intent" to apply the statute retroactively (as indicated above), those claims must stand.[36]

---

[35] While *Mathews* addressed claims already pending as of the PSLRA's effective date, the Ninth Circuit in *Scott* observed the analysis in *Mathews* "appears to apply equally to cases where the claim was filed after the PSLRA's effective date based on conduct occurring before that date." 215 F.3d at 944.

[36] Defendants have argued elsewhere CRARA does not have a "retroactive effect" with respect to claims against them because, Defendants assert, such claims do not constitute "vested rights." Even assuming *arguendo* Defendants' definition of "vested rights" is correct and applies to Plaintiffs' claims, their contention espouses an unduly myopic view of the potential factors that might support a finding of retroactive effect. *See Landgraf*, 511 U.S. at 275 n.29 ("[W]e do not restrict the presumption against statutory retroactivity to cases involving 'vested rights.' (Neither is Justice Story's definition of retroactivity . . . so restricted.)"); *Hughes*, 520 U.S. at 947; *Scott*, 215 F.3d at 947 ("Nowhere in *Landgraf* does the Court define what rights qualify as 'rights a party possessed'"). Additionally, should Defendants regurgitate the same argument here, it would fly in the face of their (erroneous) assertion that Plaintiffs' claims are somehow time-barred.

C.    THE    OHIO    FUNDS    SUCCESSFULLY    STATE    CLAIMS    FOR
NEGLIGENT MISREPRESENTATION

      **1.**      **Ohio Law Governs The Ohio Funds' Claims**

This Court has previously been reluctant, under analogous facts, to make, a choice of law

determination on an undeveloped factual record.  *See In re Nat'l Century Fin. Enters., Inc., Inv.*

*Litig.*, No. 2:03-MD-1565, 2006 WL 469468, at *7 (S.D. Ohio Feb. 27, 2006) ("*NCFE II*")

(refraining from making a choice of law determination on a motion to dismiss because "the facts

need further development before a choice-of-law determination can properly be made").  As in

the *NCFE II* litigation, a choice of law determination here is premature at the pleading stage

where discovery has yet to be conducted.  That said, if the Court were to decide the issue based

solely on the Complaint's allegations, Ohio law would apply.

Federal district courts exercising diversity jurisdiction must apply the choice of law rules

of the forum state.  *Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419, 425 (6th Cir. 2009).

Ohio has adopted the principles of the Restatement (Second) of Conflicts of Law § 148 to

determine which state's law governs misrepresentation claims for fraudulent or negligent

misrepresentation.  *See Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820-21 n.2 (6th Cir. 1990)

(applying § 148 to a fraud claim); *Lewis v. Horace Mann Ins. Co.*, 410 F. Supp. 2d 640, 653-54

(N.D. Ohio 2005) (applying § 148 to a negligent misrepresentation claim).

Restatement § 148 provides two different tests, the application of which depends on

whether the plaintiff's reliance took place in the same state where the defendant's representation

was made and received.  Under Restatement § 148(1), if a defendant's representation was made

and received in the same jurisdiction as the plaintiff's actions in reliance, then that state's law

will generally govern.  *See Ins. Distrib. Network, Inc. v. Mariano*, No. 1:04-cv-466, 2008 WL

520915, *3 (S.D. Ohio Feb. 26, 2008).  But if the act constituting plaintiff's reliance occurred in

whole or in part in a state other than the state where the defendant made the representation, Restatement § 148(2) lists six factors to consider in deciding which state's law to apply. *See id*.

Here, determining which state has the most significant relationship with Plaintiffs' negligent misrepresentation claims depends largely on facts not yet established. It is simply too early in the process to conduct a carefully reasoned choice of law determination. *See NCFE II*, at *7; *see also In re Grand Theft Auto Video Game Consumer Litig*., No. 06 MD 1739, 2006 WL 3039993, at *3 n.3 (S.D.N.Y. Oct. 25, 2006) (holding that a detailed choice of law analysis would be premature on defendants' motion to dismiss).

In an effort to short-circuit a proper choice of law determination, Defendants argue – based on material extrinsic to the Complaint – that New York law applies under Restatement § 148(2) because the credit ratings at issue were "indisputably issued in New York." *See* D. Br. at 22-23. Even if § 148(2) were to apply, Ohio law would nonetheless govern based on the enumerated factors.

In particular, Restatement § 148(2) directs the Court to consider the following six factors when determining which state has the "most significant relationship" to the parties and the transaction:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations;

> (b) the place where the plaintiff received the representations;

> (c) the place where the defendant made the representations;

> (d) the domicile, residence, nationality, place of incorporation, and place of business of the parties;

> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time; and

(f)   the place where the plaintiff is to render performance under a
       contract which he has been induced to enter by the false
       representations of the defendant.

The Complaint specifically alleges facts relating to § 148(2) factor (d) – the parties'
places of incorporation and principal places of business.   All of the Ohio Funds are
instrumentalities of the state of Ohio and have principal places of business in Ohio.  *See* ¶¶16-25.
All but one of Defendants (McGraw-Hill) are Delaware corporate entities, whose principal
places of business are in New York.  *See* ¶¶26-28.  McGraw-Hill is a New York corporation,
whose principal place of business is in New York.  *See* ¶26.

The plaintiff's principal place of business is of "substantial significance when the loss is
pecuniary in its nature . . . because a financial loss will usually be of greatest concern to the state
with which the person suffering the loss has the closest relationship."  *See* Restatement § 148
cmt. i  In fact, the "domicile, residence, and place of business of the plaintiff *are more important*
than are similar contacts on the part of the defendant."  *Id.*  (emphasis added).  Thus, the only
factor detailed in the Complaint weighs heavily in favor of applying Ohio law.

In *Sky Tech. Partners, LLC v. Midwest Research Inst.*, 125 F. Supp. 2d 286, 297–98 (S.D.
Ohio 2000), for example, even though the defendants made the misrepresentations in Missouri,
the defendants' principal place of business was in Missouri, and there was no evidence regarding
where the plaintiff received the misrepresentations, the court determined that Ohio law applied to
plaintiff's fraud claim because Ohio, the location of plaintiff's principal place of business, was
the plaintiff's "most important contact."  (citing Restatement § 148 cmt. i).

Without citing to any authority, and contrary to the general rule that a complaint's
allegations should be construed in the light most favorable to the Plaintiffs, Defendants argue
that the Court should consider material extrinsic to the Complaint:  counsel's contention that all
of the credit ratings were "indisputably" made in New York.  *See* D. Br. at 22-23.  Plaintiffs do

not know where all of the credit ratings were made.  Moreover, it is equally "indisputable" that the evidence in this case will show that many of the ABS at issue were purchased based on credit ratings *received in Ohio* and *acted upon in Ohio by Ohio Funds' personnel*.  Under these circumstances, Restatement § 148(2) factors (a), (b), and (d) clearly weigh in favor of applying Ohio law.  *See Lewis*, 410 F. Supp. 2d at 656 ("If any two of the above-mentioned contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues.") (citing Restatement § 148 cmt. j)); *Insurance Distrib.*, 2008 WL 520915 at *3 ("Here, because plaintiff's actions in reliance occurred in Indiana, and because plaintiff received Mariano's representations in Indiana, and because plaintiff's principal place of business is in Indiana, Indiana law governs plaintiff's fraud claim.").

The authorities Defendants elected to cite are wholly inapposite.  The court in *In re Nord Res. Corp. Sec. Litig.*, Nos. C-3-90-380, 391, 409 and 410, 1992 WL 1258516, at *7 (S.D. Ohio Dec. 16, 1992) applied New York law because New York was the location where the misrepresentations were both made by the defendants and received by the plaintiffs.  More importantly, "[n]othing [wa]s known of the Plaintiffs' domicile or residence."  *Id.* at *8.  And in *Q & R Assocs., Inc. v. Unifi Technical Fabrics, LLC*, No. 1:01-cv-641, 2006 WL 2850503, at *3 (S.D. Ohio Oct. 3, 2006), the only conclusive factor guiding the court's application of Ohio law was § 148(2) factor (f) – the place where plaintiff was to render performance – a factor which is not in play here.

Lastly, although not listed among the six factors in § 148(2), Defendants argue that New York law should govern because New York is the indisputable center of global finance.  *See* D. Br. at 23-24.  Whatever New York's role in finance may be, Ohio has the most compelling

interest in *this* litigation because the plaintiffs that are suffering the economic impact of Defendants' misconduct are Ohio state instrumentalities that are entrusted with managing the retirement funds of Ohio state employees.  *See* ¶¶16 (OP&F); 18 (OPERS); 20 (STRS); 22 (SERS); and 24 (Deferred Comp).  Ohio law therefore applies if a choice of law determination is to be made at this stage.

**2.    New York's Martin Act Does Not Preclude The Ohio Funds' Claims**

As a threshold matter, the Martin Act is wholly irrelevant because New York law does not apply to the Ohio Funds' claims.  *See* Section IV.C.1, *supra*[37]*; see also Fin. Trust Co. v. Citibank, N.A.*, 268 F. Supp. 2d 561, 571 (D. V.I. 2003) (rejected Martin Act argument where Virgin Islands law governed claims); *NCFE I*, 580 F. Supp. 2d at 647 n.2 (rejected Martin Act argument on a motion to dismiss where the choice of law determination was premature); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 CIV. 8058, 2001 WL 1111508, at *11 (S.D.N.Y. Sept. 19, 2001) (same).  Further, even if New York law applied, the Martin Act would not preclude the Ohio Funds' claims.

"Under the Martin Act, the [New York] Attorney General is empowered to make suitable rules and regulations as needed in connection with condominiums and other investments.  This is to protect the investing public as a whole and to redress harm suffered by individual investors because of misleading or fraudulent practices in connection with the promotion or sale of securities."  *Berman v. 283 Washington Ave.*, No. 101706-09, 2009 WL 2207515, slip op. at 5 (N.Y. Sup. Ct. July 14, 2009).  Defendants argue that the Martin Act provides the New York Attorney General ("NYAG") with "exclusive" standing to assert the claims brought by the Ohio

---

[37] The Martin Act is codified in Article 23-A of the General Business Law, which includes Sections 352 and 353.  *See* N.Y. Gen. Bus. L. §§352-53.

Attorney General on behalf of the Ohio Funds.  D. Br. at 24-25 (the "enforcement of claims covered by [the Martin Act's] terms are reserved to the [New York] Attorney General.").

Defendants' construction of the Martin Act would effectively give the NYAG veto power over the Ohio Attorney General's decision to bring this action on behalf of Ohio state instrumentalities.  It would also have the equally perverse effect of giving the New York legislature veto power over the Ohio General Assembly's decision to make the Ohio Attorney General the *only* person with the authority to represent the Ohio Funds in legal matters.  *See* Ohio Rev. Code §§ 145.10, 148.02, 742.09, 3307.13, 3309.13 (2010).  No other party, including the NYAG, is authorized to represent the Ohio Funds, and, as Ohio instrumentalities, the Ohio General Assembly has the sole authority to make this decision.  Defendants' contorted argument clearly offends basic principles of federalism, and it must be rejected.  *See Pacific Employers Ins. Co. v. Indus. Accident Comm'n of Cal.*, 306 U.S. 493, 504-05 (1939) (The Constitution's Full Faith and Credit clause[38] does not "enable one state to legislate for the other or to protect its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it.").

In addition to being contrary to basic constitutional principles, Defendants' argument fails because: (i) the Martin Act only applies to securities transactions "within or from" New York; (ii) the Martin Act did not abolish existing common law claims.

The Martin Act prohibits fraudulent and deceitful conduct in connection with securities *transactions* that are *"within or from" New York.*  *See* N.Y. Gen. Bus. L. § 352-c (prohibiting

---

[38] According to the clause, "Full Faith and Credit shall be given in each State to the Public Acts . . . of every other State."  U.S. CONST. art. IV, §1.  Courts interpret a statute as a "public act" under the Full Faith and Credit clause.  *See Carroll v. Lanza*, 349 U.S. 408, 411 (1955); *Broderick v. Rosner*, 294 U.S. 629, 644 (1935); *John Hancock Mut. Life Ins. Co. v. Yates*, 299 U.S. 178, 183 (1936).

fraud and deceit "where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase *within or from this state* of any securities") (emphasis added). Nothing in the Complaint indicates that Plaintiffs' 308 separate ABS transactions that tooko place in their entirety in New York. As a result, Defendants have no basis to argue that Plaintiffs' *transactions* occurred "within or from" New York, and correspondingly no basis to argue that the Martin Act applies.  *See, e.g., Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*, No. 8:07-cv-00690, 2008 WL 4372847, at *3 (M.D. Fla. Sept. 24, 2008) ("[T]he jurisdiction for the Martin Act is limited to acts that take place *with their entirety in the State of New York*.") (emphasis added); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 410 (S.D.N.Y. 2005) ("The Court construing the Complaint in the light most favorable to plaintiffs, it appears that *conduct was not confined to New York* and, indeed, that some plaintiffs may have interacted with defendants exclusively outside of New York") (emphasis added); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 592 F. Supp. 2d 608, 639-40 (S.D.N.Y. 2009) (Martin Act did not apply where some of the securities were marketed and sold outside of New York); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 165 (S.D.N.Y. 2001) (Martin Act did not apply where a New York bank's traders in London and Hong Kong negotiated the sale of securities with a purchaser situated in Beijing).

Defendants cite *People v. Coventry First LLC*, No. 0404620/2006, 2007 WL 2905486, slip op. at 6 (N.Y. Sup. Ct. Sept. 25, 2007) for the proposition that the "within or from" prong "is met either where a party to the transaction was a New York entity *or* where the alleged misconduct took place in [New York]."  D. Br. at 26.  The court in *Coventry*, however, did not address the fact that the Martin Act's "within or from this state" language clearly refers to where

"the issuance, distribution, exchange, sale, negotiation or purchase" *of the security* takes place. *See* N.Y. Gen. Bus. L. § 352-c.

Likewise, in *Coventry,* the court did not address the New York Court of Appeals' decision in *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314 (2002). In *Goshen*, New York's highest court held that, under New York's Consumer Protection Act, in-state conduct that gives rise to an out-of-state injury is not actionable *unless the* "*transaction in which the consumer was deceived occurred in New York.*" *Id*. at 324. The Court of Appeals expressed particular concern that a broader interpretation of the statute's extraterritorial impact "would tread on the ability of other states to regulate their own markets and enforce their own consumer protection laws." *Id*. at 325. The Court's circumscribed approach to the consumer fraud statute in *Goshen* is equally warranted with respect to the extraterritorial impact of New York's securities fraud statute.

That there is no private right of action under the Martin Act has been clear for over twenty years. *See CPC Int'l, Inc. v. McKesson Corp*., 70 N.Y.2d 268, 276 (N.Y. 1987). The Court of Appeals in *CPC* simultaneously made clear, though, that a private litigant could assert a common law fraud claim in connection with a securities purchase. *See id*. at 284-85 ("we conclude that a valid cause of action for common-law fraud is stated").

