# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

_____

OHIO POLICE & FIRE PENSION FUND,
OHIO PUBLIC EMPLOYEES RETIREMENT
SYSTEM, STATE TEACHERS
RETIREMENT SYSTEM OF OHIO,
SCHOOL EMPLOYEES RETIREMENT
SYSTEM OF OHIO,  and OHIO PUBLIC
EMPLOYEES DEFERRED
COMPENSATION PROGRAM,

                    Plaintiffs,

        v.

STANDARD & POOR'S FINANCIAL
SERVICES LLC, THE MCGRAW-HILL
COMPANIES, INC., MOODY'S CORP.,
MOODY'S INVESTORS SERVICE, INC.,
and FITCH, INC.,

                 Defendants.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 2:09-cv-1054

Judge Graham
Magistrate Judge Kemp

## THE RATING AGENCIES' JOINT REPLY MEMORANDUM
## OF LAW IN FURTHER SUPPORT OF THEIR MOTION
## <u>TO DISMISS THE COMPLAINT</u>

Floyd Abrams (admitted *pro hac vice*)
S. Penny Windle (admitted *pro hac vice*)
Tammy L. Roy (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Counsel for Defendants The McGraw-Hill
Companies, Inc. and Standard & Poor's
Financial Services LLC*

Drew H. Campbell (0047197)
BRICKER & ECKLER LLP
100 South Third Street
Columbus, Ohio 43215
Telephone: (614) 227-2319
Facsimile: (614) 227-2390

*Trial Counsel for Defendants The McGraw-
Hill Companies, Inc. and Standard & Poor's
Financial Services LLC*

3736226v1

James J. Coster (admitted *pro hac vice*)
Joshua M. Rubins (admitted *pro hac vice*)
SATTERLEE STEPHENS BURKE & BURKE
LLP
230 Park Avenue, 11th Floor
New York, New York 10169
Telephone: (212) 818-9200
Facsimile: (212) 818-9606

*Counsel for Defendants Moody's Corp. and
Moody's Investors Service, Inc.*

Michael H. Carpenter
Jeffrey A. Lipps
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: (614) 365-4100
Facsimile: (614) 365-9145

*Trial Counsel for Defendants Moody's
Corp. and Moody's Investors Service, Inc.*

Martin Flumenbaum (admitted *pro hac vice*)
Roberta A. Kaplan (admitted *pro hac vice*)
Julia Tarver Mason (admitted *pro hac vice*)
Tobias J. Stern (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Counsel for Defendant Fitch, Inc.*

Thomas D Warren
BAKER & HOSTETLER LLP
3200 National City Center
1900 East 9th Street
Cleveland, Ohio 44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

*Trial Counsel for Defendant Fitch, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................4

I.    THE FIRST AMENDMENT BARS PLAINTIFFS' CLAIMS ............................................. 4

    A.  The Rating Agencies' Rating Opinions Are Matters of Public Concern ........................... 4

Plaintiffs offer no plausible basis to refute the conclusion that Defendants' widely disseminated ratings on a large array of MBS, which allegedly impacted over two million Ohio residents, are matters of "public concern."

Principal Authorities: *Jefferson County School District No. R-1* v. *Moody's Investor's Services, Inc.*, 175 F.3d 848 (10th Cir. 1999); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 511 F. Supp. 2d 742 (S.D. Tex. 2005).

    B.  Ratings Are Constitutionally Protected Opinions ............................................. 9

Plaintiffs do not and cannot deny the Sixth Circuit's clear holding in *Compuware* that letter ratings, of the kind published by Defendants on the securities here, are opinions that enjoy absolute constitutional protection. Plaintiffs' assertion that *Compuware* is distinguishable rests on two legal fallacies: that the constitutional protection of speech setting forth opinions is limited to defamation or "defamation-type" actions brought by "public figure" plaintiffs, and that the First Amendment protection afforded to ratings is somehow dependent on whether the rating agency issuing the rating was acting as a "journalist" or a member of the "media." There is no merit to either proposition.

Principal Authorities: *Compuware Corp.* v. *Moody's Investors Services, Inc.*, 499 F.3d 520 (6th Cir. 2007); *Wampler* v. *Higgins*, 752 N.E. 2d 962 (Ohio 2001); *New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010); *New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC.*, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010); *New Jersey Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010); *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010); *In re Lehman Bros. Sec. and ERISA Litig.*, 2010 WL 545992 (S.D.N.Y. Feb. 17, 2010).

    C.  The Ratings Are Also Protected By The Actual Malice Standard ................................... 12

It is appropriate at this stage of the litigation to dismiss Plaintiffs' claims for failure to plead "actual malice." Plaintiffs have failed to allege facts, as they must, that plausibly suggest that those specifically responsible for the ratings at issue, at each of the Rating Agencies, believed them to be false at the time they were issued.

Principal Authorities: *Bell Atlantic* v. *Twombly*, 550 U.S. 544 (2007); *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009); *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009); *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010); *In re Lehman Bros. Sec. and ERISA Litig.*, 2010 WL 545992 (S.D.N.Y. Feb. 17, 2010).

-i-

II.   PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW ................................. 15

A.   The Presumption Against Preemption Does Not Apply Here ......................................... 16

Where the language of a statute expressly preempts certain actions, no presumption against preemption should be applied.

Principal Authorities: *Riegel* v. *Medtronic, Inc.*, 552 U.S. 312 (2008).

B.   CRARA Expressly Preempts Plaintiffs' Claims ............................................................ 16

Plaintiffs cannot escape the fact that this case, at its core, seeks to challenge and regulate the substance of Defendants' ratings and the methodologies underlying them.  CRARA prohibits precisely such efforts by delegating targeted regulatory powers exclusively to the SEC and by expressly providing that *no one* may regulate the substance of an NRSRO's credit ratings or analytical methodologies by imposing liability for arguably negligent mistakes or misjudgments.

Principal Authorities: 15 U.S.C. § 78o-7(c)(1)-(2).

C.   Plaintiffs' Claims Are Also Precluded By Conflict Preemption ..................................... 21

The establishment of an NRSRO registration scheme was not the only purpose of CRARA.  Congress also intended to protect the independence and substance of Rating Agency procedures and methodologies by prohibiting outside regulation.  Plaintiffs' claims here directly conflict with this clear Congressional intent.

Principal Authorities: H.R. Rep. No. 109-546 (2006).

D.   Plaintiffs Had No Vested Rights Before the Enactment of CRARA ............................. 22

Giving effect to the preemption provisions of CRARA would have no retroactive effect because Plaintiffs' claims did not vest prior to the effective date of CRARA.

Principal Authorities: *Fernandez-Vargas* v. *Gonzales*, 548 U.S. 30 (2006); *Arbour* v. *Jenkins*, 903 F.2d 416 (6th Cir. 1990).

III.  PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED UNDER BOTH NEW YORK OR OHIO LAW ............................................. 26

A.   New York Law Governs Plaintiffs' Negligent Misrepresentation Claim ....................... 26

Not only do Plaintiffs concede that the "most significant relationship" test set forth in Section 148 of the Restatement (Second) Conflict of Laws governs the choice of law analysis in this case, they also do not and cannot deny the litany of significant contacts establishing that New York law applies.  Plaintiffs should not be permitted to forestall application of New York law merely by engaging in selective, incomplete pleading.

Principal Authorities: Restatement (Second) of Conflict of Laws (1971).

B.   Martin Act Preemption ................................................................................................. 31

1.   Federalism Does Not Preclude Application of New York Law ............................31

The fact that Plaintiffs are represented by the Ohio Attorney General neither changes the substance of New York law, which Ohio and other federal courts routinely apply, nor leads to any federalism issues.

Principal Authorities: *KA Investments LDC* v. *Number Nine Visual Technology Corp.*, 2002 WL 31194865 (D. Mass. Aug. 26, 2002); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2003 WL 23305555 (S.D. Tex. Dec. 11, 2003).

2.   The Martin Act Applies to Plaintiffs' Claim Because the Securities Purchases
     Did Occur "Within or From" New York ................................................................33

The Martin Act applies to securities transactions "within or from" New York, which includes transactions where a party to the transaction was a New York entity, or where the alleged misconduct took place in New York. Contrary to Plaintiffs' unsupported assertions, there is no requirement that all relevant actions take place in New York for the Martin Act to apply.

Principal Authorities: *People* v. *Coventry First LLC*, 2007 WL 2905486 (N.Y. Sup. Ct. Sept. 25, 2007); *Ashland Inc.* v. *Morgan Stanley & Co.,* 2010 WL 1253932 (S.D.N.Y. Mar. 30, 2010).

3.   The Martin Act Preempts Plaintiffs' Negligent Misrepresentation Claim ...........35

Consistent with the myriad New York state and federal cases holding that the Martin Act preempts negligent misrepresentation claims for securities purchases "within or from" New York, Plaintiffs' negligent misrepresentation claim must be dismissed.

Principal Authorities: *Ambac Assurance UK Ltd.* v. *J.P. Morgan Investments*, No. 650259/2009 (N.Y. Sup. Ct. Mar. 24, 2010); *Assured Guaranty (UK) Ltd.* v. *J.P. Morgan Investment Management, Inc.*, No. 603755/2008 (N.Y. Sup. Ct. Jan. 29, 2010); *Ashland Inc.* v. *Morgan Stanley & Co., Inc.*, 2010 WL 1253932 (S.D.N.Y. Mar. 30, 2010).

C.   Plaintiffs Do Not Adequately Plead A Duty of Care As Required Under Both New
     York and Ohio Law ................................................................................................ 37

Plaintiffs do not adequately plead that they had a relationship with Defendants giving rise to a duty of care, as is required to plead a claim for negligent misrepresentation under both New York and Ohio law. Plaintiffs' conclusory and inaccurate assertion that they are members of a "limited class of institutional investors" is insufficient to support the finding of a duty because the "limited class" of which Plaintiffs are members includes *everyone who ever received a prospectus for any MBS rated by any Defendant*.

Principal Authorities: *Credit Alliance Corp.* v. *Arthur Andersen & Co.*, 483 N.E.2d 110 (N.Y. 1985); *In re National Century Financial Enterprises, Inc., Investment Litig.*, 580 F. Supp. 2d 630 (S.D. Ohio 2008); *LaSalle National Bank* v. *Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y. 1996).

D.   Plaintiffs Fail To Allege Any Actionable Misrepresentation ........................................... 41

Plaintiffs fail to allege any actionable misrepresentation of fact because they do not and cannot allege that Defendants did not believe their ratings at the time they were issued.

Principal Authorities: *New Jersey Carpenters Health Fund* v. *Residential Capital, LLC,* 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010); *New Jersey Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010); *New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*, 2010 WL 1172694

(S.D.N.Y. Mar. 26, 2010); *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010); *In re Lehman Bros. Sec. and ERISA Litig.*, 2010 WL 545992 (S.D.N.Y. Feb. 17, 2010); *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009).

E. Plaintiffs Do Not Plead Justifiable Reliance ................................................................... 44

As "sophisticated" investors, Plaintiffs' conclusory assertion that they would not have invested in the MBS at issue but for the Rating Agencies' ratings is simply not enough to allege justifiable reliance, and the Court may dismiss on that basis under Rule 12(b)(6).

Principal Authorities: *Doe* v. *SexSearch.com*, 551 F.3d 412 (6th Cir. 2008); *Quinn* v. *McGraw-Hill Cos.*, 168 F.3d 331 (7th Cir. 1999).

F. Plaintiffs Fail to Adequately Plead Causation ................................................................. 49

    1. Even If True, the Allegations in the Complaint Do Not Establish a Causal Connection Between Defendants' Alleged Misstatements and Plaintiffs' Purported Losses ........................................................................................................49

Plaintiffs do not come close to alleging that Defendants' alleged misrepresentations *directly caused* the loss about which Plaintiffs complain.  The allegations in the Complaint either are conclusory, actually concern transaction causation, or demonstrate that the collapse of the real estate market — and not Defendants' ratings — caused their losses.

Principal Authorities: *Laub* v. *Faessel*, 745 N.Y.S.2d 534 (1st Dep't 2002).

    2. Plaintiffs' Alleged Losses Were Caused by a Marketwide Collapse that the Court May Properly Consider on a Motion to Dismiss ........................................51

The authorities that Plaintiffs themselves cite make quite clear that the Court *should* consider undisputed marketwide phenomena, including the collapse of the housing market, on a Rule 12(b)(6) motion to dismiss.

Principal Authorities: *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009); *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

G. Plaintiffs' Claims Are Time-Barred in Whole or in Part ................................................... 53

    1. The Three-Year Statute of Limitations Applied Under New York Law Bars Plaintiffs' Claim for Negligent Misrepresentation .................................................54

Because Plaintiffs have deliberately avoided allegations sounding in fraud, there can be no dispute that their negligent misrepresentation claim is subject to the three-year statute of limitation of N.Y. CPLR 214.

Principal Authorities: N.Y. CPLR 214; *In re Argo Communications Corp.*, 134 B.R. 776 (Bankr. S.D.N.Y. 1991).

    2. Plaintiffs' Claims Are Untimely Under Ohio Law ................................................56

The two-year "discovery" statute of limitations provided under the Ohio Securities Laws is applicable to negligent misrepresentation claims.

Principal Authorities: Ohio Rev. Code § 1707.43(B).

(a) The *Nullum Tempus* Doctrine Does Not Apply to Plaintiffs' Claim .............. 56

Plaintiffs do not qualify for *nullus tempus* protection because they are not instrumentalities of the State of Ohio and their claims are not brought in a governmental capacity.

Principal Authorities: *Fair* v. *SERS*, 335 N.E.2d 868 (Ohio Ct. App. 1975); *Williams* v. *Infra Commerc Anstalt*, 131 F. Supp. 2d 451 (S.D.N.Y. 2001); *Hamilton County Commissioners* v. *Cincinnati H. & D. Ry.*, 23 Ohio Dec. 426 (Ohio Ct. Com. Pl. 1911).

(b) Plaintiffs' Were on Inquiry Notice of Their Claims More Than Two Years Before the Complaint Was Filed .......................................................................... 60

It is clear from the sources cited in Defendants' Opening Brief that Plaintiffs were on inquiry notice of their claims prior to November 20, 2007. Having effectively conceded that they made no investigation of Defendants' conduct prior to this date, Plaintiffs' claims are time-barred.

Principal Authorities: *Sims* v. *Ohio Casualty Insurance Co.*, 151 Fed. App'x 433 (6th Cir. 2007); *Lentell* v. *Merrill Lynch & Co.*, 340 F.3d 94 (2d Cir. 2003); *In re Lehman Bros. Sec. and ERISA Litig.*, 2010 WL 545992 (S.D.N.Y. Feb. 17, 2010).

IV.  PLAINTIFFS' BLUE SKY CLAIMS MUST BE DISMISSED .......................................... 65

A. Plaintiffs Fail to Identify Facts Sufficient for a Nexus with Ohio ................................... 66

The Complaint is devoid of allegations that demonstrate any relevant connection to Ohio, let alone any activities in Ohio that "directly concern" the sale of securities.

Principal Authorities: *In re Revco Sec. Litig.*, 1991 WL 353385 (N.D. Ohio 1991).

B. Plaintiffs Fail As A Matter of Law To Establish that the Rating Agencies Can Be Held Liable Under Section 1707.41 ..................................................................................... 67

Plaintiffs effectively concede, as they must, that Defendants do not qualify as "sellers" subject to liability under § 1707.41. The law and Plaintiffs' own allegations are also flatly inconsistent with Plaintiffs' tortured assertion that Defendants can be held liable under § 1707.41 as a receiver of profits.

Principal Authorities: Ohio Rev. Code § 1707.41; *Federated Management Co.* v. *Coopers & Lybrand*, 738 N.E.2d 842 (Ohio Ct. App. 2000).

C. Plaintiffs Fail to Allege an Improper Sale by a Seller or that the Rating Agencies Participated In or Aided Such Sale ............................................................................. 68

Plaintiffs fail to allege any substantive, primary violation of Ohio securities law by an actual seller that would permit the imposition of secondary liability under § 1707.43.

Principal Authorities: Ohio Rev. Code §§ 1707.41, 1707.43, 1707.44; *Hardin* v. *Reliance Trust Co.*, 2006 WL 2850455 (N.D. Ohio Sept. 29, 2006).

CONCLUSION ............................................................................................................... 71

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ABF Capital Management* v. *Askin Capital Management*, *L.P.*, 957 F. Supp.
1308 (S.D.N.Y. 1997) ............................................................... 23n

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d                 *passim*
155 (S.D.N.Y. 2009) ...............................................................

*Addeo* v. *Braver*, 956 F. Supp. 443 (S.D.N.Y. 1997) ..................................... 64

*Altria Group, Inc.* v. *Good*, 129 S. Ct. 538 (2008) ......................................... 20

*Ambac Assurance UK Ltd.* v. *J.P. Morgan Investments*, No. 650259/2009
(N.Y. Sup. Ct. Mar. 24, 2010) ...................................................... 37

*In re Ambac Financial Group, Inc. Securities Litigation*, 2010 WL 727227
(S.D.N.Y. Feb. 22, 2010) ........................................................... 51n

*American Motorist Insurance Co.* v. *Custom Rubber Extrusions, Inc.*, 2006
WL 2460861 (N.D. Ohio Aug. 23, 2006) ..................................... 52-53

*Arbour* v. *Jenkins*, 903 F.2d 416 (6th Cir. 1990) .............................................. 23-24, 24n

*Arctic Express, Inc.* v. *Del Monte Fresh Produce NA, Inc.*, 366 B.R. 786
(S.D. Ohio 2007) ...................................................................... 28

*In re Argo Communications Corp.*, 134 B.R. 776 (S.D.N.Y. 1991)................................ 54

*Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009) ........................................................ 13

*Ashland Inc.* v. *Morgan Stanley & Co.*, 2010 WL 1253932 (S.D.N.Y.
Mar. 30, 2010) ......................................................................... 33-34, 37

*Assured Guaranty (UK) Ltd.* v. *J.P. Morgan Investment Management, Inc.*,
No. 603755/2008 (N.Y. Sup. Ct. Jan. 29, 2010) ........................... 37

*Bankers Life Insurance Co.* v. *Credit Suisse First Boston Corp.*, 2008 WL
4372847 (M.D. Fla. Sept 24, 2008) ............................................ 34n

*Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007).................................... 13

3736226v1

**Page**

*Bernie* v. *Waterfront Ltd. Dividend Housing Ass'n*, 614 F. Supp. 651 (S.D. Ohio 1985) ........................................................................................................ 66

*Berry* v. *Indianapolis Life Insurance Co.*, 608 F. Supp. 2d 785 (N.D. Tex. 2009) ........................................................................................................ 29n

*Boomershine* v. *Lifetime Capital, Inc.*, 2008 WL 54803 (Ohio Ct. App. Jan. 4, 2008) ........................................................................................................ 70

*Caboara* v. *Babylon Cove Development, LLC*, 862 N.Y.S.2d 535 (2d Dep't 2008) ........................................................................................................ 36

*Chrysler Corp.* v. *Commissioner of Internal Revenue*, 436 F.3d 644 (6th Cir. 2006) ........................................................................................................ 18

*City of Painesville* v. *First Montauk Financial Corp.*, 178 F.R.D. 180 (N.D. Ohio 1998) ........................................................................................................ 61n

*In re Columbus Skyline Securities, Inc.*, 660 N.E.2d 427 (Ohio 1996) ........................... 70n

*Commercial Financial Services, Inc.* v. *Arthur Andersen LLP*, 94 P.3d 106 (Okla. Civ. App. 2004) ........................................................................................ 12n

*Compuware* v. *Moody's Investors Services, Inc.*, 499 F.3d 520 (6th Cir. 2007) ........................................................................................................ 9-12

*Connell Construction Co.* v. *Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616 (1975) ........................................................................................ 21

*Corley* v. *United States*, 129 S. Ct. 1558 (2009) ........................................................... 18

*In re County of Orange*, 245 B.R. 138 (C.D. Cal. 1997) .................................................. 12n, 15

*County of Orange* v. *McGraw-Hill Cos.*, 245 B.R. 151 (C.D. Cal. 1999) ..................... 9n-10n

*Credit Alliance Corp.* v. *Arthur Andersen & Co.*, 483 N.E.2d 110 (1985) ..................... 38-39

*CSX Transportation* v. *Globe Metallurgical, Inc.*, 2007 WL 1567690 (S.D. Ohio May 25, 2007) ........................................................................................ 28

*Dawson* v. *Bumble & Bumble*, 246 F. Supp. 2d 301 (S.D.N.Y. 2003) ............................ 53

*DDJ Management, LLC* v. *Rhone Group, LLC*, 875 N.Y.S.2d 17 (1st Dep't 2009) ........................................................................................................ 46-47

-vii-

**Page**

*DeFazio* v. *Washington Public Power Supply System*, 679 P.2d 1316 (Or. 1984) .................................................................................................... 59

*Diario El Pais, S.L.* v. *Nielsen Co., (US)*, 2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) ....................................................................................... 13

*Dodds* v. *Cigna Securities, Inc.*, 12 F.3d 346 (2d Cir. 1993) ......................... 60n

*Doe* v. *SexSearch.com*, 551 F.3d 412 (6th Cir. 2008) ..................................... 45

*Domenikos* v. *Roth*, 288 Fed. App'x 718 (2d Cir. 2008) ................................ 62

*Doss, Inc.* v. *Christie's Inc.*, 2009 WL 3053713 (S.D.N.Y. Sept. 23, 2009).................. 55n

*Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ................ 6n

*Enigma Holdings, Inc.* v. *Gemplus International S.A.*, 2006 WL 2859369 (N.D. Tex. Oct. 6, 2006) ............................................................... 29n

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 2003 WL 23305555 (S.D. Tex. Dec. 11, 2003) .................................. 32-33

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 511 F. Supp. 2d 742 (S.D. Texas 2005) .................................................. 5, 15, 10n, 12n

*In re Enron Corp. Securities Derivative & "ERISA" Litigation*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) ................................................... 7

*In re Enron Corp. Securities Derivative & "ERISA" Litigation*, 540 F. Supp. 2d 800 (S.D. Tex. 2007) ................................................... 45

*Fair* v. *SERS*, 335 N.E.2d 868 (Ohio Ct. App. 1975) .................................. 56-57

*Faulkner* v. *Beer*, 2007 WL 4639458 (N.Y. Sup. Ct. Dec. 21, 2007) ............ 36n

*Federated Management Co.* v. *Coopers & Lybrand*, 738 N.E.2d 842 (Ohio Ct. App. 2000) ............................................................................. 66-68

*Fernandez-Vargas* v. *Gonzales*, 548 U.S. 30 (2006) ..................................... 23-25

*Fidelity Federal Savings and Loan Ass'n* v. *De la Cuesta*, 458 U.S. 141 (1982) ................................................................................................. 21

**Page**

*First Equity Corp.* v. *Standard & Poor's Corp.*, 690 F. Supp. 256 (S.D.N.Y. 1988), *aff'd on other grounds*, 869 F.2d 175 (2d Cir. 1989) ..................................... 10n

*First Financial Savings Bank, Inc.* v. *American Bankers Insurance Co.*, 1989 WL 168015 (E.D.N.C. Aug. 4, 1989) ...................................................... 12n

*First National Bank* v. *Heuer*, 702 F. Supp. 173 (N.D. Ill. 1988) ................................... 30

*In re Fitch, Inc.*, 330 F.3d 104 (2d Cir. 2003) ................................................................. 11n

*In re Ford*, 446 N.E.2d 214 (Ohio Ct. App. 1982) ........................................................... 57

*Fraternity Fund Ltd.* v. *Beacon Hill Asset Management LLC*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005) ...................................................................................... 34n

*Fromer* v. *Yogel*, 50 F. Supp. 2d 227 (S.D.N.Y. 1999) .................................................... 55

*Garcia* v. *Wyeth-Ayerst Laboratories*, 385 F.3d 961 (6th Cir. 2004) ............................... 24n

*Gavin* v. *AT&T Corp.*, 2005 WL 1563122 (N.D. Ill. June 7, 2005), *rev'd on other grounds*, 464 F.3d 634 (7th Cir. 2006) ................................................... 33

*Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974) ............................................................. 10

*In re Ghali*, 615 N.E.2d 268 (Ohio Ct. App. 1992) ..................................................... 57, 59n

*Gianakakos* v. *Commodore Home Systems, Inc.*, 727 N.Y.S.2d 806 (3d Dep't 2001) ........................................................................................................ 55

*Goodman Manufacturing Co.* v. *Raytheon Co.*, 1999 WL 681382 (S.D.N.Y. Aug. 31, 1999) ................................................................................................... 45

*Goshen* v. *Mutual Life Insurance Co.*, 98 N.Y.2d 314 (2002) ........................................ 34n

*In re Grand Theft Auto Video Game Consumer Litigation (No. II)*, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) ..................................................... 26-27, 27n

*Greenburg* v. *Hiner*, 359 F. Supp. 2d 675 (N.D. Ohio 2005), *aff'd*, 173 Fed. App'x 367 (6th Cir. 2006).................................................................... 61-62, 64

*Grimesy* v. *Huff*, 876 F.2d 738 (9th Cir. 1989).............................................................. 24n

3736226v1

**Page**

*Hainbuchner* v. *Miner*, 1986 WL 3205 (Ohio Ct. App. Mar. 14, 1986), *aff'd*, 31 Ohio St. 3d 133 (1987) .................................................................. 70

*Hamilton County Commissioners* v. *Cincinnati H. & D. Ry.*, 23 Ohio Dec. 426 (Ct. Com. Pl. 1911), *rev'd on other grounds*, 92 Ohio St. 513 (1915) ...................................................................................................... 58

*Hammond* v. *United States*, 786 F.2d 8 (1st Cir. 1986)................................... 24n

*Hardin* v. *Reliance Trust Co.*, 2006 WL 2850455 (N.D. Ohio Sept. 29, 2006) ...................................................................................................... 69-70

*Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657 (1989).................. 15

*Havenick* v. *Network Express, Inc.*, 981 F. Supp. 480 (E.D. Mich. 1997) ...................... 64-65

*Hayes* v. *Mid-Ohio Securities, Corp.*, 2006 WL 2233234 (N.D. Ohio Aug. 3, 2006) ...................................................................................... 62-63

