**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Ohio Police & Fire Pension Fund, et al.,     :

          Plaintiffs,     :

       v.     :

Standard & Poor's Financial Services,     :
LLC, et al.,

                          :

          Defendants.

Case No. 2:09-cv-1054

Judge Graham

<u>OPINION AND ORDER</u>

      This action is brought by five state investment funds ( the "Ohio Funds") against certain credit rating agencies (the "Rating Agencies") for losses allegedly arising from the Ohio Funds' purchase of residential and commercial mortgage-backed securities. The complaint alleges that the high credit ratings assigned by the Rating Agencies to the securities were false, negligently assigned, and based on flawed methodologies. The Ohio Funds allege that they relied on the credit ratings in making their purchases and have now lost $457 million in these purportedly safe investments. They assert claims for violations of the Ohio Securities Act and for negligent misrepresentation.

      This matter is before the court on the Rating Agencies' motion to dismiss. They raise numerous grounds for dismissal, but the unifying theme is that their ratings were predictive opinions and, absent specific allegations of fraudulent intent or of a duty to the Ohio Funds, the Agencies cannot be held liable for alleged negligence in their methodologies.

      The court agrees with the Rating Agencies and thus grants the motion to dismiss.

I.    **Background**

   A.    **Summary of the Allegations**

The  plaintiffs are the Ohio Police & Fire Pension Fund, Ohio Public Employees Retirement

System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio, and

Ohio Public Employees Deferred Compensation Program.  From January 1, 2005 to July 8, 2008, the

Ohio Funds made 308 separate investments in mortgage-backed securities — 263 in residential mortgage-

backed securities and 45 in commercial mortgage-backed securities.  The Ohio Funds held securities

issued by about 100 different issuers, including Banc of America, Bear Stearns, Citigroup, Countrywide,

Credit Suisse, GMAC, Goldman Sachs, JPMorgan Chase, Lehman Brothers, Merrill Lynch, Morgan

Stanley, Wachovia, Washington Mutual, and Wells Fargo.

   The complaint does not state the total amount invested in mortgage-backed securities or state

the present value of the securities held by the Ohio Funds.  It only alleges a total loss of $457 million

and associates the loss with the subprime mortgage crisis and the struggles of the housing market in the

United States.

   The defendants are Standard & Poor's Financial Services, LLC, The McGraw-Hill Companies,

Inc. (which owns Standard & Poor's), Moody's Corp., Moody's Investors Service, Inc., and Fitch, Inc.

The Rating Agencies are each designated as a nationally recognized statistical rating organization

(NRSRO), meaning that the Securities and Exchange Commission has approved their ratings to be used

for certain regulatory purposes.  See 15 U.S.C. § 78o-7.

   At least one of the Rating Agencies assigned a credit rating for each of the securities purchased

by the Ohio Funds.  According to the complaint, each security received the highest investment grade

rating possible of AAA or its equivalent.  The complaint alleges that the Ohio Funds relied on the high

2

ratings in making their investment decisions and that they only purchased securities with ratings "at or above a certain level based upon their governing investment guidelines."  Compl., ¶ 29.

The complaint alleges that the high ratings assigned to the securities were inflated because of flaws in the Rating Agencies' methodologies.  In particular, the complaint critiques the "issuer pays" model of credit ratings, whereby the issuer of a security (instead of the investor) pays the Rating Agencies to provide ratings.  This model has been used for asset-backed securities ("ABS"), including the ones purchased by the Ohio Funds.  The complaint alleges that despite outwardly assuring investors of their objectivity, the Rating Agencies allowed conflicts of interest to taint the ratings process:

> The issuer pays model cultivated a market-driven system whereby issuers and underwriters could essentially shop around for a desired rating: if an issuer was dissatisfied with an agency's proposed rating, the issuer could simply turn to another agency that would provide the desired rating.  Given that the Rating Agencies did not receive their full fees for a deal unless the deal was completed and the requested rating was provided, they had an acute financial incentive to relax their stated standards of "integrity" and "objectivity" to placate their clients.  While the potential for such a conflict of interest had always been inherent in the issuer pays model, recent revelations have shown that the Rating Agencies in fact succumbed to the conflict and degraded their ratings standards.

Compl., ¶7.