The New York Court of Appeals has never ruled, however, that the Martin Act abolished all existing common law claims relating to securities purchases. The better reasoned decisions, including the most recent pronouncements from New York's Appellate Division, agree that enforcement of the Martin Act is reserved for the NYAG, but that private plaintiffs may still pursue traditional common law claims. *See, e.g., Caboara v. Babylon Cove Dev., LLC*., 862 N.Y.S.2d 535, 538 (N.Y. App. Div. 2d Dep't 2008) ("No case from the Court of Appeals holds

that the Martin Act not only failed to provide, expressly or impliedly, for a private right of action, but also, abrogated or supplanted an otherwise viable private cause of action whenever the allegations would support a Martin Act violation"); *Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639, 640 (N.Y. App. Div. 4th Dep't 2001) ("Nothing in the Martin Act, or in the Court of Appeals cases construing it, precludes a plaintiff from maintaining common-law causes of action based on such facts as might give the Attorney General a basis for proceeding civilly or criminally against a defendant under the Martin Act."); *Faulkner v. Beer*, No. 0603597/2005, 2007 WL 4639458, slip op. at 11 (N.Y. Sup. Ct. Dec. 21, 2007) (citation omitted) (sustained negligent misrepresentation claim holding "the Martin Act does not preclude a private party from prosecuting claims for fraudulent and deceptive practices in connection with the sale of securities, even if the alleged fraudulent conduct is such that the [NYAG] would be authorized to bring an action against the defendant under the Martin Act").

Although the majority of federal courts in the Southern District of New York have held that the Martin Act preempts negligent misrepresentation claims for securities purchases "within or from" New York, these decisions stem from a misunderstanding of certain state court decisions in the condominium purchase context, which is also regulated by the Martin Act.[39]  *See* Chiplock Decl., Exh. E, Matthew W. Woodruff, *Does the Martin Act Preempt Common-Law*

---

[39] The Court in *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) dismissed a breach of fiduciary duty claim out of "respect for state Courts' interpretation of their own law."  The *Castellano* court, however, did not have the benefit of the state court rulings in *Carboara, Scalp & Blade* or *Faulkner*.  In fact, a different panel of the Second Circuit in *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) held in that same year that *Horn v. 440 East 57th Co.*, 547 N.Y.S.2d 1 (N.Y. App. Div. 1st Dep't 1989) did "not explore the issue with the level of depth that would justify a ruling by" the Second Circuit in the absence of a ruling from New York's Court of Appeals.

*Causes of Action?* (N.Y.L.J. Sep. 4, 2008) (explaining "the state court view of the Martin Act that is decidedly at odds with prevailing federal authority").[40]

The state court decisions in question merely hold that the Martin Act only precludes private plaintiffs from using the disclosure obligations imposed by the Martin Act to satisfy the duty element of a common law claim.  *See Caboara v. Babylon Cove Development, LLC*, 862 N.Y.S.2d at 538 ("The purpose of the prohibition is 'to prevent an end run' around the exclusive nature of the Martin Act rule by precluding a private plaintiff from bringing a cause of action, for example, that, 'although styled as one for common-law fraud, lacks proof of an essential element of common-law fraud.'") (citations omitted).

Indeed, just last year, New York's Court of Appeals made this distinction crystal clear in *Kerusa Co. v. W10Z/515 Real Estate Ltd.*, 12 N.Y.3d 236, 243-47 (N.Y. 2009) when it held that the plaintiff could not state a common law fraud claim when the plaintiff's claim relied *entirely* on disclosures obligations imposed by the Martin Act *which did not exist at common law:*

> In sum, Kerusa's remaining cause of action for fraud relies entirely on alleged omissions from filings required by the Martin Act and the Attorney General's implementing regulations.  That Kerusa alleged the elements of common-law fraud does not transmute a prohibited private cause of action to enforce Martin Act disclosure requirements into an independent common-law tort.

As the court noted, "[b]y requiring a broad class of sellers of [participation interests in] real estate to make disclosures to buyers, the Martin Act dramatically altered the common-law rule." *Id*. at 244.  This stands in stark contrast to the Court of Appeals' decision in *CPC*, where it allowed a common law fraud claim involving the purchase of stock to proceed *because the*

---

[40] *See also Xpedior Credit Trust v. Credit Suisse First Boston (U.S.A.), Inc.* No. 02 Civ. 9149, 2004 WL 435058, at *9 (S.D.N.Y. Mar. 9, 2004) ("There is nothing in . . . the New York Court of Appeals cases . . . or in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action.") (citation omitted); *Cromer Fin. Ltd. v. Berger*, No. 00 CIV 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept. 19, 2001) (same).

*defendants' duty to speak truthfully arose from the common-law – not the Martin Act. CPC*, 20 N.Y.2d at 284-85.

> As 72 N.Y. Jur. 2d Investment Securities § 279 (2010) succinctly notes:
>
>> The Martin Act, which prohibits fraudulent practices with respect to stocks, bonds, and other securities, does not preclude a plaintiff from maintaining common law causes of action based on such facts as might give the Attorney General a basis for proceeding civilly or criminally against a defendant under the Act.

*See also Berman*, 2009 WL 2207515, slip. op. at 6 (plaintiff was allowed to proceed with his case even though he had filed a complaint with the NYAG because "[a] plaintiff is not, however, precluded from commencing a common law cause of action for breach of contract or fraud which is distinct from a claim under the Martin Act.") (citations omitted).  As the Ohio Funds are not alleging claims under the Martin Act, their common law claims should likewise be allowed to proceed.

### 3.	The Ohio Funds' Claims Are Timely Under Ohio And New York Law

The Ohio Funds' claims are timely.  Under Ohio law, state instrumentalities such as the Ohio Funds are exempt from the applicable statute of limitations under the common law doctrine of *nullum tempus occurrit regi* (literally, "no time runs against the king").  Even assuming *arguendo* that Ohio's two-year statute of limitations applies, which it does not, the Ohio Fund filed within two years' notice of their claims.  By contrast, New York law applies a six-year statute of limitations to negligent misrepresentation claims.  Plaintiffs purchased ABS during the period from January 1, 2005 through July 8, 2008.  ¶1.  Thus, all of Plaintiffs' purchases occurred less than six years prior to the November 20, 2009 filing of Plaintiffs' Complaint.  Accordingly, the Ohio Funds' claims are timely, whichever state's law applies.

a.    **The Ohio Funds Are Exempt From Ohio Rev. Code § 1707.43(B) Under the *Nullum Tempus* Doctrine**

Irrespective of when Plaintiffs' complaint was filed, state instrumentalities such as the Ohio Funds are exempt from generally worded statutes of limitations under the common law doctrine of *nullum tempus occurrit regi*.  Long recognized by Ohio courts, the *nullum tempus* doctrine provides that "the state of Ohio, absent express statutory provision to the contrary, is exempt from the operation of a generally worded statute of limitations."  *Ohio Dep't. of Transp. v. Sullivan* (1988), 38 Ohio St.3d 137, 527 N.E.2d 798, 801.  Because the statute of limitations applicable to the Ohio Funds' claims is generally worded, Plaintiffs are not subject to its deadline.

The Ohio Funds' claims are subject to the terms of the two-year statute of limitations contained in Ohio Rev. Code § 1707.43(B).  *Ryan v. Ambrosio*, 2008-Ohio-6646, ¶12.  ("Claims that are predicated on a sale of securities are governed by the statute of limitations found in R.C. 1707.43").

By its terms, Ohio Rev. Code § 1707.43(B) does not expressly apply to the State of Ohio:

> No action for the recovery of the purchase price as provided for in this section, and no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707 of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than five years from the date of such sale or contract for sale, whichever is the shorter period.

As a result, Ohio Rev. Code § 1707.43(B) is "generally worded," and the State is exempt from its terms.  In *Sullivan*, for instance, the relevant statute of limitations was deemed generally worded where it did not explicitly mention the State, merely providing that "[a]n action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose."  *Sullivan*, 527 N.E.2d at 801.  By contrast, a statute of limitations was deemed

specifically worded, and therefore applicable to the Department of Mental Retardation, where the statute required "[a]ll actions to enforce the collection of payments . . . charged by *the department* shall be commenced within six years." *Ohio Dep't of Mental Retardation v. Bade* (Ohio Ct. App. Feb. 9, 1990), 11th Dist. No. 88-L-13-171, 1990 WL 10953, at *2 (emphasis added); *see also Harris v. Schultz & Son, Inc.* (Ohio Ct. App. Mar. 20, 1989), 3rd Dist. No. 4-87-4, 1989 WL 29860, at *5 ("[T]his general statute of limitations is not expressly made applicable to the state and therefore may not be held to govern the timeliness of this action.").

Thus, the only remaining question is whether the Ohio Funds, as "instrumentalities" of the State of Ohio, may also invoke the doctrine. As explained by the United States Supreme Court in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624 (1983):

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

These "distinctive features" of government instrumentalities, the Court declared, permit them "to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies." *Id*. at 624-25.

The history and operation of the Ohio Funds is entirely consistent with the Supreme Court's description of government instrumentalities.[41]   In fact, Ohio courts have previously treated them as such.  *See, e.g., In re Ford* (1982), 3 Ohio App.3d 416, 418, 446 N.E.2d 214 ("[W]e find that the State Teachers Retirement Board is an instrumentality of the state."); *Fair v. Sch. Employees Ret. Sys.* (1975), 44 Ohio App.2d 115, 119, 335 N.E.2d 868 ("The School Employees Retirement Board . . . is an instrumentality of the state exercising its powers and duties throughout the state[.]); *see also* 2004 Ohio Op. Att'y Gen. No. 2004-014 (2004), at *13 (finding OPERS, OP&F, STRS and SERS are not state agencies).

As instrumentalities of the state, the *nullum tempus* doctrine exempts the Ohio Funds from generally worded statutes of limitations.  In *Law v. Lake Metroparks*, 11th Dist. No. 2006-L-072, 2006-Ohio-7010, at ¶12, the court expressly noted "[t]he rule that municipalities and *instrumentalities* of the state were immune from the running of the statute of limitations . . . ." (emphasis added).  Further, in *In re Ghali* (1992), 83 Ohio App.3d 460, 467, 615 N.E.2d 268, the court used the definition of "state" found in Ohio Rev. Code §2743.01(A), which expressly includes state instrumentalities such as the Ohio Funds, when it decided that the State Medical Board was exempt from the statute of limitations.[42]

---

[41] As detailed in ¶¶16, 18, 20, 22, and 24 of the Complaint, the Ohio Funds were established by enabling statutes for the purpose of providing retirement, disability, and other benefits to specified categories of public servants and their beneficiaries.  The administration and management of the Ohio Funds are vested in a board of trustees, the composition of which is defined by statute.  Each board holds title to the assets of its system.  Membership in the Ohio Funds, the conditions for receiving benefits, and the formulas for determining the amount of any benefit due are also established by statute.  Lastly, the monies of the Ohio Funds are kept in statutorily designated accounts, which are "separate and distinct legal entities" for all purposes except deposit and investment.

[42] Under Ohio Rev. Code § 2743.01(A), "state" is defined as "the state of Ohio, including, but not limited to, the general assembly, the supreme court, the offices of all elected state officers, and all departments, boards, offices, commissions, agencies, institutions, and other *instrumentalities* of the state."  (emphasis added).

In an analogous case from outside the jurisdiction, the *nullum tempus* doctrine was found to exempt a Kansas retirement system from the applicable statute of limitations.  In *Kan. Pub. Employees Ret. Sys. v. Reimer & Koger Assocs.*, 941 P.2d 1321, 1333-43 (Kan. 1997), the Supreme Court of Kansas held that investments by the Kansas Public Employees Retirement System were governmental in nature and therefore subject to the *nullum tempus* doctrine.  The court was particularly persuaded by the fact that "[a]ll taxpayers of Kansas and those of any city, county, school district, or other governmental entity within the KPERS system are interested in the subject matter of the litigation because it may have a very direct effect on the amount of taxes levied in the future."  *Id*. at 1342.

The Ohio Supreme Court described the purpose of the *nullum tempus* doctrine as serving "the public policy of preserving the public rights, revenues, and property from injury and loss." *Sullivan*, 527 N.E.2d at 798.   Application of the doctrine in this instance is particularly appropriate given the Ohio Funds' role in securing retirement funds and other benefits for Ohio state employees.

**b.      Plaintiffs Filed Within Two Years' Notice of Their Claims, Satisfying Ohio Rev. Code § 1707.43(B)**

Section 1707.43(B) of the Ohio Securities Act provides that actions under Chapter 1707 of the Revised Code shall not be brought "more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than five years from the date of such sale or contract for sale."  Ohio Rev. Code § 1707.43(B).  Under Ohio law, common law negligent misrepresentation claims are also controlled by this provision where the claims are predicated on securities transactions.  *See Ryan v. Ambrosio*, 8th Dist. No. 91036, 2008-Ohio-6646 at ¶12, 2008 WL 5258308 ("Claims that are predicated on a sale of securities are governed by the statute of limitations found in R.C.

1707.43."); *Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 467 (N.D. Ohio 2008) (Ohio Rev. Code § 1707.43 "applie[s] when the claims arise out of a sale or contract for sale made in violation of the Ohio securities laws").[43]

Defendants contend that their wrongdoing was so obvious that Plaintiffs were on inquiry notice of their alleged claims long before November 20, 2007 (*i.e.*, two years prior to the filing of the Complaint).  D. Br. at 49.  As discussed below, this contention finds no support in the Complaint and rests on self-serving assumptions that do not withstand even mild scrutiny.

The Sixth Circuit has expressly held that the "discovery rule" under Ohio Rev. Code § 1707.43(B) is governed by the standard applicable to federal securities claims.  *See Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 562 (6th Cir. 2005).  Thus, the two-year discovery period under the Ohio Securities Act is triggered by the Sixth Circuit's "inquiry notice" standard, which is an objective, two-pronged inquiry.  *See Hayes v. Mid-Ohio Sec. Corp.*, No. 1:05 cv 1800, 2006 WL 2233234, at *3 (N.D. Ohio Aug. 3, 2006) (citing *Wyser-Pratte*, 413 F.3d at 563, n.9).

First, "knowledge of suspicious facts" – colloquially referred to as "storm warnings" – triggers a duty to investigate.  *Hayes*, 2006 WL 2233234, at *3.  Second, the limitation period will then only begin to run "when a reasonably diligent investigation would have discovered the [wrongdoing]."  *Id.* (citing *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1183 (2004)).

---

[43] To the extent that Defendants argue that Plaintiffs' negligent misrepresentation claims are also controlled by the four-year statute of limitations under Ohio Rev. Code § 2305.09, Defendants are in error.  *See Ryan v. Ambrosio*, 2008-Ohio-6646, at ¶12 ("[W]hen two statutes of limitations could apply to a claim, the more specific statute governs.") (citing *Lynch v. Dean Witter Reynolds, Inc.* (1999), 134 Ohio App.3d 668, 731 N.E.2d 1205); *Lopardo*, 548 F. Supp. 2d at 467 (same).  Plaintiffs' negligent misrepresentation claims are therefore only subject to the two-year notice period found in Ohio Rev. Code § 1707.43(B).