*In re Hayes Lemmerz International, Inc. Equity Securities Litigation*, 271 F. Supp. 2d 1007 (E.D. Mich. 2003) .............................................. 69n

*Healthcare Finance Group, Inc.* v. *Bank Leumi USA*, 669 F. Supp. 2d 344 (S.D.N.Y. 2009) ................................................................................ 53

*Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603 (S.D.N.Y. 2008) ...................................................................................................... 34

*Holbrook* v. *Brandenburg*, 2009 WL 1387192 (Ohio Ct. App. May 15, 2009) ...................................................................................................... 58

*Hoover* v. *Langston Equipment Assoc.*, 958 F.2d 742 (6th Cir. 1992)........................... 60n

*Hughes Aircraft Co.* v. *United States*, 520 U.S. 939 (1997)............................................ 23n, 25

*Indiana State District Council of Laborers and HOD Carriers Pension and Welfare Fund* v. *Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009) ................................ 50

*INS* v. *St. Cyr*, 533 U.S. 289 (2001)................................................................................ 23n

*Insurance Distribution Network, Inc.* v. *Mariano*, 2008 WL 520915 (S.D. Ohio Feb. 26, 2008) ........................................................................ 29, 30n

*International Paper Co.* v. *Ouellette*, 479 U.S. 481 (1987)............................................ 21

-x-

**Page**

*Jackson A&E Assocs.* v. *OPERS*, 2003 WL 22999448 (Ohio Ct. App.
Dec. 23, 2003) ................................................................................... 57

*Jamhour* v. *Scottsdale Insurance Co.*, 211 F. Supp. 2d 941 (S.D. Ohio
2002) ................................................................................................ 30

*Jefferson County School District No. R-1* v. *Moody's Investors Services,
Inc.*, 175 F.3d 848 (10th Cir. 1999)................................................... 4-5, 9-11

*Joffee* v. *Lehman Bros., Inc.*, 2005 WL 1492101 (S.D.N.Y. June 23, 2005) ................. 35

*KA Investments LDC* v. *Number Nine Visual Technology Corp.*, 2002 WL
31194865 (D. Mass. Aug. 26, 2002)................................................. 32

*Kassover* v. *UBS AG*, 619 F. Supp. 2d 28 (S.D.N.Y. 2008)............................ 36

*Kerusa Co.* v. *W10Z/515 Real Estate L.P.*, 12 N.Y.3d 236 (2009) ................ 36n

*Kimmel* v. *Schaefer*, 89 N.Y.2d 257 (1996)................................................ 49

*Kolfenbach* v. *Mansour*, 36 F. Supp. 2d 1351 (S.D. Fla. 1999) ................ 25

*KPERS* v. *Reimer & Koger Assocs.*, 941 P.2d 1321 (Kan. 1997) ................ 57

*Landgraf* v. *USI Film Products*, 511 U.S. 244 (1994)....................... 23, 23n

*LaSalle National Bank* v. *Duff & Phelps Credit Rating Co.*, 951 F. Supp.
1071 (S.D.N.Y. 1996) ...................................................................... 12n, 40

*Laub v. Faessel*, 745 N.Y.S.2d 534 (1st Dep't 2002)....................... 49

*Law* v. *Lake Metroparks*, 2006 WL 3833863 (Ohio Ct. App. Dec. 29, 2006) ............... 57, 58n

*LC Capital Partners, LP* v. *Frontier Insurance Group, Inc.*, 318 F.3d 148
(2d Cir. 2003) ................................................................................. 60n, 62

*Lehman Bros. Commercial Corp.* v. *Minmetals International Non-Ferrous
Metals Trading Co.*, 179 F. Supp. 2d 159 (S.D.N.Y. 2001) ............ 34n

*In re Lehman Bros. Securities and ERISA Litigation*, 2010 WL 337997
(S.D.N.Y. Feb. 1, 2010) .................................................................. 68

*In re Lehman Bros. Securities and ERISA Litigation*, 2010 WL 545992
(S.D.N.Y. Feb. 17, 2010) ................................................................ *passim*

**Page**

*Leider* v. *Ralfe*, 387 F. Supp. 2d 283 (S.D.N.Y. 2005)...................................... 34n-35n

*Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) .......................... *passim*

*Levitt* v. *Bear Stearns & Co.*, 340 F.3d 94 (2d Cir. 2003).................................. 60, 62, 63n

*Lewis* v. *Horace Mann Insurance Co.*, 410 F. Supp. 2d 640 (N.D. Ohio 2005) ............................................................................................................ 29-30, 30n

*Lippe* v. *Bairnco Corp.*, 225 B.R. 846 (S.D.N.Y. 1998) ................................ 54n

*Lunsford* v. *Price*, 885 F.2d 236 (5th Cir. 1989) ......................................... 24n

*Marcus* v. *Frome*, 329 F. Supp. 2d 464 (S.D.N.Y. 2004)................................ 35-36

*Martin* v. *Steubner*, 485 F. Supp. 88 (S.D. Ohio 1979)................................. 66, 69-70

*Mathews* v. *Kidder, Peabody & Co.*, 161 F.3d 156 (3d Cir. 1998) ................... 25

*Mecklenburg County* v. *Time Warner Entertainment-Advance/Newhouse Partnership*, 2010 WL 391279 (W.D.N.C. Jan. 26, 2010) ......................... 59

*Medtronic, Inc.* v. *Lohr*, 518 U.S. 470 (1996) ................................................ 20

*Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 382 F. Supp. 2d 411 (S.D.N.Y. 2003) ..................................................................................... 48-49

*Milin Pharmacy, Inc.* v. *Cash Register Systems, Inc.*, 570 N.Y.S.2d 341 (2d Dep't 1991) ................................................................................................ 55n

*In re Moody's Corp. Securities Litigation*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009) .................................................................................................. 51n, 51-52, 63n

*Nanopierce Technologies Inc.* v. *Southridge Capital Management LLC*, 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003)............................................. 35

*In re National Century Financial Enterprises, Inc.*, 504 F. Supp. 2d 287 (S.D. Ohio 2007)........................................................................................ 55n

*In re National Century Financial Enterprises, Inc., Investment Litigation*, 604 F. Supp. 2d 1128 (S.D. Ohio 2009) ..................................................... 52n

**Page**

*In re National Century Financial Enterprises, Inc., Investment Litigation,*
  541 F. Supp. 2d 986 (S.D. Ohio 2007)......................................................... 8n

*In re National Century Financial Enterprises, Inc., Investment Litigation,*
  2006 WL 469468 (S.D. Ohio Feb. 27, 2006)............................................... 26-27, 27n

*In re National Century Financial Enterprises, Inc., Investment Litigation,*
  580 F. Supp. 2d 630 (S.D. Ohio 2008)....................................................... *passim*

*Nelson* v. *DeVry, Inc.*, 2008 WL 2845300 (E.D. Pa. July 22, 2008) ............................... 13

*New Jersey Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*, 2010
  WL 1473288 (S.D.N.Y. Mar. 29, 2010) ................................................... 2, 10-11, 41-42

*New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL
  1257528 (S.D.N.Y. Mar. 31, 2010)............................................................ 2, 10, 41-42

*New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group,*
  *PLC*, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)....................................... 2, 10, 41-43

*New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964).................................................. 14

*Nicosia* v. *DeRooy*, 72 F. Supp. 2d 1093 (N.D. Cal. 1999)............................................ 15

*NM Homes, Inc.* v. *JP Morgan Chase Bank, N.A.*, No. 1:08-cv-07679-PAC
  (S.D.N.Y. Mar. 30, 2010)......................................................................... 37

*In re NovaGold Resources Securities Litigation*, 629 F. Supp. 2d 272
  (S.D.N.Y. 2009) ....................................................................................... 63n

*Ong ex rel. Ong* v. *Sears, Roebuck & Co.*, 2005 WL 2284285 (N.D. Ill.
  2005) ...................................................................................................... 69n

*Pacific Employers Insurance Co.* v. *Industrial Accident Commission*, 306
  U.S. 493 (1939)........................................................................................ 32

*In re Parmalat Securities Litigation*, 479 F. Supp. 2d 332 (S.D.N.Y. 2007) .................. 55n

*Parrott* v. *Coopers & Lybrand*, 95 N.Y.2d 479 (2000) ................................................. 41

3736226v1

| | **Page** |
|---|---|
| *Pension Committee of the University of Montreal Pension Plan* v. *Banc of America Securities, LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009) ............................. | 34n |
| *People* v. *Coventry First LLC*, 2007 WL 2905486 (N.Y. Sup. Ct. Sept. 25, 2007) ................................................................................................ | 33 |
| *Picard Chemical Inc. Profit Sharing Plan* v. *Perrigo Co.*, 940 F. Supp. 1101 (W.D. Mich. 1996) ................................................................ | 69n |
| *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009) ............................... | 14, 43 |
| *Popp Telecom, Inc.* v. *American Sharecom, Inc.*, 361 F.3d 482 (8th Cir. 2004) ................................................................................................ | 25 |
| *Premier Business Group* v. *Red Bull of North America, Inc.*, 2009 WL 3242050 (N.D. Ohio Sept. 30, 2009) ........................................ | 41 |
| *Pro Bono Investments, Inc.* v. *Gerry*, 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005) ........................................................................... | 35 |
| *Quinn* v. *McGraw-Hill Cos.*, 168 F.3d 331 (7th Cir. 1999) ............................ | 47-48 |
| *R.A. Civitello Co.* v. *City of New Haven*, 504 A.2d 542, 546 (Conn. Ct. App. 1986) ................................................................................... | 58 |
| *In re Revco Securities Litigation*, 1991 WL 353385 (N.D. Ohio Dec. 12, 1991) ................................................................................................ | 66 |
| *Riegel* v. *Medtronic, Inc.*, 552 U.S. 312 (2008) ............................................ | 16 |
| *Rowan County Board of Education* v. *United States Gypsum Co.*, 418 S.E.2d 648 (N.C. 1992) .......................................................... | 58-59 |
| *Salmon* v. *Schwarz*, 948 F.2d 1131 (10th Cir. 1991) ..................................... | 24n |
| *Scalp & Blade, Inc.* v. *Advest, Inc.*, 722 N.Y.S.2d 639 (4th Dep't 2001) ....... | 35-36 |
| *Scott* v. *Boos*, 215 F.3d 940 (9th Cir. 2000) ................................................ | 24-25 |
| *Sedona Corp* v. *Ladenburg Thalmann & Co.*, 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) .......................................................................... | 34 |

3736226v1

**Page**

*Seneca Insurance Co.* v. *Wilcock*, 2002 WL 1067828 (S.D.N.Y. May 24, 2002) ................................................................................................................ 55

*Sims* v. *Ohio Casualty Insurance Co.*, 151 Fed. App'x 433 (6th Cir. 2005) ................... 60

*Silkwood* v. *Kerr McGee Corp.*, 464 U.S. 238 (1984) ...................................................... 19-20

*Sky Technology Partners, LLC* v. *Midwest Research Institute*, 125 F. Supp. 2d 286 (S.D. Ohio 2000) ........................................................................................ 29

*Smith* v. *Asbell*, 2005 WL 1111630 (Ohio Ct. App. May 6, 2005) ................................ 60n

*Sowell* v. *American Cyanamid Co.*, 888 F.2d 802 (11th Cir. 1989) ............................... 24n

*St. Amant* v. *Thompson*, 390 U.S. 727 (1968) .................................................................. 12-13

*Staehr* v. *Hartford Financial Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) ........................................................................................................... 62-63, 63n

*State* v. *Sullivan*, 527 N.E.2d 798 (Ohio 1988) ............................................................... 56

*State* v. *Taubman, State* v. *Taubman,* 606 N.E.2d 962 (Ohio Ct. App. 1992) ................ 70n

*Sykes* v. *RFD Third Avenue 1 Assocs., LLC*, 884 N.Y.S.2d 745 (1st Dep't 2009) ........................................................................................................... 26n, 41

*Symens* v. *SmithKline Beecham Corp.*, 152 F.3d 1050 (8th Cir. 1998) ........................ 24n

*In re Taxable Municipal Bond Securities Litigation*, 1993 WL 591418 (E.D. La. Dec. 29, 1993) .................................................................................... 11n-12n

*Thompson* v. *TransAm Trucking, Inc.*, 2009 WL 1542738 (S.D. Ohio June 1, 2009) ........................................................................................... 45n

*Time, Inc.* v. *Hill*, 385 U.S. 374 (1967) ........................................................................... 13

*In re TMI*, 89 F.3d 1106 (3d Cir. 1996) ........................................................................... 24n

*Trierweiler* v. *Croxton & Trench Holding Corp.*, 90 F.3d 1523 (10th Cir. 1996) ...................................................................................................... 28n

**Page**

*Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 2010 WL
    816623 (S.D.N.Y. Mar. 11, 2010) .................................................................... 2-3, 11,
14-15, 42-
43

*United States* v. *Mandycz*, 447 F.3d 951 (6th Cir. 2006) ................................ 58

*Von Hoffmann* v. *Prudential Insurance Co. of America*, 202 F. Supp. 2d 252
    (S.D.N.Y. 2002) .................................................................................................. 55

*Wampler* v. *Higgins*, 752 N.E. 2d 962 (Ohio 2001) ........................................ 11

*Williams* v. *Infra Commerc Anstalt*, 131 F. Supp. 2d 451 (S.D.N.Y. 2001) .................. 58

*In re WRT Energy Securities Litigation*, 2005 WL 323729 (S.D.N.Y. Feb. 9,
    2005) .................................................................................................................. 69n

*Wyser-Pratte Management Co.* v. *Telxon Corp.*, 413 F. 3d 553 (6th Cir.
    2005) .................................................................................................................. 63

*Zanett Lombardier, Ltd.* v. *Maslow*, 815 N.Y.S.2d 547 (1st Dep't 2006) ...................... 47

*Zeran* v. *America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ........................................ 24n

Congressional Reports

    H.R. Rep. No. 109-546 (2006) .................................................................... 22

Constitutional Provisions

    U.S. Const. amend. I ...................................................................................... 4-15

Law Reviews

    Richard Baumann, *A Big Surprise*, 26 Int'l Fin. L. Rev. 30 (Nov. 2007) .................. 39n

    Sara Hanks, *Rule 144A: Another Cabbage in the Chop Suey*, 24 Geo.
    Wash. J. Int'l L. & Econ. 305 (1990) ........................................................ 39n

Regulations

    SEC Regulations

        17 C.F.R. § 230.144A (2010) ........................................................ 46n
        17 C.F.R. § 230.144A(7)(a) (2010) ............................................. 7
        17 C.F.R. § 240.17g-(1)-6) (2010) .............................................. 20

3736226v1

**Page**

17 C.F.R. § 249b.300 (2010) ........................................................................ 20

Rules

Fed. R. Civ. P.

8........................................................................................................ 1, 55n
9(b)................................................................................................... 55n, 63n
12...................................................................................................... 53
12(b)(6) ............................................................................................ 1, 13, 51-
                                                                                          52, 60n

Statutes

Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120
Stat. 1327 (2006)......................................................................................... 15-26, 65

15 U.S.C. § 78o-7 ............................................................................... 20
15 U.S.C. § 78o-7(c)(1) ..................................................................... 17
15 U.S.C. § 78o-7(c)(2) ..................................................................... 17
15 U.S.C. § 78o-7(o)(1) ..................................................................... 17, 17n

N.Y. CPLR

213(1) (McKinney 2003) ................................................................... 54
214 (McKinney 2003)........................................................................ 54-55
214(4) (McKinney 2003) ................................................................... 54

N.Y. Gen. Bus. Law

§ 352 *et seq*. (McKinney 1996)......................................................... 31-37

Ohio Rev. Code

§ 145.04(E) (Thomson Reuters 2010) ................................................ 46
§ 145.11 (Thomson Reuters 2010)..................................................... 59
§ 145.80 (Thomson Reuters 2010)..................................................... 58
§ 145.116(A) (Thomson Reuters 2010) .............................................. 46
§ 148.02 (Thomson Reuters 2010)..................................................... 46
§ 742.03(B)(2) (Thomson Reuters 2010)........................................... 46
§ 742.11 (Thomson Reuters 2010)..................................................... 59
§ 742.116(A) (Thomson Reuters 2010) .............................................. 46
§ 1707.41 (Thomson Reuters 2010)................................................... 65, 67-70
§ 1707.41(A) (Thomson Reuters 2010) .............................................. 67

-xvii-

**Page**

§1707.43 (Thomson Reuters 2010)........................................................... 65, 67-60

§ 1707.43(B) (Thomson Reuters 2010) ................................................... 56-65

§ 1707.44(B)(4) (Thomson Reuters 2010)............................................... 69

§ 3307.05(C) (Thomson Reuters 2010) ................................................... 46

§ 3307.15 (Thomson Reuters 2010)......................................................... 59

§ 3307.80 (Thomson Reuters 2010)......................................................... 58

§ 3307.154(A) (Thomson Reuters 2010) ................................................. 46

§ 3309.05(D) (Thomson Reuters 2010) ................................................... 46

§ 3309.15 (Thomson Reuters 2010)......................................................... 59

§ 3309.80 (Thomson Reuters 2010)......................................................... 58

§ 3309.159(A) (Thomson Reuters 2010) ................................................. 46

Securities Exchange Act of 1934

§ 20, 15 U.S.C. § 78t (2006) ................................................................... 69n


**Other Authorities**

Bradley J. Gans, *The Mechanics of Rule 144A/Regulation S Underwritings*,
751 PLI/Comm 457 (1997)..................................................................... 39n

Ohio Op. Atty. Gen. No. 2004-014 (2004) .............................................. 57

Restatement (Second) of Conflict of Laws (1971) ................................... 26-31

Restatement (Second) of Torts (1977).................................................... 41

Defendants Standard & Poor's Financial Services LLC, The McGraw-Hill Companies, Inc., Moody's Corp., Moody's Investors Service, Inc., and Fitch, Inc. ("Fitch," and collectively, the "Rating Agencies" or "Defendants") respectfully submit this reply memorandum in further support of their Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 8 and 12(b)(6).[1]

## PRELIMINARY STATEMENT

In this action, Plaintiffs seek recovery of hundreds of millions of dollars in purported securities "losses" arising from over 300 separate purchases they made of securities backed by residential and commercial mortgages beginning in 2005, just prior to the precipitous collapse of the U.S. housing market and the ensuing global financial crisis. Now, in the aftermath of that market collapse, Plaintiffs pursue claims against the Rating Agencies that published opinions to the market on the creditworthiness of the securities Plaintiffs purchased. (Compl. ¶ 1). As demonstrated in Defendants' Opening Brief ("Defs. Op. Br."), Plaintiffs' claims fail as a matter of law. Notwithstanding its heft, Plaintiffs' Opposition Brief ("Opp.") cannot begin to cure the facial defects of the Complaint.

Most fundamentally, Plaintiffs' claims must fail because they have not pled an actionable misstatement of fact by the Rating Agencies. In their Opposition Brief, Plaintiffs simply ignore both Sixth Circuit precedent, and the wealth of recent cases, that have held that credit ratings, like those at issue here, are opinions — not statements of fact. The opinion nature of ratings precludes Plaintiffs' claims both under constitutional principles (Section I, *infra*) *and* because, as forward-looking, predictive statements of opinion, the Rating Agencies' ratings simply cannot be actionable unless Plaintiffs provide a plausible factual basis to assert that these opinions were not truly held by the Rating Agencies when issued (Section III.D, *infra*). This latter principle has

---

[1] As previously noted, because the allegations in the Complaint regarding The McGraw-Hill Companies, Inc. concern its wholly-owned subsidiary, Standard & Poor's Financial Services LLC, we refer to these two Defendants collectively as "S&P." As also previously noted, Moody's Investors Service, Inc. is the only Moody's entity engaged in the business of developing and publishing rating opinions, and Moody's Corp., its parent corporation, is incorrectly named as a defendant herein. For the purposes of the present motion only, however, the two Moody's entities are referred to collectively as "Moody's."

been the basis for the dismissal of misstatement claims based on credit ratings in at least *six cases* in the past two months:

- Most recently, on March 31, 2010, in *New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010), a federal district court dismissed misstatement claims based on credit ratings and other statements about the adequacy of the credit enhancement or "cushion" built into certain structured finance transactions.  The court held:

  > [C]redit ratings and the adequacy of credit enhancements are clearly opinion statements because they predict future value and reliability, and are not actionable unless it is alleged that the opinions were not truly held.  Plaintiffs' allegations that the ratings were outdated and the credit enhancements inadequate are not actionable.  (internal citations omitted).

- In *New Jersey Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *8 (S.D.N.Y. Mar. 29, 2010), a federal district court dismissed misstatement claims based on allegedly "false" ratings, appraisals and other similar statements.  The court explained:

  > Plaintiff fails to allege that the Originators, the Rating Agencies, or the Defendants made knowingly false statements at the time they published their appraisals, loan-to-value ratios, and ratings.  Consequently, the Court dismisses Plaintiff's allegations regarding the appraisals, credit enhancements, credit rating, rating agencies, and loan-to-value ratios. . . .  [T]hese are statements of opinion, not facts.  They are not actionable where, as here, the Complaint fails to allege that the speaker did not truly believe the statements at the time it was made public.

- In *New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*, 2010 WL 1172694, at *14 (S.D.N.Y. Mar. 26, 2010), a federal district court dismissed misstatement claims based on credit ratings, holding:

  > [C]redit ratings and the relative adequacy of protective credit enhancements are statements of opinion, as they are predictions of future value and future protection of that value. . . .  Plaintiffs can only demonstrate an actionable misstatement if 'the opinion is both (1) not believed by the speaker and (2) objectively untrue.'  Plaintiffs have failed in this regard. (internal citations omitted).

- In *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 2010 WL 816623, at *5 (S.D.N.Y. Mar. 11, 2010), a federal district court dismissed misstatement claims based on credit ratings and statements that the rating agencies had considered the credit quality of the underlying mortgage pool in issuing their ratings.  The court held:

3736226v1

> [W]hether the 'credit quality of the mortgage pool' was 'properly considered' or 'adequate' to support a particular rating was not a matter of objective fact. It was instead a statement of opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating. For the statements to be actionable, therefore, the amended complaint must allege that the rating agencies did not truly hold those opinions at the time they were made public. There are no such allegations in the amended complaint.

- In *In re Lehman Bros. Securities and ERISA Litigation*, 2010 WL 545992, at *6 (S.D.N.Y. Feb. 17, 2010), a federal district court dismissed misstatement claims based on credit ratings, holding:

    > Whether the credit enhancements were adequate to support the Certificates' ratings . . . was not a statement of fact. It was instead a statement of opinion by each ratings agency that it believed, based on the methods and models it used, that the amount and form of credit enhancement built into each Certificate, along with the Certificate's other characteristics, was sufficient to support the rating assigned to it. For the statements to be actionable, therefore, the complaint must allege that the ratings agencies did not truly hold those opinions at the time they were made public. To this end, the complaint alleges that Moody's and S & P used out-of-date models based on assumptions that did not reflect the realities of the mortgage market. . . . These allegations are insufficient to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued. At best, they support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions. Consequently, the claims based on these statements fail.

Plaintiffs have offered nothing more than the same conclusory allegations — largely based on *post hoc* criticisms of the Rating Agencies — that were found to be insufficient in each of these cases. Plaintiffs' allegations, even assuming them to be true, simply do not, as they must, give rise to an inference that the Rating Agencies did not genuinely believe the rating opinions at issue in this action at the time they were published. This failing warrants dismissal of each of the claims asserted in the Complaint. *See* Sections I, III.D; Defs. Op. Br., Sections I, III.C.2, IV.A.

Plaintiffs also attempt to avoid the clear preemption provisions of the Credit Rating Agency Reform Act of 2006 ("CRARA") by simply recharacterizing the allegations of the Complaint. But a review of the Complaint can lead to no other conclusion than that Plaintiffs' claims fall directly within the preemptive scope of CRARA. *See* Section II. Moreover, even if federal

law did not preempt their claims, Plaintiffs fail to distinguish the weight of authority that has found securities-based claims such as those asserted in this case to be preempted under controlling New York law. *See* Sections III.A and III.B. Finally, beyond these clear bars to their claims, Plaintiffs simply have not met their burden to plead a plausible factual basis for the other required elements of their claims. *See* Sections III.C-G & IV.

For the reasons set forth below and in the Rating Agencies' Opening Brief, Plaintiffs' claims must therefore be dismissed.

## ARGUMENT

### I.
### THE FIRST AMENDMENT BARS PLAINTIFFS' CLAIMS

As established in the Rating Agencies' Opening Brief ("Defs. Op. Br."), Plaintiffs' purported claims are barred by fundamental principles of constitutional law, both because the Rating Agencies' publicly-disseminated credit ratings are non-actionable expressions of opinion, and because Plaintiffs fail to allege that the Rating Agencies acted with actual malice. Plaintiffs' protracted arguments to the contrary do not alter this conclusion.

**A.     The Rating Agencies' Rating Opinions Are Matters of Public Concern**

Plaintiffs first seek to overcome the protections afforded to the Rating Agencies' rating opinions with their conclusory and demonstrably false contention that the ratings on the securities at issue here are not "matters of 'public concern'" because Plaintiffs allegedly "were 'part of a limited class of qualified investors to whom Defendants intended their ratings to be supplied as part of the issuance' of the ABS at issue in this case." (Opp. at 30).   But, as demonstrated further below, there can be no reasonable dispute that the Rating Agencies' credit ratings on the securities at issue are indeed matters of public concern and the wide dissemination of those ratings to the market confirms this point.

***First***, credit ratings, by their very nature, are "matters of public concern." As one court has explained, "'[g]iven the importance of financial information to investors and the economy as a whole, a bond rating constitutes a matter of "public concern."'" *Jefferson County School*

*District No. R-1* v. *Moody's Investor's Services, Inc.*, 175 F.3d 848, 856 n.3 (10th Cir. 1999) (citation omitted).  *See also In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 511 F. Supp. 2d 742, 825 (S.D. Tex. 2005) ("[N]ationally published credit ratings focus upon matters of public concern" and constitute "matters of public concern and opinion even if negligently prepared . . .").