The complaint thus alleges that the Rating Agencies collaborated with ABS issuers to achieve the targeted ratings.  The Agencies allegedly "placated issuers by maintaining artificially low expected loss projections."  Compl., ¶65.  Underestimating the rate of default in stress tests of the collateral pool, in turn, lessened the need for credit enhancements, or measures needed to shield the senior tranche securities (the ones that would receive the highest credit rating) from the loss caused by default and deficiencies of loans in the pool.  "[E]ach credit enhancement would reduce the issuer's profit; thus, issuers had an acute financial interest in awarding their business to the rating agency that assigned the lowest 'expected loss' designations, as lower expected losses led to greater profit."  Id.

The complaint further alleges the Rating Agencies used "outdated" models that "failed to adequately assess levels of required credit enhancement." Id., ¶82. According to the complaint, the Rating Agencies' models for determining the amount and form of credit enhancement in mortgage-backed securities relied heavily on traditional 30-year, fixed-rate mortgage loans. The models failed to account for the new varieties of loans available, including subprime and adjustable rate mortgages.

The Ohio Funds also contend that the Rating Agencies "failed to make adequate disclosures regarding the ratings process and their methodologies." Id., ¶91. This lack of transparency, the complaint alleges, made it impossible for investors in structured finance securities to know the details of the underlying asset pool and to know whether the Agencies had deviated from their models. In the Ohio Funds's view, it was therefore all the more critical that the Rating Agencies used objective and accurate models of analysis when assigning their ratings. Id., ¶8 (". . . the Rating Agencies provided the only practicable means for assessing the performance of these complex and opaque securities.").

Finally, the complaint alleges that the Rating Agencies failed to monitor their ratings. According to the complaint, "the Rating Agencies failed to conduct surveillance due to a lack of personnel and inadequate models to track required developments." Id., ¶94. The lack of follow up allegedly allowed the original, inflated ratings to remain in effect long after they should have been adjusted.

### B.    Causes of Action

The Ohio Funds assert a claim under § 1707.41 of the Ohio Securities Act, alleging that the offering materials they received contained the "unfounded and unjustifed AAA ratings." Compl., ¶164. The inflated ratings carried with them a false representation that the mortgage-backed securities had a credit quality consistent with the Agencies' criteria for AAA ratings. The ratings were inflated because, according to the Ohio Funds, the models used to rate the securities did not accurately reflect the credit risks of the underlying collateral. The Ohio Funds also contend that the Agencies did not adequately

monitor the securities they rated, and this exacerbated the effects of their failure to assign accurate ratings initially.  In addition, the Ohio Funds allege that: (1) the Agencies received substantial profit from their ratings work on the securities sold to the Ohio Funds; (2) the Agencies' ratings were material to the Ohio Funds' investment decisions; (3) the Ohio Funds reasonably relied on the credit ratings; (4) and the inflated ratings were a direct and proximate cause of the losses the Ohio Funds suffered.

The complaint also asserts a claim under § 1707.43 of the Ohio Securities Act, which extends secondary liability to anyone who "participated in or aided the seller in any way" in making an unlawful sale of securities.  Though not expressly stated in the complaint, the clear implication is that the Agencies' ratings allegedly aided the sellers in making the sales of mortgage-backed securities to the Ohio Funds.

Lastly, the complaint asserts a claim for negligent misrepresentation, alleging that the Rating Agencies owed the Ohio Funds "a duty to act with reasonable care in preparing, assigning, maintaining, and disseminating the AAA credit ratings assigned to each of the securities" the Ohio Funds purchased. Compl., ¶ 153.  The Rating Agencies allegedly breached this duty by failing to manage and disclose conflicts of interest caused by the issuer pays model, by using faulty models in determining ratings, and by failing to adequately monitor the structured finance securities they had rated.  These alleged failures led to the assignment of inaccurately high credit ratings to the securities purchased by the Ohio Funds. The complaint further alleges that: (1) the Rating Agencies knew, or should have known, that their ratings were materially false or misleading; (2) the ratings were material to the Ohio Funds' investment decisions; (3) the Rating Agencies knew that institutional investors like the Ohio Funds would justifiably rely on the ratings; (4) the Ohio Funds were part of a limited class of qualified investors to whom the Agencies' intended to supply their ratings; and (5) the Rating Agencies' negligent and inaccurate ratings proximately caused the Ohio Funds' loss.