Significantly, Plaintiffs must be on notice of more than the mere *possibility* of wrongdoing to trigger the limitations period. *Wyser-Pratte*, 413 F.3d at 562. That is, the limitations period only begins to run when plaintiffs "are able, in the exercise of reasonable diligence, to discover the *facts necessary to support their claims*." *Id*. at 562–63 (citing *New England Health*, 336 F.3d at 501) (emphasis added).

Inquiry notice is an inherently fact-specific question on which Defendants bear the burden of proof. *See Bano v. Union Carbide Corp*., 361 F.3d 696, 710 (2d Cir. 2004). In order to demonstrate inquiry notice at the motion to dismiss stage, Defendants must present *uncontroverted* evidence that *irrefutably* demonstrates when Plaintiffs discovered or should have discovered the wrongful conduct. *In re Firstenergy Corp*. *Sec*. *Litig*., 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) (quoting *Newman v. Warnaco Group, Inc*., 335 F.3d 187, 194–95 (2d Cir. 2003)). "[C]ourts have variously described defendants' burden in this regard as '*extraordinary*' and appropriate only in '*extreme circumstances*'." *In re Sumitomo Copper Litig*., 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) (emphasis added). Given this heavy burden, inquiry notice is typically not decided on a motion to dismiss. *See In re Century Bus*. *Servs*. *Sec*. *Litig*., No. 1:99cv02200, 2002 WL 32254513, at *24 (N.D. Ohio June 27, 2002) (finding inquiry notice analysis inappropriate on a motion to dismiss).

In an effort to meet this heavy burden, Defendants argue that Plaintiffs' claims are time-barred because "widely reported" articles purportedly placed Plaintiffs on notice of their claims prior to November 20, 2007. Defendants submit various exhibits ranging from periodicals and excerpts of testimony all the way to unrelated litigation involving one or more Defendants. Defendants' argument that these materials suffice to provide storm warnings of their wrongdoing is wholly baseless.

Neither the materials provided nor any other information available prior to November 20, 2007 detailed the facts necessary to support Plaintiffs' claims. *Wyser-Pratte*, 413 F.3d at 562-63 (citations omitted). None of the materials that Defendants submit discuss Defendants' specific misconduct in rating the ABS purchased by the Ohio Funds. Nor do the materials provide specific information concerning the adequacy of each of Defendants' models or each of Defendants' failures to manage their potential conflicts. Nor do they relate specifically to the securities at issue in this case, many of which Defendants continued to rate "AAA" after November 20, 2007. *See* Compl., Exhs. A-E. Finally, and perhaps most importantly, the materials Defendants submit either contain denials of wrongdoing by Defendants or were issued contemporaneously with such statements, thereby dissipating any storm warnings that Defendants claim existed at the time.

Storm warnings must be "company-specific" and trigger the duty to investigate only with "data that 'relates *directly* to the misrepresentation and omissions'" alleged in the Ohio Funds' Complaint. *Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 169 (2d Cir. 2005) (quoting *Newman v. Warnaco Group, Inc*., 335 F.3d at 193)). Generic storm warnings which do not specifically detail the claims at issue will not suffice. *See, e.g., Staehr v. Hartford Fin. Serv. Group*, 547 F.3d 406 (2d Cir. 2008) (finding investors not on inquiry notice where the publicly available information in the record before the court consisted almost exclusively of generic articles on potential conflicts of interest); *Lentell*, 396 F.3d at 170 ("generic articles on the subject of structural conflicts [at financial firms]" did not place investors on inquiry notice).

Here, none of the submissions discuss Defendants' specific misconduct in rating the ABS purchased by the Ohio Funds. For example, the article titled *Failing Grades*? (*see* Warren Decl., Exh. E) briefly discusses the "potential for conflicts of interest" but does not provide a *single*

*example* of how Defendants actually failed to manage their potential conflicts.  In the storm

warnings context, the difference between seeing an actual conflict and a potential conflict is the

difference between seeing lightning and a lightning bug.  *See Lentell*, 396 F.3d at 170 ("Conflicts

of interest present opportunities for fraud, but they do not, standing alone, evidence fraud – let

alone furnish a basis sufficiently particular to support a fraud complaint.").

Similarly, Exhibit I to the Warren Declaration is a brief article from www.cnnmoney.com

regarding subprime debt investments.  While the article generally discusses the credit rating

industry amidst the subprime mortgage crisis, it fails to mention any specific misconduct with

respect to any Defendant.  Without details of "company-specific" wrongdoing, the various

articles do not give rise to storm warnings as a matter of law.  *See Staehr*, 547 F.3d at 428

("Because nearly all of the stories in the record are devoid of company-specific information, the

argument that they constitute 'storm warnings' is far from compelling."); *Fogarazzo v. Lehman

Bros., Inc.*, 341 F. Supp. 2d 274, 299–300 (S.D.N.Y. 2004) (media reports of industry-wide

misconduct did not trigger inquiry notice because the reports did not specifically mention

defendants).[44]

---

[44] The complaints in the three lawsuits offered by Defendants provide little more than conclusory allegations contending that Moody's or McGraw-Hill's financial statements were materially false and misleading because the defendants misrepresented or failed to disclose fully the excessively high ratings assigned to bonds backed by subprime mortgages.  *See generally* Warren Decl., Exhs. L–N; *see also* Warren Decl. Exh. L, at ¶35 (conclusory one-paragraph scienter allegations); Exh. M, at ¶39 (same); Exh. N, at ¶35 (same).  Each of the three actions asserts fraud claims under the federal securities laws on behalf of a putative class of purchasers of Moody's or McGraw-Hill common stock.  *Id.*  Because the Ohio Funds do not allege claims involving the purchase of either Moody's or McGraw-Hill's common stock, and the ABS at issue in this case involve complex structured finance products, these lawsuits could not have put Plaintiffs on notice of their distinct claims involving the ABS listed in the Exhibits to Plaintiffs' Complaint.  *See City of Painesville v. First Montauk Fin., Corp.*, 178 F.R.D. 180, 195 (N.D. Ohio 1998) (finding prior lawsuits filed *by the same plaintiff* failed to establish inquiry notice where subsequently filed lawsuit alleged a different basis for the defendants' wrongdoing).

Not surprisingly, Moody's attempt to use this tactic in other litigation was recently rejected. In *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506–07 (S.D.N.Y. 2009), Moody's submitted many of the same news articles and other publications that purportedly warned of potential conflicts of interest in the credit-rating industry. The court found that the statements only referenced the credit ratings industry in "general terms," and identified only potential conflicts of interest. *Id.* at 505–06 ("The mere identification of potential conflicts of interest is not sufficient to trigger inquiry notice."). Consequently, the court concluded that, despite the volume of paper submitted, plaintiffs were not on inquiry notice. *Id.* at 506–07.

Furthermore, even if Defendants' submissions were to be construed as storm warnings, any such storm warnings were dissipated by Defendants' contemporaneous public statements of reassurance and comfort that counteracted any negative information contained in the submissions. *See Bovee v. Coopers & Lybrand*, 320 F. Supp. 2d 646, 655–56 (S.D. Ohio 2004) (finding plaintiffs did not have a duty to investigate where "reassuring statements were also made that . . . negated the 'storm warning' effect of the disclosures.").

For example, Defendants argue that a May 16, 2007 *Financial Times* article disclosed a purported conflict of interest in the rating system caused by the collaborative role the Rating Agencies play in the securitization process. *See* D. Br. at 46. Defendants fail to reference, however, the reassuring statement from S&P's head of European structured finance that concludes the same article:

> Banks come to us with a proposed transaction and we explain how it might be rated under our criteria. In many cases, the transaction is then restructured by the bank in order to meet our criteria. *There's nothing sinister about this process – we don't advise on how deals should be structured or arbitrate on which deals can proceed or not.*

*See* Warren Decl., Exh. E (emphasis added).

The same article notes that Gloria Aviotti, head of global structured finance at Fitch Ratings, "says that ratings methods for structured products – a class that includes mortgage-backed securities . . . are among the agency's most clearly and publicly defined.  That transparency, she argues, helps avoid conflicts because it gives investors the opportunity to see that Fitch treats all similar structures in the same way."  *Id.*

Defendants also cite September 26, 2007 testimony by Vickie Tillman, S&P's Executive Vice President, to support the proposition that Defendants' use of outdated and flawed models was publicly known by summer of 2007.  *See* D. Br. at 46.  Once again, Defendants fail to note several reassuring statements from the same testimony, including Tillman's assertion that S&P was "taking steps to ensure that our ratings – and the assumptions that underlie them – are analytically sound in light of shifting circumstances."  *See* Warren Decl., Exh. J.  Tillman later addressed whether the potential conflicts of interest inherent in the "issuer pays" business model "led S&P and others to issue higher, or less rigorously analyzed, ratings so as to garner more business."  *Id.*  Tillman adamantly denied the accusation, stating there was "no evidence – none at all – to support this contention with respect to S&P . . . .  Indeed, what evidence there is on the subject shows the opposite."  *Id.*[45]

Defendants offered additional words of comfort throughout 2007 defending the ratings process for structured finance products and proclaiming that the inherent conflicts of interest did not affect the ratings quality.  For example:

---

[45] Defendants submit testimony from the same congressional hearing by Michael Kanef, group managing director at Moody's, to support the contention that Defendants' failure to perform "due diligence" on ABS was widely stated by Defendants "by at least September 2007."  *See* D. Br. at 48.  Again, Defendants' chosen excerpt omits critical words of comfort appearing later in the testimony, such as Kanef's reassurances that "Moody's does not structure, create, design or market securitization products" and "[t]he integrity and objectivity of our rating process is of utmost importance to us."  *See* Warren Decl., Exh. K.

- On August 13, 2007, Anthony Mirenda, a spokesman for Moody's, said in a *USA Today* article that fees from investment banks play no role whatsoever in the ratings assigned by the firm.  "We don't let commercial considerations influence how we assign a rating.  Our reputation in the marketplace is our most important marketing tool.  We're not going to sacrifice our reputation for sake of one issuer.'"

- On September 17, 2007, *The Wall Street Journal* published a letter submitted by Vickie Tillman, which stated that S&P has "numerous safeguards in place that have helped us effectively manage" potential conflicts of interest.  "Our credit ratings provide objective, impartial opinions on the credit quality of bonds."

- On September 27, 2007, Michael Kanef said in an article published by *The New York Times* that Moody's had no conflicts of interest that led to inflated ratings. "The integrity and objectivity of our rating processes is of utmost importance to us.  Our continued reputation for objective and independent ratings is essential to our role in the marketplace."

- On October 11, 2007, Ms. Tillman submitted a letter to the editor of *The Washington Post* reiterating that "[t]here is no evidence – none at all – to support" the contention that the issuer pays model influenced ratings.[46]

In 2008, Defendants continued to reassure investors that the conflicts inherent in the issuer pays model were well managed and the Rating Agencies remained independent.  For example:

- On April 18, 2008, Vickie Tillman addressed the potential conflicts of interest in a letter to the editor of the *Washington Times*, stating that "[w]hat is important is how we continue to manage such potential conflicts."  Tillman continued by asserting that "[a]t Standard and Poor's, we bring a crucial independent and unbiased voice to the markets."

- On April 30, 2008, Claire Robinson, a Senior Managing Director at Moody's, stated in Congressional testimony that Moody's had taken measures to "continue effectively managing potential conflicts of interest."[47]

---

[46] *See* Chiplock Decl., Exhs.F-I.  In addition to allegations in the Complaint, the Court may consider public records, such materials that are integral to the Complaint, or that are otherwise appropriate for the taking of judicial notice.  *See Wyser-Pratte*, 413 F.3d at 560.  Of course, Plaintiffs do not submit these materials for the truth of the matter asserted therein.  Rather, Plaintiffs submit these materials to demonstrate Defendants' statements of comfort that would dissipate any purported storm warnings, and that any determination of whether Plaintiffs were on inquiry notice would be premature at the *pleading stage*.

Thus, Defendants were reassuring the market that their ratings were pristine both during and after the time Defendants claim Plaintiffs were on notice of their alleged claims.  Further, as the Exhibits to Plaintiffs' Complaint illustrate, Defendants continued to rate many of the securities at issue in this case "investment grade" or higher after November 20, 2007.  Compl., Exhs. A-E.  Accordingly, any supposed storm warnings were dissipated by Defendants' own statements of comfort and their conduct.

Lastly, as a factual matter, Plaintiffs were not on notice of their claims until the summer or fall of 2008 *at the earliest*.  Assuming *arguendo* that any storm warnings existed, any investigation conducted by the Ohio Funds would only have triggered the running of the statute of limitations, "when a reasonably diligent investigation would have discovered the [wrongdoing]."  *Hayes,* 2006 WL 2233234, at *3 (citation omitted).

Defendants themselves concede that the SEC's Summary Report, released on July 22, 2008, principally informs Plaintiffs' allegations.  D. Br. at 20.  The July 2008 SEC Report was released on July 22, 2008.  The July 2008 SEC Report publicly disclosed various confidential materials from which Plaintiffs learned *for the first time* many of the facts underlying their allegations, including:

- The Rating Agencies failed to take steps to prevent considerations of market share and other business interests from influencing ratings and ratings criteria, as evidenced by internal communications at one Defendant indicating concern in market share when firm employees were discussing whether to make certain changes in ratings methodology.  ¶¶61–63.

- The problematic linkage between the analysts rating the securities and the fee discussions with the issuers, evidencing an acute awareness, when rating an issuer, of the Rating Agency's business interest in securing the rating of the deal.  ¶¶74–75.

---

[47] *See* Chiplock Decl., Exhs. J and K at 3.

- The Rating Agencies were actively involved in structuring the ABS to help the issuers achieve desired ratings.  ¶¶78, 80.

- The Rating Agencies lacked specific written procedures for rating RMBS and CDOs, and failed to make adequate disclosures regarding their rating process and methodologies.  ¶¶89, 91–93.

- The Rating Agencies failed to monitor adequately the ABS they rated due to a lack of personnel and inadequate models to track required developments.  ¶¶94–95.

Plaintiffs were not and could not have been on notice of these facts prior to the issuance of the July 2008 SEC Report.

   If the SEC, with its broad investigatory powers, vast resources, and unique history with NRSROs, could not issue its findings until July 22, 2008, surely the Ohio Funds' investigation should not be held to a higher standard.  The test is merely what a reasonable investigation would have uncovered, not what a perfect investigation would have discovered.  Regardless, the issue is wholly inappropriate to decide on a motion to dismiss.  *See In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *24 (finding inquiry notice analysis inappropriate on a motion to dismiss).

   Similarly, subsequent events such as the hearings before the U.S. House of Representatives Committee on Oversight and Government Reform on October 22, 2008 and September 30, 2009, progressively revealed additional facts that form the basis of Plaintiffs' claims.  *See* ¶¶64, 66–68, 85, 87–88.  It goes without saying that Plaintiffs could not have been aware of the facts contained in the testimony prior to its publication.