      *Second*, Plaintiffs themselves repeatedly confirm in the Complaint and their Opposition Brief that the securities at issue here, and thus the ratings on those securities, are in fact matters of public concern.  Specifically, Plaintiffs assert that they are "Ohio state instrumentalities that are entrusted with managing the retirement funds of Ohio state employees" (Opp. at 61-62) and that their investments, and allegedly the Defendants' ratings, impact "*nearly two million Ohio residents* who are participants in the retirement plans."  (*Id*. at 107) (emphasis added).[2]  The large number of Ohio residents on behalf of whom Plaintiffs purport to have purchased the securities and the alleged impact of Plaintiffs' purchases on both the State of Ohio and its residents belie Plaintiffs' conclusory claim that the ratings at issue here did not involve "matters of public concern."  Plaintiffs' claim is also contradicted by the allegations of the Complaint that the Rating Agencies' ratings are "used for a variety of purposes *vital to the financial markets*" and are of such public importance that "'[m]ost financial institutions in the United States (banks, insur-

---

[2]  *See also* Compl. ¶¶ 16-17 (alleging that Ohio Police and Fire Pension Fund provides "retirement, disability and other benefits to active police officers and firefighters, retirees, and beneficiaries and survivors"; "serves more than 56,210 public employees across the State of Ohio"; and "manages approximately $10.2 billion in asserts"); ¶¶ 18-19 (alleging that Ohio Public Employees Retirement System provides "retirement, disability and survivor benefit programs to public employees in the State of Ohio"; "serves more than 3,700 public employers, over 936,000 members, and 166,500 retirees and surviving beneficiaries"; "manages approximately $66 billion in assets . . . .making it the largest public pension fund in Ohio"); ¶¶ 20-21 (alleging that State Teachers Retirement System of Ohio provides "retirement, disability, and other benefits to active, inactive, and retired Ohio public educators"; "serves more than 455,000 public employees across the State of Ohio"; and "manages approximately $56.8 billion in assets"); ¶¶ 22-23 (alleging that School Employees Retirement System of Ohio provides "pension benefits and access to post-retirement health care coverage to active and retired non-teaching public school employees"; "serves more than 189,000 public employees across the State of Ohio"; and "manages approximately $8.8 billion in assets"); ¶¶ 24-25 (Ohio Public Employees Deferred Compensation Program provides "supplement[al] retirement benefits" for "other Ohio retirement systems"; serves "over 193,000 participants from 1,745 Ohio state and local governments"; and manages "approximately $7.1 billion in assets").

3736226v1

ance companies, mutual funds, pension funds) are required by law to incorporate NRSRO ratings in their business decisions.'"  (Compl. ¶ 29 (emphasis added)).

*Third*, as detailed below, the Rating Agencies' ratings on the securities at issue here were widely disseminated to the market, confirming that they address matters of public concern and implicate First Amendment principles.  Accordingly, the cases on which Plaintiffs rely in their Opposition Brief are inapposite.  *See, e.g., In re National Century Financial Enterprises, Inc. Investment Litigation*, 580 F. Supp. 2d 630, 640, 648 (S.D. Ohio 2008) ("*NCFE IV*") (declining to apply the First Amendment on a motion to dismiss because "the complaint d[id] not allege that the ratings of the . . . notes were published to the investing public at large" but rather alleged that they appeared *only* in "the offering materials given to only a select class of qualified investors"); *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 175-76 (S.D.N.Y. 2009) (acknowledging that the First Amendment applies to ratings in "typical circumstances" but concluding that at the motion to dismiss stage it was bound to accept the affirmative and specific allegations made by plaintiffs that the ratings on a particular issuer "*were never widely disseminated, but were provided instead in connection with a private placement to a select group of investors*" (emphasis added)).[3]

Here, by contrast, the Complaint contains no allegation that the rating opinions at issue were disseminated by the Rating Agencies in a limited or private fashion.  While Plaintiffs con-

---

[3]  In declining to apply the First Amendment on the basis of the specific facts alleged by plaintiffs, both *NCFE IV* and *Abu Dhabi* also rely on *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U.S. 749 (1985).  *Dun & Bradstreet* involved a purely factual (and indisputably libelous) credit report about the solvency of a private, local Vermont construction company that was never intended for any kind of publication but, to the contrary, was *privately* circulated to *five* customers who were contractually forbidden to share the information with anyone else.  *Id.* at 751. In addition to carefully limiting its finding to the specific facts of the case with regard to the "content, form and context" of the speech at issue, the Supreme Court explicitly warned that its decision was not necessarily applicable to "all credit reporting," let alone other kinds of commentary and analysis on creditworthiness:

> The dissent suggests that our holding today leaves all credit reporting subject to reduced First Amendment protection.  This is incorrect.  The protection to be accorded a particular credit report depends on whether the report's "content, form and context" indicate that it concerns a public matter.  *Id.* at 762 n.8.

tend for the first time in their Opposition Brief that certain of their purchases were made in "private placements," by their own admission over 250 of their purchases — *i.e.,* over 80% of the purchases at issue — were made in *public* offerings in which the Rating Agencies' ratings were published in offering documents publicly-filed with the Securities and Exchange Commission. *See* Opp. at 31 n.22 (asserting that only 54 of the 308 purchases at issue occurred in "private placements"); Defs. Op. Br. at 12-13.  Moreover, so-called "private" placements to "qualified institutional investors" (Opp. at 31) are not restricted as to the *number* of persons who may be offered the security and, thus, receive information about the security; rather, the restriction is simply to a *type* of purchaser.  *See, e.g.*, 17 C.F.R. 230.144A(7)(a) (offers may be made to an unlimited number of qualified institutional buyers that "own[] and invest[] on a discretionary basis at least $100 million in securities").  In fact, although "qualified investors" or "institutional investors" are subsets of the general investing public, they are a subset that likely numbers in the tens of thousands.  *See* Section III.C, *infra*; *see also*, *e.g.*, Jim Bartos, *United States Securities Law, a Practical Guide*, at 88 (3d ed. 2006) ("Given the number of [qualified institutional buyers], this may be a relatively broad distribution . . . Rule 144A distributions can look, from a marketing perspective, more like an institutional public offering than a traditional private placement."); Edward F. Greene, *U.S. Private Placements and Rule 144A*, 867 PLI/Corp 735, 773 (1994) (describing securities offered to "a broad universe of [qualified institutional buyers]"); *In re Enron Corp. Securities Derivative & "ERISA" Litigation*, 529 F. Supp. 2d 644, 767 (S.D. Tex. 2006) (recognizing that "the fact that the [bond] market is substantially composed of large [qualified institutional buyers], with trained staffs and substantial research capabilities that keep them well informed, ensures the market is informationally efficient").

Accordingly, even if, as Plaintiffs contend, a small fraction of the securities at issue involved private placements, the fact that a security was sold in a "private placement" under the securities law has no bearing on whether that security, and any ratings on it, are matters of public concern within the meaning of the First Amendment.  Specifically, that a security may be issued in a "private placement" does *not* mean that its ratings were disseminated to only a limited

3736226v1

group. Indeed, as Plaintiffs here expressly allege in the Complaint, the ratings were published by the Rating Agencies in other documents *independent from the offering documents*. *See, e.g.*, Compl. ¶¶ 106, 116, 126, 136, 146 (alleging that the Rating Agencies also published "'Pre-Sale' reports" for the securities "that customarily contained their preliminary ratings"). Thus, it is simply not the case, as was alleged in *NCFE*, that the ratings appeared only in "the offering materials given to only a select class of qualified investors." *NCFE IV*, 580 F. Supp. 2d at 648.[4]

**Fourth**, that the ratings at issue were widely disseminated is also a fundamental aspect of Plaintiffs' claims. As Plaintiffs allege, the securities at issue entitle the securityholder to a portion of the proceeds earned on a pool of underlying mortgage loans. (Compl. ¶ 32). "The interest and principal payments from the [loan pools] are . . . used to make regular interest and principal payments to the purchasers" of the securities. (Compl. ¶ 33). Plaintiffs' theory of harm is not that any regular interest or principal payment to which they were entitled was not paid or that they sold any of the securities at issue at a loss. Indeed, the Complaint contains no such allegations. Instead, Plaintiffs base their claims exclusively on an alleged drop in the market value of the securities they purchased when the alleged "flaws in the Defendants' AAA ratings gradually became clear." *See* Compl. ¶ 9. *See also* Opp. at 101-02 ("*When the market learned that Defendant's ratings were inflated*, it became clear that investors had not received what they had bargained for and, as was reasonably foreseeable, the ABS declined in value.") (emphasis added). Thus, Plaintiffs' "damages" are necessarily dependent on the dissemination of the Rating Agencies' ratings broadly to the market such that news about those ratings allegedly affected how the market values those securities. Plaintiffs cannot be heard to argue both that the ratings were disseminated *only* to a "limited class" of investors, while also claiming that the market was

---

[4] The wide dissemination of Plaintiffs' ratings is also further confirmed by the Complaint's repeated references to the "prospectuses" in which the ratings for each of the securities at issue were published (*see, e.g.*, Compl. ¶¶ 105-110, 115-121, 125-131, 135-141, 145-151) — a term that, as this Court has recognized, is defined by the Supreme Court and "traditional understanding" as being "'confined to documents *related to public offerings*.'" *In re National Century Financial Enterprises, Inc., Investment Litigation*, 541 F. Supp. 2d 986, 1010-11 (S.D. Ohio 2007) ("*NCFE III*") (citation omitted) (emphasis added).

fully aware of the ratings such that information about them could be incorporated into the market price for the securities.

In short, Plaintiffs offer no plausible basis to refute the conclusion that the Rating Agencies' widely disseminated ratings on a large array of mortgage-backed securities ("MBS"), which allegedly impacted over two million Ohio residents, are indeed "matters of public concern" as a matter of law. As such, the ratings at issue here are entitled to protection under the First Amendment.

### B. Ratings Are Constitutionally Protected Opinions

Plaintiffs do not and cannot deny that in *Compuware* the Sixth Circuit held that a letter rating, of the kind published by the Rating Agencies on the securities at issue here, enjoys absolute constitutional protection under the First Amendment and could not give rise to a cognizable claim. *Compuware* v. *Moody's Investors Services, Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (recognizing that a "credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors" and holding that there was no basis to "conclude that the credit rating itself communicates any provably false factual connotation" that could render it actionable). *See also Jefferson County*, 175 F.3d at 855. Plaintiffs nevertheless contend that both *Compuware* and the Tenth Circuit's decision in *Jefferson County* — which adopted precisely the same reasoning — are somehow inapplicable because they involved "public figure" plaintiffs who sued Moody's for "defamation or 'defamation-type' injury." (Opp. at 26). Their argument is without merit.

Leaving aside Plaintiffs' lengthy and ultimately irrelevant discussion of the history of defamation law in this country, Plaintiffs cite no authority for the untenable proposition that the constitutional protection of speech setting forth opinions is limited to defamation or "defamation-type" actions brought by "public figure" plaintiffs.[5] Plaintiffs certainly cite nothing in either the

---

[5] Similarly, the "actual malice" doctrine (which is discussed further in Section I.C, *infra*) is in no way limited to defamation or "defamation-type" actions involving "public figure" plaintiffs. *See, e.g., County of Orange* v.

Footnote continued on next page.

3736226v1

*Compuware* or *Jefferson County* decisions to suggest that the Sixth or Tenth Circuits made such a distinction or based their rulings on such a principle.  In fact, in *Jefferson County*, the Tenth Circuit expressly recognized that courts have "reject[ed] a *variety of tort claims* based on speech protected by the First Amendment."  175 F.3d at 857 (emphasis added).  Moreover, accepting Plaintiffs' theory that only defamation claims are precluded would be fundamentally antithetical to the core free speech principles that are protected in the United States Constitution.  *See Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) ("Under the First Amendment . . . . [h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").

Regardless of the particular claim asserted, the underlying fundamental question in *Compuware* and *Jefferson County* was, as it is here, whether the plaintiffs' claims are based on an actionable misstatement of *fact*.  *Compuware* and *Jefferson County* answer this question directly: credit ratings are opinions, *not* statements of fact and thus, they are entitled to First Amendment protection.  *See Compuware*, 499 F.3d at 529 (a "credit rating is a predictive opinion").  Independent from this First Amendment protection, as noted above, recently, numerous other courts have repeatedly confirmed that credit ratings are "opinions," not statements of fact.  *See Royal Bank of Scotland Group*, 2010 WL 1172694, at *14 ("[C]redit ratings . . . are statements of opinion, as they are predictions of future value and future protection of that value."); *Residential Capital, LLC*, 2010 WL 1257528, at *6 (same); *DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *8 ("[T]he Court dismisses Plaintiff's allegations regarding the appraisals, credit enhance-

---

Footnote continued from previous page.

*McGraw-Hill Cos.*, 245 B.R. 151, 155-57 (C.D. Cal. 1999) (applying actual malice standard to breach of contract and professional negligence claims brought by plaintiff); *First Equity Corp.* v. *Standard & Poor's Corp.*, 690 F. Supp. 256, 258 (S.D.N.Y. 1988) (applying actual malice standard where plaintiffs sought to impose liability on S&P for "publication of a non-defamatory misstatement" and citing cases); *aff'd on other grounds*, 869 F.2d 175 (2d Cir. 1989); *In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 511 F. Supp. 2d 742, 811 (S.D. Texas 2005) (applying actual malice standard to negligence claims and observing that "First Amendment protections and the actual malice standard . . . have been expanded to reach beyond their traditional application to the law of defamation").

3736226v1

ments, credit rating, rating agencies, and loan-to-value ratios. . . . [T]hese are statements of opinion, not facts."); *Tsereteli*, 2010 WL 816623, at *5; *In re Lehman Bros.*, 2010 WL 545992, at *6. As demonstrated below in Section III.D, these cases also compel dismissal of Plaintiffs' claims because they make clear that Plaintiffs simply have not pled an actionable misstatement of fact on which to base their claims.

There is also no merit to Plaintiffs' claim that *Compuware* and *Jefferson County* are materially different to the case at bar because the Rating Agencies here purportedly stepped outside their "traditional information-gathering and disseminating role." (Opp. at 26-27). Assuming, just for these purposes, the truth of that allegation, Plaintiffs' argument rests on the legal fallacy that the First Amendment protection afforded to ratings is somehow dependent on whether the rating agency issuing the rating was acting as a "journalist" or a member of the "media." Not so. Ratings are protected by the First Amendment because of what they are: predictive opinions on matters of public concern. *See Compuware*, 499 F.3d at 529. Indeed, courts in this state have also found no rational basis for denying constitutional protection for opinion speech to non-media speakers. *See, e.g.*, *Wampler* v. *Higgins*, 752 N.E. 2d 962, 972 (Ohio 2001) (confirming constitutional protection for opinions irrespective of whether defendant is a media entity).[6]

Finally, Plaintiffs urge this Court to ignore the established law of this Circuit because, they assert, courts that have been "confronted with facts analogous to those at issue here" have held that "laws of general applicability . . . apply to rating agencies for their ratings, notwithstanding the protections generally offered by the First Amendment to the press." (Opp. at 13, 20). Plaintiffs omit that all but one of the cases they cite were rendered by courts *outside of this Circuit* and must therefore yield to the controlling authority of *Compuware*.[7] Plaintiffs' remain-

---

[6] Plaintiffs' reliance on *In re Fitch, Inc.*, 330 F.3d 104 (2d Cir. 2003) is misplaced because that case does not involve a First Amendment liability analysis, but rather the different – and most certainly distinct – question of whether Fitch, in the context of a third party subpoena, qualified as a "journalist" under New York's *statutory shield law*. Moreover, the decision specifically limits its holding to the specific facts of the statutory construction issue. *Id*. at 111.

[7] The cases that Plaintiffs cite are also inapplicable on their own merits in any event. *In re Taxable Municipal Bond*

Footnote continued on next page.

3736226v1

ing case, *NCFE IV*, is inapposite because, as discussed above, that case involved distinct factual allegations that are not present in this case.

In short, under the controlling authority of *Compuware*, Plaintiffs' claims — which seek to impose liability on the Rating Agencies for allegedly negligently issuing credit ratings — must be dismissed.

### C.   The Ratings Are Also Protected By The Actual Malice Standard

Even if *Compuware*'s absolute protection did not apply here, the ratings at issue in this case would also be protected by the "actual malice" standard of the First Amendment.  In their Opposition Brief, Plaintiffs contend that it would not be appropriate at this stage of the litigation to dismiss their claims for failure to meet the actual malice standard, and, in any event, that the allegations of the Complaint satisfy the relevant standard.  (Opp. at 33-35).  Both of these contentions are without merit.  Courts routinely dismiss cases at the pleading stage for failure to meet the actual malice standard and this case merits the same result.

The actual malice standard requires a plaintiff to plead that the defendant subjectively doubted the truth of the statement asserted.  *See St. Amant* v. *Thompson*, 390 U.S. 727, 731

---

Footnote continued from previous page.

*Securities Litigation*, 1993 WL 591418 (E.D. La. Dec. 29, 1993) and *First Financial Savings Bank, Inc.* v. *American Bankers Insurance Co.*, 1989 WL 168015 (E.D.N.C. Aug. 4, 1989) provide little to no reasoning behind their summary dismissals of First Amendment arguments, as recognized by the Court in *In re County of Orange*, 245 B.R. 138, 150 n.6 (C.D. Cal. 1997) (noting that "[t]his important constitutional issue warrants more attention than was afforded in those cases").  As subsequent decisions have recognized, *LaSalle National Bank* v. *Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y 1996) is also of questionable authority.  *See In re Enron Corp.*, 511 F. Supp. 2d at 822 n.80 (noting that "the *LaSalle* court failed to note the important and distinguishing factual basis for the decision (the report's 'content, form, and context . . . as revealed by the whole record'), *i.e.*, that the report was of only limited interest to a private plaintiff, the credit rating agency and the five subscribers who received it and who were required to keep it confidential, and therefore the speech did not relate to matters of public concern"); *County of Orange*, 245 B.R. at 144 n.2 (disagreeing with *LaSalle* because its "statement of the law is too broad").  Moreover, the complaint in *LaSalle*, unlike the Complaint here, contained issuance-specific allegations including, *inter alia*, references to the rating agency defendant's self-described "due diligence investigation" and onsite review in connection with the issuance, specific documentation allegedly reviewed or not reviewed by the rating agency in connection with the issuance, and detailed allegations of the rating agency's "intimate knowledge" of the specific issuer.  *LaSalle*, 951 F. Supp. at 1075-80, 1085-88.  *Commercial Financial Services, Inc.* v. *Arthur Andersen LLP*, 94 P.3d 106 (Okla. Civ. App. 2004) is wholly inapposite given, *inter alia*, that the plaintiff was not an investor, but an issuer that had a contract with the rating agency.  The *Abu Dhabi* decision is also distinguishable for the reasons addressed in Section III.D, *infra*.

3736226v1

(1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."). Following *Twombly* and *Iqbal*, a complaint must be dismissed on a Rule 12(b)(6) motion if a plaintiff fails to allege facts that render the actual malice element of its claims "plausible." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007); *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009). *See also Diario El Pais, S.L.* v. *Nielsen Co., (US), Inc.*, 2008 WL 4833012, at *6-*7 (S.D.N.Y. Nov. 6, 2008) (applying the *Twombly* "plausibility" standard in granting a Rule 12(b)(6) motion to dismiss where plaintiffs' "conclusory and unsupported assertions that the Defendant knew the [statements at issue] were inaccurate" were "insufficient to meet the pleading requirements for actual malice"); *Nelson* v. *DeVry, Inc.*, 2008 WL 2845300, at *2 (E.D. Pa. July 22, 2008) (negligence claims dismissed pursuant to official immunity statute where "plaintiffs have failed to allege facts that plausibly suggest that the act of filing a false report [by officer] was the result of actual malice or willful misconduct" and "have not alleged facts that suggest that discovery will reveal evidence of willful misconduct or actual malice").

Here, the allegations of the Complaint amount to no more than repeated accusations of negligence. *See, e.g.*, Compl. ¶ 1 (alleging that the Rating Agencies "*negligently* assigned" "AAA (or equivalent) credit ratings" (emphasis added)); *id.* ¶ 2 (alleging that the Rating Agencies "*negligently* provided unjustified and inflated ratings" (emphasis added)); *id.* ¶ 161 (referring to the Rating Agencies' alleged "*negligence* in performing their duties" and their alleged "*negligent* misrepresentations and omissions" (emphasis added)). As demonstrated in the Rating Agencies' Opening Brief, claims of alleged negligence do not come close to satisfying the actual malice standard. *See, e.g.*, *Time, Inc.* v. *Hill*, 385 U.S. 374, 389 (1967); Defs. Op. Br. at 11.

Plaintiffs nevertheless argue that the allegations of the Complaint raise substantial questions of fact as to whether the Rating Agencies' purported misconduct satisfies the actual malice standard, "including whether Defendants 'entertained serious doubts as to the truth' of their statements." (Opp. at 34-35). In support of this contention, Plaintiffs rely on after-the-fact

events and hindsight criticisms of the Rating Agencies that, they assert, demonstrate that the Rating Agencies' methods for rating MBS were generally "flawed." *See, e.g.,* Compl. ¶ 9 (alleging that "[w]hen the housing and credit markets finally collapsed, the flaws in the Defendants' AAA ratings gradually became clear"). Leaving aside that saying a process is "flawed" falls well short of pleading actual malice, none of these allegations purport to speak to the ratings of the securities actually at issue here or to the issue of whether those specifically responsible for the ratings at issue, at each of the rating agencies, actually believed them to be false. *See, e.g.*, *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 287 (1964) (presence of information in defendant's files did not establish actual malice because "the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication").[8]

Moreover, these types of *post hoc* allegations on which Plaintiffs rely have been repeatedly rejected at the pleading stage as insufficient with respect to a rating agency's subjective belief about its ratings at the time they were issued. *See, e.g.*, *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 309-10 (D. Mass. 2009) ("Plaintiffs' allegations rest on uncited and undated after-the-fact admissions and laments by purported insiders. . . . None of the purported comments made by S&P and Moody's employees in the wake of the collapse of the sub-prime mortgage market (in 2007) 'support the inference' that the ratings were compromised as of the dates (in 2005 and 2006) when the [ratings were issued]."); *Tsereteli*, 2010 WL 816623, at *5 ("[T]he amended complaint alleges only that [the rating agencies] used out-of-date models, did not verify the loan information provided to them, and have since downgraded the Certificates' ratings. These allegations are insufficient to support an inference that the Ratings Agencies did not actually believe that the ratings they had assigned

---

[8] Plaintiffs' generalized allegations contrast starkly with the specific allegations about particular securities deemed sufficient in the cases on which Plaintiffs rely. *See, e.g.*, *Abu Dhabi*, 651 F. Supp. 2d at 178 (sustaining claim where plaintiffs alleged, *inter alia*, that the Rating Agencies "were in possession of non-public information that would have contradicted the assignment of high ratings to the Rated Notes").

were supported by the factors they said they had considered.  At best, they support an inference that some people believed or now believe that a different set of . . . assumptions, might have resulted in a different rating.  Consequently, the claims based on these statements fail."); *In re Lehman Bros.*, 2010 WL 545992, at *6 (same).

Plaintiffs also point to alleged "incentives" of the Rating Agencies to inflate their ratings. *See, e.g.*, Compl. ¶ 7 (alleging that the Rating Agencies had "acute financial incentive to relax their stated standards of 'integrity' and 'objectivity' to placate their clients"); ¶¶ 56, 77.  As a matter of law, the "[e]conomic interests of the defendant," however, "cannot serve as a basis for actual malice."  *Nicosia* v. *DeRooy*, 72 F. Supp. 2d 1093, 1109 (N.D. Cal. 1999) (citing *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657 (1989)).   The fact that the Rating Agencies were paid by issuers is similarly insufficient.  Indeed, the court in *In re Enron Corp.* rejected this very argument at the pleading stage, holding that fees were irrelevant to proper First Amendment analysis because "the nationally published credit ratings focus upon matters of public concern."  511 F. Supp. 2d at 825; *see also In re County of Orange*, 245 B.R. 138, 142-44 (C.D. Cal. 1997) (holding that credit ratings are matters of public concern and applying the actual malice standard even where S&P was paid a fee by the issuer of a debt obligation to provide the rating).

In short, because Plaintiffs have failed to plead *any* facts that could satisfy the "actual malice" standard and overcome the constitutional protections afforded to the Rating Agencies' credit ratings, the Complaint should be dismissed in its entirety.[9]

## II.
## PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW

Plaintiffs' claims are also preempted by the Credit Rating Agency Reform Act of 2006

---

[9]   As noted above, the same principles confirmed in these recent cases also compel dismissal on the ground that Plaintiffs have failed to allege a statement of *fact* – the *sine qua non* of any negligent misrepresentation claim.  *See* Section III.D, *infra*.

("CRARA").  While Plaintiffs concede that CRARA "addresses state regulation directed at . . . 'the substance of credit ratings' or the 'procedures and methodologies for determining ratings'" (Opp. at 42), they devote most of their Opposition Brief to attempting to recast their allegations in an effort to avoid CRARA's preemptive scope.  But a review of the actual allegations of the Complaint makes clear that this case is nothing more than a back-door attempt by the Ohio Attorney General to do what CRARA prohibits:  1) regulate the substance of the Rating Agencies' ratings and the procedures and methodologies underlying those ratings; and 2) regulate NRSROs in other areas over which the SEC has exclusive regulatory authority.  As demonstrated in Defendants' Opening Brief and below, the allegations upon which Plaintiffs base their claims amount to *precisely* the type of challenge that is expressly preempted by CRARA.  (Defs. Op. Br. at 20-21).  Plaintiffs make several arguments in opposition which in essence ask this Court to disregard the clear language of CRARA.  Each is without merit.

### A.    The Presumption Against Preemption Does Not Apply Here

As a preliminary matter, Plaintiffs make a passing reference in their Opposition Brief to a "starting presumption" against preemption.  (Opp. at 36).  Leaving aside whether such a presumption would apply in the context of field preemption (which is *not* argued here), recent Supreme Court rulings have made clear that the same is not true where, as here, the language of the statute expressly preempts certain actions.  In fact, in *Riegel* v. *Medtronic, Inc.,* 552 U.S. 312 (2008), a case involving express preemption language directly analogous to the language at issue here and discussed in detail in the Defendants' Opening Brief (p. 19), the Supreme Court declined to apply the presumption against preemption entirely.  In short, the relevant inquiry is whether the express language of CRARA is preemptive.