## II.    Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Iqbal, 129 S.Ct. at 1949-50; Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); Twombly, 550 U.S. at 555-56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949; see also Twombly, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); Papasan v. Allain, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Twombly, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 129 S.Ct. at 1950.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 129 S.Ct.

at 1950.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. At 1949. Though "[s]pecific facts are not necessary," Erickson, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage," Twombly, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Iqbal, 129 S.Ct. at 1949; Twombly, 550 U.S. at 555-56.  This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'– 'that the pleader is entitled to relief.'" Iqbal, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.    Discussion

### A.    Section 1707.41 of the Ohio Securities Act

Ohio's blue sky law prohibits sellers of securities from using material misrepresentations or omissions of material fact in printed materials that are reasonably relied on by purchasers.  The relevant statutory provision states as follows:

> In addition to the other liabilities imposed by law, any person that, by a written or printed circular, prospectus, or advertisement, offers any security for sale, or receives the profits accruing from such sale, is liable, to any person that purchased the security relying on the circular, prospectus, or advertisement, for the loss or damage sustained by the relying person by reason of the falsity of any material statement contained therein or for the omission of material facts, unless the offeror or person that receives the profits establishes that the offeror or person had no knowledge of the publication prior to the transaction complained of, or had just and reasonable grounds to believe the statement to be true or the omitted facts to be not material.

O.R.C. § 1707.41(A).

The Rating Agencies contend that the Ohio Securities Act cannot apply here because the sales of securities had no nexus with Ohio.  The court must reject this argument.  Though it is true that the complaint does not identify the location(s) where the 300-plus securities transactions took place or identify who the sellers were, the court finds that it is sufficient at the pleading stage that the complaint alleges the purchasers were in Ohio.  See A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities, 163 F.3d 780, 787 (3d Cir. 1999) (holding that the extraterritoriality principle of Commerce Clause jurisprudence is not offended by applying a state's blue sky law to a multi-state transaction so long as there is an "in-state component" to the transaction, such as the buyer or seller residing in that state).

The Rating Agencies offer numerous other grounds for why the § 1707.41 claim (as well as the § 1707.43 and negligent misrepresentation claims) should be dismissed, including that their ratings enjoy absolute immunity under the First Amendment,[1] Ohio law is preempted in this area by the Credit Rating Agency Reform Act of 2006,[2] and the claims are time-barred.[3]  The court finds it unnecessary to address

---

[1]  Courts have traditionally extended First Amendment protection to credit ratings of publicly-held companies, where the ratings were offered to the investing public at large as an informational service.  See, e.g., Compuware Corp. v. Moody's Investors Services, Inc., 499 F.3d 520, 525-26 (6th Cir. 2007); In re Enron Corp. Securities, Derivative & "ERISA" Litig., 511 F.Supp.2d 742, 826-27 (S.D. Tex. 2005).  Recently, courts have declined to extend such protection at the motion to dismiss stage where the rating is allegedly the product of the issuer pays model and is meant only for a select few investors.  See, e.g., In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 580 F.Supp.2d 630, 639-40 (S.D. Ohio 2008); Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc., 651 F.Supp.2d 155, 175-76 (S.D.N.Y. 2009).

[2]  The only decision on this issue thus far has held that the Credit Rating Agency Reform Act does not preempt state law claims arising from misrepresentations by rating agencies because Congress did not include express preemption language in the statute, 15 U.S.C. § 78o-7(c).  Anschutz Corp. v. Merrill Lynch and Co. Inc., __ F.Supp.2d __, 2011 WL 1134321, at *21 (N.D. Cal. 2011) ("[T]here is no language to indicate that the SEC's exclusive authority extends to enforcement of claims that arise from sources other than the CRARA.").

[3]  The Ohio Funds counter the statute of limitations argument by invoking the doctrine of nullum tempus occurrit regi, or "no time runs against the king."  As the Rating Agencies point out, the issue of whether the Ohio Funds are instrumentalities of the state for purposes of this doctrine would appear to be one of first impression.

8

these legal issues because § 1707.41 so clearly does not apply to the situation at hand.

The Rating Agencies rightly argue that they were not the sellers of the securities purchased by the Ohio Funds. This leaves the Ohio Funds to argue that the Rating Agencies are liable because they "receive[d] the profits accruing from such sale." O.R.C. § 1707.41(A). The Ohio Funds contend that the Rating Agencies received profits because "the Rating Agencies did not receive their full fees for a deal unless the deal was completed and the requested rating was provided." Compl., ¶ 7. Elsewhere the complaint alleges that the Rating Agencies were not paid unless the "target rating was attained" and the "credit rating was issued." Id., ¶¶ 40, 77.