   Many of the facts supporting Plaintiffs' claims became public knowledge starting on July 22, 2008, continuing thereafter through the fall of 2008.  Without these facts, and those developed during Plaintiffs' own investigation, Plaintiffs could not have stated their claims, particularly in light of the Supreme Court's pleading decisions in *Twombly* and *Iqbal*.  Therefore,

the Ohio Funds were not on inquiry notice of their claims until, at the earliest, the summer or fall

of 2008, well within the two-year statute of limitations period.

**c.      The Ohio Funds' Claims Are Timely Under New York Law**

Even if New York law were to apply, which it does not, Plaintiffs' negligent

misrepresentation claims are timely.  Under New York law, the six-year "catch-all" limitations

period provided under New York Civil Practice Law Rules ("CPLR") § 213(1) governs all

claims "for which no limitation is specifically proscribed by law."  New York courts consistently

recognize that claims "sounding in negligent misrepresentation [are] governed by a six-year

statute of limitations."  *Milin Pharmacy, Inc*. *v*. *Cash Register Sys*., *Inc*., 570 N.Y.S.2d 341, 341–

42 (N.Y. App. Div. 2d Dep't 1991) (citing CPLR § 213(1)); *see also Doss, Inc*. *v*. *Christie's Inc*.,

No. 08 Civ. 10577, 2009 WL 3053713, at *3 (S.D.N.Y. Sept. 23, 2009) ("A cause of action for

negligent misrepresentation or constructive fraud is also governed by a six-year statute of

limitations . . ."); *Shaheen v*. *Stephen Hahn, Inc*., No. 92 Civ. 8062, 1994 WL 854659, at *2

(S.D.N.Y. March 9, 1994) ("Under New York law, [negligent misrepresentation] claims must be

commenced within six years from the purchase made in reliance on the misrepresentation").

Plaintiffs' negligent misrepresentation claims are well within the six-year period with respect to

each and every ABS purchased during the Relevant Period, which began on January 1, 2005.

Defendants contend that the statute of limitations for a negligent misrepresentation is

three years.  *See* D. Br. at 45.  The only authority Defendants cite to advance their proposition,

*Colon v*. *Banco Popular N*. *Am*., 874 N.Y.S.2d 44 (N.Y. App. Div. 1st Dep't 2009), is off point.

As explained in 75A N.Y. Jur. 2d Limitations and Laches § 233, the court in *Colon* merely

applied CPLR § 214's three-year limitations period for personal injury actions.  Moreover,

Defendants point to *Lasher v*. *Albion Cen*. *Sch*. *Dist*., 833 N.Y.S.2d 791, 792 (N.Y. App. Div.

4th Dep't 2007), *see* D. Br. at 45, for the proposition that the "period of limitations for purposes

of the negligent misrepresentation claim began to run from the date on which the plaintiffs relied upon the alleged misrepresentation. . . ." (citing *Fandy Corp. v. Lung-Fong Chen*, 691 N.Y.S.2d 572 (N.Y. App. Div. 2d Dep't 1999). *Fandy Corp.* itself, however, recognizes that a cause of action for negligent misrepresentation is covered by a six-year statute of limitations. 691 N.Y.S.2d at 352-53. Defendants' argument is without merit.

> **4.    The Ohio Funds Allege All Of The Elements Of A Negligent Misrepresentation Claim**

Recognizing the strength of the Ohio Funds' claims, Defendants repeatedly ask the Court to ignore allegations that are plain on their face. On a Rule 12(b)(6) motion, however, all of Plaintiffs' factual allegations are accepted as true, and the Complaint is to be construed liberally in favor of the non-moving party. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). Plaintiffs have alleged more than sufficient factual detail to establish all of the elements of a negligent misrepresentation claim under both Ohio and New York law. Accordingly, the Motion to Dismiss should be denied.

> **a.    The Ohio Funds Allege Facts Giving Rise To a Duty**

Defendants argue that the Court should ignore Defendants' duty to the Ohio Funds because it would subject them to "unlimited liability" to the general public. D. Br. at 27. Defendants' timeworn refrain about the specter of "unlimited liability" is a straw man that is contrary to the Complaint's detailed factual allegations as well as Ohio and New York law.

The Rating Agencies' work in connection with the ABS purchased by the Ohio Funds was the exact opposite of their traditional role where they acted in a journalistic capacity and rated corporate debt based on publicly available information. Here, the Ratings Agencies worked hand in glove with the arrangers and issuers of ABS to not only rate the ABS but also

structure them in order to sell the ABS to a limited class of institutional investors.[48]  *See* ¶¶2, 76, 78-81.  As Defendants are well aware, the ABS deals "started with the ratings," and were specifically targeted to institutional investors like the Ohio Funds, whose guidelines emphasized the importance of Defendants' ratings.  *See* ¶¶3, 29, 157-60.  In fact, the ABS could not have been issued without Defendants' AAA ratings because the offerings would not have generated sufficient proceeds to purchase the underlying mortgages absent the AAA premium that investors paid for AAA tranches.  *See* ¶¶3, 109, 111, 119, 121, 129, 131, 139, 141, 149, 151.  As set forth below, these allegations, which demonstrate that Defendants were the architects of the ABS that Plaintiffs purchased, suffice to establish Defendants' duty to speak with reasonable care under both Ohio and New York law.

> Under Ohio law:

> > One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

*Delman v. City of Cleveland Heights* (1989), 41 Ohio St.3d 1, 534 N.E.2d 835, 838 (1989), , (adopting Restatement (Second) of Torts § 552(1)).

Plaintiffs easily meet the requirement that they are "one of a limited group of persons for whose benefit and guidance" Defendants supplied their ratings.  *See, e.g.*, ¶¶157–59; *see also* Restatement (Second) of Torts § 552(2)(a).  Defendants: (i) rated discrete ABS tranches that they

---

[48]  The cases Defendants cite recognize this critical distinction between those who provide financial information to the general public and those who provide financial information to a limited group of investors contemplating the purchase of a security.  In *In re Enron,* 511 F. Supp. 2d 742, 827 (S.D. Tex 2005), for instance, the court held that a lender could not rely on statements that the ratings agencies issued concerning "Enron's creditworthiness for repayment of specific bonds" because the plaintiff was simply a general corporate lender that "*did not purchase these bonds.*" (emphasis added).

helped to create, *see, e.g.*, ¶¶76–81; (ii) were aware that their ratings would be used by the issuer to sell the ABS tranches to a limited group of qualified investors, *see, e.g.*, ¶157; (iii) worked with the arrangers to market the securities to this limited group, *see, e.g.*, ¶¶106, 116, 126, 136, 146, 157; (iv) knew that their AAA ratings were a precondition of the issuance of the securities, which were targeted to institutional investors, *see, e.g.*, ¶¶107, 117, 127, 137, 147, 157-60; and (v) received payment for their work in both structuring and rating the security, *see, e.g.*, ¶¶2, 57, 77.

Although Plaintiffs' claims are subject to Rule 8's liberal notice pleading requirements, Defendants essentially ask the Court to ignore Plaintiffs' detailed allegations that establish Defendants' duty:

- In supplying the false and misleading ratings on the securities in which Plaintiffs invested, Defendants knew Plaintiffs and other qualified institutional investors, and their agents, intended to, and did, rely on the ratings in deciding whether to purchase and/or retain the securities and that without those ratings Plaintiffs and other qualified institutional investors never would have acquired and/or retained the securities. ¶157.

- Plaintiffs were part of a limited class of qualified investors to whom Defendants intended their ratings to be supplied as part of the issuance of the securities in which Plaintiffs ultimately invested. ¶158.

- Defendants issued ABS credit ratings during the Relevant Period to provide guidance to investors, including Plaintiffs, in making investment decisions, and Defendants knew Plaintiffs and other investors would rely on those ratings. ¶159.

- The underlying mortgage asset base was to be acquired and created after the ABS was sold, which in turn would only occur if one or more of Defendants had provided the AAA rating necessary for the issuance of the security. ¶¶109, 119, 129, 139, 149.

- Had Defendants not assigned the initial AAA ratings to the ABS described in the Exhibits, the issuers could not have created the securities as described in the respective prospectuses, let alone sold them. The AAA ratings were necessary for the ABS to be sold at a price sufficient to generate the proceeds necessary to purchase the planned mortgage pools as described in the relevant prospectuses. Without the AAA rating, the economic basis for the ABS would have collapsed, as would the entire planned offering for each ABS. ¶¶111, 121, 131, 141, 151.

While Defendants inexplicably ask the Court to ignore these allegations as being "boilerplate" and "vague," *see* D. Br. at 28 & n.13, the prospectuses cited in the Complaint further support and expand upon the Ohio Funds' allegations.[49]  In fact, the prospectuses cited in the Complaint[50] further detail that the securities were marketed to a limited class of institutional investors and that Defendants' ratings were a precondition to the issuance of the ABS:

- The prospectuses expressly state that the securities were being distributed through an agent "primarily with institutional investors" and by placement by the arranger "directly with institutional investors."[51]

- Defendants' issuance of AAA ratings to certain tranches of the offerings was a precondition to the issuance of the securities.[52]

- Defendants' AAA ratings were a condition for certain targeted investors to purchase the ABS.  For example, investment grade ratings were a condition for ERISA plans to be able to purchase the securities pursuant to exemptions to the SEC's prohibited transaction regulations[53] and a condition for public pension

---

[49] A "court ruling on a motion to dismiss may consider a document that is referenced in the complaint and is central to the plaintiff's claims."  *See Hardy v. Midland Enterprises, Inc.*, No. 01-4212, 2003 WL 2007940, at *2 (6th Cir. April 30, 2003); *Carter v. Delaware County Board of Commissioners*, No. 2:07-cv-1189, 2009 WL 544907, at *1 n.2 (S.D. Ohio Mar. 3, 2009) (The "Court also has wide discretion to consider documentary evidence submitted by a plaintiff in opposition to a motion to dismiss.") (citations omitted).

[50] *See, e.g.*, Chiplock Decl., Exh. L, Countrywide Series 2007-17 Prospectus ("Countrywide Prospectus") (cited at ¶¶127(a), 129(a)); Exh. M, Lehman Series 2007-10 Prospectus ("Lehman Prospectus") (cited at ¶¶127(d) and 129(d)); Exh. N, Goldman Series 2007-GG10 Prospectus ("Goldman Prospectus") (cited at ¶¶127(e) and 129(e)).

[51] *See, e.g.*, Chiplock Decl., Exh. L, Countrywide Prospectus at 107 (emphasis added).  *See also* Exh. M, Lehman Prospectus at 189 ("the Depositor will authorize Underwriters or other persons acting as the depositor's [sic] agents to solicit offers by certain institutions to purchase the Securities").

[52] *See, e.g.*, ¶¶107, 117, 127, 137, 147; Chiplock Decl., Exh. L Countrywide Prospectus at 108, S-115; Exh. M, Lehman Prospectus at S-18, S-100; Exh. N, Goldman Prospectus at S-197.

[53] *See, e.g.*, Chiplock Decl. Exh. M, Lehman Prospectus at 182; See Exh. L, Countrywide Prospectus at 104; See Exh. N, Goldman Prospectus at S-194.

funds to invest in the securities pursuant to their state laws and investment guidelines.[54]

- Many of the ABS required minimum investments of $100,000 to $1,000,000,[55] amounts that only institutional investors typically invest in a single offering of securities.[56]

When Defendants are not ignoring Plaintiffs' allegations, they selectively distort them despite personal knowledge to the contrary, Defendants argue:

> Here, Plaintiffs' claims are explicitly based on the Rating Agencies' ratings of publicly offered, registered securities and thus unequivocally involve matters of public concern.  As the Offering Documents make clear, and as Plaintiffs themselves acknowledge in their Complaint, the Rating Agencies' ratings were published in "prospectuses and full supplements" that were "filed with the SEC." (*See, e.g.*, ¶106).

D. Br. at 12.  Defendants not only mischaracterize ¶106, omitting the "or otherwise distributed to investors" language, but also know full well that 54 of the ABS offerings in question were *private placements*.  Defendants are intimately familiar with these private placements *because they helped structure these offerings and currently rate the securities*.  For that matter, if Defendants had any doubts as to which securities were issued pursuant to private placements, they easily could have determined this information by checking against the securities' CUSIP numbers,[57] all of which are listed in the exhibits to the Complaint.[58]

---

[54] *See, e.g.*, Chiplock Decl., Exh. N, Goldman Prospectus at 74-75; *see also* ¶ 29.

[55] *See, e.g.*, Chiplock Decl., Exh. M, Lehman Prospectus, at S-3.

[56] *See NCFE I*, 580 F. Supp. 2d at 640 ("[T]he complaint characterizes the . . . note offerings as being targeted to a select class of institutional investors with the resources to invest tens of millions of dollars in the notes.").

[57] As explained on the SEC's website, "[t]he CUSIP system – owned by the American Bankers Association and *operated by Standard & Poor's* – facilitates the clearing and settlement process of securities.  The number consists of nine characters (including letters and numbers) that uniquely identify a company or issuer and the type of security."  See CUSIP Number, http://www.sec.gov/answers/cusip.htm (last visited March 9, 2010) (emphasis added).

Under facts remarkably similar to the foregoing, this Court found that rating agencies were liable to the purchasers of notes rated by the agencies where "the complaint alleges that the . . . note offerings were targeted to a select class of institutional investors, not to the investing public." *NCFE I*, 580 F. Supp. 2d at 648.  In *NCFE I*, an institutional investor purchased asset-backed notes issued by trusts pursuant to prospectuses that required defendant Moody's to rate the notes AAA.  *See id*. at 634.  This Court rejected Moody's argument that it could not be liable for disseminating information to the investing public because the Court found that the complaint alleged "Moody's prepared the bond ratings knowing that its ratings would be seen on the offering materials given to only a select class of qualified investors, of whom [plaintiff] was one."  *See id*. at 648.  The instant facts support the same outcome.

Defendants instead rely on inapposite Ohio cases that stand for the unremarkable proposition, with which Plaintiffs do not quibble, that liability for a negligent misrepresentation does not extend to the *entire world*.  Defendants cite *Guttner v. Dow Jones, Inc*. (1986), 22 Ohio St.3d 286, 289, 490 N.E.2d 898, wherein the court found that a financial newspaper was not liable to its entire readership.  Similarly, in *Federated Mgmt. Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 383-86,[59] the court found only that a commercial lender had no duty to the investing public at large.  In *Amann v. Clear Channel Commc'ns, Inc*. (2006), 165 Ohio App.3d 291, 298-99, 846 N.E.2d 95 the court merely found that the owner of radio stations was not liable to its entire listening audience for the inaccuracy in an advertiser's commercial.

---

[58]  *See* Complaint Exhs. A-1 (nos. 1-11); A-2 (nos. 1-2); B-1 (nos. 1-17); B-2 (nos. 1-22); D-1 (nos. 1-2).  The private placements are all shaded peach.