### B.    CRARA Expressly Preempts Plaintiffs' Claims

As already established (Defs. Op. Br. at 14-21), CRARA expressly preempts Plaintiffs' claims, which are based on criticisms of the substance of, and procedural methodologies underlying, the Rating Agencies' credit rating opinions.  In their Opposition Brief, Plaintiffs maintain that "Defendants cannot point to any indication of congressional intent to foreclose Plaintiffs'

-16-

claims." (Opp. at 36). Plaintiffs ignore, of course, the most obvious and relevant statement of Congressional intent: the clear language of the statute itself. *See Greenlaw* v. *U.S.*, 128 S.Ct. 2559, 2572 (2008) ("[T]he text of the relevant statute provides the best evidence of congressional intent.").

First, the statute in unmistakable terms grants the SEC "exclusive authority" to regulate those instances where an NRSRO is alleged to have issued ratings in "material contravention" of its procedures. 15 U.S.C. § 78o-7(c)(1). Second, the Act provides that "notwithstanding" any other law, the substance of ratings and the methodologies used to generate them are not matters for external regulation. 15 U.S.C. § 78o-7(c)(1)-(2). In other words, in order to protect the independence of the Rating Agencies' credit rating opinions (whether from state regulation or non-fraud claims that challenge the *quality*, not honesty, of those opinions), Congress has concluded that only the SEC may regulate an NRSRO's conduct, and that no one may regulate the substance of an NRSRO's credit ratings by imposing liability for arguably negligent mistakes or misjudgments.

Plaintiffs try to avoid this language by pointing to a third preemption provision in CRARA, which preempts states from "establishing and enforcing a licensing and registration regime upon NRSROs." *See* Opp. at 41 (quoting 15 U.S.C. § 78o-7(o)(1)).[10] Plaintiffs assert that this provision "indicates that if Congress had intended the 'regulation of the substance of credit ratings . . .' provision to encompass all state common law and statutory claims relating to credit ratings, it would have said so explicitly." *Id.* But Plaintiffs' position only reinforces the case for preemption. It is, of course, true that this third provision prohibits states from establishing a registration regime, but as a matter of law that leads only to the conclusion that the two other preemption provisions in CRARA (*i.e.*, the provisions on which the Defendants actually

---

[10] Specifically, this provision provides that "[n]o provision of the laws of any State or political subdivision thereof requiring the registration, licensing, or qualification as a credit rating agency or a nationally recognized statistical rating organization shall apply to any nationally recognized statistical rating organization." 15 U.S.C. § 78o-7(o)(1).

3736226v1

base their argument) *must* necessarily broaden the preemptive scope of CRARA, lest they have no meaning at all.  *See Corley* v. *United States*, 129 S. Ct. 1558, 1566 (2009) ("'[A] statute should be construed [to give effect] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (citations omitted)); *Chrysler Corp.* v. *Commissioner of Internal Revenue*, 436 F.3d 644, 654-55 (6th Cir. 2006) ("[W]e must construe a statute as a whole and, in so doing, we must strive to 'interpret provisions so that other provisions in the statute are not rendered inconsistent, superfluous, or meaningless.'" (citation omitted)).[11]

Plaintiffs next contend that their claims "do not fall within [the] purview" of CRARA's express preemption provisions.  (Opp. at 42).  But, Plaintiffs simply cannot escape the fact that this case, at its core, seeks to challenge and regulate (through the imposition of liability) the very substance of Defendants' ratings and the methodologies underlying them.  Indeed, the Complaint is replete with allegations attacking the substance or "accuracy" of the Rating Agencies' ratings.  *See, e.g.,* Compl. ¶ 6 (alleging that "the Rating Agencies failed to provide *accurate* ratings"), ¶¶ 17, 19, 21, 23, 25, 102, 112, 122, 132, 142, 154, 168, 180.  Plaintiffs' negligent misrepresentation claim is expressly based on the allegation that the Rating Agencies "assign[ed] and maintain[ed] *inaccurate, unjustifiably high* credit ratings.  (*Id.* ¶ 154 (emphasis added)).  Plaintiffs' claims under the Ohio Securities Act are similarly based on the allegation that the Rating Agencies "failed to assign structured finance products the *appropriate* lower ratings."  (*Id.* ¶¶ 166, 178 (emphasis added)).  Plaintiffs similarly expressly challenge the Rating Agencies' procedures and methodologies, including the appropriateness of the models used during the rating process.  *See id.* at ¶ 6 (alleging that the Rating Agencies "failed . . . to employ adequate rating methodologies"); ¶ 8 (referring to allegedly "outdated and flawed methodologies for evaluating ABS issuances"); ¶ 82 (alleging that the "Rating Agencies did not have adequate credit models to address

---

[11]  Plaintiffs' citation to Congressman Kanjorski's comment (Opp. at 44) that the provision "should be viewed narrowly as limiting a State's authority to regulate day-to-day activities of credit rating agencies" is directed only at third preemption provision and does not purport to address the scope of the two preemption provisions actually at issue here.  152 Cong. Rec. H7569 (Sept. 27, 2006).

the risks esoteric structured finance securities presented"); ¶ 85 (referring to alleged "inadequacies in the Rating Agencies' ratings practices"); ¶¶ 154, 155, 166, 167, 178, 179.

Notwithstanding that Plaintiffs' claims are clearly focused on subjects that CRARA preempts, Plaintiffs contend that their claims are permissible because "none of Plaintiffs' claims require jurors to determine standards governing 'the substance of credit ratings' or the 'procedures and methodologies' for determining the ratings." (Opp. at 46). Yet, to resolve Plaintiffs' claims of "inaccurate" credit ratings and "inadequate" ratings methodologies, a jury would necessarily be required to determine what the "accurate" credit rating and "adequate" rating methodologies "should have been." As such, Plaintiffs run directly into the preemption provision of CRARA prohibiting the regulation of the "substance" of ratings and ratings methodologies, which in no uncertain terms prohibits precisely the instant attempt.[12]

In response, Plaintiffs offer up the assertion that the precise phrase used in CRARA — "regulate the substance of" — has not been "clarified" by either Congress or any court. (Opp. at 38-39). But, the fact that no court has expressly interpreted this phrase does not render it meaningless. Plaintiffs are effectively asking this Court to determine that because no case has construed the *exact* language at issue here, all other cases interpreting analogous language, *see, e.g.,* Defs. Op. Br. at 17-20, are inapposite and this language should be presumed a nullity. The argument must be rejected.

Nor can CRARA's preemption provisions be ignored, as Plaintiffs urge, because their enforcement would somehow create "immunity" for the Rating Agencies. (Opp. at 36). Plaintiffs cite a number of cases for the proposition that Congress could not have intended to remove "all

---

[12] Plaintiffs' claims also appear to contravene CRARA's express grant of "exclusive authority" to the SEC over NRSROs. Although Plaintiffs argue that the SEC's "exclusive authority" is limited to the subject matters listed in the statute — *i.e.*, compliance by NRSROs with their procedures for issuing ratings (Opp. at 40) — the Complaint makes clear that Plaintiffs are seeking here to supplant the authority and judgment of the SEC in direct conflict with CRARA. *See* Defs. Op. Br. at 16. Indeed, throughout the Complaint, Plaintiffs rely on the SEC's examination of the Rating Agencies as the very basis for their claims. *See, e.g.*, Compl. ¶¶ 7, 8, 61, 62, 63, 74, 75, 78, 80, 89, 91, 92, 93, 94, 95.

means of judicial recourse for those injured by illegal conduct" (Opp. at 41 (citing *Silkwood* v. *Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984))), or grant the rating industry "complete immunity." (Opp. at 36 (citing *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 487 (1996))). But, the Rating Agencies have not and do not argue that CRARA preempts "all means" of judicial recourse or grants the Rating Agencies complete "immunity" for all conceivable claims. On the contrary, CRARA provides the SEC with statutorily prescribed and exclusive authority to regulate, and where appropriate, impose sanctions on NRSROs. *See* 15 U.S.C. § 78o-7. *See also* 17 C.F.R. §§ 240.17g-(1)-(6), 249b.300 (implementing regulations). In addition, CRARA preempts only *non-fraud* claims by plaintiffs that seek to impose liability on NRSROs for the substance of their ratings or their underlying rating procedures and methodologies. CRARA would not preempt, for example, a properly pled securities fraud claim under the Securities Exchange Act of 1934.

Finally, Plaintiffs' reliance on *Altria Group, Inc.* v. *Good*, 129 S. Ct. 538 (2008) is misplaced. In *Altria*, the Court considered the issue of whether the preemptive language of the Federal Cigarette Labeling and Advertising Act preempted claims under the Maine Unfair Trade Practices Act ("MUTPA") based on allegations that cigarette manufacturers had affirmatively misrepresented their "light" cigarettes as presenting fewer health risks. A majority of the Court held that it did not because enforcement of MUTPA was not aimed at regulating the content of cigarette labels, but rather to ensure that the content was not fraudulent, *i.e.,* the MUTPA embodies a "duty not to deceive." Thus, the Court noted, if plaintiffs "prevail at trial, petitioners will be prohibited from selling as 'light' or 'low tar' only those cigarettes that are not actually light and do not actually deliver less tar and nicotine. Barring intervening federal regulation, petitioners would remain free to make *nonfraudulent use* of the 'light' and 'low-tar' descriptors." *Id*. at 546 n.10 (emphasis added). Here, Plaintiffs are not asserting a claim of fraud or deception, but one of negligence, *i.e.,* that the actual ratings or the methodologies underlying those ratings should have been different. Such claims are precisely the type of claims that CRARA preempts.

Any reasonable reading of CRARA's preemption provisions, particularly when considered in light of the wealth of cases cited by Defendants in their Opening Brief (Defs. Op. Br. at

-20-

17-20), warrants the conclusion that Plaintiffs' claims — which are clearly aimed at both the substance of and methodologies behind the Rating Agencies' ratings — are preempted.

### C.      Plaintiffs' Claims Are Also Precluded By Conflict Preemption

Contrary to Plaintiffs' assertion, Defendants do not "rest their preemption argument solely on an 'express' preemption theory."  (Opp. at 47).  The language of CRARA both expressly preempts Plaintiffs' claims under the principle of "express preemption" *and* evidences Congress' intent to regulate certain subject matters relating to NRSROs such that state law, including common law and statutory claims, that conflict with the language and expressed goals of CRARA are also preempted under the principle of "conflict preemption."[13]

Plaintiffs concede that "where state law 'is in actual conflict' with [a] federal statute," it is preempted.  (Opp. at 47).  *See also Fidelity Federal Savings and Loan Ass'n* v. *De la Cuesta*, 458 U.S. 141, 153 (1982); *Connell Construction Co.* v. *Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 635-36 (1975) (preempting a state antitrust law "because it creates a substantial risk of conflict with policies central to federal labor law"); *International Paper Co.* v. *Ouellette*, 479 U.S. 481, 494 (1987) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal.").  Plaintiffs nevertheless argue that there can be no conflict preemption in this case because, they imply, the sole purpose of CRARA was to establish a "licensing and registration regime" for NRSROs.  (Opp. at 47).  But Plaintiffs cannot reasonably be heard to argue that CRARA is nothing more than a "licensing" statute while simultaneously seeking to piggy-back on findings from the broad examination of the Rating Agencies conducted by the SEC pursuant to the oversight and enforcement authority granted to the SEC under the very same (supposed "licensing") statute.  *See, e.g.*, Compl. ¶¶ 82-93.

Indeed, as Plaintiffs acknowledge, CRARA is also aimed at fostering competition among

---

[13] Defendants do not, however, argue that "field preemption" exists here.

rating agencies and bringing transparency and accountability to the credit rating industry through exclusive oversight by the SEC. *See* H.R. Rep. No. 109-546, at 14 (2006) ("NRSROs will be held accountable under the securities laws: The SEC will be able to inspect, examine, and bring enforcement actions against rating agencies under the 1934 Act."). More importantly for present purposes, CRARA could hardly be clearer seeking to preserve the independence of credit ratings agencies in reaching rating opinions and protecting the substance of their underlying procedures and methodologies. *See id.* ("Congress and the SEC must be cautious not to intrude into the ratings procedures and methodologies. H.R. 2990 does not intrude into these procedures and the Manager's Amendment expressly affirms that the SEC may not intrude into the ratings procedures and methodologies."). It is these federal aims that Plaintiffs' claims threaten.

As discussed above, Plaintiffs seek to impose liability here on the theory that the Rating Agencies' rating opinions and methodologies were "inaccurate" and "flawed." *See, e.g.*, Compl. ¶¶ 7, 8, 17. That is, Plaintiffs seek to regulate the substance of the Rating Agencies' ratings and/or the methodologies by which those ratings are determined. This *directly conflicts* with Congress' clear intent to leave the substance and methodologies of an NRSRO's ratings independent and *unregulated*. Accordingly, Plaintiffs' claims are also preempted under conflict preemption principles.

### D.  Plaintiffs Had No Vested Rights Before the Enactment of CRARA

Plaintiffs assert that because they purchased some of the securities at issue prior to the enactment of CRARA, enforcement of CRARA's preemption provisions as to those purchases would have an "impermissible retroactive effect." (Opp. at 53 ("[T]he portion of Plaintiffs' claims based on conduct occurring prior to the effective date of the [CRARA] would not be preempted.")). It is well-settled as a matter of law, however, that because Plaintiffs' claims did not vest prior to the effective date of CRARA — if indeed they have vested at all — giving effect to the clear preemption provisions of CRARA in this case would have *no* retroactive effect whatso-

ever (let alone an "impermissible" one).[14]

The Supreme Court has held that a statute acts retroactively only when it has the effect of "tak[ing] away or impair[ing] *vested rights* acquired under existing laws, or creat[ing] . . . a new disability, in respect to transactions or considerations already past." *Fernandez-Vargas* v. *Gonzales*, 548 U.S. 30, 37 (2006) (emphasis added) (alterations in original) (citation and internal quotation mark omitted). *See also Landgraf* v. *USI Film Products*, 511 U.S. 244, 280 (1994) (a statute has an impermissible retroactive effect where it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed").[15]  Plaintiffs' argument regarding retroactivity necessarily assumes, then, that Plaintiffs' interests in its common law claims somehow "vested" at the time of their ARS purchases.  (Opp. at 55 (arguing that "no preemption applies with respect to ABS purchases the Ohio Funds made prior to June 18, 2007," the effective date of CRARA)).  This is incorrect as a matter of law.

The Court of Appeals for the Sixth Circuit, consistent with the majority of the other Circuits, has held that "a legal claim affords no definite or enforceable property right until reduced

---

[14]  Here, as established below, "retroactivity" is a non-issue because Plaintiffs cannot show that any right "vested" prior to CRARA's effective date.  That said, nothing in the text of CRARA suggests that Congress intended to *withhold* application of CRARA's preemption provisions from "cases where the allegedly fraudulent conduct took place prior to the enactment, but the suit is brought after the enactment."  *Cf. ABF Capital Management* v. *Askin Capital Management, L.P.,* 957 F. Supp. 1308, 1320 (S.D.N.Y. 1997).  Furthermore, contrary to Plaintiffs' assertion, as the Supreme Court has held, "mere promulgation of an effective date does not provide sufficient assurance that Congress specifically considered the potential unfairness that retroactive application would produce."  *INS* v. *St. Cyr*, 533 U.S. 289, 317 (2001); *Landgraf* v. *USI Film Products*, 511 U.S. 244, 257 (1994).

[15]  In a footnote, Plaintiffs argue that *Landgraf* does "not restrict the presumption against statutory retroactivity to cases involving 'vested rights.'" (Opp. at 57 n.36 (citing *Landgraf*, 511 U.S. at 275 n.29)).  Plaintiffs omit that this language in *Landgraf* specifically discusses the presumption's application to *procedural* issues.  *Landgraf*, at 275 n.29 ("A new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed" and noting that "the applicability of [procedural] provisions ordinarily depends on the posture of the particular case.").  Accordingly, this limitation has no application here.  Equally unhelpful is Plaintiffs' citation to *Hughes Aircraft Co.* v. *United States*, 520 U.S. 939 (1997), regarding *Landgraf's* lack of a definition of what rights a party possessed.  (Opp. at  57 n.36).  This is unremarkable, considering *Landgraf* addresses a claim that *was already on appeal.*  However, in *Fernandez-Vargas*, the Supreme Court *did* clarify that "putative claims to relief are not 'vested rights,' a term that describes something more substantial than inchoate expectations and unrealized opportunities."  548 U.S. at 44 n.10.

to final judgment." *Arbour* v. *Jenkins*, 903 F.2d 416, 420 (6th Cir. 1990) (citation and internal quotation marks omitted).[16] The Supreme Court has similarly held that "putative claims to relief are not 'vested rights,' a term that describes something more substantial than inchoate expectations and unrealized opportunities" and determining that an immigration claim extinguished by a newly enacted statute was not "an immediate fixed right of present or future enjoyment has also been set forth by the Supreme Court." *Fernandez-Vargas,* 548 U.S. at 44 n.10 (citation and internal quotation marks omitted). Where, as here, a claim to relief is "contingent," or requires a plaintiff "to take some action that would elevate it above the level of hope," it is not a vested right. *Id.* Any potential but unfiled claims Plaintiffs may have possessed prior to the enactment of CRARA were mere "inchoate expectations" that, absent a filing by Plaintiffs to raise them "above the level of hope," are not protected by any presumption against retroactivity. Thus, Plaintiffs' rights in this action could not have vested until, at the very earliest, they filed their claims. Plaintiffs brought suit here on November 20, 2009, two years and five months after the effective date of CRARA. Enforcement of CRARA here would therefore have no impermissible retroactive effect.[17]

Not to be deterred, Plaintiffs latch on to *Scott* v. *Boos*, 215 F.3d 940 (9th Cir. 2000), a Ninth Circuit opinion decided long before *Fernandez-Vargas* and at odds with an overwhelming

---

[16] *See also Symens* v. *SmithKline Beecham Corp.*, 152 F.3d 1050, 1056 n.3 (8th Cir. 1998) (concluding that "plaintiffs had no vested rights in these unasserted [tort] claims"); *Zeran* v. *America Online, Inc.*, 129 F.3d 327, 335 (4th Cir. 1997) ("No person has a vested right in a nonfinal tort judgment, much less an unfiled tort claim."); *In re TMI*, 89 F.3d 1106, 1113 (3d Cir. 1996) ("[A] pending tort claim does not constitute a vested right."); *Salmon* v. *Schwarz*, 948 F.2d 1131, 1143 (10th Cir. 1991) ("'[A] legal claim [for tortious injury] affords no definite or enforceable property right until reduced to final judgment . . .'" (quoting *Arbour*, 903 F.2d at 420) (alteration in original)); *Lunsford* v. *Price*, 885 F.2d 236, 240-41 & n.13 (5th Cir 1989) (citing *Hammond* v. *United States*, 786 F.2d 8, 12 (1st Cir. 1986)); *Grimesy* v. *Huff*, 876 F.2d 738, 744 (9th Cir. 1989) (noting that "plaintiffs' property interest in their cause of action did not vest until there was a final, unreviewable judgment"); *Sowell* v. *American Cyanamid Co.*, 888 F.2d 802, 805 (11th Cir. 1989) ("[A] legal claim affords no definite or enforceable property right until reduced to final judgment."); *Hammond*, 786 F.2d at 12 ("[R]ights in tort do not vest until there is a final, unreviewable judgment."). *But see Garcia* v. *Wyeth-Ayerst Laboratories*, 385 F.3d 961, 968 (6th Cir. 2004) ("A litigant has no vested property right in a cause of action until it accrues." (citation and internal quotation marks omitted)).

[17] In this respect, *NCFE* is again distinguishable. Plaintiffs in *NCFE* filed their claims approximately three years before the effective date of CRARA. Accordingly, Defendants respectfully submit that the retroactivity concerns referenced by this Court in *NCFE* are not implicated here.

3736226v1

majority of the Circuits.  In *Scott*, the Ninth Circuit found that the PSLRA, which prohibits RICO causes of action based on securities fraud, did not preempt a securities based RICO cause of action that was based on conduct pre-dating the PSLRA.  *Id.* at 946 (finding that application of the PSLRA would have a "retroactive effect").  On nearly identical facts, however, other courts have found the opposite.  *See, e.g.*, *Popp Telecom, Inc.* v. *American Sharecom, Inc.*, 361 F.3d 482, 490 (8th Cir. 2004) (finding that PSLRA, like SLUSA, was merely procedural and affirming summary judgment "because the Dissenters filed their RICO claim after the PSLRA's effective date"); *Kolfenbach* v. *Mansour*, 36 F. Supp. 2d 1351, 1353-54 (S.D. Fla. 1999) (holding that the application of the PSLRA had no retroactive effect because plaintiff had no vested rights in a cause of action prior to filing a claim).  Moreover, in reaching its decision, the *Scott* court adopted the analysis in *Mathews* v. *Kidder, Peabody & Co.*, 161 F.3d 156 (3d Cir. 1998) — a case that, unlike the present one, involved a claim that was already pending when the relevant preemption statute was enacted.

Plaintiffs' reliance on *Hughes Aircraft Co.* v. *United States*, 520 U.S. 939 (1997), is similarly misplaced.  In *Hughes*, the Supreme Court applied the presumption against preemption in a case where an amendment to the False Claims Act "create[d] a new cause of action" by removing a previous affirmative defense.  *Id.* at 950.  The court determined that where the defendant had previously availed himself of the affirmative defense prior to the enactment of the amendment, the defendant could not be subject to new litigation based on the same events after the amendment.  *Id.* at 951-52.  This is a far cry from the "inchoate expectations" at issue here with respect to Plaintiffs' unfiled claims.  Indeed, *Hughes* stands only for the unremarkable proposition that a statute cannot take away an *existing* and *vested* right.[18]

---

[18]  Plaintiffs also assert that a "vested right" argument by Defendants would contradict Defendants' argument that Plaintiffs' claims are also time-barred.  This makes no sense.  Defendants argue that the earliest a plaintiff can have a vested right in a cause of action is at filing.  This in no way precludes Defendants' argument that Plaintiffs were on inquiry notice of their claims years before filing them.  In fact, it is Plaintiffs who present conflicting arguments.  Plaintiffs argue in no uncertain terms that they were not even on notice of their asserted claims — let alone filing them such that Plaintiffs could at least argue that they had vested — in November 2007 (Opp. at 74-75), well *after*

Footnote continued on next page.

In sum, Plaintiffs have provided no basis for this Court to disregard the clear terms of CRARA, including its absolute prohibition of state regulation of the substance of, and methodologies behind, an NRSRO's ratings.

### III.
### PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM
### SHOULD BE DISMISSED UNDER BOTH NEW YORK AND OHIO LAW

#### A.     New York Law Governs Plaintiffs' Negligent Misrepresentation Claim

As demonstrated in Defendants' Opening Brief (Defs. Op. Br. at 22-24), application of Ohio's choice of law rules — specifically the factors articulated in Restatement (Second) of Conflict of Laws § 148(2) (1971) — establish that New York has the "most significant relationship" to the claims and the parties in this case and should apply.  In an apparent attempt to avoid the application of New York law, which takes a "narrow approach" to negligent misrepresentation,[19] Plaintiffs first argue that "a choice of law determination [at this stage] is premature" (Opp. at 58), and then argue that what they characterize as "the only [Restatement] factor detailed in the Complaint weighs heavily in favor of applying Ohio law" (*id.* at 60).  Upon examination, however, neither argument has merit.

First, in support of their plea to delay decision on the choice of law question, Plaintiffs cite two cases that bear little relevant factual resemblance to the instant case with respect to choice of law:  *In re National Century Financial Enterprises, Inc., Investment Litigation*, 2006 WL 469468 (S.D. Ohio Feb. 27, 2006) ("*NCFE I*"), and *In re Grand Theft Auto Video Game Consumer Litigation*, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) ("*Grand Theft Auto*").  Unlike this case, those cases involved significantly more complicated choice of law determinations requiring the Court to consider the application of numerous states' competing interests in

---

Footnote continued from previous page.

the effective date of CRARA.

[19]  *See Sykes* v. *RFD Third Avenue 1 Assocs., LLC*, 884 N.Y.S.2d 745, 747 (1st Dep't 2009).

having their own law applied.[20]  Here, the parties are in agreement that the choice of law deter-

mination is binary — either New York or Ohio law applies, and the questions relevant to that

decision involve facts that are not seriously in dispute.

Plaintiffs' request boils down to a claim that the Court should postpone choice of law

considerations — and risk later inconsistencies in this case when that decision is made — be-

cause "determining which state has the most significant relationship . . . depends largely on facts

not yet established."  (Opp. at 59).  Plaintiffs' assertion is curious, given that the only significant

and relevant "facts not yet established" are facts *known exclusively to Plaintiffs*, which Plaintiffs

deliberately chose not to plead in the Complaint.  As discussed in Defendants' Opening Brief, in

considering which law should control, Ohio courts look to the following relevant factors:[21]  (1)

the place where *Plaintiff acted in reliance* upon Defendants' representations; (2) the place where

---

[20]  More specifically, as the Court will recall, *NCFE* involved numerous sets of plaintiffs and defendants scattered in numerous states around the country, making the choice between numerous different jurisdictions' laws quite diffi-cult.  As there were "plausible arguments for applying the law of several of those states," the Court held that further details regarding the various transactions at issue, as well as each plaintiff's relationships with each of the various defendants, were necessary for the Court to make the determination which of those states had the most significant relationship to the claims at issue.  *NCFE I*, 2006 WL 469468, at *7.  The other case Plaintiffs cite, *Grand Theft Auto*, was a nationwide class action with similarly complicated choice of law considerations.  In addition, in *Grand Theft Auto*, the choice of law question was merely *incidental* to the issue of standing, on which defendants based their motion to dismiss.  The Court accordingly declined to make a choice of law determination at that stage of the litigation because the issue would be "appropriately answered through the class certification process," which had not yet occurred.  *Grand Theft Auto*, 2006 WL 3039993, at *3.  Neither of these cases should inform either the timing or substance of the Court's choice of law determination.  In contrast to the multidistrict litigation in *NCFE I* and the nationwide class action litigation in *Grand Theft Auto* — both of which involved plaintiffs located nationwide, and even worldwide — this case involves a *single* group of Plaintiffs, all located in Ohio, and a *single* group of defen-dants, all located in New York.  (Compl. ¶¶ 16, 18, 20, 22, 24, 26-28).  Thus, while the courts in *NCFE I* and *Grand Theft Auto* had to grapple with the implication of multiple parties in multiple jurisdictions, this action presents no such quandary.