The Ohio Funds' argument has no merit because the language of the statute plainly requires that the profits accrue from the sale of securities, not from work performed in preparation for a securities offering, if the fee is not contingent upon an actual sale. The "deal" that the Rating Agencies completed was the securitization process and the final assignment of a rating. Compl., ¶ 40. It was at this point that the Rating Agencies were paid. Id. The complaint makes clear that payment of the Rating Agencies' fees preceded, and was independent of, the sale of securities.

The court's understanding of O.R.C. § 1707.41(A) is confirmed by Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 738 N.E.2d 842 (Ohio Ct. App. 2000). In that case, the plaintiff brought suit under § 1707.41 against an agent bank that received a referral fee which was calculated as a percentage of the fee earned by the underwriter in offering the securities for sale. The court denied summary judgment to the bank and held that the bank could be liable under the "receives the profits accruing from such sale" language of § 1707.41(A) because the referral fee was contingent upon the actual sale of securities. The court expressly distinguished the bank's referral arrangement from the fees earned by attorneys in preparation for an upcoming note offering – "Attorneys who perform services for underwriters in connection with a securities offering would receive their fee

regardless of whether the securities actually went up for sale." Federated Mgmt, 137 Ohio App.3d at 388, 738 N.E.2d at 858.

Accordingly, the Ohio Funds' claim under  O.R.C. § 1707.41 is dismissed.

### B.    Section 1707.43 of the Ohio Securities Act

The Ohio Funds' claim under § 1707.43 for rescission and recovery of the purchase price fares no better.  To establish a claim under this section, a purchaser must prove that a violation of § 1707 took place.  As discussed above, the Ohio Funds cannot demonstrate that the Rating Agencies themselves violated § 1707.41, so they must establish a predicate violation by the seller and then show that the Rating Agencies are liable as ones who "participated in or aided the seller in any way in making such sale."  O.R.C. § 1707.43(A).

The complaint wholly fails to plead a predicate violation that the sellers made false representations or material omissions in connection with the sale of the securities.  Under Rule 9(b), Fed. R. Civ. P., averments of fraud and the circumstances constituting the fraud must be stated with "particularity."  To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"  Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).

The complaint identifies who the issuers of the securities were, but it does not contain even a general allegation that the issuers violated the Ohio Securities Act, let alone plead a violation with particularity.  Moreover, the complaint does not allege that the issuers were the actual sellers, nor does it identify any underwriters, placement agents, investment managers, or brokers who may have been involved in the sales transactions.  And aside from generally alleging that the Ohio Funds purchased the

mortgage-backed securities from January 1, 2005 to July 8, 2008, the complaint does not state the date of purchase for each transaction. The Rating Agencies thus cannot be held liable under § 1707.43 as one who participates or aids in an unlawful sale because the complaint fails to allege a predicate violation of § 1707.

Accordingly, the Ohio Funds' claim under O.R.C. § 1707.43 is dismissed.

### C. Negligent Misrepresentation

The Ohio Funds allege that the Rating Agencies had a duty to act with reasonable care in assigning their credit ratings and that they breached their duty by failing to manage and disclose conflicts of interest, using faulty models in determining their ratings, and failing to adequately monitor ratings.

As an initial matter, the parties disagree on whether New York or Ohio law should apply. The Rating Agencies argue that New York law should apply because the Rating Agencies have their headquarters in New York and issued their ratings out of that state. This case is about alleged deficiencies in the credit ratings process, the Rating Agencies argue, and New York has the greatest interest in that issue. The Ohio Funds counter that they received and relied on the ratings in Ohio. The Ohio Funds further argue that Ohio has a strong interest in this case because the economic loss suffered was to the retirement funds of state employees. See Restatement (Second) of Conflicts of Laws §148(2).

The court finds that the negligent misrepresentation claim fails no matter whether New York or Ohio law applies.