[59]  Defendants incorrectly characterize *Federated Mgmt.* as a case involving a company's auditors.  In actuality, the case did not – as here – involve professionals, such as an auditor, in the business of providing information.  The appellee in *Federated Mgmt.* was a commercial lender that the court deemed did not have a duty to provide information about an issuer's financial condition to the investing public.  *See* 137 Ohio App.3d at 383-86.

To give their straw man the appearance of heft, Defendants pack their memorandum with pages of similarly inapposite cases that do not make their position more persuasive.  These cases stand either for the unremarkable *Guttner* proposition that a media outlet is not responsible to its entire universe of viewers,[60] involve defendants that are not professionals in the business of providing information[61] or are cases where the courts held that the proper remedy sounded in contract.[62]

The one case Defendants cite that is even remotely analogous to the instant situation recognizes the distinction Defendants ignore.  In *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prods., Inc.*, No. 2:02-cv-1288, 2007 WL 894833, at *10 (S.D. Ohio Mar. 22, 2007), the court recognized the well-established proposition that representations to the "public-at-large" do not result in liability, but it allowed a negligent misrepresentation claim to proceed where the plaintiff was among the type of customers who received the false marketing materials:

---

[60] *See Stancik v. CNBC*, 420 F. Supp. 2d 800, 808 (N.D. Ohio 2006) (holding that, under *Guttner*, television viewer not in a foreseeable limited class such that a duty attaches, otherwise cable network would face *unlimited liability*).

[61] *See Premier Bus. Group, LLC v. Red Bull of N. Am. Inc.*, No. 08-CV-01453, 2009 WL 3242050, at *11 (N.D. Ohio Sept. 30, 2009) (holding that misstatements by beverage manufacturer were not actionable where complaint did not include "allegations indicating the Red Bull was in the business of supplying information to guide others in their businesses. . .  Red Bull, after all, is in the business of selling energy drinks, not in the business of supplying information").

[62] *See Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n* (1990), 54 Ohio St.3d 1, 560 N.E.2d 206, 209-11 (flooring contractor could not bring negligence claim against third-party architect based on damages sustained in connection with installation contract with hospital); *Universal Contracting Corp. v. Aug*, 1st Dist. No. C-030719, A-0103486, 2004-Ohio-7133, at ¶23, 2004 WL 3015325, at *4,, (contractor could not recover against company's CEO for negligent misrepresentation when it already received duplicate judgment for the same damages in breach of contract action); *Wodek v. Bradt Constr., Inc.* (Mar. 19, 1997), 9th Dist. No. 2578-M, 1997 WL 148055, at *1-2 (homeowners could not recover for negligent misrepresentation against retailer who recommended pool installer because damages were sustained from breach of installation contract).

> Viewing the facts in a light most favorable to National Mulch, it cannot be
> said that as a matter of law National Mulch was a member of a faceless or
> unresolved class of persons.  Instead, reasonable minds could conclude that
> National Mulch was a member of a limited class of foreseeable persons that
> might rely upon the representations made.

While the reasoning of *Guttner* and *Federated Mgmt.* may counsel against unlimited liability, it does not exculpate Defendants from liability for structuring and rating the ABS for a limited class of institutional investors.  A public policy concern over "unlimited liability" for information providers should not be corrupted into a license for Defendants to disseminate false and inflated credit ratings in exchange for a cut of the arranging bank's profits.

In arguing that they possessed no duty under New York law, Defendants once again ignore the distinction between "unlimited liability" to the investing public and liability to a limited class of intended beneficiaries.[63]  Defendants' actions here easily meet the three-pronged duty test set forth by the New York Court of Appeals in *Credit Alliance Corp. v. Arthur Anderson & Co.,* 65 N.Y.2d 536, 551 (N.Y. 1985):  (i) the professional must have been aware that the information was to be used for a particular purpose or purposes; (ii) in furtherance of which a known party or parties was intended to rely; and (iii) there must have been some conduct on the part of the professionals linking them to that party or parties, which evinces the professionals' understanding of that parties' reliance.

First, there is little doubt that Defendants, government-certified NRSROs, were aware that their ratings would be used for the particular purpose of issuing and marketing the ABS:

---

[63] *See, e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993) ("[P]laintiffs allege that some as yet unknown agents of Time Warner made misleading statements . . . in discussions with the reporter or analyst."); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 869 F.2d 175, 179 (2d Cir. 1989) (financial publication akin to a newspaper is not exposed to liability to all subscribers that may invest based on information it publishes).

- The prospectuses for each of the ABS provided that Defendants' highest ratings for certain tranches was a precondition to their issuance. ¶¶107, 117, 127, 137, 147.

- Defendants were intimately involved in structuring the ABS, including providing arrangers with guided feedback on structure and configuration to make sure that the most profitable ratings were obtained. ¶¶51, 81.

- Defendants often released "Pre-Sale" reports prior to the issuance of ABS that contained their preliminary ratings to facilitate sales. ¶¶51, 81.

New York courts have found that facts such as these establish that the professional must have been aware that the information was to be used for a particular purpose or purposes. Faced with strikingly similar allegations, the court in *LaSalle*, 951 F. Supp. at 1093 found that a credit rating agency met the first prong where: (i) "the Offering Memoranda stipulated that a precondition of the issuance of the bonds was that they be rated AAA" by the credit rating agency; (ii) the agency had "substantial influence in drafting the documents pursuant to which the bonds" were offered; and (iii) the "agency consented to the use of its name in the disclosure documents" and "description of the issue." The same outcome is warranted here.

Defendants' assertion that New York law requires Defendants to be aware that *these specific Plaintiffs* were interested in *these specific securities* ignores the factual allegations and applicable law. *See* D. Br. at 31. As discussed above, Defendants were aware that the ABS they were structuring and rating were being marketed to a limited class of institutional investors based on the ratings that these investors required. These facts alone are sufficient to meet the second prong of *Credit Alliance* under the well settled rule in New York law that "[k]nowledge of the identity of each particular plaintiff is not necessary . . . if the defendant's representation is *designed to target a select group of qualified investors rather than the public at large*." *LaSalle*, 951 F. Supp at 1093 (emphasis added); *see also* Restatement Torts § 552, cmt. h ("[I]t is not necessary that the maker should have any particular person in mind as the intended, or even the

probable recipient of the information.  In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied.").[64]  Defendants' cases do not alter the result.[65]

Nor are Defendants correct that the third prong of *Credit Alliance* requires Plaintiffs to allege direct contact with Defendants.  *See* Restatement Torts § 552, comment g. ("[D]irect communication of the information to the person acting in reliance upon it is not necessary."). Here the Complaint alleges that Defendants "were actively involved in helping issuers structure the products to receive the requested rating," *see, e.g.,* ¶76, and agreed to "targeted ratings so that the ABS could be marketed to investors like the Ohio funds" who were unable to purchase lower rated securities due to regulatory restrictions or state laws, *see, e.g.,* ¶¶29, 77.  These allegations alone are sufficient "linking conduct" to meet the third prong because the end and aim of Defendants' conduct was to ensure that the ABS could be sold to institutional investors.[66]

---

[64] *See also Schwartz v. Michaels*, No. 91 CIV. 3538, 1992 WL 184527, at *32-32 (S.D.N.Y. July 23, 1992) (specific knowledge for whom audit is being prepared is not necessary where the "financial reports . . . were intended to be distributed to a select group of qualified investors, and not to the public at large.").

[65] With respect to the *second prong*, Defendants mistakenly rely on *Sykes v. RFD Third Ave. 1 Assocs., LLC*, 884 N.Y.S. 2d 745 , 746 (N.Y. App. Div. 1st Dep't 2009).  In *Sykes*, the court held that the designer of a heating, ventilation and air conditioning system was not liable to the future purchaser of a condominium for negligent misrepresentation where the designer had no role in preparing the offering memorandum that contained representations concerning the HVAC system.  Defendants also mistakenly rely on *Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183, 192-193 (S.D.N.Y. 1999).  In *Vanguard*, the court held that brokers who provided pricing estimates used to compile a municipal bond index were not liable to an investor in futures contracts where the investor "by its own admission [was] a member of the general investing public" and the bond index was not distributed in an offering memorandum "but [was] published in The Bond Buyer" – a financial publication available to an "indeterminable number of investors."

[66] *See, e.g., LaSalle*, 951 F. Supp. at 1094 (As to the third prong, plaintiffs "sufficiently alleged both that (1) the primary if not exclusive end and aim of Duff & Phelps' Bond rating was so that the Bonds could be marketed and sold to the plaintiffs, and (2) Duff & Phelps helped shape the Bond ratings program to meet the plaintiffs' need (*i.e.,* to attain an "AA" rating, thereby enabling

Defendants do not cite any applicable case supporting a contrary result.[67]  Defendants'

reliance on *M&T Bank Corp. v. Gemstone CDO VII, Ltd*., 68 A.D.3d 1747 (N.Y. App. Div. 1st

Dep't 2009) is misplaced.  Unlike here, where the Complaint contains well-pleaded allegations

that Defendants participated in structuring and rating the securities to be marketable to a limited

class of investors, *M&T Bank Corp*. is silent as to any allegations that the securities were

provided to a limited class of investors or that they were structured and rated specifically to

induce reliance.

In sum, Defendants have consistently ignored the well-pleaded allegations that establish

Defendants' duty under New York's *Credit Alliance* test and applicable Ohio law.

### b.    Defendants' Credit Ratings Are Actionable False Statements

This Court and others throughout the country have rejected Defendants' argument that

credit ratings, like those assigned to ABS, are non-actionable "opinions."  *See, e.g., NCFE I*, 580

F. Supp. 2d at 638-39 (finding that Moody's and Fitch's ratings of asset-backed notes were

actionable misrepresentations); *Abu Dhabi*, 651 F. Supp. 2d at 176 (Moody's and S&P's ratings

of a special investment trust's notes were actionable misrepresentations); *LaSalle*, 951 F. Supp at

1085 (Duff & Phelps' ratings of asset-backed bonds were actionable misrepresentations); *In re*

*Taxable Mun. Bond Sec. Litig.*, 1993 WL 591418, at *5 (S&P's bond ratings were actionable

---

the bonds to be issued).");  *Duke v. Touche Ross & Co.,* 765 F. Supp. 69 (S.D.N.Y. 1991)
(negligent representation could proceed where "the report at issue was not disseminated to the
public at large.  Rather, it was distributed to a select group of qualified investors.").

[67] Defendants rely on *SIPC v. BDO Seidman, LLP*, 222 F.3d 63, 75 (2d Cir. 2000) for the
proposition that a plaintiff *generally* must establish direct contact with the defendant.  In *SIPC*,
however, the court found that the second and third prongs of *Credit Alliance* were lacking – not
because of a lack of direct conduct – but because SIPC asserted claims on behalf of an entire
universe of customers that "plaintiffs concede[d] . . . never received or reviewed any of the
financial statements" on which the claims were based.  In short, the Plaintiff in *SIPC* did not
allege facts on which to base reliance.

misrepresentations); *First Fin*. *Sav*. *Bank, Inc*., 1989 WL 168015, at *5 (E.D.N.C. Aug. 4, 1989) (holding that S&P's bond ratings were actionable misrepresentations and that any additional discussion would be a "waste of paper").

This Court has correctly noted, "the Supreme Court has 'rejected the argument that statements concerning opinions or beliefs . . . could not be a basis for' an action for securities fraud.'" *See NCFE I*, 580 F. Supp. 2d at 639 (citing *Mayer*, 988 F. 2d at 638 (6th Cir. 1993); and *Virginia Bankshares, Inc*. *v*. *Sanberg*, 501 U.S. 1083, 1093 (1991) ("conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading")).  In fact, negligent misrepresentation claims usually involve a "professional (*e.g*., an accountant) who is in the business of rendering opinions to others for their use in guiding their business." *Ziegler*, 464 F. Supp. 2d at 738; *see also Kimmell v*. *Schaefer*, 89 N.Y.2d 257, 263 (N.Y. 1996) (negligent misrepresentation claims typically involve "[p]rofessionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients").

Thus, courts recognize the well-settled rule that "[a]n opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis." *Abu Dhabi*, 651 F. Supp. 2d at 176; *NCFE I*, 580 F. Supp. 2d at 639 ("Statements which contain the speaker's opinion are actionable . . . if the speaker does not believe the opinion and the opinion is not factually well grounded") (citation omitted).

The AAA credit ratings assigned by Defendants "were the gold standard for investors such as the Ohio Funds, who willingly paid a premium for AAA rated securities in exchange for the supposedly lower risk such high ratings purportedly entailed." ¶3.  Here Defendants issued ratings that they did not believe to be accurate and/or that had no basis in fact:

- Defendants sacrificed the integrity of their ratings to reap substantial profits from ABS issues that were contingent upon the ratings.  ¶¶42-75.

- Defendants played an intimate and active role in structuring the ABS to achieve ratings desired by the arranger in order to share in the profits.  ¶¶76-81.

- Defendants used methodologies they knew were outdated and inapplicable to rate the ABS.  ¶¶82-93.

These factual allegations are more than sufficient to make Defendants' inflated and inaccurate ratings actionable.  *See, e.g., Abu Dhabi*, 651 F. Supp. 2d at 179 (where the ratings agencies "knew that the ratings process was flawed . . . and knew that the Ratings Agencies could not issue an objective rating because of the effect it would have on their compensation, it may be plausibly inferred" that they knew they were issuing false and misleading ratings). The AAA ratings themselves, which conveyed Defendants' conclusion that the ABS carried the lowest possible credit risk, are demonstrably false in the light of obvious credit risks that Defendants should have uncovered.  *See CPC*, 70 N.Y.2d at 286 (rejecting defendants' "contention that the financial projections were mere opinions which could not be the basis for common-law fraud" where plaintiff "alleges that defendants made the projections knowing that they were false and unreasonable and that they were not based on [the company's] actual financial condition"); *Snead v. McCaskey* (Ohio Ct. App. June 27, 1997), 11th Dist. No. 96-G-2007, 1997 WL 402396, at *4 (noting that opinions can form the basis for a misrepresentation claim under Ohio law); *see also* Section IV.A, *supra* (addressing the same argument in the First Amendment context).

The decisions Defendants cite are inapposite.  Both *Compuware* and *Jefferson County*, as discussed in Section IV.A, involve defamation claims.  Defamation claims, in contrast to misrepresentation claims, require a demonstrably false statement of defamatory fact as an express element of the claim.  *See Compuware*, 499 F.3d at 529 ("Put differently, a viable

defamation claim exists only where reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts.") (citations omitted). Further, none of the other cases Defendants cite stand for the broad proposition that a statement of opinion can never serve as the basis for a misrepresentation claim under Ohio or New York law.[68]

### c.  The Ohio Funds Allege Justifiable Reliance

As is their habit in this Court and others, Defendants argue that Plaintiffs fail to allege that they justifiably relied on Defendants' credit ratings despite the express allegation of justified reliance in ¶160 of the Complaint.  Moreover, whether Plaintiffs' reliance was justified "is largely a question of fact inappropriate for resolution on a motion to dismiss."  *NCFE I,* 580 F. Supp. 2d at 648; *see also Thomson v. TransAm Trucking, Inc*., No. 2:08-cv-927, 2009 WL 1542738, at *5 (S.D. Ohio June 1, 2009) (same); *Truck-Lite Co. v. GS1 US, Inc*., No. 07-CV-68A, 2008 WL 833498, at *3 (W.D.N.Y. Mar. 27, 2008) ("The issue of reasonable reliance, like the special relationship issue, is a question of fact that is not appropriately resolved at the pleading stage.") (citations omitted).