[21]  New York law must apply under the choice of law test established in either § 148(1) or § 148(2).  As Plaintiffs correctly note, under § 148(1), if a defendant's representations were made and received in the same state as the plaintiff's actions in reliance, then that state's law should apply; but if the reliance occurred in whole or in part in a state other than that where the representations were made, § 148(2) governs the choice of law analysis.  (Opp. at 58-59).  Plaintiffs ask this Court to assume that Plaintiffs relied on the Rating Agencies' representations in Ohio, but they plead no facts whatsoever to support that assumption.  In any event, even if Plaintiffs *had* pled facts regarding their reliance, it would be *impossible* for § 148(1) to trigger the application of Ohio state law.  Given that the Rating Agencies indisputably made their representations in New York, either (1) Plaintiffs' reliance also occurred in New York, in which case New York law applies, or (2) Plaintiffs' reliance occurred in Ohio, in which case § 148(2) gov-erns, and New York law applies.

-27-

*Plaintiff received the representations*; (3) the place where *Defendants made the representations*; and (4) the domicile, residence, nationality, place of incorporation, and *place of business of the parties*.[22]  Despite Plaintiffs' protestations to the contrary, there is no real dispute that the credit ratings at issue in this litigation were all issued from New York, as all of the Defendants' offices are based in New York.[23] And there is no dispute about the parties' respective places of business. Thus, the only relevant "facts not yet established" are where Plaintiffs, or their agents, received and relied upon Defendants' ratings — facts singularly within Plaintiffs' knowledge.  Under these circumstances, Plaintiffs should not be permitted to forestall application of New York law merely by engaging in selective, incomplete pleading.  *See, e.g.*, *Arctic Express, Inc.* v. *Del Monte Fresh Produce NA, Inc.*, 366 B.R. 786, 792 (S.D. Ohio 2007) ("Artful pleading will not cloak a plaintiff's claim from the otherwise applicable law." (citation and internal quotations marks omitted)); *see also CSX Transportation* v. *Globe Metallurgical, Inc.*, 2007 WL 1567690, at *5 (S.D. Ohio May 25, 2007) (choice of law is a "threshold issue" that must be settled before the Court can address the claim at issue).[24]

---

[22]  There is no serious dispute that the last two factors, "the place where a tangible thing which is the subject of the transaction between the parties was situated at the time" and  "the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant" have no relevance here, where securities are not "tangible thing[s]" and there is no contract under which plaintiff must render performance.  *See, e.g.*, *Trierweiler* v. *Croxton and Trench Holding Corp.*, 90 F.3d 1523, 1537 (10th Cir. 1996) (stating that factor (e) applies only to "tangible things" and is "irrelevant to a purely financial transaction" (citing Restatement § 148 cmt. i)).

[23]  Any number of public sources — including sources Plaintiffs cite in their Complaint — unquestionably show that Defendants rated MBS out of their New York Offices.  *See, e.g.*, Jack Milligan, "The Model Meltdown:  The Credit-Rating Agencies Were Caught by Surprise When the Mortgage Meltdown Hit," Mortgage Banking, Apr. 1, 2008 (cited in Compl. ¶ 79) (referring to Fitch, S&P, and Moody's as "New York-based rating agencies"); Moody's Corp., Annual Report 2005, at 12, 38 (cited in Compl. ¶ 44) (noting that Moody's Investors Service is headquartered in New York and consists of a structured finance rating group that assigns credit ratings and sells investor-oriented credit research); Financial Oversight of Enron:  The SEC and Private-Sector Watchdogs:  Hearing Before the Senate Committee on Governmental Affairs, 107th Cong. 11 (2002) (testimony of Ronald M. Barone, Managing Director, S&P) (cited in Compl. ¶ 47) (explaining how a major corporation that S&P rated visited New York repeatedly to appeal for higher ratings); "Fitch Announces Support for Credit Rating Agency Reform Act of 2006," Business Wire, July 31, 2006 (cited in Compl. ¶ 50) (reporting Fitch press release from New York that announced Fitch's support for CRARA).

[24]  Indeed, rather than compel deferral of the choice of law inquiry, courts have held that a plaintiff's failure to plead facts necessary to determine governing law under Section 148 of the Restatement is, in and of itself, a proper basis for dismissal.  *See, e.g.*, *Berry* v. *Indianapolis Life Insurance Co.*, 608 F. Supp. 2d 785, 800 n.16 (N.D. Tex. 2009)

Footnote continued on next page.

3736226v1

In addressing the choice of law question on the merits, Plaintiffs largely rely on the fact that they are instrumentalities of, and incorporated in, Ohio.  (Opp. at 59-61).  Plaintiffs rely entirely on a single case, *Sky Technology Partners, LLC* v. *Midwest Research Institute*, 125 F. Supp. 2d 286 (S.D. Ohio 2000), for the proposition that their location within Ohio should control the Court's choice of law determination.  (Opp. at 60).  But that is not what *Sky Technology* says.  In that case, the determining factor in the Court's choice of law analysis was *not* that the plaintiff simply resided in Ohio, but instead that "all the design, development and programming work" the plaintiff did in reliance on the defendant's alleged misrepresentation occurred in Ohio. 125 F. Supp. 2d at 297 (alteration in original) (citation omitted).  Here, however, Plaintiffs have alleged *no* details — jurisdictional or otherwise — about any relevant significant actions that allegedly happened in Ohio.

Plaintiffs also assert for the first time in their Opposition Brief — yet nowhere in the Complaint — that "the evidence in this case will show that many of the ABS at issue were purchased based on credit ratings *received in Ohio* and *acted upon in Ohio by Ohio Funds' personnel.*"  (Opp. at 61 (emphasis in original)).  Plaintiffs contend that these unpled facts, along with Plaintiffs' Ohio domicile, combine to mandate the application of Ohio law.  (*Id.* at 61-62).  Plaintiffs rely on *Insurance Distribution Network, Inc.* v. *Mariano*, 2008 WL 520915 (S.D. Ohio Feb. 26, 2008) and *Lewis* v. *Horace Mann Insurance Co.*, 410 F. Supp. 2d 640 (N.D. Ohio 2005).  As Plaintiffs themselves emphasize, however, both cases premised their application of a particular state's law on the fact that the plaintiff pleaded facts demonstrating contacts with that

---

Footnote continued from previous page.

("A complaint should be dismissed when the governing law cannot be determined from the facts alleged therein."); *Enigma Holdings, Inc.* v. *Gemplus Int'l S.A.*, 2006 WL 2859369, at *7 (N.D. Tex. Oct. 6, 2006) (dismissing fraud-based claims because, although plaintiffs alleged facts regarding the parties' places of business, "[p]laintiffs' alleged facts only cursorily address[ed] the place where the defendants made the representations and [did] not address the place, or places, where the plaintiff acted in reliance upon the defendants' representations or the place where plaintiffs received the representations").  Choice of law "is normally 'a threshold inquiry that must be made before the Court can adequately address the sufficiency of the pleadings.'"  *Berry*, 608 F. Supp. 2d at 800 n.16 (citation omitted).

3736226v1

state under *two* Restatement factors *other than* the plaintiff's place of incorporation or place of business.[25]  (Opp. at 61).  Once more, these facts are exclusively within Plaintiffs' knowledge, and the Court should not permit Plaintiffs to evade the application of New York law by coyly avoiding specificity in their Complaint.

Ultimately, Plaintiffs cannot and do not deny the numerous facts supporting the application of New York law under § 148(2):  that the Rating Agencies are based in New York (Compl. ¶¶ 26-28), that the alleged misstatements at issue — the ratings themselves (*id.* ¶ 154) — were made in New York, and that approximately 85% of the securities listed in the Complaint were issued by New York entities and/or underwritten by New York investment banks.[26]  Indeed, Plaintiffs conveniently overlook the fact that the state where the alleged misstatements were made is crucial to the choice of law analysis and is "'as important a contact in the selection of the law governing actions for fraud . . . as is the place of the defendant's conduct in the case of injuries to persons or to tangible things.'"  *See, e.g.*, *Jamhour* v. *Scottsdale Insurance Co.*, 211 F. Supp. 2d 941, 952 (S.D. Ohio 2002) (quoting Restatement § 148 cmt. c) (alteration in original); *see also First National Bank* v. *Heuer*, 702 F. Supp. 173, 175 (N.D. Ill. 1988) (applying the law of the state where the defendant made the representation because "in cases of fraud or misrepresentation, unlike personal injury actions, the place of the loss is less important than the place the defendant allegedly made the misrepresentations").

---

[25]  The Court in *Lewis* based its application of Ohio law not only on the fact that the plaintiff received and relied upon the representation in Ohio, but also on the fact that the tangible thing that was the subject of the parties' transaction (in that case, a used motor vehicle) was located in Ohio and that the plaintiff agreed to render performance under the contract at issue in Ohio.  410 F. Supp. 2d at 655.  The court there explicitly relied upon well-pleaded facts under factors (e) and (f) of Restatement § 148(2), which aligned with factors (a) and (b).  *Id.* at 655-56.  Here, as noted above, factors (e) and (f) have no relevance to Plaintiffs' claim.  In *Insurance Distribution Network, Inc.* v. *Mariano*, 2008 WL 520915, at *3 (S.D. Ohio 2008), the court's choice of law discussion was exceedingly brief, failing to provide or discuss any details regarding the location where the defendant made the alleged misrepresentations.  As that is the sole factor under which there exist factual contacts in this case, *Insurance Distribution Network* provides no insight into the choice of law analysis here.

[26]  This figure was obtained from a review of the prospectuses, private placement memoranda, and other information filed with the Securities and Exchange Commission for 304 of the 308 securities listed in the exhibits to the Complaint.

Finally, Plaintiffs in no way refute — and, in fact, tacitly concede — that New York has a long-standing, compelling interest in the operations of information providers and other finance industry professionals that operate their businesses in New York, the indisputable center of global finance. (Opp. at 61-62; *see also* Defs. Op. Br. at 23-24). For all these reasons, as well as for the reasons outlined in Defendants' Opening Brief, the Court should apply New York law to Plaintiffs' negligent misrepresentation claim.

### B. Martin Act Preemption

Defendants demonstrated in their Opening Brief that New York's Martin Act preempts Plaintiffs' negligent misrepresentation claim. Plaintiffs make three arguments in response; none are supported by the law or the facts in this case.

### 1. Federalism Does Not Preclude Application of New York Law

Plaintiffs first argue that applying well-settled New York law in this case raises federalism concerns. *See* Opp. at 63 (arguing that "Defendants' construction of the Martin Act would effectively give the [New York Attorney General] veto power over the Ohio Attorney General's decision to bring this action on behalf of Ohio state instrumentalities").

This argument is a red herring, at best. The issue is not whether the New York Attorney General has a "veto," but that New York law, which governs Plaintiffs' claim, does not recognize a private right of action for non-fraud tort claims based upon securities transactions that occur within or from New York. The fact that Plaintiffs are represented by the Ohio Attorney General can neither change the substance of New York law, which Ohio and other federal courts routinely apply, nor lead to any federalism issues. Indeed, if the Court were to follow this logic, it would violate principles of federalism by allowing a determination made by the Ohio Attorney General to trump the legislative and judicial pronouncements of otherwise applicable New York law and judicial rules.

The reason is simple. Plaintiffs themselves made the free choice first to purchase securities created and structured in New York by New York banks and rated by New York credit rating agencies and then to sue New York-based rating agencies for claims arising out of their purchase

of securities issued within or from New York. Like any plaintiff — whether their lawyer is a state attorney general or a private firm — Plaintiffs are bound by the legal consequences of their actions. And the consequences under New York law, which clearly applies to Plaintiffs' claim, is that Plaintiffs' claim for negligent misrepresentation is preempted.

Plaintiffs appear to be conflating customary choice of law ramifications with principles of federalism. For example, Plaintiffs point to the undisputed proposition that the Full Faith and Credit Clause does not "enable one state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences *of acts within it*." *Pacific Employers Insurance Co.* v. *Industrial Accident Commission*, 306 U.S. 493, 504-05 (1939) (emphasis added). This argument ignores the fact that acts about which they sue — the ratings of MBS — all occurred *in New York*, where all of the Defendants are based and where approximately 85% of the entities that issued and/or underwrote the securities at issue were based, not in Ohio. *See* Section III.A, *supra*.

Plaintiffs quote the *Pacific Employers* case out of context. That case involved the question of whether California could enforce its own Workers Compensation statute to a workplace accident in California that involved a Massachusetts resident, in the face of a conflicting Massachusetts statute. *See Pacific Employers*, 306 U.S. at 497-99. The Martin Act issue before the Court in this action, however, is *not* a case of competing and mutually exclusive statutes, but one in which Plaintiffs simply do not like the law. Defendants do not argue that the Martin Act preempts Plaintiffs' Ohio law claims under Ohio Blue Sky Laws, but only that the Martin Act preempts Plaintiffs' negligent misrepresentation claim *under New York common law*.

Not surprisingly, Plaintiffs cannot point to *any* decision in which a court has declined to apply the Martin Act to a claim because of asserted federalism concerns. Indeed, multiple district courts outside of New York have dismissed claims preempted by the Martin Act, including claims brought by non-New York plaintiffs. *See KA Investments LDC* v. *Number Nine Visual Tech. Corp.*, 2002 WL 31194865, at *14 (D. Mass. Aug. 26, 2002) (dismissing Minnesota plaintiffs' negligent misrepresentation claim as preempted by Martin Act); *In re Enron Corp. Securi-*

*ties, Derivative & "ERISA" Litigation*, 2003 WL 23305555, at *14 (S.D. Tex. Dec. 11, 2003) (in purported national class action, dismissing negligent misrepresentation claim as preempted by Martin Act); *see also Gavin* v. *AT & T Corp.*, 2005 WL 1563122, at *18 n.13 (N.D. Ill. June 7, 2005) (noting that "[e]ven if Gavin's state law claims were not preempted by SLUSA, they would be precluded by New York's 'blue sky' law, the Martin Act"), *rev'd on other grounds*, 464 F.3d 634 (7th Cir. 2006). Thus, Plaintiffs' flawed federalism argument must be rejected.

### 2. The Martin Act Applies to Plaintiffs' Claim Because the Securities Purchases Did Occur "Within or From" New York

Plaintiffs next argue that the Martin Act does not apply to their negligent misrepresentation claim because the securities purchases at issue did not occur "within or from" New York. In so arguing, Plaintiffs misstate New York law, claiming that the Martin Act is limited to acts that take place *in their entirety* in New York. (Opp. at 64-65). It is well-established, however, that there is no such requirement under New York law. Indeed, applying Plaintiffs' interpretation would be contrary to both the text of the Martin Act and to the voluminous caselaw interpreting it.

As established in Defendants' Opening Brief, the Martin Act applies to transactions "within or from" New York, which includes transactions (1) where a party to the transaction "was a New York entity" or (2) "where the alleged misconduct took place" in New York. *See* Defs. Op. Br. at 26; *People* v. *Coventry First LLC*, 2007 WL 2905486, at *6 (N.Y. Sup. Ct. Sept. 25, 2007), *aff'd sub nom. Cuomo* v. *Coventry First LLC*, 861 N.Y.S.2d 9 (1st Dep't 2008), *aff'd*, 13 N.Y.3d 108 (2009); *see also id.* (finding that "within or from" New York requirement had been met where "298 of 3,469 life settlement purchases by Coventry First between 2001 and March 2006 involved New York sellers"). In short, there is no requirement that all relevant actions take place in New York for Martin Act preemption to apply.

A recent Southern District of New York decision confirms as much. In *Ashland Inc.* v. *Morgan Stanley & Co.*, 2010 WL 1253932, at *16-*17 (S.D.N.Y. Mar. 30, 2010), the Court dismissed on Martin Act preemption grounds a negligent misrepresentation claim brought by Ash-

land, Inc., a company incorporated and doing business in Kentucky. Ashland's claims arose out of advice given to it by Morgan Stanley in connection with the purchase of auction rate securities. *Id.* at *1. While many of the key actions took place in Kentucky, including Ashland's receipt of advice from Morgan Stanley and Ashland's placing orders for the securities purchases at issue, the remainder of the relevant facts occurred in New York. *Id.* at *16-*17. The Court ruled that the Martin Act applied to the transactions and thus preempted Ashland's negligent misrepresentation claim. *Id.* at *17. In doing so, the Court explained that the application of the Martin Act did not depend on whether more events took place in New York than elsewhere. Rather, the Court explained the touchstone of the applicability of the Martin Act is whether "a 'substantial portion of the events giving rise to a claim occurred in New York.'" *Id.* at *16 (quoting *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 611 n.9 (S.D.N.Y. 2008)); *see also Sedona Corp* v. *Ladenburg Thalmann & Co.*, 2005 WL 1902780, at *21 (S.D.N.Y. Aug. 9, 2005) ("The scope of the Martin Act . . . includes more [than] the actual purchase or sale of securities within or from New York. Related investment advice and negotiation over securities are activities within the Martin Act's purview . . . .")[27]

---

[27] In the New York cases cited by Plaintiffs, unlike the action now before the Court, nearly *all* of the relevant actions underlying the events at issue occurred *outside* of New York. *See Fraternity Fund Ltd.* v. *Beacon Hill Asset Management LLC*, 376 F. Supp. 2d 385, 410 (S.D.N.Y. 2005) (declining to apply the Martin Act where, at best, "some plaintiffs may have interacted with defendants *exclusively outside of New York*" (emphasis added)); *Pension Committee of the University of Montreal Pension Plan* v. *Banc of America Securities, LLC*, 592 F. Supp. 2d 608, 639-40 (S.D.N.Y. 2009) (Martin Act did not apply because defendants "performed most of their work for [plaintiffs] in Curacao, Netherlands Antilles . . . . [and] the securities were mostly marketed and sold to foreign investors, and only a limited number of investors in the United States participated"); *Lehman Bros. Commercial Corp.* v. *Minmetals International Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 165 (S.D.N.Y. 2001) (Martin Act did not apply where "Lehman traders in London and Hong Kong negotiated the sale of these securities with Hu, who was situated in Beijing"); *Bankers Life Insurance Co.* v. *Credit Suisse First Boston Corp.*, 2008 WL 4372847, at *3 (M.D. Fla. Sept. 24, 2008) (on motion to reconsider, relying exclusively on *Fraternity Fund* for the proposition that all relevant actions must occur entirely within New York, without further discussion and without further noting that in *Fraternity Fund*, the acts may have occurred exclusively *outside* New York). Plaintiffs' attempted reliance on *Goshen* v. *Mutual Life Insurance Co.*, 98 N.Y. 2d 314 (2002), a case interpreting New York's Consumer Protection Act, is similarly unavailing. First, the *Goshen* decision has never been applied to the Martin Act. (Opp. at 65). Plaintiffs provide no basis for the Court to ignore the clear statements of New York courts on the scope of the Martin Act in favor of the New York Court of Appeals' interpretation of *different* language in a *different* New York law. Moreover, *Goshen* does not even limit the reach of New York's Consumer Protection Act in the way Plaintiffs seek to limit the Martin Act (that is, to only those transactions taking place *in their entirety* in New York). *See Leider* v. *Ralfe*, 387 F. Supp. 2d 283, 294 (S.D.N.Y. 2005) ("Those cases that have rejected [Consumer Protection Act] claims

Footnote continued on next page.

### 3.  The Martin Act Preempts Plaintiffs' Negligent Misrepresentation Claim

Despite Plaintiffs' concession that "the majority of federal courts in the Southern District of New York have held that the Martin Act preempts negligent misrepresentation claims for securities purchases 'within or from' New York," (Opp. at 66), Plaintiffs nonetheless urge this Court to reject that abundant and consistent body of caselaw,[28] and instead rule that the Martin Act does *not* preempt negligent misrepresentation claims.  In support, Plaintiffs rely on two isolated — and roundly criticized — New York Appellate Division cases, all the while ignoring more recent New York state court cases that have expressly found preemption.

First, Plaintiffs rely on *Scalp & Blade, Inc.* v. *Advest*, *Inc.*, 722 N.Y.S.2d 639, 640 (4th Dep't 2001), a decision involving both intentional and negligent misrepresentation claims that predates a substantial number of Martin Act preemption cases and which has been affirmatively discredited.  While the court in that case reversed a lower court's dismissal of common law claims on Martin Act preemption grounds, it provided no reasoning whatsoever for doing so beyond its own *ipse dixit*.  Indeed, it is so incongruous with subsequent caselaw that it has been repeatedly described as a "solitary island[] in a stream of contrary opinion."  *Nanopierce Technologies, Inc.* v. *Southridge Capital Management LLC*, 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003); *accord Pro Bono Investments, Inc.* v. *Gerry*, 2005 WL 2429787, at *16 (S.D.N.Y. Sep. 30, 2005) (calling *Scalp & Blade* "not persuasive"); *Joffee* v. *Lehman Bros.*, 2005 WL 1492101, at *13 (S.D.N.Y. June 23, 2005) (finding that *Scalp & Blade* represents the "minority view" and noting that "[t]he rule adopted by the majority of state intermediate appellate courts that have considered the issue is that claims for negligent misrepresentation . . . are covered by the Martin Act and cannot be asserted by private litigants"); *Marcus* v. *Frome*, 329 F. Supp. 2d

---

Footnote continued from previous page.

for lack of a geographical nexus to New York involved schemes with *no tangible tie to the state*." (emphasis added) (citing *Goshen* 98 N.Y.2d at 324-25, 26)).

[28]  *See* Defs. Op. Br. at 25 (collecting cases).

464, 476 n.4 (S.D.N.Y. 2004) ("*Scalp & Blade* [does not] provide a persuasive basis for conclud-ing that negligent misrepresentation claims are not precluded by the Martin Act.").

The other case on which Plaintiffs rely, *Caboara* v. *Babylon Cove Development, LLC*, 862 N.Y.S.2d 535 (2d Dep't 2008), has also been soundly rejected, and, equally as important, does not address the question before this Court. *Caboara* involved fraud and breach of contract claims arising out of the sale and purchase of condominium units, the purchase of which is regu-lated in part by the Martin Act. Thus, the court in *Caboara* had no occasion to address non-fraud tort claims such as the negligent misrepresentation claim at issue here. *Id.* at 537. And, although the court in *Caboara* declined to dismiss the fraud and breach of contract claims under the Mar-tin Act, it did so without any consideration of the substantial body of caselaw going the other way. *Caboara*'s failure to address the Martin Act preemption caselaw has led other New York courts openly to question its force and precedential value. *See Kassover* v. *UBS AG*, 619 F. Supp. 2d 28, 39 (S.D.N.Y. 2008) ("*Caboara* appears to overlook a long-standing distinction between courts' treatment of common law fraud claims," which are not preempted by the Martin Act, "and that of other state law claims based on deceptive practices," which *are* preempted).[29]

Despite their acknowledgement that the weight of authority calls for Martin Act preemp-tion, Plaintiffs argue that these cases "stem from a misunderstanding of certain state court deci-sions in the condominium purchase context, which is also regulated by the Martin Act." (Opp. at 66). Plaintiffs' sole citation for this remarkable proposition is a legal newspaper article written in September 2008 (Opp. at 66-67, Ex. E), which clearly has not persuaded New York courts

---

[29] Plaintiffs' reliance on *Faulkner* v. *Beer* is also unavailing. The claims in *Faulkner* sounded in fraud and the deci-sion held that the Martin Act did not preempt "claims for fraudulent and deceptive practices." *Faulkner* v. *Beer*, 2007 WL 4639458 (N.Y. Sup. Ct. Dec. 21, 2007). Equally misplaced is Plaintiffs' reliance on *Kerusa Co.* v. *W10Z/515 Real Estate L.P.*, 12 N.Y.3d 236 (2009), which also concerns the preemption of fraud claims, not negli-gent misrepresentation claims like the instant one. *See id.* at 245 ("The question on this appeal is whether *Kerusa* has any common-law claim for fraud, as distinct from a claim under the Martin Act, which only the Attorney Gen-eral may bring."). Thus, at best, *Kerusa* stands for the proposition that well-pleaded common law fraud claims are not preempted by the Martin Act. Yet that is an uncontroversial proposition that Defendants do not deny, and, of course, Plaintiffs have specifically *avoided* styling their action as a fraud claim.

against Martin Act preemption since that time.  Indeed, Plaintiffs cannot deny that the New York state courts' most recent decisions have repeatedly affirmed the majority rule that non-fraud common law claims under the purview of the Martin Act are preempted as a matter of law.  *See Ambac Assurance UK Ltd.* v. *J.P. Morgan Investments*, No. 650259/2009, slip. op. at 15 (N.Y. Sup. Ct. Mar. 24, 2010) (dismissing negligence-based claims because "plaintiff's claims do fall within the purview of the Martin Act and thus must be dismissed as preempted"); *Assured Guaranty (UK) Ltd.* v. *J.P. Morgan Investment Management, Inc.*, No. 603755/2008, slip op. at 12 (N.Y. Sup. Ct. Jan. 29, 2010) (dismissing negligence and breach of fiduciary duty claims brought by financial guarantor of notes against investment manager, holding that the claims "fall within the purview of the Martin Act and their prosecution by plaintiff would be inconsistent with the Attorney General's exclusive enforcement powers under the Act"); *Ashland*, 2010 WL 1253932, at *16-*17 (granting motion to dismiss a negligent misrepresentation claim on Martin Act preemption grounds); *NM Homes, Inc.* v. *JP Morgan Chase Bank, N.A.*, No. 1:08-cv-07679-PAC, slip. op. at 12 (S.D.N.Y. Mar. 30, 2010) (same).  Moreover, Plaintiffs fail to acknowledge that the court in *Abu Dhabi* — a case on which Plaintiffs lean heavily throughout their brief (Opp. at 19-20, 30, 93-95, 98-99) — actually dismissed the plaintiff's negligent misrepresentation claim as preempted by the Martin Act.  *See Abu Dhabi*, 651 F. Supp. 2d at 181-82 ("[T]he Second Circuit has adopted the First Department's rule that the Martin Act preempts common law tort claims in the securities context.").

The Court should reject Plaintiffs' invitation to second-guess the rulings of the myriad New York courts based on already rejected arguments.