In New York, a majority of courts have held that the state's Martin Act, N.Y. Gen. Bus. Law §352 *et seq.*, preempts common law claims relating to securities transactions if the claim does not require proof of intent. See e.g., In re Wachovia Equity Securities Litig., 753 F.Supp.2d 326, 380-81 (S.D.N.Y. 2011) (citing cases). These courts have held that the Martin Act gives the New York Attorney General exclusive authority to prosecute such claims and that no private right of action is allowed. In re Beacon

11

Associates Litig., 745 F.Supp.2d 386, 431-32 (S.D.N.Y. 2010). Courts have found that a claim of negligent misrepresentation relating to a securities transaction is among the types of claims preempted by the Martin Act because it does not require proof of intent. In re Wachovia., 753 F.Supp.2d at 380-81. This alone would cause the Ohio Funds' claim of negligent misrepresentation to fail under New York law. Moreover, even if the Martin Act does not preempt the Ohio Funds' claim, the claim would still fail under New York law for the same reasons it fails under Ohio law, as discussed below – namely, that in New York there must be a duty owed by the defendant to the plaintiff, and there must be an actionable misrepresentation. See Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551 483 N.E.2d 110, 118 (N.Y. 1985).

The court now turns to those elements under Ohio law. In Ohio, a claim for negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989) (quoting Restatement (Second) of Torts § 552(1)); see also Robson v. Quentin E. Cadd Agency, 179 Ohio App.3d 298, 304, 901 N.E.2d 835, 840 (Ohio Ct. App. 2008).

The Rating Agencies' motion to dismiss makes numerous arguments, but the court will focus on the two that most clearly are fatal to the negligent misrepresentation claim: the Rating Agencies did not owe a duty to the Ohio Funds, and the credit ratings are not actionable misrepresentations.

1.    **A Duty**

Liability for negligent misrepresentation is limited to a loss suffered "by the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information."  Restatement (Second) of Torts § 552(2)(a).  Ohio courts have thus held that a provider of information owes no duty "to the extensive, faceless, and indeterminable investing public-at-large." Federated Mgmt., 137 Ohio App.3d at 385, 738 N.E.2d at 856.  "The Restatement clearly indicates that liability may be imposed for negligent misrepresentation only if the disseminator of the information intends to supply it to a specific person or to a limited group of people."  Amann v. Clear Channel Communications, 165 Ohio App.3d 291, 297, 846 N.E.2d 95, 100 (Ohio Ct. App. 2006).

Absent privity of contract or a fiduciary duty, "a special relationship" must exist to create a duty and satisfy § 552(2)(a).  In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 580 F.Supp.2d 630, 639-40 (S.D. Ohio 2008); Doe v. SexSearch.com, 502 F.Supp.2d 719, 731 (N.D. Ohio 2007); Ziegler v. Findlay Indus., 464 F.Supp.2d 733, 738 (N.D. Ohio 2006) ("A core requirement in a claim for negligent misrepresentation is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction.").  "Usually the defendant is a professional (e.g., an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class."  Ziegler, 464 F.Supp.2d at 738.

The court finds that the complaint fails to allege a special relationship between the Ohio Funds and the Rating Agencies.  There is no allegation that the parties had any direct communication, nor is it alleged that the Rating Agencies knew or foresaw that the Ohio Funds in particular would be relying on their ratings.  See Haddon View Inv. Co. v. Cooper & Lybrand, 70 Ohio St. 2d 154, 156, 436 N.E.2d 212, 214 (Ohio 1982) (holding that an accounting firm can be held liable for professional negligence in

13

rendering service to a limited partnership because it was "specifically foreseen" that the limited partners would rely on the accountant's representation").

Instead, the complaint alleges that the Ohio Funds were "part of a limited class of qualified investors to whom Defendants intended their ratings be supplied." Compl., ¶ 158. This allegation of a "limited class" is not elsewhere supported by the complaint. See Iqbal, 129 S.Ct. at 1949 ("Threadbare recitals . . . supported by mere conclusory statements, do not suffice."); Twombly, 550 U.S. at 555, 557 ("labels and conclusions" devoid of "further factual enhancements" are insufficient). When the court examines the complaint to determine how the class was "limited," it finds little to circumscribe the class. The complaint alleges that AAA ratings were important to investors like the Ohio Funds "who *willingly* paid a premium for AAA rated securities." Compl., ¶ 3 (emphasis added). Later the complaint alleges that the AAA ratings were targeted to investors "*interested* in purchasing the highest investment grade securities." Id., ¶ 77 (emphasis added). "Willingness" and "interest" are hardly rigorous standards for narrowing the class.