That being said, Plaintiffs' reliance allegations more than suffice at the pleading stage:

- The AAA ratings were crucial to the Ohio Funds' decisions to purchase these securities.  ¶¶100.

---

[68] *See, e.g., Grammer v. Turits*, 706 N.Y.S.2d 453, 455 (N.Y. App. Div. 2d Dep't 2000) (court only required "*information*" that "was incorrect or false"); *Texlon Corp. v. Smart Media of Del., Inc.*, 9th Dist. Nos. 22098, 22099, 2005-Ohio-4931, at ¶34  (party was accused of breaching its contractual obligations and "[t]o hold otherwise would be to convert every unfulfilled contractual promise, *i.e.,* every alleged breach of contract, into a tort claim."); *CNA Reinsurance of London Ltd. v. Home Ins. Co.*, No. 85 CIV. 5681, 1990 WL 3231 (S.D.N.Y. Jan. 10, 1990) ("Each of these statements, labeled by plaintiffs as representations, is no more than a projection or promise of future conduct."); *Miami Valley Paper, LLC v. Lebbing Eng'g & Consulting GMBH*, No. 1:05-CV-00702, 2009 WL 818618, at *12 (S.D. Ohio Mar. 26, 2009) ("A statement of opinion or belief such as occurs in 'puffing' generally cannot constitute a misrepresentation.") (citing *Kondrat v. Morris* (Ohio Ct. App. 1997), 118 Ohio App.3d 198, 208, 692 N.E.2d 246.

- Absent those high ratings, the Ohio Funds would not have purchased the [ABS]. ¶¶111, 121, 131, 141, 151.

- In deciding to purchase and/or retain the securities identified in the attached exhibits, Plaintiffs justifiably relied on the false and misleading AAA ratings Defendants supplied.  ¶160.

Ignoring these allegations, Defendants argue that the Ohio Funds have failed to satisfy Ohio law's "justifiable reliance" standard "because they have not pled that Defendants' credit ratings were the *only* basis upon which they purchased the securities."  D. Br. at 44.  Although stated boldly, Defendants do not cite *a single case* demonstrating that Ohio law requires Plaintiffs to plead *exclusive* reliance upon Defendants' misrepresentations.  Moreover, the two cases that Defendants do cite were both summary judgment decisions where the court determined that the plaintiff's reliance was not justified because the plaintiff had doubts about the defendant's representation and, as a result, contacted third parties who had superior knowledge about the issue.[69]

Defendants additionally assert that, under Ohio law, Plaintiffs were not entitled to rely on Defendants' credit ratings because the Ohio Funds are sophisticated investors.  *See* D. Br. at 44. In making this argument, which has been rejected elsewhere, Defendants ignore the superior expertise of the NRSRO Defendants, s*ee* ¶29, and Defendants' superior knowledge of the

---

[69] *See Johnson v. Church of the Open Door,* 179 Ohio App.3d 532, 2008-Ohio-6054, at ¶20, 902 N.E.2d 1002 (sustained trial court's finding that the plaintiffs did not justifiably rely on the recommendation of their pastor, who was not a licensed financial advisor, to invest with a third party where the plaintiffs "continued to be wary about [the pastor's advice] and contacted others who had invested with" the third party); *Davis v. Montenery*, 173 Ohio App.3d 740, 2007-Ohio-6221, at ¶60, 880 N.E. 2d 488 ("when buyers continue to investigate possible problems on their own and look to others, such as inspectors' and electricians' representations, the buyers are not justifiably relying on the agent's misrepresentations *regarding those problems.*") (emphasis added).

underlying asset pools given their role in structuring the ABS, s*ee* ¶¶37-41, 76-81.[70]  *See Abu Dhabi*, 651 F. Supp. 2d at 181 (finding that "the market at large, *including sophisticated investors*, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status and . . . the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain.") (emphasis added).  Defendants' argument begs the fundamental question:  if "sophisticated" investors were not intended and entitled to rely on Defendants' expertise, why were Defendants paid extraordinary fees for their involvement?

Defendants' reliance argument fares no better under New York law.  Defendants contend that:  (i) Plaintiffs have failed to plead a "special relationship of trust or confidence" between Plaintiffs and Defendants; and (ii) Plaintiffs fail to plead that Defendants were "aware of the use to which [their ratings] would be put and supplied it for that purpose."[71]  D. Br. at 42.  As discussed above, *see* Section IV.C.4, *supra,* Plaintiffs allege sufficient factual detail to establish both of these factors. *See also Abu Dhabi*, 651 F. Supp. 2d at 181; *LaSalle,* 951 F. Supp. at 1093-

---

[70] Defendants cite *Quinn v. McGraw-Hill Cos.,* 168 F.3d 331, 336 (7th Cir. 1999).  But in *Quinn*, the court merely held that an experienced banker was not entitled to claim reasonable reliance on S&P's "A" rating of bonds when, *inter alia*, he knew that a material portion of the underlying collateral was already delinquent.  Here, by contrast, there was no apparent reason to doubt the veracity of Defendants' ratings at the time Plaintiffs purchased the ABS.  Defendants' citation to cases that direct the court to consider the characteristics of the parties and the investment merely strengthens Plaintiffs' position.  *See Parkhurst v. North Am. Fin. Servs.*, 919 F. Supp. 270, 273-74 (E.D. Mich. 1996) (experienced but not expert investor was entitled to rely on broker who, *inter alia*, possessed more information concerning the securities than did the investor); *Amerifirst Savings Bank of Xenia v. Krug* (1999), 136 Ohio App.3d 468, 496-97, 737 N.E.2d 68 (bank could rely on loan dealer who gathered information about customers).

[71] The New York Court of Appeals has held that three factors are relevant to the reliance element of a negligent misrepresentation claim: (i) whether the defendant "held or appeared to hold unique or special expertise"; (ii) whether there was "a special relationship of trust or confidence" between the parties; and (iii) "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."  *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (N.Y. 1996).

94 ("Plaintiffs have adequately alleged that Duff & Phelps knew that a select group of qualified investors would rely on the inaccurate rating contained in the Offering Memoranda.  Duff & Phelps expressly consented to the use of its Bond rating in the Offering Memoranda").

Defendants' vague allusion to prospectus disclaimers that the credit ratings were "not recommendations to buy, sell or hold the securities," *see* D. Br. at n.21, also fails under New York law.  *See Abu Dhabi*, 651 F. Supp. 2d at 176 ("[T]he disclaimers in the Information Memoranda that 'a credit rating represents a Rating Agency's opinion regarding credit quality and is not a guarantee of performance or a recommendation to buy, sell or hold any securities,' are unavailing and insufficient to protect the Rating Agencies from liability for promulgating misleading ratings") (citations omitted).  Any such disclaimers do not protect Defendants from liability where, as is the case here, information regarding the falsity of the ratings was unavailable to plaintiffs, and the "disclaimers" are nothing more than boilerplate that failed to alert the Ohio Funds that the ratings were not prepared with due care and reasonable diligence to determine the true credit risks associated with the ABS.  *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 417 (S.D.N.Y. 2003) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 330 (2d Cir. 2002)).

### d.   The Ohio Funds Allege Proximate Causation

This Court can readily dispose of Defendants' argument that Plaintiffs fail to allege proximate causation.  Plaintiffs have far exceeded their minimal obligation to provide a "short and plain statement" connecting their reliance on Defendants' misrepresentations to Plaintiffs' losses.  *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 758 (S.D. Ohio 2006).[72]

---

[72] Although Plaintiffs do not assert a federal securities law claim, courts in Ohio and New York have noted the similarity between the loss causation standard for federal securities fraud and for common law misrepresentation claims.  *See* D. Br. at 41 n.20.  The heightened pleading standards associated with Rule 9(b) and the Private Securities Litigation Reform Act of 1995 do

The pleading standard under Rule 8(a) is "not meant to impose a great burden upon a plaintiff," as the Complaint need only provide "*some indication* of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm. v. Broudo*, 544 U.S. 336, 347 (2005) (emphasis added). Consequently, courts have routinely found that "loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss." *Eastwood Enters., LLC v. Farha*, No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668, at *5 (M.D. Fla. Sept. 28, 2009); *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 690 (E.D. Mich. 2004) ("whether loss causation actually exists is an issue of fact inappropriate for resolution on a motion to dismiss").

The Complaint alleges both transaction causation and loss causation.[73]  Transaction causation is similar to reliance. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (transaction causation established by alleging that but for the claimed misrepresentation plaintiff would not have entered into the transaction).  As demonstrated above, *see* Section IV.C.4, *supra*, and as detailed in ¶¶100, 111, 121, 131, 141, 151, 157 of the Complaint, the Ohio Funds have sufficiently alleged that they would not have purchased the ABS but for Defendants' AAA ratings.  *See also* ¶29 ("[C]ertain investors (*e.g.*, state pension funds like the Ohio Funds) may only purchase or hold securities with ratings at or above a certain level based upon their governing investment guidelines.").

---

not, however, apply to the Ohio Fund's state law claims, which are merely subject to the traditional notice pleading requirements of Rule 8(a).

[73] *See Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (N.Y. App. Div. 1st Dep't 2002) ("both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)."   It is unclear whether "transaction causation" is a distinct element of proximate causation under Ohio law.  Regardless, Plaintiffs have sufficiently pled it.

Plaintiffs likewise have established loss causation by pleading a "causal connection" between their reliance on the inflated ratings and the economic losses that resulted as the true risks of the ABS and Defendants' shoddy ratings practices gradually were revealed:[74]

- To date, the Ohio Funds have suffered losses in excess of $457 million on the ABS at issue in the action, as further detailed in the attached exhibits. ¶101; *see also* ¶¶17, 19, 21, 23, 25.

- When the housing and credit markets finally collapsed, the flaws in Defendants' AAA ratings gradually became clear. Moreover the value of the AAA rated securities purchased by the Ohio Funds dropped precipitously, causing the Funds to lose in excess of $457 million as these purportedly safe investments became obvious for what they were – high risk securities that both the issuers and Rating Agencies knew to be little more than a house of cards. ¶9.

- The Rating Agencies' false and misleading representations regarding their ratings – most prevalently, the inflated ratings themselves – caused the Ohio Funds to suffer significant losses when the real estate market collapsed during the last two years. ¶100.

- Defendants' high ratings were a precondition of the arrangers issuing the ABS. ¶¶107, 117, 127, 137, 147.

- The ABS Plaintiffs purchased lost value when Defendants corrected the inflated ratings and/or the market became aware of the true credit risk of the putatively highly rated ABS. ¶¶104, 114, 124, 134, 144.

In other words, Plaintiffs have pleaded that (i) the arrangers were able to structure and sell the ABS only because of Defendants' ratings, and (ii) the Ohio Funds purchased the ABS at the agreed upon price based on the specific risk versus return characteristics of each ABS as reflected in the ratings. When the market learned that Defendants' ratings were inflated, it became clear that investors had not received what they had bargained for and, as was reasonably

---

[74] *See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1002 (S.D. Ohio 2008) ("Loss causation requires a 'causal connection between the material misrepresentation and the loss'").

foreseeable, the ABS declined in value.  Plaintiffs have clearly exceeded their obligation to allege a causal connection between Defendants' ratings and Plaintiffs' losses.[75]

Defendants' argument that Plaintiffs cannot allege loss causation without alleging that they sold the ABS, s*ee* D. Br. at 38, fails as a matter of law.  *See, e.g., Varghese v. China Shenghuo Pharm. Holdings, Inc*., No. 08 Civ. 7422, 2009 WL 4668579 (S.D.N.Y. Dec. 9, 2009) (noting "'decades of precedent' . . . that plaintiffs holding [but not having sold] shares at time of suit 'have not been precluded from maintaining securities fraud actions'"); *Ong v. Sears, Roebuck & Co*., 459 F. Supp. 2d 729, 743 (N.D. Ill. 2006) ("Nothing in *Dura* suggests, however, a requirement that . . . plaintiffs must sell their securities in order to suffer the requisite economic loss."); *In re Bridgestone Sec. Litig*., 430 F. Supp. 2d 728, 738 (M.D. Tenn. 2006) (plaintiff's claim sustained where she did not allege that she sold her stock at a loss); *In re Royal Dutch/Shell Transp. Sec. Litig*., 404 F. Supp. 2d 605, 608 (D. N.J. 2005) ("*Dura* neither expressly nor implicitly mandates that the subject securities be sold in order for a plaintiff to have suffered cognizable economic loss").  This should come as no surprise given that it is well established that losses "may be calculated by reference to the amount that the purchaser overpaid and the true value of the securities."  *Id*. at 610.

Defendants lastly argue that Plaintiffs' complaint should be dismissed due to the occurrence of an "intervening event" – "the precipitous collapse of the U.S. housing market (and, in turn, the ABS market) in 2007 and the global credit market crisis that followed as a result."

---

[75] *See, e.g., DeMarco v. Robertson Stevens Inc.*, 318 F. Supp. 2d 110, 125 (S.D.N.Y. 2004) ("the Court must conclude that plaintiffs have adequately alleged loss causation because the decline in stock price was a foreseeable consequence of defendants' fraudulent statements that allegedly inflated the price, because . . . revelation of the misrepresentation will lead inexorably to a price correction"); *In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 366 (S.D.N.Y. 2001) ("This Court is persuaded that the Shareholders' allegations against CIBC satisfy the loss causation requirement . . . it was a reasonably foreseeable consequence that the value of Livent's common stock would decline precipitously when the misrepresentations . . .  were revealed.").

*See* D. Br. at 39-41.  Defendants' argument is premature, legally and factually incorrect, and the clearest evidence yet that the Rating Agencies are unrepentant about their role in the Ohio Funds' losses and the collapse in the U.S. housing market to which they so glibly refer.

As a threshold matter, Defendants' argument is improper at the pleading stage.  *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 513 (S.D.N.Y. 2009) ("In cases of an intervening event the question of causation is reserved for trial and is not subject to analysis in a Rule 12(b)(6) motion to dismiss.") (citing *Lentell*, 396 F.3d at 174))[76]; *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 604 F. Supp. 2d 1128, 1147 (S.D. Ohio 2009) ("[T]he fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability.") (citing *Clinger v. Duncan* (1957), 166 Ohio St. 216, 222, 141 N.E.2d 156.