### C.  Plaintiffs Do Not Adequately Plead a Duty of Care as Required Under Both New York and Ohio Law

Under both New York and Ohio law, in order to adequately plead a claim for negligent misrepresentation, Plaintiffs must plead a relationship with Defendants giving rise to a duty of care.  As demonstrated in Defendants' Opening Brief (Defs. Op. Br. at 27-35), Plaintiffs have not

adequately pled that Defendants owed them a duty of care. The absence of a legal duty is fatal to Plaintiffs' negligent misrepresentation claim, and their arguments to the contrary fail.

The parties agree that courts look to the three-prong test articulated in *Credit Alliance Corp.* v. *Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985), to determine whether a legal duty has been established: (i) the professional must have been aware that the information was to be used for a particular purpose or purposes; (ii) in furtherance of which a *known party or parties* was intended to rely; and (iii) there must have been some conduct on the part of the professionals *linking them to that party or parties*, which evinces the professionals' understanding of that parties' reliance. (Opp. at 90). All three prongs must be satisfied. The court in *Credit Alliance* made quite clear that it was not sanctioning liability to "any foreseeable plaintiff," but rather only those in a relationship "approaching privity." 483 N.E.2d at 119.

Plaintiffs myopically focus on the first prong of the *Credit Alliance* test — whether the defendant was aware that the information would be used for a particular purpose — to the exclusion of the second and third prongs. More particularly, Plaintiffs focus on allegations regarding the relationship between Defendants and the *issuers* of the securities, not Defendants and Plaintiffs. (Opp. at 83-91). For example, Plaintiffs argue that Defendants rated "discrete ABS tranches that they helped to create" (*id.* at 84-85), and that Defendants were "intimately involved in the structuring of ABS" (*id.* at 91). There is no dispute that Defendants knew that their ratings would be included in prospectuses used to sell MBS. That fact, however, is probative only of the first prong of the test. Likewise, Plaintiffs' allegation that Defendants "received payment for their work in both structuring and rating the security" is in no way probative of a relationship approaching privity between Plaintiffs and Defendants since there is *no* allegation that Plaintiffs were the ones making the payments. (*Id.* at 85). Indeed, none of Plaintiffs' allegations regarding Defendants' supposed role in the structuring of MBS suggests a relationship between *Defendants and Plaintiffs*.

In their failed attempt to meet the second prong of the *Credit Alliance* test, Plaintiffs do nothing more than repeat the Complaint's conclusory assertion that they are members of a "lim-

-38-

ited class of institutional investors" — without defining that term or pointing to any facts upon which to conclude that "institutional investors" are a limited class.  (Opp. at 84, 86, 90, 91). Plaintiffs do not allege how many institutional investors there are or how many of them received prospectuses related to the MBS purchased by Plaintiffs.  Indeed, Plaintiffs' characterization of this group as "limited" or "select" is conclusory and wholly inaccurate:  there are, in reality, *thousands* of these highly sophisticated institutional investors nationwide.[30]  And, in any event, Plaintiffs do not allege, nor could they, that any of the offerings was limited to such "institutional investors."

Plaintiffs also argue that they were "known recipients" of Defendants' ratings because "many" — not "most," and certainly not "all" — of the MBS required minimum investments of $100,000 to $1,000,000, "amounts that only institutional investors typically invest in a single offering of securities."  (Opp. at 87).  The notion that individual investors rarely invest more than $100,000 in a single issuance is simply counter-factual.  Plaintiffs' only source for the proposition is this Court's opinion in *NCFE IV*, 580 F. Supp. 2d 630 (S.D. Ohio 2008), which stated that the specific offering at issue was characterized "as being targeted to a select class of institutional investors with the resources to invest *tens of millions of dollars* in notes."  *Id.* at 640 (emphasis added).

While Plaintiffs attempt to distinguish the long line of Ohio and New York cases cited by Defendants by highlighting minor factual differences with the present case, Plaintiffs cite to no

---

[30]  While undefined in the Complaint, any class of "institutional investors" would have to include, at the very least, every public and private employee pension fund, ERISA fund, college and university endowment fund, insurer, investment bank, charitable foundation, mutual fund, and hedge fund in the world, in addition to scores of trusts, partnerships, and high net worth individuals.  In short, there is nothing "limited" about such a class.  *See* Richard Baumann, *A Big Surprise*, 26 Int'l Fin. L. Rev. 30, 30 (Nov. 2007) ("For one, the US has thousands of QIBs. . . . The QIB market is so big that issuers and their underwriting banks market Rule 144A offerings to them by conducting road-shows and handing out lengthy prospectuses, as if QIBs constituted their own mini-public."); Bradley J. Gans, *The Mechanics of Rule 144A/Regulation S Underwritings*, 751 PLI/Comm 457, 653 (1997) ("More than 3,000 institutions may qualify as QIBs in the United States . . ."); Sara Hanks, *Rule 144A:  Another Cabbage in the Chop Suey*, 24 Geo. Wash. J. Int'l L. & Econ. 305, 340 (1990) (describing the group of QIBs as "a potential universe of thousands of institutions").

3736226v1

case under either New York or Ohio law finding a duty based upon a plaintiff's status as an "institutional investor" alone. The two cases cited by Plaintiffs regarding duties owed to investors both involve private placements to qualified institutional buyers. (Opp. at 88, 91 (citing *NCFE IV*, 580 F. Supp. 2d at 648; *LaSalle National Bank* v. *Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1093 (S.D.N.Y. 1996))). Here, however, there is no allegation in the Complaint that any of the MBS Plaintiffs purchased were sold through private placement. While Plaintiffs assert for the first time in their Opposition Brief that *54 of 308* MBS purchases listed in the Complaint were made through private placements (Opp. at 87), Plaintiffs can point to no case under New York or Ohio law nor any other basis for finding that Defendants owed them a duty with regard to the remaining 254 — or approximately 82 percent — of the securities.

And even with respect to the 54 alleged private placements — which, again, appears nowhere in the Complaint — Plaintiffs do not identify a relationship approaching those found in *NCFE* and *LaSalle*. *NCFE IV* concerned ratings allegedly found *only* in private placement memoranda that were used for four series of notes and alleged to have been sent to a limited number of qualified investors. *NCFE IV*, 580 F. Supp. 2d at 634-36. The claim in *NCFE IV* arose from the defendants' alleged negligence in rating that specific offering. Likewise, *LaSalle* concerned investors in a single bond issue and allegations about the rating agency's alleged negligence with respect to the rating of that specific bond. *LaSalle*, 951 F. Supp. at 1073. In both cases the issuer was alleged to be operating "Ponzi" schemes. *NCFE IV*, 580 F. Supp. 2d at 636; *LaSalle*, 951 F. Supp. at 1073. The rating agencies in those cases were accused of negligence in failing to detect massive frauds at the specific companies and relaying ratings to small groups of investors in those companies without detecting the frauds.

In this case, by contrast, Plaintiffs bring claims involving *hundreds of MBS issues*. Indeed, the Complaint does not make any specific allegation about the process of rating the securities at issue at all, instead making general allegations regarding Defendants' processes for rating all MBS. As a result, the "limited class" of which Plaintiffs are members includes *everyone who ever received a prospectus for any MBS rated by any Defendant*. Despite Plaintiffs' protests to

the contrary (Opp. at 88-92), their theory of liability would establish open-ended liability to the entire investing public.

Finally, Plaintiffs seek to escape the requirement of a relationship approaching privity by quoting Restatement (Second) of Torts § 552 (1977), comment g: "direct communication of the information to the person acting in reliance upon it is not necessary." (Opp. at 92). Whether direct communication is necessary or not, there is no question that New York law follows a "narrow approach" to negligent misrepresentation, requiring allegation of "a 'special relationship,' i.e., 'a relationship so close as to approach that of privity.'" *Sykes* v. *RFD Third Avenue 1 Assocs., LLC*, 884 N.Y.S.2d 745, 747 (1st Dep't 2009) (quoting *Parrott* v. *Coopers & Lybrand LLP*, 95 N.Y.2d 479, 483 (2000)); *accord Edison Fund* v. *Cogent Inc. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 233 (S.D.N.Y. 2008) ("It is well established that plaintiffs must allege the existence of a 'special relationship' with the defendants in order to state a claim [for negligent misrepresentation].").  *See also Premier Business Group* v. *Red Bull of North America, Inc.*, 2009 WL 3242050, at *11 (N.D. Ohio Sept. 30, 2009) (dismissing negligent misrepresentation claim for failure to plead a "special relationship" akin to a fiduciary relationship, such as "a client placing his or her trust in an attorney or accountant").

### D.   Plaintiffs Fail to Allege Any Actionable Misrepresentation

Plaintiffs' negligent misrepresentation claim also fails for the independent reason that Plaintiffs simply have not pled *any* actionable misrepresentation of fact by any of the Rating Agencies.

As discussed above, recently, several federal courts evaluating alleged misstatement claims against the Rating Agencies based on their credit ratings have repeatedly confirmed that ratings on, *inter alia*, structured finance securities like the ones at issue here, are opinions, *not statements of fact.  See Residential Capital, LLC*, 2010 WL 1257528, at *6 ("[C]redit ratings and the adequacy of credit enhancements are clearly opinion statements because they predict future value and reliability."); *DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *8 (credit ratings "are statements of opinion, not facts"); *Royal Bank of Scotland Group*, 2010 WL 1172694, at

-41-

*14 ("[C]redit ratings and the relative adequacy of protective credit enhancements are statements of opinion, as they are predictions of future value and future protection of that value."); *Tsereteli*, 2010 WL 816623, at *5 ("[W]hether the 'credit quality of the mortgage pool' was 'properly considered' or 'adequate' to support a particular rating was not a matter of objective fact.  It was instead a statement of opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating."); *Lehman Bros.*, 2010 WL 545992, at *6 (same).

Accordingly, Plaintiffs cannot state a claim based on the Rating Agencies' rating opinions without alleging a plausible factual basis to assert that the Rating Agencies did not genuinely believe those opinions.  *See, e.g., Residential Capital, LLC,* 2010 WL 1257528, at *6 ("[C]redit ratings . . . are not actionable unless it is alleged that the opinions were not truly held."); *DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *8 (credit ratings "are not actionable where, as here, the Complaint fails to allege that the speaker did not truly believe the statements at the time it was made public"); *Royal Bank of Scotland Group,* 2010 WL 1172694, at *14 ("Plaintiffs can only demonstrate an actionable misstatement if 'the opinion is both (1) not believed by the speaker and (2) objectively untrue.'"); *Tsereteli*, 2010 WL 816623, at *5 ("For [credit ratings] to be actionable, therefore, the amended complaint must allege that the rating agencies did not truly hold those opinions at the time they were made public"); *In re Lehman Bros.*, 2010 WL 545992, at *6 (same).

While Plaintiffs assert that "Defendants issued ratings that they did not believe to be accurate and/or that had no basis in fact" (Opp. at 94), they offer no plausible factual basis whatsoever to support this purely conclusory statement.  Plaintiffs' allegations based on congressional hearing testimony (Compl. ¶¶ 47, 51, 54-55, 64, 66-69, 85-88) and newspaper articles (*id.* ¶¶ 49, 53, 71-72, 79, 83-84) in 2008 are insufficient to plead that the Rating Agencies did not believe their ratings opinions at the time they were issued.  As discussed above, federal courts have dismissed similar claims brought against the Rating Agencies based on *identical* materials.  For example, in *In re Lehman Bros.*, the court dismissed misstatement claims based on such allega-

3736226v1

tions, explaining that:

> [T]he complaint alleges that Moody's and S&P used out-of-date models based on assumptions that did not reflect the realities of the mortgage market. *Relying on a newspaper article and Congressional testimony from 2008*, it alleges that Moody's and S&P had not updated the models used to rate the Certificates since 2002 and 1999, respectively, and did not implement updated models that they had developed. It alleges further that one S&P employee admitted that "previous loss data proved to be much less of a guide to future performance" and another testified that he believed that the new models would have provided an "earlier warning about the performance" of MBS.
>
> These allegations are insufficient to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued. *At best, they support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions.* Consequently, the claims based on these statements fail.

*In re Lehman Bros.*, 2010 WL 545992, at *6 (emphasis added). This reasoning also led to the dismissal of similar misstatement claims in *Tsereteli*, in which the court held that plaintiffs' allegations "that [the Rating Agencies] used out-of-date models, did not verify the loan information provided to them, and have since downgraded the Certificates' ratings" were simply "insufficient to support an inference that the Ratings Agencies did not actually believe that the ratings they had assigned were supported by the factors they said they had considered." *Tsereteli*, 2010 WL 816623, at *5. *See also Royal Bank of Scotland Group*, 2010 WL 1172694, at *14 (characterizing plaintiffs' claims against rating agencies regarding outdated ratings models and inadequate credit enhancement as "hindsight allegations" and grounding dismissal on plaintiffs' inability to demonstrate that the credit ratings were "(1) not believed by the speaker and (2) objectively untrue" (citation omitted)); *Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d at 309-10 ("None of the purported comments made by S&P and Moody's employees in the wake of the collapse of the sub-prime mortgage market (in 2007) 'support the inference' that the ratings were compromised as of the dates (in 2005 and 2006) when the registration statements and prospectus supplements became effective." (citation omitted)).

Against the weight of this authority, and similar cases cited herein, Plaintiffs nonetheless

claim that their Complaint sufficiently states a claim based on the Rating Agencies' ratings, rely-ing largely on the holding in *Abu Dhabi*, 651 F. Supp. 2d 155, to support this proposition.  In *Abu Dhabi*, however, the complaint at issue contained the kind of issuance-specific allegations that are simply *nonexistent* here, including allegations about the structure, operations, and portfo-lio of the specific Structured Investment Vehicle ("SIV") at issue and defendants' ongoing re-sponsibilities with respect to that SIV.  *Id.* at 164-68.  Although the Court concluded that the plaintiffs there had sufficiently pled that the Rating Agencies did not believe their ratings, it em-phasized that it based its conclusion on three key allegations:  (1) that "defendants knew that al-though the actual portfolio consisted of 'much more' than fifty-five percent of [residential mort-gage-backed securities ("RMBS")], the Information Memoranda stated that the . . . SIV's portfo-lio would consist of no more than fifty-five percent of such securities"; (2) that the "Rating Agencies were in possession of non-public information that would have contradicted the assign-ment of high ratings to the Rated Notes"; and (3) that "the Rating Agencies were compensated . . . at a fee substantially larger than normally received and a fee that was directly connected to the success" of the SIV.  *Id.* at 178.  Plaintiffs have not alleged such specific facts with respect to the MBS in this case, and *Abu Dhabi* is thus entirely inapposite.

In sum, Plaintiffs' allegations consist of nothing more than generalized, after-the-fact criticisms of the Rating Agencies' ratings processes and of the ratings industry as a whole.  Such allegations are plainly insufficient to create an inference that Plaintiffs did not believe their rating opinions with respect to the MBS at issue here, and Plaintiffs' negligent misrepresentation claim must accordingly be dismissed.

### E.    Plaintiffs Do Not Plead Justifiable Reliance

Plaintiffs also do not and cannot plead justifiable reliance under either New York or Ohio law.[31]  Plaintiffs stake their argument on the wholly conclusory allegation that they "justifiably

---

[31]  As noted in the Rating Agencies' Opening Brief, the reliance analysis under Ohio and New York law is similar in that courts in both states focus their inquiry on "the circumstances of the claim and the relationship between the par-

Footnote continued on next page.

relied on the false and misleading AAA ratings Defendants supplied" (Compl. ¶ 160) — an allegation that they repeat twice more in their Opposition Brief (Opp. at 96-97) — but they fail to allege any facts to support that conclusion. In fact, their allegations that they are "sophisticated" or "qualified" investors (Compl. ¶¶ 157-58) directly contradict their claim that they were justified in blindly relying on the Rating Agencies' rating opinions without performing any investigation, research, or diligence of their own. Merely reiterating in their brief that they "justifiably relied" on the ratings does not somehow make the allegation any less conclusory.[32]

Plaintiffs first argue that reliance is a question inappropriate for this Court to address on a motion to dismiss. (Opp. at 96). But Plaintiffs overlook the fact that courts routinely dismiss claims when plaintiffs fail to plead facts supporting the conclusion that they justifiably relied on the representations at issue. *See, e.g.*, *Doe* v. *SexSearch.com*, 551 F.3d 412, 417-18 (6th Cir. 2008) (affirming motion to dismiss negligent misrepresentation claim for failure to plead justifiable reliance); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 540 F. Supp. 2d 800, 832 (S.D. Tex. 2007) (for negligent misrepresentation claim, holding that plaintiffs did not "adequately ple[a]d facts . . . sustaining a claim of justifiable reliance"); *Goodman Manufacturing Co. L.P.* v. *Raytheon Co.*, 1999 WL 681382, at *15 (S.D.N.Y. Aug. 31, 1999) (dismissing negligent representation claim for failure to plead reasonable reliance).[33]

---

Footnote continued from previous page.

ties." (Defs. Op. Br. at 43).

[32] Plaintiffs also point to allegations in their Complaint that the "AAA ratings were crucial" to their decision to purchase the MBS, and that they would not have done so "[a]bsent those high ratings" (Opp. at 96-97 (citing Compl. ¶¶ 100, 111, 121, 131, 141, 151)), but these allegations are similarly conclusory, as they constitute nothing more than a mere recitation of the reliance element of Plaintiffs' claim — rather than facts regarding *how* Plaintiffs relied and why that reliance was justified.

[33] Plaintiffs cite to *NCFE IV*, 580 F. Supp. 2d at 648, and *Thompson* v. *TransAm Trucking, Inc.*, 2009 WL 1542738, at *5 (S.D. Ohio June 1, 2009) — which relies on *NCFE IV* for its ruling on reliance — as examples of cases that declined to rule on the issue of justifiable reliance at the motion to dismiss stage. However, *NCFE IV* is inapposite because, as this Court knows, that case involved a multidistrict litigation with multiple transactions entered into by a multitude of parties scattered across the country and thus implicated complicated procedural issues necessitating further factual development on various elements of the negligent misrepresentation claim. Those concerns simply are not present here.

In any event, Plaintiffs did *not* as a matter of law justifiably rely on the Rating Agencies' credit ratings.  Plaintiffs assert that they are part of a group of "qualified institutional investors" (*See, e.g.*, Opp. at 3, 85; Compl. ¶ 157-58).  "Qualified institutional investors" are the most financially sophisticated of market participants.[34]  Plaintiffs' sophistication is underscored by their own enabling statutes:  indeed, Plaintiffs are statutorily required to appoint "investment expert members" to their respective boards of trustees to aid in the "management, analysis, supervision, or investment of assets," and to designate state-qualified "investment managers" to oversee the billions of dollars in investments that Plaintiffs maintain.  *See, e.g.*, Ohio Rev. Code §§ 145.04(E), 148.02, 742.03(B)(2), 3307.05(C), 3309.05(D) (requiring appointment of "investment expert members" to the board of trustees for PERS, Deferred Comp, OP&F,  STRS, and SERS, respectively); *id.* §§ 145.116(A), 742.116(A), 3307.154(A), 3309.159(A) (requiring designation of "investment managers" by the board of trustees of PERS, OP&F, STRS, and SERS, respectively).  *See also* Compl. ¶¶ 16, 18, 20, 22, 24.  These facts are not in dispute.

However, despite Plaintiffs' *own* statements touting their investment sophistication, and despite both the SEC rule certifying Plaintiffs to participate in transactions reserved for sophisticated investors and the Ohio enabling statutes requiring Plaintiffs to employ investment experts, Plaintiffs nonetheless ask this Court to accept their argument that they were justified in blindly relying on credit ratings to the exclusion of all other factors.  Plaintiffs cannot be heard to claim sophistication and ignorance simultaneously.  Indeed, courts have held that a sophisticated investor cannot claim justifiable reliance when it failed to undertake an investigation of its own.  *See, e.g.*, *DDJ Management., LLC* v. *Rhone Group, LLC*, 875 N.Y.S.2d 17, 19 (1st Dep't 2009) ("[A]

---

[34]  Namely, the SEC has deemed qualified institutional investors — termed "qualified institutional buyers," or "QIBs," by the SEC — sophisticated enough to participate in the generally unregulated Rule 144A market for private resales of restricted securities.  *See* 17 C.F.R. § 230.144A.  Generally speaking, QIBs include insurance companies, investment companies, business development companies, small business investment companies, employee benefit plans, charitable organizations, corporations, partnerships, business trusts, or investment advisors, acting on their own account, with at least $100 million in securities under management.  *See id.*  Plaintiffs easily meet this monetary threshold.  (Compl. ¶¶ 17, 19, 21, 23, 25).

sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it. . . . [S]ophisticated investors, as here, must have discharged their own affirmative duty to exercise ordinary intelligence and conduct an independent appraisal of the risks they are assuming." (citations and internal quotations marks omitted)); *Zanett Lombardier, Ltd.* v. *Maslow*, 815 N.Y.S.2d 547, 548 (1st Dep't 2006) (dismissing plaintiffs' misrepresentation claim stemming from investment losses because, *inter alia*, "plaintiffs, as sophisticated investors, [could not] validly claim justifiable reliance under these circumstances, as they could have discovered the underlying condition and true nature of both companies by ordinary intelligence or with reasonable investigation").

Despite Plaintiffs' attempt to distinguish it, *Quinn* v. *McGraw-Hill Cos.*, 168 F.3d 331 (7th Cir. 1999), is squarely on point and supports dismissal for failure to plead reliance.  (Opp. at 98 n.70).  In *Quinn*, plaintiff, a sophisticated investor, invested funds in a certain type of ABS known as collateralized mortgage obligations ("CMOs"), the issuance of which, as here, were conditioned on receipt of an investment grade credit rating by a credit rating agency — in that case, S&P.  *Id.* at 332-33.  When the CMOs started performing poorly, S&P downgraded its ratings, the market value of the CMOs plummeted, and the plaintiff sued S&P for, *inter alia*, negligent misrepresentation.  The Seventh Circuit affirmed the lower court's dismissal of the claim, holding:

> [N]o reasonable jury could find that [plaintiff] reasonably relied on S & P's evaluation of the quality of the bonds.  At best, he might have hoped that the bonds would retain a higher market value than they should have had for some period of time, until the true facts came out.  Ultimately, of course, matters evolved to the point where S & P decided it had no choice but to downgrade the bonds steeply.  While it is unfortunate that [plaintiff] lost money, and we take him at his word that he would not have bought the bonds without the S & P "A" rating, any reliance he may have placed on that rating to reassure himself about the underlying soundness of the bonds was not reasonable.

*Id.* at 336.  Here, too, Plaintiffs' conclusory allegation that they would not have invested in the MBS but for the Rating Agencies' ratings is simply not enough to allege justifiable reliance.

Moreover, in *Quinn*, the plaintiff received a letter cautioning that the S&P rating was "not a recommendation to buy, sell, or hold any such Bonds and may be subject to revision or withdrawal at any time," and the offering memorandum and supplement both stated that "the bonds were not insured or guaranteed." *Id.* These statements, the Court held, "should have alerted [plaintiff] to the fact that he was *responsible for doing his own homework* about the risks he was assuming." *Id.* (emphasis added). The registration statements for the MBS at issue in this case contained substantially similar statements. *See, e.g.*, Declaration of Thomas D. Warren in Support of the Rating Agencies' Motion to Dismiss the Complaint ("Warren Decl."), Ex. A ("A security rating is not a recommendation to buy, sell or hold securities and the assigning rating organization may revise or withdraw a rating at any time. The ratings do not address the possibility that holders of the offered certifications may suffer a lower than anticipated yield.").

Plaintiffs argue that such disclaimers failed to alert them of potential risks with the MBS and were defective as a matter of law, citing to *Abu Dhabi* and *Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 382 F. Supp. 2d 411 (S.D.N.Y. 2003), for support. (Opp. at 99). *Abu Dhabi*, however, addressed disclaimers only in the context of whether the credit ratings were actionable misstatements. *See Abu Dhabi*, 651 F. Supp. 2d at 176. The *Abu Dhabi* court's short discussion of reliance contained no examination whatsoever of the defendants' disclaimers or the contents thereof and is therefore irrelevant to the Court's analysis here. *See id.* at 180-81. *Merrill Lynch* is similarly inapposite. The *Merrill Lynch* court considered a single, blanket disclaimer that "neither party makes any representation or warranty as to the accuracy or completeness of" information provided in connection with the consideration of the business acquisition at issue. *Merrill Lynch & Co.*, 382 F. Supp. 2d at 414. The defendants sought to use that blanket disclaimer to negate reliance on various subsequent representations regarding company transactions, financial well-being, and the company's officers' qualifications, but the court held that the disclaimer at issue was not sufficiently specific. 382 F. Supp. 2d at 416-18. Here, by contrast, the many individual disclaimers specifying that the ratings are not "recommendation[s] to buy, sell, or hold" appear in *separate* registration statements, and thus each speaks to a *specific* secu-

-48-

rity.[35]  As there is no blanket disclaimer being applied to the separate ratings here, the concerns

that the court in *Merrill Lynch* expressed regarding lack of specificity are plainly absent.

The disclaimers thus demonstrate that the Defendants did not supply the ratings "for the

purpose of" recommending that Plaintiffs purchase the MBS at issue.  Moreover, for the reasons

described above, Section III.C, *supra*, Plaintiffs have failed to plead a "special relationship of

trust of confidence."  Therefore, Plaintiffs fail the reliance test in *Kimmel* v. *Schaefer*, 89 N.Y.2d

257 (1996), to which they cite in their brief.  (Opp. at 98 & n.71).  Plaintiffs' negligent misrepre-

sentation claim must accordingly be dismissed.

### F.  Plaintiffs Fail Adequately to Plead Causation

Plaintiffs acknowledge that they must plead both transaction causation and loss causation

under Ohio and New York law and that the requirement is analogous to that under federal securi-

ties law.  (Opp. at 99 n.72).  Plaintiffs fail, however, to do so.  Particularly, they do not come

close to alleging that Defendants' alleged misrepresentations "*directly caused* the loss about

which plaintiff complains."  (Opp. at 100 n.73 (citing *Laub* v. *Faessel*, 745 N.Y.S.2d 534, 536

(1st Dep't 2002)) (emphasis added)).