The complaint does allege that the Rating Agencies knew that the AAA ratings would be relied upon by "qualified institutional investors" like the Ohio Funds. Compl., ¶ 157. It also alleges that the investment guidelines of "certain investors," including pension funds, required them to incorporate NRSRO ratings into their decisions and purchase only those securities that had a rating "at or above a certain level." Compl., ¶ 29. Importantly, however, the complaint does not allege that the securities on which the inflated ratings appeared were offered only to qualified institutional investors or only to pension funds, nor does it allege that the Ohio Funds could purchase only AAA securities. See Grassi v. Moody's Investor's Services, No. 09-cv-0543, 2011 WL 3439184, at *13 (E.D. Cal. Aug. 5, 2011) (dismissing negligent misrepresentation claim against the Rating Agencies because investors did not allege that ratings were communicated solely to them or solely to a limited class of investors)

14

Indeed the allegations suggest both a widespread availability of the securities and a widespread reliance on the ratings – allegations that contradict the conclusory assertion that the Ohio Funds were part of a limited class for whom the ratings were intended. The complaint contains a listing of the 308 separate securities purchases that the Ohio Funds made; 100 different issuers are represented, including many well-known names in the investing arena. The complaint offers not a single allegation that these securities were offered only through private placement, or only to certain types of investors. Further, the complaint acknowledges "widespread reliance" by the investing public upon the ratings of ABS products. Compl., ¶ 98. In short, there is nothing in the complaint to support an inference that ratings were communicated only to the Ohio Funds or only to pension funds.

In their brief in opposition to the motion to dismiss, the Ohio Funds argue that 54 of the securities purchases were private placements, a fact that they say can be verified by cross-checking the CUSIP identification numbers (Committee on Uniform Securities Identification Procedures) contained in the complaint's listing of the 308 purchases made by the Ohio Funds. Even taking this into account – what amounts to a new factual allegation – the court notes that the Ohio Funds now concede that 254, or 82%, of their purchases were of publically-available securities. For these securities, there is no special relationship linking the Rating Agencies with the Ohio Funds, such that a duty of care is created under Ohio law.

With respect to the 54 private placements, the complaint still fails to offer a sufficient limiting factor. In what amounts again to a new factual allegation, the Ohio Funds contend in their brief that the prospectuses to some of the securities required minimum investments of $100,000 to $1 million. This shows, the Ohio Funds argue, that the Rating Agencies intended their ratings to be relied upon by "institutional investors" with large sums of money to invest in private placements. In arguing that this establishes a special relationship, the Ohio Funds rely heavily on this court's decision in In re Nat'l

Century Fin. Enterprises, Inc., Inv. Litig., where the court found that the complaints sufficiently alleged a special relationship between the institutional investor plaintiffs and the Rating Agencies. But that case involved securities originating from a single issuer and allegations that the placement agent was required by the issuer's governing agreement to privately place the securities with "qualified institutional buyers," as defined by SEC regulations. The complaints further alleged that, with the Rating Agencies' knowledge, the placement agent was tasked by the issuer to seek out institutional investors who desired to invest in the healthcare sector (inviting them to road show presentations put on by the issuer and placement agent) and who had "the resources to invest tens of millions of dollars." 580 F.Supp.2d at 640.

In contrast here, even looking only at the alleged private placements, there were dozens of different issuers and no allegation that the Ohio Funds were targeted or sought out by placement agents or underwriters. The fact that the Ohio Funds are institutional investors, without more, does not suffice. As the Rating Agencies correctly point out, that term encompasses thousands of mutual funds, hedge funds, public and private pension funds, ERISA funds, university endowment funds, investment banks, insurers, charitable foundations, trusts, partnerships, and high net-worth individuals. See Rating Agencies' Reply Br., p. 39 n.30; see also Compl., ¶ 29 (alleging that "most financial institutions" in the United States have the same restriction as the Ohio Funds that they must purchase only securities that are rated at or above a certain level by a NRSRO); In re Merrill Lynch Auction Rate Securities Litig., No. 09-md-2030, 2011 WL 536437, at *12 n.6 (S.D.N.Y. Feb. 9, 2011) (dismissing a negligent misrepresentation claim against the Rating Agencies relating to their ratings of auction rate securities because, among other reasons, the class of "qualified institutional buyers" is "far from narrow and circumscribed").