Furthermore, Defendants' attempt to escape liability by citing the very crisis that they created is a move worthy of Houdini.  Plaintiffs are reminded of the familiar yarn about the man who kills his parents and begs the court for mercy because he is an orphan.  *See, e.g., Motorola Credit Union Corp. v. Uzan*, 561 F.3d 123, 129 n.5 (2d Cir. 2009) ("the 'classic definition' of chutzpah has been described as 'that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan'"); *In re Coordinated Pretrial Proceedings In Petroleum Products Antitrust Litig.*, 109 F.3d 602, 610 n.1 (9th Cir. 1997) ("Effrontery.  The classic definition is the man who kills both his parents, and

---

[76] Defendants cite *Lentell*, 396 F.3d at 174 for the proposition that when losses coincide with a "market-wide phenomenon causing comparable losses to other investors, a plaintiff must allege facts that, if true, are sufficient to show that its loss was caused by the defendant's actions, rather than those intervening market-wide events.  The *Lentell* court went on to explain, however, that loss causation is pled if facts are alleged supporting an inference that the defendants' misstatements concealed the circumstances bearing on the loss suffered such that "plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."  *Id.* at 175.  That is exactly what plaintiffs have pled in this case.  *See also In re Daou Sys., Inc.*, 411 F.3d 1006, 1026-27 (9th Cir. 2005) ("A plaintiff is not required to show 'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation.").

than asks the court for mercy because he is an orphan"). The Rating Agencies' job was to evaluate the credit risks associated with the ABS, including the risk of a decline in the U.S. housing market. The Rating Agencies' wholesale failure to accurately rate those risks, choosing instead the highly lucrative fees they earned, was one of the key causes of the U.S. housing bubble and subsequent collapse. Without Defendants' ratings, the ABS could not have been sold; without the sale of ABS, the ability of the arranging banks to offload mortgage default risk through securitization would have disappeared; and without the ability to offload the default risk of the underlying risky mortgage loans would never have been made. The Complaint contains pages of allegations, based upon the SEC Report and testimony by Defendants' own employees, demonstrating that Defendants worked hand-in-glove with the arrangers to flood the market with billions of dollars worth of highly risky ABS that eventually imploded – taking the U.S. economy along with it. *See* ¶¶52-81.

Less than a month ago, a court rejected a similar intervening event argument by Ambac Financial Group, Inc., a financial insurance company that insured ABS of the type at issue here. Ambac unsuccessfully tried to blame its financial woes on the global financial crisis rather than on its own conduct. The court made short shrift of the defendants' audacious ploy:

> Defendants' arguments on this issue are premised on a convenient confusion of cause and effect. The conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business, and of the financial markets in general, rather than a passive victim.

*See In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411, 2010 WL 727227, at *22 (S.D.N.Y. February 22, 2010). Defendants' loss causation argument is equally confused.

In sum, it is beyond question that Plaintiffs have exceeded the minimal threshold for pleading that their reliance on Defendants' ratings proximately caused their losses. Having

pleaded loss causation as well as the other elements, Plaintiffs successfully state claims for negligent misrepresentation.

### D.   PLAINTIFFS HAVE ALLEGED VIABLE CLAIMS UNDER THE OHIO SECURITIES ACT

Ohio law recognizes that broad application and liberal construction of the Ohio Securities Act is necessary to protect Ohio and its residents from securities-related misconduct.  In fact, the purpose of the Ohio Securities Act is to protect buyers from the misconduct of sellers *and* every person that participated in any way in the sale of the securities.  Here, Plaintiffs have alleged that it was conduct by Defendants, in violation of Ohio's Securities Act, that made the sale of securities to Plaintiffs possible.  Therefore, this Court should deny Defendants' motion to dismiss Plaintiffs' claims under the Ohio Securities Act.[77]

### 1.   Plaintiffs' Complaint Alleges A Sufficient Ohio Nexus To Warrant Application of The Ohio Securities Act

Defendants argue that the Ohio Securities Act is inapplicable because the nexus to Ohio is peripheral to the sale of the securities.  D. Br. at 70.   Defendants' argument is based upon *In re Revco Sec. Litig*, No. 89CV593, 1991 WL 353385 (N.D. Ohio Dec. 12, 1991) – a case where neither the plaintiffs nor the defendants were residents of Ohio.  Defendants' argument fails because it focuses on a restrictive application of the Ohio Securities Act that Ohio courts have consistently rejected.

In *Federated Management Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 738 N.E.2d 842, the Tenth District Court of Appeals for Ohio held that the Ohio Securities Act

---

[77] Defendants, in summary fashion, argue that Plaintiffs' Ohio Securities Act claims fail because: (1) the claims are preempted by the CRARA; (2) the claims are time-barred; (3) credit ratings are predictive opinions and cannot constitute material misstatements of fact for pleading purposes; and (4) Plaintiffs' cannot have reasonably relied on Defendants' ratings.  Rather than re-state the reasons why Defendants' arguments fail, Plaintiffs respectfully refer this Court to Sections IV.A-C above.

applied where the issuer of a security was based in Ohio, even though the purchaser and seller were not.  In so holding, the *Federated* court implicitly recognized that the reason for applying the Ohio Securities Act would have been even stronger if either the purchaser or buyer had been based in Ohio.  *Id*. at 386 ("The question is whether those provisions [Chapter 1707] apply since neither the purchasers nor the underwriters were based in Ohio, and the marketing and solicitation of such notes did not take place in Ohio.")

In the *NCFE* litigation, this Court noted that "[t]ypically, a defrauded buyer of a security may assert a blue sky claim under the law of his own state."  *In re Nat'l Century Fin. Enters, Inc., Invest. Litig.*, 541 F. Supp. 2d 986, 1008 (S.D. Ohio 2007) ("*NCFE III*") (finding that the blue sky law claims should survive a motion to dismiss).  See also *Callahan v. Class One, Inc.* (1991), 58 Ohio St.3d 76, 567 N.E.2d 1036 (noting that the Ohio Securities Act provides protection for purchasers regardless of who initiates the transaction).  This is true even when the defendants' contacts with the state are slight.

In *Martin v. Steubner*, 485 F.Supp. 88, 100 (S.D. Ohio 1979), the court held that the Ohio Securities Act applied even where "[d]efendants have no place of business in [Ohio]; they never entered the state nor have they conducted any business here; defendants did not solicit telephonically in Ohio; and any contact with [Ohio] through use of the mails was in response to inquiries put by the plaintiff . . . ."  *Id*.  The court noted that while "these contacts are, admittedly, slight . . . viewed together with the State's interest in protecting its citizens from the sale of securities which have not been first subjected to the State's investigative and evaluative processes, such an extension does not appear unfair or to offend due process concepts."  *Id*.  Similarly, in *Bernie v. Waterfront, Ltd. Dividend Housing Ass'n*, 614 F.Supp. 651, 655 (D.C. Ohio 1985), the court noted that "the fact that much of the negotiation and solicitation of

[p]laintiff's investment occurred in New York is not as determinative of this issue as are the consequences of the contractual obligation in Ohio and the degree of interest which Ohio has in seeing that said obligations were faithfully executed." *Id.* (citing *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 382 (6th Cir. 1968).

Here, the degree of interest that Ohio has in this matter could not be more compelling. As detailed below, Plaintiffs are each instrumentalities of the State of Ohio operating pursuant to state statute, and the impact of Defendants' conduct touches each of the nearly two million Ohio residents who are participants in the retirement plans.

- Plaintiff OP&F provides retirement, disability, and other benefits to active police officers and firefighters, retirees, and beneficiaries and survivors. ¶16. OP&F serves more than 56,210 public employees across the State of Ohio, and manages approximately $10.2 billion in assets. ¶17. OP&F purchased the ABS identified in Exhibits A-1 and A-2 to the Complaint in reliance on the inflated and inaccurate credit ratings assigned by the Credit Rating Agencies. *Id.*

- PERS provides retirement, disability, and survivor benefit programs to public employees in the State of Ohio who are not covered by another state or local retirement program. ¶18. PERS serves more than 3,700 public employers, over 936,000 members, and 166,500 retirees and surviving beneficiaries. ¶19. PERS manages approximately $66 billion (as of October 23, 2009), making it the largest public pension fund in Ohio. *Id.* PERS purchased the ABS identified in Exhibits B-1 and B-2 to the Complaint in reliance on the inflated and inaccurate credit ratings assigned by the Credit Rating Agencies. *Id.*

- STRS provides retirement, disability, and other benefits to active, inactive and retired public educators. ¶20. STRS serves more than 455,000 public employees across the State of Ohio, and manages assets valued at approximately $56.8 billion (as of August 31, 2009). ¶21. STRS purchased the ABS identified in Exhibits C-1 and C-2 of the Complaint in reliance on the inflated and inaccurate ratings assigned by the Credit Rating Agencies. *Id.*

- SERS provides pension benefits and access to post-retirement health care coverage to active and retired non-teaching public school employees. ¶22. SERS serves more than 189,00 public employees across the State of Ohio, and manages assets valued as of August 31, 2009 at approximately $8.8 billion. ¶23. SERS purchased the ABS identified in Exhibits D-1 and D-2 of the Complaint in reliance on the inflated and inaccurate ratings assigned by the Credit Rating Agencies. *Id.*

- Deferred Comp is authorized to supplement retirement benefits from the Ohio retirement systems.  ¶24.  Deferred Comp provides services to over 193,000 participants from 1,745 Ohio state and local governments and manages assets valued as of September 30, 2009 at $7.1 billion.  ¶25.  Deferred Comp purchased the ABS identified in Exhibits E-1 and E-2 of the Complaint in reliance on the inflated and inaccurate credit ratings assigned by the Credit Rating Agencies.  *Id.*

To further the intended purpose of the Ohio Securities Act – the protection of the investing public – the provisions must be liberally construed.  *See In re Columbus Skyline Securities, Inc.* (1996), 74 Ohio St.3d 495, 498.  As discussed above, Plaintiffs have alleged that they received and relied on Defendants' misrepresentations in Ohio and that the sales at issue accordingly took place here.  *See* Section IV.C.1, *supra*.  Ohio has a great interest in protecting Plaintiffs – each an instrumentality of the State of Ohio operating pursuant to state statute – as well as the broad cross-section of Ohio citizens that Plaintiffs serve.  *See Martin v. Steubner*, 485 F.Supp. at 100 (noting that even slight contacts are sufficient when those contacts are viewed together with the state's interest in protecting its citizens).  Thus, Plaintiffs have alleged a nexus sufficient to warrant application of the Ohio Securities Act.

## 2.     Defendants Are Liable Under Ohio Rev. Code § 1707.41

Defendants argue that they do not qualify as "sellers" for purposes of the Ohio Securities Act.  D. Br. at 51-55.  It is on this basis that Defendants conclude that they cannot be liable under Ohio Rev. Code § 1707.41.  This argument is without merit, and ignores the plain language of the statute that imposes liability on any person offering a security for sale, *or* any person that receives the profits accruing from such sale.  *See* Ohio Rev. Code § 1707.41 (A).

In their argument, Defendants intentionally omit the text of Ohio Rev. Code § 1707.41, which provides, in relevant part:

> R.C. 1707.41 Civil liability of seller for fraud.[78]
>
> (A) In addition to other liabilities imposed by law, any person that, by a written or printed circular, prospectus, or advertisement, offers any security for sale, *or receives the profits accruing from such sale*, is liable, to any person that purchased the security relying on the circular, prospectus, or advertisement, for the loss or damage sustained by the relying person by reason of the falsity of any material statement contained therein or for the omission of material facts, unless the offeror or person that receives the profits establishes that the offeror or person had no knowledge of the publication prior to the transaction complained of, or had just and reasonable grounds to believe the statement to be true or the omitted facts to be not material.

Ohio Rev. Code § 1707.41 (A) (emphasis added).  Thus, it is not a prerequisite for liability under Ohio Rev. Code § 1707.41 that the Complaint allege that Defendants themselves "offered" any security for sale to Plaintiffs.  Instead, a claim under Ohio Rev. Code § 1707.41 is sufficiently alleged where, as here, Defendants are charged with having benefitted or profited from the sale of securities.  ¶¶7, 77.

Ohio Rev. Code §1707.41 also does not require that there be direct communication or solicitation between a defendant and a plaintiff for liability to be imposed.  For example, in *Federated*, *supra*, the Tenth District Court of Appeals for the State of Ohio addressed whether the receipt of fees in connection with the sale of a security constituted the receipt of profits accruing from the sale, sufficient to establish liability under the Ohio Securities Act.  In that case, the appellee (an agent bank for a $75 million line of credit to an issuer of notes) received a referral fee equal to twenty percent (20%) of the fees earned by the underwriter for the offering.

---

[78] The title of a statute does not constitute any part of the law as contained in the revised code. *See* Ohio Rev. Code §1.01.  Therefore, the fact that Ohio Rev. Code §1707.41 is titled "Civil liability of seller for fraud" does not mean that the defendant must be a "seller" (as that term is defined for purposes of § 12(a)(2) of the Securities Act of 1933) in order for there to be an actionable claim under Ohio Rev. Code § 1707.41.

*Id*. at 388.  The appellant contended that the receipt of the referral fee constituted the receipt of profits accruing from the sale, sufficient to establish liability under the Ohio Securities Act.  *Id*.

The court agreed with appellant, holding held that by receiving the fees, the agent bank had profited from the sale of securities sufficient to satisfy a claim under the Ohio Securities Act.  The court noted that the agent bank received its fees because the underwriter received its fees, and the underwriter received its fees because the note offering actually occurred.  *Id*. at 388.  Therefore, the court concluded that "in receiving such 'fees,' appellee *profited* from the sale of securities."  *Id*. at 388-89 (emphasis added).   In so holding, the court addressed the agent bank's argument comparing the fees it received to fees earned by attorneys and printers for an underwriter.  *Id*. at 388.  The court stated that the argument was flawed because attorneys would receive their fee regardless of whether the securities actually went up for sale.  In contrast, the agent bank only received its fee because the offering actually occurred.  *Id*.[79]

Like the agent bank in *Federated*, Defendants here "would not receive their full fees unless the issuance of the ABS was completed and the target rating was attained."   ¶77.  Plaintiffs also allege that Defendants "had an acute financial incentive" because "the Rating Agencies did not receive their full fees for a deal unless the deal was completed."   ¶7.  Based upon these allegations, among others, the Complaint sufficiently alleges that Defendants "profited" from the sale of securities.  Therefore, following the holding in *Federated,* this Court should deny Defendants' motion to dismiss Plaintiffs' claims under Ohio Rev. Code § 1707.41.

Defendants' reliance on Section 12(a) of the Securities Act of 1933 (the "Securities Act") and federal case law addressing it is misplaced.  Under the specific (and readily distinguishable)

---

[79] While the profit/benefit to the appellee in *Federated* was the receipt of a percentage of the fees that the underwriter received, liability under Ohio Rev. Code § 1707.41 will be imposed in any arrangement where the fee is contingent upon the actual sale of the security.

language of Section 12(a) of the Securities Act, liability is expressly limited to the person from

whom the security was actually purchased.  Section 12(a) provides, in relevant part, that:

> (a) In general
>
> Any Person who –
>
> > (1) *offers or sells a security* in violation of section 77e of this title, or
> >
> > (2) *offers or sells a security* (whether or not exempted by the provisions of 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
> >
> > *shall be liable,* subject to subsection (b) of this section, *to the person purchasing such security from him,* who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C.A § 77l(a) (emphasis added).