### 1.  Even If True, the Allegations in the Complaint Do Not Establish a Causal Connection Between Defendants' Alleged Misstatements and Plaintiffs' Purported Losses

Plaintiffs' purported "loss causation" allegations either are conclusory, actually concern

transaction causation, or indicate that the collapse of the real estate market — and not Defen-

dants' ratings — caused their losses.  Plaintiffs point to five allegations that they claim allege

loss causation.  (Opp. at 101).  None do so.

First, Plaintiffs point to allegations about the amount of their alleged losses.  (Opp. at 101

(citing Compl. ¶¶ 17, 19, 21, 23, 25, 101)).  On their face, these allegations only concern the

---

[35]  The disclaimers also note that "we cannot assure you that either S&P or Moody's will continue their surveillance of the ratings assigned to the offered certificates," *see, e.g.*, Warren Decl. Ex. B, which directly counteracts Plaintiffs' claims that the Rating Agencies "[f]ailed [t]o [c]onduct [a]dequate [r]atings [s]urveillance."  (Compl. ¶ 94-96).

*amount* of their alleged loss — which Defendants dispute — and say nothing about the *cause* of their alleged losses.

Second, Plaintiffs point to allegations that "When the housing and credit markets finally collapsed, the flaws in Defendants' AAA ratings became clear. Moreover the value of the AAA rated securities dropped precipitously." (Opp. at 101 (citing Compl. ¶ 9)). While this allegation alleges that Defendants' ratings were false, as to loss causation, it actually confirms that, at core, the Complaint alleges that Plaintiffs' losses were caused *by the collapse of the housing and credit markets*, not by Defendants' ratings.

Third, Plaintiffs point to the allegation that "The Rating Agencies' false and misleading representations regarding their ratings — most prevalently, the inflated ratings themselves — caused the Ohio Funds to suffer significant losses *when the real estate market collapsed during the last two years*." (Opp. at 101 (quoting Compl. ¶ 100) (emphasis added)). This conclusory allegation demonstrates again Plaintiffs' seeming awareness that their losses were in fact caused by the collapse of the housing market.

Fourth, Plaintiffs point to the allegation that "Defendants' high ratings were a precondition of the arrangers issuing the ABS." (Opp. at 101 (citing Compl. ¶¶ 107, 117, 127, 137, 147)). While this allegation, if true, may be relevant to *transaction* causation, it once again says nothing about the cause of Plaintiffs' purported *losses*.

Finally, Plaintiffs point to allegations that "The ABS Plaintiffs purchased lost value when Defendants corrected the inflated ratings and/or the market became aware of the true credit risk of the putatively highly rated ABS." (Opp. at 101 (citing Compl. ¶¶ 104, 114, 124, 134, 144)). However, Plaintiffs point to no actual corrective disclosure or losses suffered as a result of such disclosure. *See Indiana State District Council of Laborers and HOD Carriers Pension and Welfare Fund* v. *Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) ("Loss causation requires a causal connection between the material misrepresentation and the loss. . . . [A] plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market." (citations and internal quotation marks omitted)). In fact, as Plain-

-50-

tiffs acknowledge repeatedly, the collapse of the real estate market was the true cause of their losses.[36] (Opp. at 8-9, 45, 101; Compl. ¶¶ 9, 100).

> ### 2. Plaintiffs' Alleged Losses Were Caused by a Marketwide Collapse that the Court May Properly Consider on a Motion to Dismiss

Plaintiffs' Opposition Brief confirms that the collapse of the housing and credit market was the true cause of Plaintiffs' claimed losses.[37] (Opp. at 8-9, 45, 101). Having said that, Plaintiffs take feigned umbrage that Defendants would identify this true cause of their losses. Plaintiffs argue that the Court should not consider this intervening event at this stage and then, incredibly, argue that Defendants are precluded from making the argument because they are *the sole cause* of the greatest worldwide economic collapse since the Great Depression. (Opp. at 103). The first argument is wrong as a matter of law and the second — which is nowhere alleged in the actual Complaint — is not only inappropriately raised in Plaintiffs' Opposition Brief, but also implausible on its face.

First, Plaintiffs cite to *In re Moody's Corp. Securities Litigation*, 599 F. Supp. 2d 492, 513 (S.D.N.Y. 2009), for the proposition that the Court should not consider the marketwide financial collapse at the motion to dismiss phase. In fact, *In re Moody's* stands for just the opposite. The court held there that, in the case of a proffered *company-specific* intervening event,

---

[36] Plaintiffs' reliance on *In re Ambac Financial Group, Inc. Securities Litigation*, 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010), is misguided, as that case is completely inapposite. (Opp. at 104). There, *in its scienter analysis*, the court considered Ambac's argument that "the more compelling inference is that Ambac's officers could not predict the economic collapse" and rejected it because the plaintiffs alleged that Ambac's officers were "active participant[s] in the collapse of their own business." *In re Ambac*, 2010 WL 727227, at *21-*22. The financial crisis did not factor in the loss causation analysis in that case because, unlike here, the complaint "identifie[d] several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and also allege[d] that the value of plaintiffs' Ambac stock declined immediately following the corrective disclosures." *Id.* at *25.

[37] Setting aside the cause of their losses, Plaintiffs have not even adequately alleged the existence of losses. Defendants do not argue that Plaintiffs "cannot allege loss causation without alleging that they sold ABS." (Opp. at 102). But Plaintiffs must do more than simply state what their alleged losses are. Despite Plaintiffs' argument to the contrary, "'it is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality.'" *In re Moody's Corp. Securities Litigation*, 599 F. Supp. 2d 493, 512 (S.D.N.Y. 2009) (quoting *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)). Indeed, Plaintiffs do not allege that any of the fixed income securities they purchased have defaulted — especially telling given that the risk of default is the very issue upon which Defendants (allegedly falsely) opined.

"the question of causation is reserved for trial and is not subject to analysis in a Rule 12(b)(6) motion to dismiss.   Where there is *a market-wide downturn* in a particular industry, however, *Plaintiffs must show that their loss was caused by the Defendants' fraud*, rather than the intervening events, in order to survive a motion to dismiss."  *Id.* (emphasis added) (internal citation omitted).  Plaintiffs conveniently omit the second, and critically relevant, sentence of the court's holding, which makes quite clear that the Court *should* consider undisputed marketwide phenomena, including the collapse of the housing market, on this motion to dismiss.  Indeed, the appropriateness of consideration of a marketwide collapse is made crystal clear in *Lentell*, also cited by Plaintiff:

> [W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.  Though all reasonable inferences are drawn in the plaintiff's favor on a motion to dismiss on the pleadings, conclusions of law or unwarranted deductions of fact are not admitted.

*Lentell*, 396 F.3d 161, 174-75 (2d Cir. 2005) (alteration in original) (citations and quotation marks omitted).[38]

Nor does Plaintiffs' second argument — that the Court should ignore the fact that a marketwide collapse caused their losses because, they maintain, *Defendants are the true cause of that collapse* (Opp. at 103-04) — pass muster.   Nothing in the Complaint or the SEC Report cited throughout the Complaint makes such a bold, and facially implausible, assertion or sets forth any plausible factual basis for such an assertion.  Plaintiffs simply cannot rewrite their Complaint through their Opposition Brief.  *See American Motorist Insurance Co.* v. *Custom Rubber Extrusions, Inc.*, 2006 WL 2460861, at *11 (N.D. Ohio Aug. 23, 2006)  (plaintiff "can-

---

[38]  Plaintiffs also cite to *In re National Century Financial Enterprises, Inc., Investment Litigation*, 604 F. Supp. 2d 1128 (S.D. Ohio 2009) ("*NCFE V*"), for the proposition that consideration of the role of the marketwide real estate collapse is premature.  (Opp. at 103).  As the Court knows well, *NCFE V* says nothing of the sort, but rather states the uncontroversial principle that an event may have more than one proximate cause.  *NCFE V*, 604 F. Supp. 2d at 1147.

not use an opposition brief as a vehicle to amend its Complaint"); *see also Dawson* v. *Bumble &*
*Bumble*, 246 F. Supp. 2d 301, 316 (S.D.N.Y. 2003) (attempts to "rewrite or amend the Com-
plaint through [a party's] opposition brief" are not permitted).

Moreover, the *fact* of the economic crisis is not in dispute and Plaintiffs cannot simply
ignore it.  Indeed, a New York court has recently considered the current financial crisis in assess-
ing the adequacy of pleading loss causation at the motion to dismiss stage.  In *Healthcare Fi-
nance Group, Inc.* v. *Bank Leumi USA*, 669 F. Supp. 2d 344 (S.D.N.Y. 2009), a case involving
investments in auction rate securities, the court dismissed fraud claims on a Rule 12 motion,
holding that while plaintiffs adequately pleaded transaction causation, they failed to plead loss
causation where their losses were caused by the marketwide collapse of the auction rate securi-
ties market.  *Id.* at 349-50.

As demonstrated in Defendants' Opening Brief, the Complaint utterly fails to plead a
causal connection between their losses and any alleged misstatements by Defendants.  (Defs. Op.
Br. at 37-41).  Nothing in Plaintiffs' Opposition Brief cures this fatal defect in the Complaint.

### G.    Plaintiffs' Claims Are Time-Barred in Whole or in Part

As demonstrated in Defendants' Opening Brief, Plaintiffs' negligent misrepresentation
claim is also time barred under both New York's three-year statute of limitations for negligent
misrepresentation claims (which runs from the date of reliance) and Ohio's two-year statute of
limitations for securities claims (which runs from the date of inquiry notice).

In response, Plaintiffs first creatively assert that the doctrine of *nullum tempus* precludes
the applicability of the Ohio statute of limitations to their claim, arguing that as "instrumentali-
ties of the state," their claims are subject to *no statutes of limitation whatsoever*.  Plaintiffs argue
in the alternative that even if the two-year Ohio statute of limitation did apply, they were not on
inquiry notice of their claims by November 2007 because despite the countless public sources
drawing such claims to their attention, these "storm warnings" were accompanied by public de-
nials from Defendants' executives.  Finally, Plaintiffs assert that even if New York law were to
apply, the relevant statute of limitation for negligent misrepresentations is six years, not three

-53-

years.  For the reasons detailed below, the Court should reject Plaintiffs' attempts to escape the clear statutes of limitations that bar their claim.

> **1.    The Three-Year Statute of Limitations Applied Under New York Law Bars Plaintiffs' Claim for Negligent Misrepresentation**

Without further detail, Plaintiffs generally allege in the Complaint that they purchased the 308 securities at issue in this case at some point(s) in time "between January 1, 2005 and July 8, 2008."  (Compl. ¶ 1).  Despite Plaintiffs' strange refusal to plead which securities were purchased when, under New York's three-year statute of limitations that runs from the date of reliance (here, the date of purchase, at the latest), any claims premised upon securities purchased prior to November 20, 2006 are plainly time-barred, pursuant to N.Y. CPLR 214.[39]  *See* N.Y. CPLR 214(4) ("The following actions must be commenced within three years: . . . an action to recover damages for an injury to property except as provided in section 214-c . . . ."); *In re Argo Communications Corp.*, 134 B.R. 776, 796 (S.D.N.Y. 1991) ("[W]ere the charge of negligent misrepresentation viewed strictly in terms of negligence, the claim would be time-barred by the three-year limitations period provided in CPLR § 214(4).").[40]

Plaintiffs attempt to avoid this fundamental defect by arguing that, if New York law controls, this Court should follow the six-year "catch-all" limitations period provided by N.Y. CPLR 213(1) which governs all claims "for which no limitation is specifically proscribed by law." (Opp. at 82-83).  Yet, what Plaintiffs fail to acknowledge is that while certain negligent misrepresentation actions are subject to a six-year statute of limitations under New York law, that is *not* the general rule in New York.  The cases Plaintiffs cite are examples of a specific *exception* to

---

[39]  While Plaintiffs refuse to specify the dates of purchase, publicly available information on the securities demonstrates that at least 214 of the 308 securities — at least 69% — were issued prior to November 20, 2006.

[40]  Plaintiffs' invocation of the *nullum tempus* doctrine — an exception to the application of Ohio statutes of limitations carved out for Ohio state entities — is irrelevant to the determination of the timeliness of the Plaintiffs' complaint, as New York law applies.  *Lippe* v. *Bairnco Corp.*, 225 B.R. 846, 854 (S.D.N.Y. 1998) ("New York does not recognize the [*nullum tempus*] doctrine . . ."). Moreover, as discussed *infra* at Section III.G.2.a, even if Ohio law were to apply to Plaintiffs' negligent misrepresentation claim, this action does not implicate the *nullum tempus* doctrine.

the general three-year limitations rule for negligent misrepresentation claims that *sound in fraud*. *See Von Hoffmann* v. *Prudential Insurance Co. of America*, 202 F. Supp. 2d 252, 263 (S.D.N.Y. 2002) (holding that a negligent misrepresentation claim "based on the same facts as a claim for fraud is governed by the six-year statute of limitation"); *Seneca Insurance Co.* v. *Wilcock*, 2002 WL 1067828, at *5 (S.D.N.Y. May 24, 2002) (a "six-year statute of limitations applies to claims of negligent misrepresentation if the claim is akin to an action for fraud"); *Fromer* v. *Yogel*, 50 F. Supp. 2d 227, 242 n.13 (S.D.N.Y. 1999) (applying six-year statute of limitations "because the essential claim of the complaint sounded in fraud").[41]  In other words, as demonstrated in Defendants' Opening Brief, because Plaintiffs have deliberately avoided allegations sounding in fraud, there is no dispute that their negligent misrepresentation claim is subject to the three-year statute of limitation of N.Y. CPLR 214.  (Defs. Op. Br. at 45).  *See, e.g.*, *Gianakakos* v. *Commodore Home Systems Inc.*, 727 N.Y.S.2d 806, 808 (3d Dep't 2001) ("[C]auses of action sounding in negligence . . . are subject to the three-year Statutes of Limitation . . .").[42]  As such, they are plainly time-barred.

---

[41]  The cases Plaintiffs cite each clearly involved negligent misrepresentation claims that sounded in fraud.  *See, e.g.*, *Milin Pharmacy, Inc.* v. *Cash Register Systems, Inc.*, 570 N.Y.S.2d 341, 341 (2d Dep't 1991) (considering "an action . . . to recover damages *for fraud and* negligent misrepresentation" (emphasis added)).  The only case cited by Plaintiffs not involving fraud is *Doss, Inc.* v. *Christie's Inc.*, 2009 WL 3053713 (S.D.N.Y. Sept. 23, 2009), and that was an action based on contract, which is clearly subject to the six-year limitation.  *Id.* at *1.

[42]  If the Court were to determine that the Complaint sounds in fraud and, thus, should be governed by the longer statute of limitations period, then Plaintiffs will face a different, but equally insurmountable, legal hurdle — the fact that their pleading clearly does not stand up to the rigors of Rule 9(b), which applies to negligent misrepresentation claims that sound in fraud.  *See, e.g.*, *In re National Century Financial Enterprises., Inc.*, 504 F. Supp. 2d 287, 321-23 (S.D. Ohio 2007) ("*NCFE II*") (holding that Rule 9(b) applies to claims that, while not styled as fraud claims, nonetheless sound in fraud); *In re Parmalat Securities Litigation*, 479 F. Supp. 2d 332, 339 n.30 (S.D.N.Y. 2007) (applying Rule 9(b) because the negligent misrepresentation claim "reallege[d] and incorporate[d] by reference all prior allegations including those alleging fraud" (internal quotation marks omitted)).  However, Plaintiffs explicitly reject this notion in their papers when they state that their negligent misrepresentation claim is subject to Rule 8. (Opp. at 9).  Simply put, Plaintiffs cannot have it both ways:  either their Complaint is timely and subject to Rule 9(b) because it sounds in fraud; or it is subject to Rule 8, as they claim in their Opposition Brief, but untimely (at least in substantial part) because it does not sound in fraud, and the three-year statute of limitations applies.  Either way, Plaintiffs' claim should be dismissed.

## 2.    Plaintiffs' Claims Are Untimely Under Ohio Law

While New York law governs Plaintiffs' negligent misrepresentation claim, *see supra* Section III.A, application of Ohio law also requires dismissal. As Plaintiffs recognize, Ohio Rev. Code. § 1707.43(B) prescribes a two-year statute of limitations for Plaintiffs' claim, which begins to run from the date that Plaintiffs had notice of the bases of their purported claims. Plaintiffs respond to this by arguing that (1) they are not subject to any Ohio statute of limitations under the doctrine of *nullum tempus*; and (2) their claims are timely in any event because Plaintiffs were not on notice of their claims until less than two years before they brought this action. Neither of these arguments has merit.

### (a)    *The Nullum Tempus Doctrine Does Not Apply to Plaintiffs' Claim*

Plaintiffs seek to avoid the clear application of § 1707.43(B) by invoking the *nullum tempus* doctrine, "an attribute of sovereignty" that prevents the application of "generally worded" statutes of limitations to claims where the State is seeking to enforce its laws and regulations for the benefit of the general public. *See State* v. *Sullivan*, 527 N.E.2d 798, 800-01 (Ohio 1988). Specifically, Plaintiffs claim that (a) they are instrumentalities of the State of Ohio, and (b) as such, they may invoke the *nullum tempus* doctrine. Plaintiffs' arguments are not only wrong, but are inconsistent with positions they have taken in other cases. Moreover, the application of the *nullum tempus* doctrine to a case like this — in which pension funds are seeking to vindicate their rights — is entirely unprecedented under Ohio law and should accordingly be rejected by this Court. Indeed, Plaintiffs cite no Ohio case — because none exists — that excludes quasi-private entities from an Ohio statute of limitations in a traditional tort suit such as this one.

In support of their *nullum tempus* defense, Plaintiffs first point to three cases for the proposition that they are instrumentalities of the State. (Opp. at 71). Yet none of these cases concern the *nullum tempus* doctrine, and, more importantly, in determining that Plaintiffs are instrumentalities, these cases *expressly distinguish Plaintiffs from other State entities that traditionally enjoy* nullum tempus *protection. See Fair* v. *SERS*, 335 N.E.2d 868, 872 (Ohio Ct. App. 1975) (noting that SERS is not a political subdivision, which is an entity that "has been delegated

certain local *governmental functions* to perform" within "a geographical or territorial portion of the state") (emphasis added); Ohio Op. Atty. Gen., at *13 No. 2004-014 (2004) (concluding that state retirement systems "are not state agencies . . . because they do not exercise their statutory functions *on behalf of the state*" (emphasis added)); *see also In re Ford*, 446 N.E.2d 214, 216 (Ohio Ct. App. 1982) ("For the reason we noted in *Fair*, *supra*, [STRS] is not a political subdivision . . .").  It is also notable that, while now attempting to fashion itself as an instrumentality of the State of Ohio, Plaintiff PERS has previously denied being part of the State, arguing that it was *not* an instrumentality of Ohio, and thus was not subject to the jurisdiction of the Ohio Court of Claims.  *Jackson A&E, Assocs.* v. *OPERS*, 2003 WL 22999448, at *2 (Ohio Ct. App. Dec. 23, 2003).

In any event, even if Plaintiffs could be considered to be state instrumentalities, *nullum tempus* protection still would not apply.  Indeed, neither of the two cases that Plaintiffs cite for the proposition that instrumentalities may invoke the *nullum tempus* doctrine involve instrumentalities at all.  Rather, they involve a political subdivision and state agency, respectively — *precisely* the entities that the other cases cited by Plaintiffs *distinguish* from instrumentalities.  *See Law* v. *Lake Metroparks*, No., 2006 WL 3833863, at *2 (Ohio Ct. App. Dec. 29, 2006) (considering whether a *political subdivision* may invoke the *nullum tempus* doctrine for purposes of adverse possession), *aff'd*, 116 Ohio St. 3d 322 (2007); *In re Ghali,* 615 N.E.2d 268, 272 (Ohio Ct. App. 1992) (holding that a *state agency* could seek refuge in the doctrine).

Unable to cite to any applicable Ohio authority, Plaintiffs instead cite to a Kansas case applying Kansas law and deciding that the *nullum tempus* doctrine applied to a Kansas retirement fund.  (Opp. at 72).  Of course, this lone case cited by Plaintiffs does not represent an authoritative statement of law in this Court, nor of Ohio law at all.  Additionally, the chief factor in that court's determination was that the investment losses at issue in that case *would be covered by the State*, and thus the suit to recover those losses was "primarily for the advantage of the state as a whole."  *KPERS* v. *Reimer & Koger Assocs.*, 941 P.2d 1321, 1330-31 (Kan. 1997).  By contrast, Plaintiffs here are directed by statute to create "defined contribution" plans, *see* Ohio Rev. Code

-57-

3736226v1

§ 145.80 *et seq.*; *id.* § 3307.80 *et seq.*; *id.* § 3309.80 *et seq.*, and such plans depend upon members' inputs, not the State's output.

In any event, even if Plaintiffs were considered part of the State for *nullum tempus* purposes — and they clearly cannot be — their invocation of the rule would still fail, as Plaintiffs' claims are not brought in a governmental capacity.  "As a general matter, the doctrine of *nullum tempus* typically applies where the government acts as a sovereign and seeks to vindicate public, not private, rights."  *Williams* v. *Infra Commerc Anstalt*, 131 F. Supp. 2d 451, 457 (S.D.N.Y. 2001).  Ohio courts recognize the distinction in various immunity contexts, *see Holbrook* v. *Brandenburg*, 2009 WL 1387192, at *3 (Ohio Ct. App. May 15, 2009), and have explicitly stated that "the statute of limitations *does* run against the divisions of the state . . . in all matters touching their proprietary or private interests and possessions, as distinguished from their governmental interests or public interests or possessions."  *Hamilton County Commissioners* v. *Cincinnati H. & D. Ry.*, 23 Ohio Dec. 426, 432 (Ct. Com. Pl. 1911) (emphasis added), *rev'd on other grounds*, 112 N.E. 1081 (1915); *see also United States* v. *Mandycz*, 447 F.3d 951, 964 (6th Cir. 2006) (noting an exception "when the government stands in the shoes of a private party, as opposed to when it acts in its sovereign capacity").

In determining whether a particular action on the part of an entity is proprietary or governmental, courts examine (1) who is affected by the activity in question, noting that a "public right is one with statewide implications affecting *all of the people of the state*," while a private right only affects a limited scope of the inhabitants, *see R.A. Civitello Co.* v. *City of New Haven*, 504 A.2d 542, 546 (Conn. Ct. App. 1986) (emphasis added), *superseded by statute on other grounds as stated in Padula v. Weston Board of Education*, 2009 WL 1958735, at *6 (Conn. Super. Ct. June 9, 2009); and (2) whether the activity at issue is "pecuniary activity" that is of "a type historically performed by private individuals," as such acts "are proprietary in nature."[43]

---

[43]  The cases cited by Plaintiffs are consistent with this distinction.  The Court in *Lake Metroparks* explicitly recognized that the park in question was being protected "for public travel," 2006 WL 3833863, at *4, while the Court in

Footnote continued on next page.

3736226v1

*Rowan County Board of Education* v. *United States Gypsum Co.*, 418 S.E.2d 648, 654 (N.C. 1992). Plaintiffs in this case are pension funds for private individuals, not for the benefit of the entire state of Ohio. Indeed, the provisions of the Ohio code governing Plaintiffs explicitly state that Plaintiffs "shall discharge their duties with respect to the funds *solely in the interest of the participants* . . . [and] for the *exclusive purpose of providing benefits to participants*." Ohio Rev. Code § 145.11; *id.* § 742.11; *id.* § 3307.15; *id.* § 3309.15 (emphasis added). In this action, Plaintiffs (1) are suing to collect funds invested on behalf of their members, and (2) were engaged in investment in private securities offerings for the benefit of members, an activity that is qualitatively distinct from those typically considered governmental in nature. Indeed, "[w]hen the state sends its agencies into the market to engage in ordinary commercial and property transactions indistinguishable from those of private enterprises," those transactions receive "the same security against belated litigation" as deals between private entities. *DeFazio* v. *Washington Public Power Supply System*, 679 P.2d 1316, 1349 (Or. 1984). Unlike a State "enforcing rights that are unique to it, or otherwise peculiar to the operation of government," Plaintiffs here attempt to enforce "rights that are essentially equivalent to those that private parties may have." *Mecklenburg County* v. *Time Warner Entertainment-Advance/Newhouse Partnership*, 2010 WL 391279, at *12 (W.D.N.C. Jan. 26, 2010). Therefore, Plaintiffs' attempt to invoke the *nullum tempus* statute of limitations defense available in limited circumstances to a sovereign state is simply unavailing here.

---

Footnote continued from previous page.

*In re Ghali*, 615 N.E.2d 268, 271 (Ohio Ct. App. 1992) dealt with a state agency's attempt to enforce state regulations pursuant to "its duty to protect the public welfare."

>    **(b)**    *Plaintiffs were on Inquiry Notice of Their Claims More than Two-Years Before the Complaint Was Filed*

In the alternative, Plaintiffs argue that their claims are not barred by Ohio's two-year statute of limitations because they were not on inquiry notice of those claims by November 20, 2007, two years before they filed this action.[44]

As demonstrated in the Opening Brief, to establish that Plaintiffs were on inquiry notice of their claim prior to November 2007, Defendants need only show that Plaintiffs were "presented with evidence suggesting the possibility" of their claims, *Sims* v. *Ohio Casualty Insurance Co.*, 151 Fed. App'x 433, 436 (6th Cir. 2005) (citations and internal quotation marks omitted), or were presented with "'circumstances [that] would suggest to an investor of ordinary intelligence the probability that she [had a claim].'" *Lentell*, 396 F.3d at 168 (quoting *Levitt* v. *Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003)); Defs. Op. Br. at 45-46.