##            2.      An Actionable Misrepresentation[4]

Another element of a claim for negligent misrepresent is that a person supply "false information." Delman, 41 Ohio St.3d at 4, 534 N.E.2d at 838. "To be actionable, a misrepresentation generally must relate to an existing or pre-existing fact which is susceptible of knowledge." Kondrat v. Morris, 118 Ohio App.3d 198, 207, 692 N.E.2d 246, 251-252 (Ohio Ct. App. 1997) (internal quotation omitted). Thus, predictions about the future and statements of opinion are generally not actionable. Id.

The Rating Agencies argue that their ratings were predictive opinions, a point the Ohio Funds do not seriously dispute. See, e.g., Compuware Corp. v. Moody's Investors Services, Inc., 499 F.3d 520, 522 (6th Cir.2007) (describing a credit rating as a "predictive opinion" of "future creditworthiness that is reached through a subjective weighing of [certain] factors."); Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 775 (1st Cir. 2011). As the complaint alleges, the ratings reflected the Agencies' loss projections and estimations of the need for credit enhancements. These projections and estimations were not statements of fact – the complaint offers no objective standard by which the loss projections or level and form of credit enhancements should have been evaluated. See Fait v. Regions Fin. Corp., __ F.3d __, 2011 WL 3667784, at *4 (2d Cir. Aug. 23, 2011) (holding that an estimation of fair value of assets is a statement of opinion where plaintiff "does not point to any objective standard" to be used in that estimation); In re Lehman Bros. Securities and ERISA Litig., 684 F.Supp.2d 485, 494 (S.D.N.Y. 2010) (holding that the "amount and form of credit

---

[4] It has been the court's understanding, based on the complaint and briefs, that the credit ratings were the alleged misrepresentations. However, in supplemental briefs, including one dated September 20, 2011, the Ohio Funds argue that the Rating Agencies' alleged failure to disclose their involvement in the securitization process was also a misrepresentation. Even if entertained at this late stage, this allegation fails because a "negligent misrepresentation claim does not lie for omissions; there must be some affirmative false statement." Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App.3d 137, 149, 684 N.E.2d 1261, 1269 (Ohio Ct. App. 1996).

enhancement" necessary to support a given credit rating is a statement of opinion); New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, 720 F.Supp.2d 254, 271 (S.D.N.Y. 2010) (holding that "credit ratings and the relative adequacy of protective credit enhancements are statement of opinion, as they are predictions of future value and future protection of that value").

Statements of opinion are actionable only "if the speaker does not believe the opinion and the opinion is not factually well-grounded." In re Ford Motor Co. Securities Litig., 381 F.3d 563, 572 (6th Cir. 2004); Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir. 1993).[5]  The court finds that the complaint fails to allege that the Rating Agencies did not believe their ratings.  The ratings were allegedly inflated as a result of flawed methodologies, yet the complaint does not support an inference that the Rating Agencies did not believe their ratings at the time they were made.  Much of the complaint recites congressional hearing testimony and news articles from late 2007 to 2009 concerning the in-hindsight failure of the Rating Agencies to accurately analyze the credit risks associated with subprime mortgages. These materials indicate that the Rating Agencies ignored certain employee's warnings that their models were outdated.  Faced with nearly the exact same allegations, the court in In re Lehman Bros., held that the credit ratings of mortgage-backed securities were not actionable misrepresentations:

> To this end, the complaint alleges that Moody's and S&P used out-of-date models based on assumptions that did not reflect the realities of the mortgage market.  Relying on a newspaper article and Congressional testimony from 2008, it alleges that Moody's and

---

[5] This exception to the rule that opinions are not actionable is commonly invoked in federal securities litigation.  The Ohio Funds, in relying upon this exception to argue that the ratings are actionable, have not cited any Ohio case law incorporating this exception into claims for negligent misrepresentation.  Even so, the Rating Agencies themselves rely heavily on federal case law interpreting the exception.  The court will apply the exception here because, rather than alter the Ohio Supreme Court's formulation of a negligent misrepresentation claim, the exception expounds on the meaning of "false information," when the "information" is an opinion.  See Eaves v. Designs for Finance, Inc., __ F.Supp.2d __, 2011 WL 1236173, at *15 (S.D.N.Y. 2011) (holding that the exception applies to a negligent misrepresentation claim); Rice v. Charles Schwab, No. 10-398, 2010 WL 5156654, at *3 (C.D. Cal. Oct. 22, 2010) (same); Snead v. McCaskey, No. 96-G-2007, 1997 WL402396, at *4 (Ohio Ct. App. June 27, 1997) (noting, without further explanation, that there are exceptions to the rule that opinions do not form the basis for a claim of fraud).