In *Pinter v. Dahl*, 486 U.S. 622, 643 (1988), a case relied on by Defendants, the Supreme

Court stated that the range of persons liable under Section 12(a) of the Securities Act is limited

to the actual seller, the person who actually passes title, and to individuals who successfully

solicit the purchase of securities motivated at least in part by their own financial interests or

those of the securities owner.   *Id*. at 643-47.   Defendants rely on another recent decision

interpreting Section 12(a) as it relates to the Rating Agencies for the proposition that seller

liability cannot attach without "direct contact with plaintiffs or any other sales prospects."  *In re*

*Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017, 2010 WL 337997 at *3 (S.D.N.Y. Feb. 1, 2010).

Neither of these cases applies to whether Plaintiffs' Ohio Securities Act claims are sufficiently pled.  Each case concerns language of Section 12(a) of the Securities Act that is much narrower than the language found in Ohio Rev. Code § 1707.41.  Defendants' reliance on jurisprudence interpreting Section 12(a) of the Securities Act for the argument that claims under Ohio Rev. Code § 1707.41 cannot proceed against them is accordingly without merit.

### 3.   Plaintiffs Have Sufficiently Alleged That Defendants Are Liable to Plaintiffs Under Ohio Rev. Code § 1707.43

Ohio Rev. Code § 1707.43 allows a purchaser to void a sale or contract for sale made in violation of Chapter 1707 when the following elements are established: (1) there is a "sale"; (2) of a "security"; (3) in violation of any of the noted provisions of the securities chapter, which violation materially affects the protection contemplated by the violated provision.  *Martin v. Steubner*, 485 F.Supp. 88, 97 (S.D. Ohio 1979).  Ohio Rev. Code § 1707.43 does not require that the issuer of the security be named as a defendant – the statute requires only that there was a sale of a security in violation of any provision contained in Chapter 1707 of the Ohio Revised Code.[80]

---

[80] Instructive on this issue are holdings addressing control person liability under Section 20 of the Exchange Act.  Courts have held that plaintiffs need only plead a predicate violation, not establish liability for the same, or even name the primary violator as a defendant.  *See In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F.Supp. 2d 1007, 1022 n. 11 (E.D. Mich. 2003) ("if the complaint states a primary violation by the Company, even if the Company is not named in the Complaint as a defendant, then a §20 claim can stand if the individuals were controlling persons.") (citing *In re Citisource, Inc. Sec. Litig.*, 649 F. Supp. 1069, 1077 (S.D.N.Y. 1988) ("We … hold that the liability of the primary violator is simply an element of proof of a §20(a) claim, and that liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong.")); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1033 (N.D. Ohio 2000) ("To the extent that a plaintiff sets forth a primary violation of the Exchange Act, dismissal of a §20(a) claim for derivative liability is inappropriate.") (citation omitted).

Defendants do not dispute the existence of the first two elements – a sale of a security. Rather, Defendants argue that Plaintiffs have failed to allege a violation of any provision of the Ohio Securities Act in connection with the sale of the securities at issue.  Such an argument simply ignores Plaintiffs' well-pleaded allegations.

Ohio Rev. Code § 1707.43 extends liability to those who aid or participate in any way in any violation of the provisions of Chapter 1707, including those listed in §§ 1707.41 and 1707.44.  As discussed above, Plaintiffs have sufficiently alleged a violation of § 1707.41.[81] Additionally, although not explicitly labeled as such,  Plaintiffs' allegations describe a violation ofOhio Rev. Code §1707.44(B).  Ohio Rev. Code §1707.44(B) provides:

> No  person  shall  knowingly  make  or  cause  to  be  made  any  false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement for any of the following purposes:
>
> ***
>
> (4) Selling any securities in this state ….

Ohio Rev. Code § 1707.44(B)(4) and (5).

Plaintiffs specifically allege, *inter alia*, that the offering materials falsely represented that the securities Plaintiffs purchased had a credit quality consistent with Defendants' criteria for the particular credit rating assigned.  ¶177.  Accordingly, Plaintiffs' allegations assert a violation of Chapter 1707, and therefore, a viable claim against Defendants under the Ohio Securities Act.

Further, Ohio Rev. Code § 1707.43 specifically extends liability for violations of Chapter 1707 to "[t]he person making such sale or contract for sale, *and every person that has participated in or aided the seller in any way* in making such sale or contract for sale . . . ."  Ohio

---

[81] Defendants concede that a determination by this Court that Plaintiffs have stated a claim under Ohio Rev. Code §1707.41 necessarily requires a determination by this Court that Plaintiffs have also stated a claim under Ohio Rev. Code § 1707.43.  D. Br. at 55-56.

Rev. Code § 1707.43 (A) (emphasis added).  Courts addressing the statute have consistently noted that the scope of liability under § 1707.43 is broad given the language of the statute. *NCFE I*, 580 F. Supp.2d at 649 (citing *Federated Management*, 137 Ohio App.3d at 391 ("Rather, the language is very broad, and participating in the sale or aiding the seller *in any way* is sufficient to form a basis for liability under R.C. 1707.43.")).  In addition to the broad language used in Ohio Rev. Code § 1707.43, the securities laws are to be liberally construed. *Columbus Skyline*, 74 Ohio St.3d at 498.

In *NCFE I*, this Court held that "at the pleading stage, the complaint adequately alleges that Moody's ratings of the NPF XII notes helped induce Lloyds to purchase the notes."  *NCFE*, 580 F.Supp.2d at 649-50.  In so holding, the Court noted that language of Ohio Rev. Code §1707.43 "is broad in scope given the phrase 'in any way.'"  *Id.* at 649 (citation omitted).  The court further recognized that "[c]omitting an act that induces a party to purchase securities may itself satisfy the 'in any way' standard."[82]  *Id.*  (citation omitted).  Here, the act of issuing the rating was a condition precedent to any issuance of the securities at issue.  But for the issuance of the ratings, therefore, Plaintiffs could not have purchased the securities.  ¶¶29, 157.  The rating itself was not just an inducement to purchase the securities, but a fundamental requirement for the sale of the securities.

Notwithstanding the breadth of case law requiring that the "in any way" standard be interpreted broadly, Defendants, citing to one Ohio common pleas court decision, argue that liability under § 1707.43 requires direct involvement in the actual sale or solicitation of

---

[82] Inducement is not a definitive test for liability to apply under Ohio Rev. Code §1707.43.  "Rather, the 'inducement' test is but one factor in determining liability under R.C. 1707.43.  Ohio Rev. Code § 1707.43 does not require that a person induce a purchaser to invest in order to be held liable.  Rather, the language is very broad, and participating in the sale or aiding the seller *in any way* is sufficient to form a basis for liability under R.C. 1707.43."  *Federated Management,* 137 Ohio App.3d at 391 (emphasis in original).

securities.  In *Hild v. Woodcrest Ass'n* (Ct. Com. Pl. 1977), 59 Ohio Misc. 13, the defendant "prepare[d] a . . . memorandum for the purpose of attracting potential investors" and "contacted a number of its own clients (including the plaintiff) interest in making the type of investment available."  There, the court found that, undoubtedly, the accounting firm had participated in the sales to the plaintiff to an extent well within the liberal language of Ohio Rev. Code § 1707.43.[83] *Id*. at 28-29.  The conduct of the accounting firm in *Hild* obviously fell within the scope of conduct prohibited by Ohio Rev. Code § 1707.43.  However, *Hild* has not been interpreted as limiting liability under Ohio Rev. Code §1707.43 to only the most obvious cases.

In *Hild*, the court indicated that in *other* states, "participating" and "aiding" had been interpreted as implying some activity in inducing the purchaser to invest.  *Id*. at 28-29.  However, as explained in *Federated*:

> *Hild* did not adopt the other states' approach as the definitive test.  Rather, the 'inducement' test is but one factor in determining liability under R.C. 1707.43.  R.C. 1707.43 does not require that a person induce a purchaser to invest in order to be held liable.  Rather, the language is very broad, and participating in the sale or aiding the seller *in any way* is sufficient to form a basis for liability under R.C. 1707.43.

*Federated*, 137 Ohio App.3d at 391.  In fact, the court in *Hild* emphasized that Ohio Rev. Code § 1707.43 extends liability beyond the actual seller/issuer of the security.  *Hild*, 59 Ohio Misc. at 28.[84]

---

[83] The defendant accounting firm, Coopers & Lybrand, was retained by the issuer to develop financial and investment information and to prepare a memorandum for purposes of attracting potential investors.  Coopers also contacted its own clients who were interested in making that type of investment.  *Hild*, 59 Ohio Misc. at 28.

[84] In another case, *Corporate Partners, L.P. v. Natl. Westminster Bank PLC*, 126 Ohio App.3d 516, 524, 710 N.E.2d 1144 (1998), the court held that although a different entity was responsible for soliciting and making the sale of stock, the mere preparation of a private placement memorandum, which was distributed to prospective investors, may subject one to liability under Ohio Rev. Code § 1707.43.

Defendants' reliance on case law addressing liability under other states' blue sky laws is misplaced. Each of the cases cited by Defendants from other states address statutes whose language is significantly narrower than the "in any way" language found in Ohio Rev. Code § 1707.43. In both *Ackerman v. Schwartz*, 733 F. Supp. 1231 (N.D. Ind. 1989) and *Rendler v. Markos*, 154 Wis. 2d 420 (Wis. Ct. App. 1990), the courts were asked to apply blue sky laws with language that was significantly narrower than Ohio Rev. Code § 1707.43. *See Schwartz*, 733 F. Supp at 1252 (applying Ind. Code §§ 23-2-1-19 and 23-2-1-1(b), which create liability for "agent[s] who materially aid in the sale" of an unregistered security, and define "agent" as "any individual . . . who represents . . . issuer in effectuating or attempting to effect purchases or sales of securities"); *Rendler*, 154 Wis. 2d at 430-32 (applying Wis. Code §§ 551.59(4) and 551.02(2) which create liability for "for agent[s] who materially aid in the act or transaction constituting the violation," and define "agent" as "any individual . . . who represents . . . issuer in effecting or attempting to effect transactions in securities.").

Unlike the cases cited by Defendants that construe different states' statutes, the broad language of Ohio Rev. Code § 1707.43 clearly applies to Plaintiffs' allegations. With respect to Defendants' liability under Ohio Rev. Code § 1707.43, Plaintiffs have alleged, among other things:

- During the Relevant Period, issuers and the Rating Agencies engaged in a collaborative process for arriving at ratings most favorable to the issuer. Typically, the sponsoring bank initially designated a target rating it required. The Rating Agencies then worked with the issuer to design the credit enhancement aspects of the capital structure to justify the desired rating. ¶65.

- The Rating Agencies placated issuers by maintaining artificially low expected loss projections thereby keeping ratings (and the profits associated with those ratings) artificially high. *Id.*

- Because the desired rating of a securitized product was the starting point for any securities offering, the Rating Agencies were actively involved in helping issuers structure the products to achieve the requested rating. This results-oriented approach

resulted in a highly subjective ratings process, where the Rating Agencies essentially worked backwards, starting with the issuer's target rating and thereafter working toward a structure that could conceivably yield the desired rating. ¶76.

• The Rating Agencies would not receive their full fees unless the issuance of the ABS was completed and the target rating was attained. Therefore, both the issuers and the Rating Agencies were highly incentivized to agree to the targeted ratings so that the ABS could be marketed to investors like the Ohio Funds, which were interested in purchasing the highest investment grade securities. ¶77.

• In sum, the role that the Rating Agencies played in rating structured finance products was far different from their work in rating corporate and municipal bonds, and similar traditional debt products. In the structured finance area, the rating is less an outcome of the work performed than it is the result of the issuer and the Rating Agencies working together to achieve the targeted rating. In this process, the Rating Agencies provided issuers with guided feedback on structure and configuration to make sure that the desired ratings were obtained. ¶81.

As detailed above, Defendants were hired by the issuers of the securities, and aided the issuers by structuring the ABS and providing the requested ratings. Defendants and the issuers "worked together to achieve the targeted rating" with Defendants providing feedback to guide the structure and configuration of the offering. Short of being the issuer itself, Defendants could not have been more involved in the sale of ABS to Plaintiffs. In fact, without the rating, the issuance could not have been sold. The broad and liberally construed language of Ohio Rev. Code § 1707.43 makes clear that Plaintiffs have sufficiently alleged their claim against Defendants under the Ohio Securities Act.

V.    <u>CONCLUSION</u>

For the many reasons set forth herein, Defendants' Motion to Dismiss the Complaint should be denied.

Dated:  March 22, 2010                              Respectfully submitted,

                                                    RICHARD CORDRAY
                                                    OHIO ATTORNEY GENERAL


                                                    <u>s/ John P. Gilligan</u>
                                                    John P. Gilligan  (0024542)
                                                    250 West Street
                                                    Columbus, Ohio  43215-2538
                                                    Telephone:    (614) 462-2700
                                                    Facsimile:    (614) 462-5135
                                                    Email:        jgilligan@szd.com

                                                    *Trial Attorney for Plaintiffs Ohio Police &*
                                                    *Fire Pension Fund, Ohio Public Employees*
                                                    *Retirement System, State Teachers Retirement*
                                                    *System of Ohio, School Employees Retirement*
                                                    *System of Ohio, and Ohio Public Employees*
                                                    *Deferred Compensation Program*

Of Counsel:

John C. McDonald (0012190)
Matthew L. Fornshell (0062101)
Kevin L. Murch (0066833)
Katherine G. Manghillis (0077307)
SCHOTTENSTEIN ZOX & DUNN CO., LPA
250 West Street
Columbus, Ohio  43215-2538
Telephone:    (614) 462-1087
Facsimile:    (614) 228-4846
Email:        jmcdonald@szd.com
              mfornshell@szd.com
              kmurch@szd.com
              kmanghillis@szd.com

{H1831226.2 }

118

ENTWISTLE & CAPPUCCI LLP
Andrew J. Entwistle (admitted *pro hac vice*)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Richard W. Gonnello (admitted *pro hac vice*)
Francis P. McConville (admitted *pro hac vice*)
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone:      (212) 894-7200
Facsimile:      (212) 894-7272
Email:          aentwistle@entwistle-law.com
                jwhitman@entwistle-law.com
                rgonnello@entwistle-law.com
                fmcconville@entwistle-law.com


LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Steven E. Fineman (admitted *pro hac vice*)
Daniel P. Chiplock (admitted *pro hac vice*)
Michael Miarmi (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone:      (212) 355-9500
Facsimile:      (212) 355-9592
Email:          sfineman@lchb.com
                dchiplock@lchb.com
                mmiarmi@lchb.com


Richard M. Heimann (admitted *pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:      (415) 956-1000
Facsimile:      (415) 956-1008
Email:          rheimann@lchb.com


*Special Counsel for Plaintiffs Ohio Police & Fire Pension Fund, Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio, and Ohio Public Employees Deferred Compensation Program*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 22nd day of March, 2010, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


s/ John P. Gilligan
*One of the Attorneys for the Plaintiffs*