In the Opening Brief, Defendants cited to countless public sources published prior to November 2007 that raised questions about the very same practices upon which Plaintiffs purport to frame their claim here.  (Defs. Op. Br., Exs. E-J).  Defendants also cited to not one, but three, separate complaints filed before November 2007 that contain allegations virtually identical to the allegations raised by Plaintiffs here.  The central assertion in those pleadings — just like in the Complaint here — was that the plaintiffs lost money because the Rating Agencies "misrepresented or failed to disclose that [they] assigned excessively high ratings to bonds backed by risky

---

[44] Plaintiffs' suggestion that the question of inquiry notice cannot be decided on a Rule 12(b)(6) motion to dismiss is plainly wrong, as courts have, in "'a vast number of cases,'" dismissed actions involving plaintiffs that were on inquiry notice on 12(b)(6) motions.  *Lentell*, 396 F.3d at 168 (quoting *LC Capital Partners, LP* v. *Frontier Insurance Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003)).  *See, e.g.*, *Dodds* v. *Cigna Securities, Inc.*, 12 F.3d 346, 352 n.3 (2d Cir. 1993) ("Where, as here, the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate."); *Hoover* v. *Langston Equipment Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992) (holding that statute of limitations defense may be raised on a motion to dismiss where it is apparent from the face of the complaint that the claim is untimely); *Smith* v. *Asbell*, 2005 WL 1111630, at *10-*11 (Ohio Ct. App. May 6, 2005) (holding that the plaintiff "had the requisite constructive notice to trigger the statute of limitations" and "that the trial court properly dismissed the case because the allegations in the complaint concede that the statute of limitations had already expired").

subprime mortgages . . . . [and] maintained . . . excessively high ratings, rather than downgrade the bonds to reflect the true risk of owning subprime-mortgage-backed debt," as a result of conflicts of interest which allowed them to "reap[] millions of dollars in fees." (Defs. Op. Br., Ex. L, at ¶¶ 3-4; *see also id.* Exs. M, N). That is precisely what Plaintiffs have claimed in this action. Indeed, Plaintiffs' central allegation here is that the Rating Agencies "falsely represented that their AAA credit ratings were independent, objective, and based upon thoughtful and adequate methodologies . . . . and negligently provided unjustified and inflated ratings in exchange for the lucrative fees." (Compl. ¶ 2).[45]

It is clear, then, that Plaintiffs were on inquiry notice of their claims prior to November 2007 and thus had a "duty to begin investigating the possibility of fraud." *Greenburg* v. *Hiner*, 359 F. Supp. 2d 675, 682 (N.D. Ohio 2005), *aff'd*, 173 Fed. App'x 367 (6th Cir. 2006). In fact, a recent case involving credit rating agencies' ratings of MBS strongly suggests that Plaintiffs were on notice of their claims as early as 2003 — well before the time period during which Plaintiffs allege they purchased the securities at issue (Compl. ¶ 1):

> [T]he risk that the ratings agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years. . . . [A] January 2003 SEC report noted that "[c]oncerns have been expressed for a number of years about the potential conflict of interest that arises from the fact that the largest credit rating agencies rely on issuer fees for the vast majority of their revenues."

*In re Lehman Bros.*, 2010 WL 545992, at *4 (second alteration in original) (citations omitted).

---

[45] Plaintiffs attempt to distract from the obvious import of these complaints by dismissively stating that the complaints were brought by the Defendants' stockholders, not MBS securities purchasers, as in this case. Plaintiffs' contention that the complaints cannot provide notice because they do not involve identical actions by similarly situated plaintiffs is entirely without merit. The only case referenced by Plaintiffs demonstrates just this point. In *City of Painesville* v. *First Montauk Financial Corp.*, 178 F.R.D. 180 (N.D. Ohio 1998), the Court did not find that the earlier complaint put the plaintiff on warning, but it reached its conclusion not because there were different claims or parties, but instead because the central *factual allegations* of the latter complaint did not appear at all in the former. *Id.* at 195 (no inquiry notice because prior complaint "did not allege the price manipulation scheme at issue in the present action").

3736226v1

Plaintiffs effectively concede that they made no investigation of Defendants' conduct prior to November 20, 2007. This failure is fatal: "If Plaintiffs conducted no inquiry when their awareness of 'storm warnings' gave rise to the duty to investigate, knowledge of the fraud 'will be imputed as of the date the duty arose.'" *Greenburg*, 359 F. Supp. 2d at 682 (quoting *LC Capital*, 318 F.3d at 154); *see also Domenikos* v. *Roth*, 288 Fed. App'x 718, 720 (2d Cir. 2008) ("[W]here an investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." (citation and internal quotation marks omitted)); *Staehr* v. *Hartford Financial Services Group, Inc.*, 547 F.3d 406, 426 (2d Cir. 2008) (same); *Lentell*, 396 F.3d at 168 (same); *Levitt*, 340 F.3d at 103 (same).

Not to be deterred, Plaintiffs actually try to argue that the numerous "storm warnings" outlined in Defendants' Opening Brief did not have the effect of putting them on inquiry notice. (Defs. Op. Br. at 46-49). First, Plaintiffs claim that the "storm warnings" did not relate to the specific securities they purchased. They then suggest that the "storm warnings" were not sufficiently "company-specific." Next, Plaintiffs vainly argue that because the "storm warnings" were accompanied by public defenses from Defendants, Plaintiffs were somehow excused of their responsibility to investigate. Finally, Plaintiffs reference other third-party investigations by Congress and the SEC that were not completed until after November 2007, purportedly excusing them of their independent duty to investigate the claims. For the reasons explained below, each of these arguments is easily rejected.

First, Plaintiffs' suggestion that the "storm warnings" were insufficient because they allegedly did not directly concern the *specific securities they purchased* borders on the specious. (Opp. at 75). That level of specificity is simply not required to establish inquiry notice, nor can Plaintiffs credibly argue otherwise.[46] Rather, "[c]ircumstances must be sufficient to place [Plain-

---

[46] Ironically, Plaintiffs' own claim is based on the same generalized allegations; Plaintiffs make virtually no allegations regarding the specific offerings about which they sue.

tiffs] on notice as to serious problems . . . .  It is not necessary, however, that [Plaintiffs] have knowledge of *all* facts necessary to bring an action . . ."  *Hayes* v. *Mid-Ohio Securities, Corp.*, 2006 WL 2233234, at *4 (N.D. Ohio Aug. 3, 2006) (emphasis in original).  Thus, the Sixth Circuit does not require that Plaintiffs "secure[] direct evidence of [the Rating Agencies'] culpability" before running the statute of limitations.  *Wyser-Pratte Management Co.* v. *Telxon Corp.*, 413 F.3d 553, 564 (6th Cir. 2005).  Here, the relevant "storm warnings" concerned MBS assets in general, the precise type of assets underlying Plaintiffs' claims.

Second, Plaintiffs' repeated insistence that the publicly available information must be company-specific is also legally without force.  Indeed, the very source that Plaintiffs cite for their assertion that "[w]ithout details of 'company-specific' wrongdoing, the various articles do not give rise to storm warnings as a matter of law" (Opp. at 76) directly refutes that claim: "[W]e have not created a categorical rule that inquiry notice can only be triggered by public pronouncements containing company-specific information . . ."  *Staehr*, 547 F.3d at 429.  Rather, the company-specific requirement repeatedly relied upon by Plaintiffs is a direct function of the heightened pleading requirements imposed by the Private Securities Litigation Reform Act in securities fraud cases.  *See Lentell*, 396 F.3d at 171 (holding that it is not true that "inquiry notice could never be established on the basis of non-specific public-pronouncements, *but the level of particularity in pleading required by the PSLRA* is such that inquiry notice" requires such information (emphasis added)).[47]  Even if this argument were valid, it is simply inapplicable here:

---

[47] Tellingly, all of the key cases cited by Plaintiffs involve the Private Securities Litigation Reform Act.  *See, e.g.*, *Staehr*, 547 F.3d 406; *Lentell*, 396 F.3d 161; *Levitt*, 340 F.3d 94.  PSLRA cases impose a heightened pleading burden by requiring the plaintiffs to plead them with "particularity."  *Lentell*, 396 F.3d at 168-70.  Thus, as one court explained, "[g]iven the heightened pleading standard . . . it is reasonable to require that plaintiffs need more information before they may be charged with being on notice of a securities fraud claim."  *In re NovaGold Resources Securities Litigation*, 629 F. Supp. 2d 272, 288 n.6 (S.D.N.Y. 2009).  Such reasoning, while sound, is entirely inapplicable here.

This rationale also explains the decision in *In re Moody's Corp. Securities Litigation*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009).  There, the Court clearly explained that the plaintiffs' claims were subject to both the heightened pleading standards set forth in Rule 9(b) and to the PSLRA.  *Id.* at 504.  Thus, while the plaintiffs in that case may have been able to rule upon the *Staehr* Court's demand for company-specific information, Plaintiffs here cannot.

each of the five articles submitted to the court specifically name all three Defendants.  Indeed, given the nature of the Plaintiffs' pleading, and in particular their reliance on grouping the Rating Agencies, it is entirely improper for Plaintiffs to demand more of the submitted materials than they would have this Court demand of their own pleadings.

Third, Plaintiffs' reliance on alleged "public statements of reassurance and comfort" is misplaced.  (Opp. at 77).  Denials of wrongdoing are inapplicable to the inquiry notice calculus. *See Addeo* v. *Braver*, 956 F. Supp. 443, 451-52 (S.D.N.Y. 1997) (noting that once reassuring statements directly contradict public reports, it is no longer reasonable to rely upon them). Moreover, Plaintiffs' position would effectively eviscerate the inquiry notice rule entirely except in those limited situations in which a defendant publicly admits wrongdoing.

Nor can Plaintiffs excuse their failure to investigate by pointing to SEC and congressional investigations whose reports were concluded after November 2007.  (Opp. at 81).  For one thing, Plaintiffs fail to identify any information generated by these later investigations that was not previously available.  Indeed, other than a few choice quotes, the passages Plaintiffs cite from the SEC report are *nearly identical to, and not more specific than*, the criticisms levied by the various sources attached to the Rating Agencies' motion.  In any event, while the Plaintiffs focus on the results of these various investigations, they fail to recognize that not only did the SEC *begin* its investigation in August of 2007, (SEC Report at 1), and not only did Congress hold hearings on these issues in September 2007, (Defs. Op. Br., Exs. J, K), but the articles provided by Defendants reference several other entities either investigating or suing the Rating Agencies on the same bases that form the Plaintiffs' claims here.  (*Id.*, Exs. E, F, G, H).  Therefore, as the *Greenburg* court recognized, inquiry notice is a standard that evaluates what a Plaintiff could have discovered through a reasonable investigation.  It does not reward plaintiffs who merely wait for others to discover such facts.  *Greenburg*, 359 F. Supp. 2d at 682 ("Plaintiffs are not permitted to [m]erely bring[] suit after the scheme has been laid bare through the efforts of others." (alteration in original) (citation and internal quotation marks omitted)); *Havenick* v. *Network Express, Inc.*, 981 F. Supp. 480, 514 (E.D. Mich. 1997) ("[I]f the investor noticed or

-64-

should have noticed the storm warnings and fails to inquire further with reasonable diligence, knowledge of the alleged fraud will be imputed to him or her."). Indeed, as noted above, "[a] reasonable investor would have known that the ratings agencies were paid by the issuers" as early as 2003. *In re Lehman Bros.*, 2010 WL 545992, at *4. Clearly, then, Plaintiffs did not conduct a reasonable investigation into Defendants' conduct prior to November 20, 2007.

For these reasons, Plaintiffs' claims are untimely under Ohio law as well.

## IV.
## PLAINTIFFS' BLUE SKY CLAIMS MUST BE DISMISSED

Plaintiffs do not contest that no credit rating agency has ever been found liable under the Blue Sky laws of Ohio or, indeed, of any other state. Nor do they offer any basis for subjecting the Rating Agencies to state security law regulation in the face of the SEC's exclusive authority under CRARA to regulate their activities. *See* Section II, *supra*.

Even more strikingly, Plaintiffs' Opposition Brief highlights the fundamental — and fatal — defect in their Blue Sky claims: the Rating Agencies are not "sellers" of securities as a matter of law, and there is indeed no claim in this action against *any* seller. Plaintiffs effectively concede, as they must, that, as this Court has previously held, rating agencies are not sellers because they did not offer any securities for sale. (Opp. at 108-09). Instead, in a transparent and far-fetched attempt to salvage a claim under Ohio Rev. Code § 1707.41, they claim that the Rating Agencies "receive[d] the profits accruing from" the sale of securities. (*Id.*). But both the law and Plaintiffs' own allegations are flatly inconsistent with the tortured assertion that rating agencies can be held liable under Section 1707.41 as an alleged receiver of profits.

The inability to identify an actionable sale by any seller also undermines Plaintiffs' argument that a sufficient nexus exists to apply Ohio's Blue Sky claims to New York based Rating Agencies. Moreover, it conclusively negates their "secondary liability" claim under Ohio Rev. Code § 1707.43 because, in the absence of any substantive, primary violation of the Ohio securities law against an actual seller, Plaintiffs simply cannot assert a claim for secondary liability against the Rating Agencies. Finally, even if Plaintiffs *had* alleged a claim against a seller, the

-65-

allegations against the Rating Agencies do not amount to aiding a seller in the *sale* of securities.

### A.    Plaintiffs Fail to Identify Facts Sufficient for a Nexus with Ohio

Plaintiffs do not dispute that the Rating Agencies are based in New York, issue all their ratings from New York, and did not in any way solicit any of the Ohio Plaintiffs to purchase the securities at issue. Significantly, while Plaintiffs seek to hold the Rating Agencies liable for their purchases of MBS, the Complaint is devoid of allegations tying the alleged actions of the Rating Agencies to the *sale* of these securities in Ohio.

These facts are dispositive of Plaintiffs' claim because they fail to establish a nexus between the alleged conduct at issue and Ohio. (Defs. Op. Br. at 50-51). They are also in stark contrast to the cases Plaintiffs cite. In both *Federated Management Co.* v. *Coopers & Lybrand*, 738 N.E.2d 842, 857-58 (Ohio Ct. App. 2000), and *NCFE IV*, 580 F. Supp. 2d 630, the issuers of the securities at issue were *based in Ohio*. Clearly, Ohio has an interest in regulating securities issued from Ohio, and has a nexus to the sale of those securities. Similarly, in *Martin* v. *Steubner*, 485 F. Supp. 88, 100 (S.D. Ohio 1979), and *Bernie* v. *Waterfront Ltd. Dividend Housing Ass'n*, 614 F. Supp. 651, 655 (S.D. Ohio 1985), the plaintiff was affirmatively solicited in Ohio, through newspaper advertisements and/or mailed letters; here, Plaintiffs do not contend that they were solicited at all, let alone solicited in Ohio.

Plaintiffs nonetheless argue that merely and solely because they are based in Ohio, Ohio's Blue Sky Laws necessarily apply. That is not the law. Plaintiffs ignore the fundamental requirement that any activities in Ohio must "directly concern the sale of" securities. *In re Revco Securities Litigation*, 1991 WL 353385, at *14 (N.D. Ohio Dec. 12, 1991). Here, given that Plaintiffs' claims are based on New York-issued ratings, and given that Plaintiffs do not assert that they were solicited or contacted in Ohio, no wrongdoing is alleged to have taken place in Ohio and the sale of these securities simply does not implicate Ohio's Blue Sky laws. *Cf. Federated Management*, 738 N.E.2d at 857 (finding Ohio Blue Sky law applicable because the Court "believes that the ties to Ohio in this case are significant insofar as the wrongdoing alleged against appellee," as the allegations related to appellee's relationship with the Ohio-based is-

suer).

### B.    Plaintiffs Fail As A Matter of Law To Establish That the Rating Agencies Can Be Held Under Section 1707.41

Separate and apart from the absence of a sufficient nexus, the Rating Agencies cannot be held liable under Section 1707.41 because they are not "sellers" within the meaning of the statute.  Indeed, while Plaintiffs repeatedly cite to this Court's decision in *NCFE IV*, they conspicuously ignore this Court's plain finding that Moody's, the rating agency in that case, was not potentially liable under Section 1707.41 because it was obviously not a seller of the securities at issue — and could only even be *potentially* liable under a secondary-liability theory.  *NCFE IV*, 580 F. Supp. 2d at 649.

Unable to argue otherwise, Plaintiffs instead attempt an end-run around the holding in *NCFE IV* by contending that the Rating Agencies can still be held liable under § 1707.41(A) as persons that "receive[d] the profits accruing from such sale."  (Opp. Br. at 108 (citing § 1707.41(A))).  Yet, all Plaintiffs point to in the Complaint in ostensible support of this assertion is their allegation that the Rating Agencies "did not receive their full fees for a deal unless the deal was completed."  (Compl. ¶ 7; *see also id.* ¶ 77).  This allegation, even if true, plainly offers no support at all for the proposition that the Rating Agencies received even a penny of "profits accruing" *from the sale of securities themselves*.

Indeed, Plaintiffs' own allegations make it clear that the Rating Agencies' receipt of fees have *no* connection to the completion of even a single sale — because, *inter alia*, the "deal" that had to be completed for the Rating Agencies to allegedly receive their fees was *the securitization process* and *not* any subsequent sale of the securitized offering.  The Complaint plainly alleges that the Rating Agencies' fees were tied to their issuance of ratings prior to and independent of the sale of the securities.  *See* Compl. ¶ 40 ("The Rating Agency then notified the arranger of the final ratings decisions.  The arranger then decided whether to have the credit rating issued and made public.  The Rating Agency was typically only paid if the credit rating was issued.").

-67-

There is not — and could not be — *anything* in the Complaint to suggest that the Rating Agencies were only paid when, or if, investors made purchases.

The *Federated Management* case, cited as purported support for the position that the fees the Rating Agencies received for rating the securities at issue amount to "profits accruing from [the] sale" of the securities, is of no help to Plaintiffs. On the contrary, *Federated Management* illustrates the inapplicability of § 1707.41 to the fees received by the Rating Agencies. In *Federated Management*, the defendant agent bank received a "referral fee" for its referral of a business opportunity to *the purchasing investor* — a payment obviously directly linked to the sale itself. 738 N.E.2d at 858. The Court contrasted this activity, however, to the work performed by an attorney in connection with a securities offering, who would receive his fee "regardless of whether the securities actually went up for sale." *Id.* Precisely like the hypothetical attorney discussed by the *Federated Management* court, the Rating Agencies simply provide services — *prior* to any sale — that are allegedly necessary to the securitization process. *Cf. In re Lehman Bros. Securities and ERISA Litigation*, 2010 WL 337997, at *4 (S.D.N.Y. Feb. 1, 2010) (analogizing the alleged role of the Ratings Agencies to that of a builder or architect of a house, who "cannot properly be said to have participated in any legally relevant sense in its resale down the line"). The Rating Agencies' fees are not dependent on any sale of the securities they rate, and the Complaint does not allege otherwise. Thus, Plaintiffs' unprecedented attempt to cast the net of Section 1707.41 over the activities of the Rating Agencies, based solely on the fees they receive for issuing ratings, fails as a matter of law.

### C. Plaintiffs Fail to Allege an Improper Sale by a Seller or that the Rating Agencies Participated In or Aided Such Sale

Plaintiffs contend that, without alleging any misconduct or misstatements by an actual seller, they can still seek to hold the Rating Agencies liable for aiding in or participating in the sale of a security. In fact, however, Plaintiffs' § 1707.43 claim necessarily fails in the absence of a substantive, primary violation of the Ohio securities law against a seller. Indisputably, there is no such allegation here.

-68-

Plaintiffs do not dispute that Section 1707.43 *creates no independent cause of action*. Thus, no liability can be imposed under this purely remedial provision unless there has been a *violation of a separate, substantive provision of the Ohio Securities Statute. See Hardin* v. *Reliance Trust Co.*, 2006 WL 2850455, at *4 (N.D. Ohio Sept. 29, 2006); *Martin*, 485 F. Supp. at 97. Plaintiffs do not allege a Section 1707.41 violation against any actual seller,[48] but instead rely on their allegations against the Rating Agencies as the basis for their Section 1707.41 claim. (Opp. at 113).

Plaintiffs fail to allege the violation of any substantive provision of the Ohio Securities Act in connection with the sale of the securities at issue. Instead, Plaintiffs attempt to manufacture a claim based on Ohio Rev. Code § 1707.44(B)(4), which states that "[n]o person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement for [the purpose of] . . . "[s]elling any securities in this state." First of all, as Plaintiffs concede, the *Complaint alleges no violation of this provision*. (Opp. at 113). Moreover, this provision again requires a false statement relating to the "selling" of a security, which as demonstrated, is not present here; ratings are simply not factual statements that can be proven "false."

---

[48] Not only do Plaintiffs fail to name any actual seller as a defendant, they fail to identify the sellers or allege any wrongdoing by such sellers. Thus, Plaintiffs' citation to "analogous" holdings allowing "control person" claims under Section 20 of the Exchange Act of 1934 to proceed where the primary violator is not *named* as a defendant miss the mark, *see* Opp. at 112 n.80, as these cases allow claims to proceed where a primary violator was not named as a defendant but was identified and alleged to have engaged in conduct which would constitute a primary violation. *See In re Hayes Lemmerz International, Inc. Equity Securities Litigation*, 271 F. Supp. 2d 1007, 1021 n.11 (E.D. Mich. 2003) ("[I]f the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons." (emphasis added)) (cited by Plaintiffs). Moreover, Plaintiffs ignore the case law to the contrary dismissing "control person" claims where the primary violator is not named as a defendant. *See Ong ex rel. Ong* v. *Sears, Roebuck & Co.*, 2005 WL 2284285, at *26-*27 (N.D. Ill. Sept. 14, 2005); *In re WRT Energy Securities Litigation*, 2005 WL 323729, at *13 (S.D.N.Y. Feb. 9, 2005), *decision vacated in part on reconsideration on other grounds*, 2005 WL 2088406 (S.D.N.Y. Aug 30, 2005); *Picard Chemical Inc. Profit Sharing Plan* v. *Perrigo Co.*, 940 F. Supp. 1101, 1135 (W.D. Mich. 1996). Finally, Plaintiffs ignore the obvious policy reasons why the statutes at issue would treat the issue of secondary liability differently and have different requirements as to the assertion of claims against the primary violator. Section 20 seeks to hold liable the real, *controlling* wrongdoer who has used a corporate entity as the vehicle for improper activity. Section 1707.43 is directed only those who allegedly assist the primary wrongdoer.

*See* Sections I and III.D, *supra*. Thus, absent a tenable allegation alleging a seller violation under § 1707.41 (or any other violation), there can be no claim for "secondary liability" under § 1707.43 against the Rating Agencies. *See Hardin*, 2006 WL 2850455, at *4 ("Section 1707.43 is only a 'remedies' statute that provides for the *joint* liability of persons who aid or participate in sales *made in violation of other portions* of the Ohio Securities Act. Accordingly, *§ 1707.43 is not susceptible to being 'violated.'*") (emphasis added); *Martin*, 485 F. Supp. at 97 (Section 1707.43 claim requires proof that a *substantive* provision has been violated).

Moreover, even if, *arguendo*, Plaintiffs could assert a § 1707.43 claim in the absence of a seller violation, the disconnect between the actual sellers of the securities at issue and the Rating Agencies also illustrates the implausibility of Plaintiffs' contention that the issuance of rating opinions constitutes conduct amounting to "aid or participation" in the sale of securities. The Complaint clearly asserts that it is the ratings themselves that are the only misstatements on which their claims are based. (Compl. ¶ 157). As Defendants' Opening Brief emphasizes, and Plaintiffs do not dispute, the Rating Agencies' ratings are consistently presented with the caveat that they are *not* recommendations to "purchase, sell or hold any security." (Defs. Op. Br. at 43). Given these express statements, and in the absence of any factual allegations tying the Rating Agencies in any way to even a single sale, Plaintiffs could not state a claim for secondary liability under § 1707.43 even if a primary violation had been alleged (which it has not). *See Boomershine* v. *Lifetime Capital, Inc.*, 2008 WL 54803, at *2 (Ohio Ct. App. Jan 4, 2008); *Hainbuchner* v. *Miner*, 1986 WL 3205, at *2 (Ohio Ct. App. Mar. 14, 1986), *aff'd*, 31 Ohio St. 3d 133 (1987).[49]

---

[49] In this regard, Plaintiffs too readily dismiss federal case law and other state securities law consistent with the notion that liability for securities law violations requires a more direct connection to the sale of securities than presently alleged. Ohio's Blue Sky Law does not exist in a vacuum, and particularly where Plaintiffs are arguing for an unprecedented expansion of the statute, the Court can and should look to guidance in the interpretation of similar laws. *See*, *e.g.*, *State* v. *Taubman*, 606 N.E.2d 962, 969 (Ohio Ct. App. 1992) (noting that "Ohio securities laws are very similar to the federal legislation"); *In re Columbus Skyline Securities, Inc.*, 660 N.E.2d 427, 429 (Ohio 1996) (federal securities law informed analysis of Ohio provision).

For all these reasons, Plaintiffs' Blue Sky claims should be dismissed.

## CONCLUSION

The claims asserted against the Rating Agencies should be dismissed in their entirety.


Dated: April 19, 2010

Respectfully submitted,


Floyd Abrams (admitted *pro hac vice*)
S. Penny Windle (admitted *pro hac vice*)
Tammy L. Roy (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420

*Counsel for Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC*

By:  __/s/ Drew H. Campbell_____
    Drew H. Campbell (0047197)
BRICKER & ECKLER LLP
100 South Third Street
Columbus, Ohio 43215
Telephone: (614) 227-2319
Facsimile: (614) 227-2390

*Trial Counsel for Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC*


James J Coster (admitted *pro hac vice*)
Joshua M. Rubins (admitted *pro hac vice*)
SATTERLEE STEPHENS BURKE &
BURKE LLP
230 Park Avenue, 11th Floor
New York, New York 10169
Telephone: (212) 818-9200
Facsimile: (212) 818-9606

*Counsel for Defendants Moody's Corp. and Moody's Investors Service, Inc.*

By:  __/s/ Michael S. Carpenter_____
    Michael H. Carpenter
    Jeffrey A. Lipps
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: (614) 365-4100
Facsimile: (614) 365-9145

*Trial Counsel for Defendants Moody's Corp. and Moody's Investors Service, Inc.*

-71-

Martin Flumenbaum (admitted *pro hac vice*)
Roberta A. Kaplan (admitted *pro hac vice*)
Julia Tarver Mason (admitted *pro hac vice*)
Tobias J. Stern (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Counsel for Defendant Fitch, Inc.*

By: ___/s/ Thomas D. Warren_____
      Thomas D. Warren
BAKER & HOSTETLER LLP
3200 National City Center
1900 East 9th Street
Cleveland, Ohio 44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

*Trial Counsel for Defendant Fitch, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 19, 2010, a true copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing by electronic receipt to the parties.

/s/ Drew H. Campbell_____
Drew H. Campbell (0047197)

3736226v1