S&P had not updated the models used to rate the Certificates since 2002 and 1999, respectively, and did not implement updated models that they had developed. It alleges further that one S&P employee admitted that "previous loss data proved to be much less of a guide to future performance" and another testified that he believed that the new models would have provided an "earlier warning about the performance" of MBS.

These allegations are insufficient to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued. At best, they support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions. Consequently, the claims based on these statements fail.

684 F.Supp.2d at 495. See also New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., No. 08-cv5653, 2010 WL 1473288, at *8 (S.D.N.Y. March 29, 2010) (holding that credit ratings of mortgage-backed securities were not actionable because the claim that ratings methodologies were flawed did not support an inference that the Rating Agencies did not believe the ratings at the time they were made).

Similarly, the First Circuit recently held that credit ratings of mortgage-backed securities are not actionable misrepresentations:

The complaint includes acknowledgments from S&P and Moody's executives conceding, in hindsight, that the models and data that the rating agencies were using were deficient. But the ratings were not false or misleading because rating agencies should have been using better methods and data. Defendants are not liable under the securities laws when their opinions, or those they reported, were honestly held when formed but simply turn out later to be inaccurate; nor are they liable only because they could have formed "better" opinions.

In addition to claiming that the ratings were faulty, the complaint also alleges that the ratings agencies produced high ratings aimed at keeping business, and it quotes individuals at the rating companies to support that proposition and to suggest that some inside the company thought that ratings were skewed. But, tellingly, the complaint stops short of alleging expressly that the leadership of S&P or Moody's believed that their companies ratings were false or were unsupported by models that generally captured the quality of the securities being rated.

Plumbers' Union, 632 F.3d at 775 (citing cases); accord Tsereteli v. Residential Asset Securitization Trust, 692 F.Supp2d 387, 395 (S.D.N.Y. 2010); In re Merrill Lynch, 2011 WL 536437, at **12-13.

The Ohio Funds make a bare allegation that the Rating Agencies knew or should have known that their ratings were false or misleading. Compl., ¶ 155. But a complaint must provide further factual enhancement to avoid dismissal under Rule 12(b)(6). Twombly, 550 U.S. at 557. The complaint here contains no issuance-specific allegations that the Rating Agencies had knowledge of deficiencies in the collateral pools, such that it knew that the ratings for each of the 308 securities purchased by the Ohio Funds were false at the times when the ratings were assigned. Nor does the complaint allege that the Rating Agencies knew of specific deficiencies common to the collateral pools underlying all of the securities purchased by the Ohio Funds. Thus, this case is distinguishable from those handful of cases where courts have found credit ratings to be actionable misrepresentations. See Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc., 651 F.Supp.2d 155, 178 (S.D.N.Y. 2009) (the complaint alleged that a high rating was assigned to notes issued by a structured investment vehicle even though the Rating Agencies knew that the vehicle had exceeded its stated percentage limit on how much of the portfolio could consist of MBS); Anschutz Corp. v. Merrill Lynch and Co. Inc., __ F.Supp.2d __, 2011 WL 1134321, at **5, 17 (N.D. Cal. 2011) (the complaint alleged that the Rating Agencies knew of specific deficiencies regarding auction rate securities issued by two trusts); In re Nat'l Century, 580 F.Supp.2d at 639 (the complaints identified numerous ways in which the assets that backed the issuer's notes were deficient at the time the notes were rated).

In summary, the court finds that the negligent misrepresentation claim must be dismissed because the complaint fails to allege that the Rating Agencies owed a duty to the Ohio Funds and that the ratings were actionable misrepresentations.

**IV.     Conclusion**

Accordingly, the Rating Agencies' motion to dismiss (doc. 27) is GRANTED.  The Clerk of Court is instructed to enter judgment in favor of the defendants and close this case.


                                         s/ James L. Graham
                                         JAMES L. GRAHAM
                                         United States District Judge


DATE: September 26, 2011